**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

Yvette Yuri Lanuza Digan,

      Plaintiff,

v.

Luxco, Inc.

        Defendant.

**COMPLAINT AND DEMAND FOR A JURY TRIAL**

**INTRODUCTION**

1.  This is an action for damages arising from severe and
    life-altering burn injuries sustained by Plaintiff Yvette
    Yuri Lanuza Digan, a resident of the Hong Kong Special
    Administrative Region, the People's Republic of China (HK
    SAR), when Defendant Luxco's inherently dangerous
    product, Everclear, a 190-proof grain ethanol product,
    was poured near or onto an open fire, creating an
    explosive fireball that engulfed her body, causing
    catastrophic burn injuries.

2.  For decades, Everclear has left a trail of destruction
    across college campuses nationwide, from alcohol
    poisonings and fatal intoxications to sexual assaults
    facilitated by its odorless, colorless, and extremely
    potent nature.

3.  Not content with this notorious legacy, Defendant Luxco,
    Inc. (Luxco) made the calculated decision to make its
    product even more dangerous by deliberately removing
    explicit safety warnings against applying the product to
    open flames, warnings that had previously protected
    consumers from the exact type of catastrophic burn
    injuries suffered by Ms. Digan.

4.  Adding to the egregiousness of Defendant's conduct, Luxco
    continues to manufacture and sell the identical 190-proof
    grain alcohol under different brand names that retain
    comprehensive safety warnings, while deliberately
    removing these warnings only from the premium-branded
    Everclear product.

5.  Most disturbing of all, Defendant's marketing campaign
    actively promoted dangerous uses of Everclear, including
    applications near open flames and as a fuel, while
    simultaneously stripping away critical safety warnings
    that would have alerted consumers to these precise
    dangers.

6.  Plaintiff asserts various claims for negligence and
    breach of warranty.

7.  Despite the clear and present danger Everclear poses to
    public safety, regulatory agencies have failed to take
    action. The Massachusetts Department of Fire Services

(DFS) has acknowledged the dangers posed by Everclear but indicated that regulatory authority over the alcoholic beverages lies outside its jurisdiction. A copy of email correspondence between the Plaintiffs attorney and DFS is attached hereto as Exhibit 1.

8.  On May 30, 2025, Plaintiff's attorney sent to the Massachusetts Attorney General's Office (AG)via email to Amy Karangekis, a letter outlining the significant danger that Everclear posed to the pubic urgently request that it take action to ban the sale of Everclear immediate. A copy of the email in letter is attached as Exhibit 2.

9.  As on July 13, 2025, the AG has neither responded to the Plaintiff's letter or banned the sale of Everclear in Massachusetts.

10.  On June 29, 2025, Plaintiff's attorney sent an email to the Alcoholic Beverage Control Commission (ABCC) indicating that she intended to seek a preliminary injunction and requesting it state its position as the Court would likely inquire why it had not taken any action. A copy of the email is attached hereto as Exhibit 3.

11.  As of July 13, 2025, the ABCC had not responded to the Plaintiff's request.

12. In light of the imminent risk to public safety and the lack of regulatory action, Plaintiff seeks both monetary damages for her catastrophic injuries and preliminary and permanent injunctive relief to prevent further tragedies.

## REQUESTS FOR INJUNCTIVE RELIEF

13. Plaintiff seeks both preliminary and permanent injunctive relief requiring Defendant to:

   a. Immediately cease distribution and sale of Everclear 190-proof grain alcohol in Massachusetts; and

   b. Recall all Everclear 190-proof grain alcohol in Massachusetts.

14. The requested injunctive relief is necessary because:

   a. Everclear poses an ongoing and imminent threat to public safety;

   b. Despite correspondence with regulatory agencies, no action has been taken to address the danger;

   c. Without court intervention, additional catastrophic burn injuries like those suffered by Plaintiff remain inevitable; and

   d. No adequate remedy at law exists to prevent irreparable harm of severe burn injuries to future victims.

**JURISDICTION AND VENUE**

15. This Court has jurisdiction under 28 U.S.C. § 1332(a)(2) because Plaintiff is a citizen of Hong Kong SAR, Defendant is a Missouri corporation with its principal place of business in Missouri, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

16. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in Worcester, Massachusetts, within this District.

**PARTIES**

17. Plaintiff Yvette Yuri Lanuza Digan is a resident of and domiciled in the Hong Kong Special Administrative Region, People's Republic of China, who was lawfully present in Massachusetts as an exchange student at Boston University at the time of the incident.

18. Defendant Luxco, Inc. is a Missouri corporation with its principal place of business at 5050 Kemper Avenue, St. Louis, Missouri 63139. Luxco regularly conducts business in Massachusetts, including the distribution, marketing, and sale of Everclear throughout the Commonwealth.

## FACTUAL ALLEGATIONS

### __The Plaintiff__

19. Plaintiff Yvette Yuri Lanuza Digan is a 22-year-old law student from Hong Kong whose promising future was catastrophically altered by Defendant's reckless conduct.

20. Prior to the incident, Yvette was thriving academically and artistically. She maintained a 3.2 GPA while pursuing her Bachelor of Laws at the City University of Hong Kong, where she was selected to participate in a prestigious summer exchange program with Boston University.

21. Beyond her academic achievements, Yvette was a gifted singer and musician who carefully balanced her legal studies with her passion for music. Her parents describe her as "enthusiastic, cheerful and full of hope," a young woman "full of dreams" who worked diligently to "harness her talent in singing and music while studying hard to finish her Law degree in flying colors."

22. Yvette had arrived in the United States just days before the accident, filled with excitement about immersing herself in a new academic environment and culture.

23. Based upon information and belief the Defendant does not maintain a place of business in Massachusetts.

24. Although the Plaintiff has sent the Defendant a c. 93A demand letter, she is filing this complaint now due to

the imminent threat to the lives and safety of the public and intends to seek a preliminary injunction at the earliest opportunity. A copy of the c. 93A demand letter is attached hereto as Exhibit 4.

## The Incident

25. On May 13, 2025, Plaintiff was an invited guest at a social gathering at the Zeta Psi fraternity house located at 32 Dean Street, Worcester, Massachusetts.

26. During this gathering, a fraternity member, Henry Pharris, poured Everclear near or onto an open fire in the backyard of the fraternity house, whose flames may not have been visible due to the way ethanol burns.

27. When the Everclear vapors contacted the open flame, an enormous fireball instantly erupted, enveloping Plaintiff who was nearby. The explosive fireball ignited her clothing and caused severe, life-altering burn injuries to substantial portions of her body.

28. Plaintiff was initially transported to a hospital in Worcester via ambulance and then transferred to Massachusetts General Hospital by helicopter due to the severity of her burns.

29.  Plaintiff has undergone numerous surgeries and painful
     procedures, with her treatment ongoing and a prolonged
     recovery expected due to the life-altering nature of her
     injuries.

### Everclear's Unique Danger

30.  Everclear is an ultra-high ethanol content grain spirit
     manufactured and distributed by Luxco. Unlike
     conventional spirits, such as vodka, whisky or rum, that
     typically contain 40% ethanol (80-proof), Everclear
     contains 95% ethanol (190-proof), making it one of the
     most potent distilled alcoholic beverages legally
     available for consumer purchase in some parts of the
     United States.

31.  Its strength places it in a fundamentally different risk
     category than ordinary consumer alcoholic beverages, with
     properties more closely resembling laboratory-grade
     ethanol or industrial solvents than those of typical 80-
     proof spirits.

32.  According to a standard Safety Data Sheet (SDS) for 95%
     ethanol, Everclear presents exceptional and unique fire
     hazards when compared to lower proof spirits:

     a. Flash Point: 57.2°F (14.0°C) - This means the liquid
        produces ignitable vapors at room temperature, making
        it extraordinarily dangerous near any ignition source;

b. Hazard Classification: "Category 2 Flammable Liquid" with the signal word "DANGER"- The highest hazard classification for consumer products;

c. Flammability Limits: Lower 3.3%, Upper 19% - This wide flammable range means vapors can ignite across a broad spectrum of concentrations; and

d. Specific Hazards: The SDS explicitly states "Vapors may form explosive mixtures with air" and "Vapors may travel considerable distance to a source of ignition and flash back."

33. The extreme danger of Everclear is starkly evident when compared to standard 80-proof spirits. An 80-proof spirit (40% ethanol, 60% water) burns with a relatively low-intensity flame when exposed to an open fire, as its high water content acts as a natural fire suppressant. In contrast, Everclear (95% ethanol, 5% water) behaves like industrial solvents or commercial fire accelerants due to its minimal water content.

34. Peer-reviewed research published by Log and Moi in the *International Journal of Environmental Research and Public Health* (2018) explains what happens once ethanol poured from a container ignites: "If liquid is then poured onto an ignition source, e.g., a burning flame, the poured heavy gas mixture and the liquid will catch fire. It is highly probable that the flame will propagate into the container and ignite the internal combustible air fuel gas mixture. As the internal gas volume ignites, the resulting volume expansion displaces the liquid in

the bottom of the container which is then violently
released through the container opening."

35. This precise ignition sequence, scientifically
established, occurred during the May 13, 2025 incident,
directly inflicting the catastrophic burns sustained by
Plaintiff when Everclear ignited.

### Luxco's Knowledge and Deliberate Warning Removal

36. Luxco was fully aware of the extreme flammability hazards
posed by Everclear, as evidenced by multiple sources that
demonstrate the company's longstanding knowledge of these
risks.

37. Mr. John Rempe, Luxco's master distiller and blender,
possesses specialized knowledge far beyond that of an
ordinary person regarding the explosive properties of
high-proof alcohol. With a bachelor's degree in biology
from Saint Louis University, certification as a Food
Scientist, and over 25 years of experience at Luxco,
Rempe has extensive expertise in the chemical properties
and safety risks of high-proof ethanol.

38. For decades prior to 2018, all Everclear bottles featured
a prominent warning in a large red rectangle on the front
label explicitly stating: **"CAUTION: DO NOT APPLY TO OPEN
FLAME. KEEP AWAY FROM FIRE, HEAT AND OPEN FLAME –
CONTENTS MAY IGNITE OR EXPLODE. DO NOT CONSUME IN**

**EXCESSIVE QUANTITIES. NOT INTENDED FOR CONSUMPTION UNLESS MIXED WITH NON-ALCOHOLIC BEVERAGE."**

39. The front of the bottle also contained two additional warnings to alert consumers to the hazardous nature of the product, providing: **"CAUTION!! EXTREMELY FLAMMABLE — HANDLE WITH CARE,"** and **"WARNING OVERCONSUMPTION MAY ENDANGER YOUR HEALTH."**

40. Luxco's other 190-proof products ethanol products, such as Golden Grain and Crystal Clear, both containing 95% ethanol, also carried identical warnings in prominent red rectangles.

41. Golden Grain's label, in use since 2002, also included additional back-label warnings: **"WARNING: FLAMMABLE LIQUID," "DO NOT USE THIS PRODUCT FOR FLAMING DISHES OR DRINKS," "ALL 190-PROOF ALCOHOL MAY FLARE UP AND CONTINUE TO BURN WHEN IGNITED, POSSIBLY WITH AN INVISIBLE FLAME,"** and **"DO NOT POUR DIRECTLY FROM THE BOTTLE NEAR THE FLAME OR INTENSE HEAT AS PRODUCT MAY EXPLODE."**

42. These consistent, explicit warnings across Luxco's product line confirm the company's longstanding knowledge of the severe flammability risks associated with Everclear and its equivalent products, especially when used near an open flame.

43. On October 11, 2010, Rempe personally signed the TTB Form
    5100.31 Certificate of Label Approval (COLA) application
    for Crystal Clear, certifying under penalty of perjury
    that the representations on the labels, including the
    comprehensive warnings about flammability and explosion
    risks, "truly and correctly represent the content of the
    containers to which this labels will be applied."

44. In 2018, Luxco decided to rebrand Everclear, and, in the
    process, prioritized marketing appeal over consumer
    safety. Luxco drastically reduced the warning and
    relegated it to a small rectangle on the **REAR** label below
    the government warning, which read, "WARNING: FLAMMABLE
    LIQUID. HANDLE WITH CARE." This represents an 85%
    reduction in warning content with the critical
    instruction about open flames completely eliminated.

45. The warning's relegation to the back label was made even
    more dangerous by its design. The new back label featured
    a primarily white and blue color scheme, with the warning
    placed in a small red rectangle. The visual design of the
    label caused this small warning to blend into the overall
    aesthetic rather than stand out as a critical safety
    message.

46. On September 8, 2017, Rempe personally signed the TTB
    Form 5100.31 for approval of the new Everclear labels
    that drastically reduced safety warnings, certifying

under penalty of perjury that he had "read, understood and complied with the conditions and instructions" attached to the form.

47. As a master distiller with extensive expertise in the chemical properties of high-proof spirits, Rempe was intimately familiar with the extreme flammability of 95% ethanol, its propensity to create explosive fireballs when exposed to flame, and the specific dangers of container vapor ignition. However, despite extensive knowledge of these hazards, he deliberately approved the removal of warnings about these precise dangers from Everclear labels.

48. Notably, Luxco made no changes to the warnings on Crystal Clear or Golden Grain, which is striking given that these products, identical in composition to Everclear, were not promoted for uses beyond consumption as alcoholic beverages, and then only after appropriate dilution.

### Promoting Everclear for Dangerous Uses

49. After stripping pre-2018 warnings of Everclear's severe flammability and propensity to explode, Luxco brazenly marketed it for uses near ignition sources, alongside other non-beverage applications.

50. Luxco's official website for Everclear explicitly marketed it as suitable for a number of uses aside from

that of an alcoholic beverage, including, ink paints, laundry detergent, skin scrub, disinfectant, perfume, shower spray, jewelry cleaner, glass cleaner, deodorant spray, and to make extractions and tinctures.

51. Luxco also recklessly promoted Everclear for culinary and household uses where open flames from gas stoves, ovens, and candles are common. Its social media accounts featured photos and videos showing Everclear poured into cooking pans near gas stove flames and used in fondue pots with open candle flames, often with the bottle inches from ignition sources.

52. Most alarmingly, one video depicted a lighter igniting a candle fueled by Everclear, falsely suggesting the product was safe to use as a fuel.

53. In a particularly deceptive practice, Defendant included on the aforementioned video promoting Everclear as a fuel a deliberately obscured disclaimer stating: "DISCLAIMER: High-proof alcohol is flammable. Handle carefully and keep away from flames until ready to ignite. Follow all safety precautions. Keep out of the reach of children and pets."

54. This critical safety information was rendered virtually invisible by using a font color almost identical to the background and employing a miniscule font size that made

it practically impossible for viewers to notice, much
less read. This calculated design choice demonstrate
Defendant's actual knowledge of the danger while
intentionally ensuring consumers would not perceive the
"warning."

55.   The below screen capture from Everclear's official
Instagram account shows both the promotion of Everclear
as a candle fuel and the deliberately obscured
disclaimer. As is evident from the image, the disclaimer
text (appearing slightly above the bottle cap), is
rendered in a light gray color against a similar
background in a font size significantly smaller than the
promotional content, making it functionally invisible
despite containing critical safety information that would
have prevented the exact type of injury sustained by the
Plaintiff.



56. Luxco also engaged in a systematic campaign to promote Everclear within the cannabis community, a strategy that specifically encouraged uses presenting severe fire and explosion hazards.

57. As documented in multiple sponsored articles in Cannabis Now magazine, Luxco paid for content explicitly promoting Everclear for cannabis uses. These paid promotions included:

   a. "How to Make Cannabis Tinctures With Everclear Grain Alcohol" (February 12, 2023);

   b. "5 Ways to Eliminate Cannabis Odor With Everclear Grain Alcohol" (November 14, 2023);

   c. "How to Clean Glassware With Everclear" (May 16, 2023);

   d. "Cook with Everclear This Thanksgiving" (November 23, 2022); and

   e. "Everclear & Cannabis Now: A New DIY Series" (August 26, 2022).

58. These sponsored articles specifically promoted Everclear as "perfect for creating a wide range of cannabis products, including cocktails, edibles, infusions and tinctures" and "one of the best choices for making tinctures."

59. These marketing activities directly violated federal laws, as marijuana (tetrahydrocannabinol) remains classified as a Schedule I controlled substance under the federal Controlled Substances Act.

60.  This incident is not the first case where individuals have been seriously burned while Everclear was being used around an open flame since Luxco's rebranding of the product.

61.  In August 2024, a highly and internationally publicized incident occurred at Twisted Trick bar in Dallas, Texas, where Ms. Abigael Hance-Briscoe and Mr. Dustin Johnson suffered second- and third-degree burns on their faces, necks, arms and chests when a "Flaming Pineapple" cocktail made with Everclear exploded.

62.  Ms. Hance-Briscoe was hospitalized for seven weeks at Parkland Health's burn unit and required multiple skin grafts.

63.  This incident received international news coverage, including reporting by the Daily Mail and other major news outlets, which describe how the bartender "poured even more Everclear into the drink … causing the glass to explode."

64.  Given the extensive media coverage of this incident, Luxco was undoubtedly on notice of the serious dangers associated with using Everclear around open flames.

65.  Several incidents preceded Everclear's rebranding, including a 2016 University of Toledo party where

Everclear ignited, engulfing a student in flames and causing severe burns over approximately 50% of her body.

66. Another occurred in 2014 when a large vase containing Everclear broke next to a candle, igniting and causing serious injuries to a bartender.

67. A marketing study performed for Luxco in 2015 revealed that 14% of consumers that purchased Everclear once or more a month were using the product to make fuel.

## Industry Standards and Safety Features

68. Luxco's decision to reduce warnings on Everclear is particularly egregious when compared to industry standards for high-proof spirits.

69. In 2016, Bacardi discontinued its 151 proof rum (75.5% alcohol) due to safety concerns. Despite Bacardi 151 being significantly lower proof than Everclear 190 (75.5% vs. 95% alcohol), Bacardi recognized the inherent dangers and took the following safety measures before ultimately discontinuing the product:

a. Featured a warning on the front label stating, **"WARNING, FLAMMABLE, SEE BACK LABEL";**

b. Dedicated almost an entire back label exclusively to warning consumers about the unique dangers posed by high-proof alcohol; and

      c. Incorporated a fire arrestor to prevent flames from
        igniting the contents.

70.  Luxco has taken the opposite approach with a
substantially more dangerous product. Rather than
following industry trends toward enhanced warnings and
safety features for high-proof spirits, Luxco
deliberately removed existing warnings from Everclear,
which at 95% ethanol is significantly more volatile and
dangerous than Bacardi 151, a product that was ultimately
discontinued due to safety reasons.

71.  The cost of installing a flame arrestor screen, typically
a simple stainless steel mesh, is estimated to be a few
cents per bottle for high-proof spirits like Everclear,
based on industry standards for similar safety devices in
liquor bottles.

**Violations of Safety Engineering Principles**

72.  In addressing product hazards, established safety
engineering principles prescribe a clear hierarchy of
controls that manufacturers should follow to protect
consumers. This hierarchy, widely recognized in product
safety engineering and embraced by organizations such as
the National Safety Council and OSHA, outlines three
fundamental approaches in descending order of
effectiveness:

a. Elimination or Substitution (Design Out the Hazard):
The most effective approach is to design the hazard out
of the product entirely or substitute with a less
hazardous alternative;

b. Engineering Controls (Guard Against the Hazard): When
hazards cannot be eliminated, they should be guarded
against through engineering controls that create a
physical barrier between the user and the danger.

c. Warnings (Alert Users to Unavoidable Hazards): The
least effective but still necessary safety measure is
to provide clear, comprehensive warnings about hazards
that cannot be designed out or guarded against.

73. Luxco's actions demonstrate a complete disregard for this

established hierarchy of safety controls:

a. Luxco failed to reduce the proof of Everclear as, by
Luxco's own admission, it is not suitable for
consumption unless mixed with a non-alcoholic beverage;

b. Luxco failed to incorporate proven and effective
engineering controls such as flame arrestors, which
Bacardi incorporated in their 151 proof rum; and

c. Luxco deliberately removed explicit warnings against
open flame application from Everclear labels,
drastically reducing warning content by approximately
85%, and relegating the diminished warning to an
inconspicuous position on the back label.

74. Rather, Defendant intentionally made Everclear even more

dangerous by removing warnings and subsequently marketing

that the product was suitable for use around open flames

and other ignition sources.

75. This systematic failure to implement basic safety

engineering principles further demonstrates Luxco's

unconscionable disregard for consumer safety and directly

contributed to the catastrophic injuries suffered by Plaintiff.

**<u>Federal Regulatory Violations</u>**

76. Luxco's post-2018 Everclear labeling violates multiple federal regulations governing alcohol beverage labeling and hazardous substances.

77. The Federal Hazardous Substances Act (FHSA), 15 U.S.C. §§ 1261-1278, and its implementing regulations under 16 C.F.R. Part 1500, specifically 16 C.F.R. § 1500.121, mandate prominent cautionary labelling for hazardous substances.

78. Everclear meets the definition of a "hazardous substance" under the FHSA due to:

   a. Its flammability (flash point of approximately 57.2°F), classifying it as a "flammable" substance under 16 CFR § 1500.3(c)(6)(ii);

   b. Its 95% ethanol content, presenting significant toxicity hazards;

   c. Its unsuitability for human consumption unless diluted, as indicated by historical labels stating "not intended for consumption unless mixed with non-alcoholic beverage"; and

   d. Luxco's deliberate marketing of Everclear for numerous non-beverage uses around the home, including as a fuel.

79. By marketing Everclear for non-beverage uses, Luxco took Everclear squarely outside the food exemption under 15 U.S.C. § 1261(f)(2).

80. The FHSA regulations require that warnings for hazardous substances appear on the principal display panel, be prominently placed and conspicuous, and include specific precautionary measures describing actions to be followed or avoided. Luxco's post-2018 labeling fails to meet these standards.

81. To the extent the Federal Alcoholic Beverage Act and associated regulations apply, Luxco has violated 27 C.F.R. § 5.122, which prohibits distilled spirits labels from containing "any statement or representation, irrespective of falsity, that is misleading to consumers as to the age, origin, identity, or other characteristics of the distilled spirits, or with regard to any other material factor."

82. The present Everclear labels mislead consumers in violation of 27 C.F.R. § 5.122 by creating a misleading safety impression through the reduction of pre-2018 prominent front-label warnings and by omitting critical safety information while promoting the product for uses near ignition sources.

83. These federal regulatory violations are significant evidence of Luxco's negligence.

## Plaintiff's Injuries

84. When Everclear's explosive vapors ignited, creating the
    fireball that engulfed her, Plaintiff suffered full-
    thickness burns covering approximately 30% of her total
    body surface area. These catastrophic injuries required
    immediate life-saving intervention and fundamentally
    altered every aspect of her existence.

85. Upon arrival at Massachusetts General Hospital in the
    early morning hours of May 14, 2025, Plaintiff's
    condition was critical. Her initial assessment revealed
    the devastating extent of her injuries: severe burns
    affecting her bilateral legs, neck, left hand and
    breasts, including her nipples.

86. The majority of her burns were classified as full-
    thickness (third-degree), meaning they had destroyed not
    only the epidermis and dermis but had penetrated into the
    subcutaneous tissue, destroying hair follicles, sweat
    glands, and nerve endings.

87. Plaintiff's treatment to date required multiple complex
    surgical procedures over the course of her
    hospitalization.

88. Throughout her hospitalization, Plaintiff required
    intensive pain management with multiple medications.

89. To date, Plaintiff has incurred medical expenses of approximately $600,000. Plaintiff is still undergoing treatment and her medical bills are anticipated to increase significantly.

90. Based on the extent and location of Plaintiff's burns, she faces a lifetime of medical management and functional limitations.

### COUNT I: NEGLIGENCE
### (Design Defect)

91. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

92. Defendant had a duty to design Everclear in a reasonably safe manner. Defendant breached this duty by:

   a. Failing to install a flame arrestor screen on the bottle, similar to was used on Bacardi 151 rum, despite the significantly higher alcohol content and flammability of Everclear;

   b. Designing its packaging to prominently position the product as a premium spirit without incorporating adequate safety features; and

   c. Failing to design the bottle or cap in a way that would prevent or mitigate the risk of the product being poured onto or near an open flame, such as through the use of flow restrictors to reduce the possibility of accidental spills and slow pouring speed, which would prevent a significant amount of ethanol making contact with a fire in a short period of time.

93. Everclear was defectively designed because:

   a. The risk of using the product outweighed its utility;

   b. Alternative designs existed that would have made the product safer while maintaining its utility;

    c. A flame arrestor screen would have prevented or significantly reduced the risk of flash fires and explosive fireballs;

    d. The cost of implementing safer design features such as a flame arrestor screen was negligible compared to the risk of severe burn injuries.

94. Defendant's design defect violated established safety engineering principles by failing to implement effective engineering controls to guard against known hazards.

95. The design defect in Defendant's product was compounded by Defendant's violations of state and federal regulations, including the Federal Hazardous Substances Act (FHSA).

96. As a direct and proximate result of Defendant's conduct, Plaintiff suffered severe and permanent injuries, including second and third-degree burns over 30% of her body, requiring multiple surgeries, skin grafts, and resulting in permanent disfigurement, scarring, physical limitations, loss of musical abilities, and psychological trauma. Plaintiff has incurred and will continue to incur substantial medical expenses, has experienced and will continue to experience severe physical pain and suffering, emotional distress, loss of enjoyment of life, monetary damages and other damages as set forth in this Complaint.

## COUNT II: NEGLIGENCE
### (Failure to Warn)

97. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

98. Defendant had a duty to adequately warn consumers of the known dangers associated with Everclear, particularly the danger of applying the product to open flames.

99. Defendant breached this duty by:

    a. Deliberately removing explicit warnings about using the product near ignition sources or applying it to an open flame;

    b. Reducing its warning from a prominent, detailed caution on the front label to a minimal warning on the back label;

    c. Failing to warn of the specific danger that the product would cause explosive fireballs when applied to open flame;

    d. Failing to warn that the product is substantially more dangerous than standard alcoholic beverages due to its extremely high alcohol content; and

    e. Selectively removing warnings from Everclear while maintaining them on chemically identical products sold under different brand names.

100. Defendant knew or should have known that

    a. 190 proof ethanol is extraordinarily dangerous when applied to open flames;

    b. Consumers were using it for fuel;

    c. The specific danger of applying 190 proof alcohol to open flames was not obvious to ordinary consumers;

    d. Removing the explicit warning about open flames would foreseeably lead to misuse and injury; and

    e. Consumers might use the product by applying it to flames if not explicitly warned against such use, especially since Defendant's marketing created the

impression that Everclear was safe to use in close
proximity to open flames and as a fuel.

101. Defendant's warning defect violated the third tier of
established safety engineering principles, failing to
provide adequate warnings for hazards that could not be
eliminated or guarded against.

102. Defendant's inadequate warnings deviated from the
standards established by federal regulations, including
the Federal Hazardous Substances Act (FHSA), 15 U.S.C. §§
1261-1278, and its implementing regulations under 16
C.F.R. Part 1500, specifically 16 C.F.R. § 1500.121.

103. Had Defendant maintained its original explicit warning
that stated **"DO NOT APPLY TO OPEN FLAME"** and **"CONTENTS
MAY IGNITE OR EXPLODE,"** the incident that caused
Plaintiff's injuries would have been prevented.

104. As a direct and proximate result of Defendant's conduct,
Plaintiff suffered severe and permanent injuries,
including second and third-degree burns over 30% of her
body, requiring multiple surgeries, skin grafts, and
resulting in permanent disfigurement, scarring, physical
limitations, loss of musical abilities, and psychological
trauma. Plaintiff has incurred and will continue to incur
substantial medical expenses, has experienced and will
continue to experience severe physical pain and
suffering, emotional distress, loss of enjoyment of life,

monetary damages and other damages as set forth in this
Complaint.

### COUNT III
### (Negligence - Voluntary Undertaking of a Duty)

105. Plaintiff incorporates all preceding paragraphs as if
fully set forth herein.

106. Defendant voluntarily undertook to market Everclear for
DIY and non-beverage uses that went far beyond its
approved purpose as a beverage alcohol product.

107. Defendant deliberately launched its "Make it Your Own"
campaign to target "varying levels of DIY consumers." By
promoting these alternative uses, Defendant assumed a
duty to ensure the product was safe for such
applications.

108. Defendant negligently performed the above duty by failing
to investigate and warn about the specific risks of these
promoted alternative uses, particularly the heightened
flammability risks when used in DIY applications
involving potential ignition sources.

109. Defendant voluntarily decided to include safety warnings
on its labels. Having chosen to provide warnings (e.g.,
**"FLAMMABLE LIQUID. HANDLE WITH CARE"**), Defendant assumed
a duty to make those warnings adequate and not
misleading. The fact that Defendant's identical products

Crystal Clear and Golden Grain maintained more extensive warnings demonstrates Luxco's recognition of this voluntary duty.

110. Defendant negligently performed the above duty by removing critical specificity about the product's extreme flammability and by eliminating the explicit warnings against use near ignition sources and applying to an open flame.

111. Defendant voluntarily undertook to redesign its Everclear packaging to encourage and facilitate expanded uses of the product, including as a fuel. Internal documents indicate Defendant's goal was "reestablishing Everclear as a DIY ingredient without position it as a completely unconsumable product." By deliberately position this product in this manner, Defendant assumed a duty to ensure consumers were adequately informed of all risks associated with these promoted uses.

112. Defendant negligently performed this duty by prioritizing marketing appeal over safety considerations, deliberately removing warnings that had previously been present while simultaneously encouraging uses that would foreseeably expose customers to increased risk.

113. As a direct and proximate result of Defendant's conduct, Plaintiff suffered severe and permanent injuries,

including second and third-degree burns over 30% of her body, requiring multiple surgeries, skin grafts, and resulting in permanent disfigurement, scarring, physical limitations, loss of musical abilities, and psychological trauma. Plaintiff has incurred and will continue to incur substantial medical expenses, has experienced and will continue to experience severe physical pain and suffering, emotional distress, loss of enjoyment of life, monetary damages and other damages as set forth in this Complaint.

### COUNT IV: NEGLIGENCE
### (Negligent Marketing)

114. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

115. Defendant had a duty to use reasonable care in marketing its inherently dangerous Everclear product.

116. Defendant breached this duty by:

   a. Actively promoting Everclear for uses near open flames and other ignition sources;

   b. Marketing Everclear for household and culinary uses where gas stoves, candles, and other ignition sources are commonly present;

   c. Featuring photographs and videos on its official social media accounts showing Everclear being used near open flames;

   d. Promoting Everclear as suitable for use as a fuel, including demonstrating its use as a candle fuel;

   e. Obscuring and concealing warnings about Everclear's hazards in social medial posts;

      f. Marketing Everclear for cannabis processing, which is
         illegal under Federal law and often involves heating
         the product; and

      g. Encouraging these dangerous uses while simultaneously
         removing explicit warnings about the dangers of using
         the product near open flames.

117. Defendant knew or should have known that:

      a. Marketing Everclear for uses near ignition sources
         created an unreasonable risk of fire and explosion;

      b. Promoting household and culinary uses would lead
         customers to use the product in environments with
         numerous ignition sources;

      c. Showing the product being used near flames and as a
         fuel would encourage consumers to engage in similarly
         dangerous behavior; and

      d. The combination of encouraging dangerous uses while
         removing, obscuring and/or concealing explicit warnings
         was particularly likely to lead to catastrophic
         injuries.

118. Defendant's negligent marketing directly contributed to
the circumstances that led to Plaintiff's injuries by
encouraging uses of the product that created an
unreasonable risk of harm.

119. As a direct and proximate result of Defendant's conduct,
Plaintiff suffered severe and permanent injuries,
including second and third-degree burns over 30% of her
body, requiring multiple surgeries, skin grafts, and
resulting in permanent disfigurement, scarring, physical
limitations, loss of musical abilities, and psychological
trauma. Plaintiff has incurred and will continue to incur
substantial medical expenses, has experienced and will
continue to experience severe physical pain and

suffering, emotional distress, loss of enjoyment of life, monetary damages and other damages as set forth in this Complaint.

### COUNT V: BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (M.G.L. c. 106, § 2-314)

120. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

121. Defendant is a merchant engaged in the business of manufacturing, distributing and selling distilled spirits, including Everclear, within the Commonwealth of Massachusetts.

122. Pursuant to M.G.L. c. 106, § 2-318, Plaintiff, as a person who could reasonably be expected to be affected by Defendant's product, is entitled to enforce the implied warranty of merchantability despite not being in privity with Defendant.

123. Defendant impliedly warranted Everclear was merchantable and fit for the ordinary purposes for which such goods of this kind are used. Through its nationwide "Make it Your Own" campaign, Defendant deliberately established new "ordinary purpose" beyond beverage consumption, including:

  a. Fuel;
  b. Solvent/cleaner;
  c. DIY applications involving ignition sources; and

d. Cannabis processing.

124. Everclear was unmerchantable because it:

a. Lacked essential safety features;

b. Contained no warnings adequate for its marketed non-beverage uses, particularly the risk of explosive fireballs and flame jetting when used near ignition sources;

c. Deviated from industry standards for products of similar danger, including its own internal standards with respect to identical products sold on different brand names by Defendant; and

d. Was unreasonably dangerous for any ordinary purpose, as its 95% ethanol content rendered it fundamentally unfit for consumer use without catastrophic risk.

125. Defendant's breach directly and proximately caused Plaintiff's injuries because:

a. Everclear's use as a fuel and/or in close proximity to a flame, was the direct mechanism of injury;

b. The absence of flame arrestor or other safety device allowed flame propagation into the bottle;

c. Inadequate warnings failed to prevent handling near open flames.

126. As a direct and proximate result of Defendant's breach of the implied warranty of merchantability, Plaintiff suffered severe and permanent injuries, including second and third-degree burns over 30% of her body, requiring multiple surgeries, skin grafts, and resulting in permanent disfigurement, scarring, physical limitations, loss of musical abilities, and psychological trauma. Plaintiff has incurred and will continue to incur

substantial medical expenses, has experienced and will
continue to experience severe physical pain and
suffering, emotional distress, loss of enjoyment of life,
monetary damages and other damages as set forth in this
Complaint.

### COUNT VI: BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE
### (M.G.L. c. 106, § 2-315)

127. Plaintiff incorporates all preceding paragraphs as if
fully set forth herein.

128. Defendant knew or had reason to know that purchasers
bought Everclear for the following particular purposes
affirmatively promoted by Defendant:

a. Fuel;

b. Solvent for flammable DIY projects; and

c. Cleaner/disinfectant.

129. Purchasers of Everclear relied on:

a. Defendant's specialized knowledge as a distiller of
high-proof spirits;

b. Defendant's explicit representation that Everclear was
"perfect" and "a must-have" for these purposes; and

c. Defendant's omission and deliberate concealment of
warnings about flammability risk, which implied the
product was safe for promoted uses.

130. Everclear was unfit for Defendant's promoted purposes
because:

a. Its extreme flammability made it inherently unsafe as a
fuel without specialized handling equipment/warnings;

b. Its use as a solvent/cleaner near ignition sources created foreseeable explosion risks; and

c. Defendant marketed non-beverage uses while stripping safety information that had previously guarded against these risks.

131. Defendant knew its product was unfit for these purposes, as evidenced by:

a. Retaining full warnings on chemically identical products;

b. Internal knowledge of consumer fuel use;

c. Prior incidents putting Defendant on notice of the dangers; and

d. obscuring and concealing warnings about extreme flammability hazards on its social media posts.

132. Defendant impliedly warranted that Everclear was fit for such particular purposes.

133. Using Everclear as a fuel and/or pouring Everclear next to an open fire, particular purposes expressly promoted by Defendant, directly and proximately caused plaintiff's injuries.

134. As a direct and proximate result of Defendant's breach of the implied warranty of fitness, Plaintiff suffered severe and permanent injuries, including second and third-degree burns over 30% of her body, requiring multiple surgeries, skin grafts, and resulting in permanent disfigurement, scarring, physical limitations, loss of musical abilities, and psychological trauma.

Plaintiff has incurred and will continue to incur substantial medical expenses, has experienced and will continue to experience severe physical pain and suffering, emotional distress, loss of enjoyment of life, monetary damages and other damages as set forth in this Complaint.

## PRAYER FOR RELIEF

**WHEREFORE,** as to all counts, Plaintiff respectfully requests that this Court:

A. Enter judgment in favor of Plaintiff on all counts;

B. Award compensatory damages in an amount to be determined at trial, exceeding $75,000;

C. Award pre-judgment interest at 12% per annum under M.G.L. c. 231, § 6B;

D. Award interest and costs;

E. Award all other damages which the Plaintiff is entitled to, as well as pre-judgment and post-judgment interests and costs; and

F. Grant such other relief as the Court deems just and proper.

G. Issue a preliminary and permanent injunction requiring Defendant to:

1. Immediately cease distribution and sale of Everclear 190-proof grain alcohol in Massachusetts in its current form; and

2. Recall all Everclear 190-proof grain alcohol currently on retail shelves in Masachusetts.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

Yvette Digan, Plaintiff
By her attorney,

_____
Adam Clermont (林汶輝)
6 Liberty Square
PMB 226
Boston, MA 02109
Tel: (413) 841-1270 (Massachusetts)
Tel: +852 9086 3191 (Hong Kong)
E-mail: aclermont@attorneyapc.com
BBO No.: 639769

# EXHIBIT 1

 Outlook

---

**RE: Yvette Digan**

---

**From** Rooney, Glenn (DFS) <Glenn.Rooney@mass.gov>
**Date** Thu 7/10/2025 11:56 PM
**To**   Adam Clermont <aclermont@attorneyapc.com>

Adam,

As you consider potential avenues for change, I would like to draw your attention to MGL Chapter 148, Section 33, which outlines the statutory duties and powers of the State Fire Marshal. Under this provision, the Marshal is charged with studying fire hazards and fire prevention matters, offering advice to municipalities, and making suggestions to the General Court and local governments regarding improvements to laws, ordinances, and bylaws related to fire safety.

While this authority allows the Marshal and by extension, DFS, to recommend changes or provide support in shaping policy, it does not grant the Marshal or DFS any regulatory authority over the sale, possession, prohibition, or labeling of alcoholic beverages, including products like Everclear. That authority, as you rightly identified, lies exclusively with the Alcoholic Beverages Control Commission (ABCC), and related consumer protection concerns are within the purview of the Attorney General's Office.

Accordingly,  we are happy to refer your concerns to the appropriate agencies and assist in facilitating any conversations. To the extent that you seek our public confirmation that ethyl alcohol poses a significant fire hazard and our recommendation against its use in cooking, cleaning, and related purposes, we can provide this – and, indeed, have provided it to the Worcester Telegram & Gazette. However, we cannot substitute our judgment for that of the appropriate government bodies, nor can we deliver regulatory outcomes that fall outside our statutory scope under either Chapter 148 or Chapter 22D.

If your goal is the prohibition or restriction of specific alcohol products in the Commonwealth, I strongly encourage you to contact:
• Alcoholic Beverages Control Commission (ABCC) – (617) 727-3040
• Consumer Protection Division, Office of the Attorney General – (617) 727-8400

We remain available to speak with you about fire safety, prevention, and public education, areas that are clearly within our mission. But I want to be candid about what DFS can and cannot do in direct response to your requests. I trust you understand that distinction, and I look forward to our continued dialogue in the spirit of collaboration.


**Glenn M. Rooney, Esq.**
*General Counsel*
Department of Fire Services

P.O. Box 1025 – 1 State Road
Stow, MA 01775

Phone :(978)-567-3183

www.mass.gov/dfs

---

**From:** Adam Clermont <aclermont@attorneyapc.com>
**Sent:** Thursday, July 10, 2025 11:32 AM
**To:** Rooney, Glenn (DFS) <Glenn.Rooney@mass.gov>
**Subject:** Re: Yvette Digan

CAUTION: This email originated from a sender outside of the Commonwealth of Massachusetts mail system.  Do not click on links or open attachments unless you recognize the sender and know the content is safe.

Glenn,

I just wanted to give you a heads up. In the past few hours, several television stations have reached seeking interviews. Given the history of this case, should one want to run a story (they are now reviewing the materials) we will move forward as quickly as possible. Thus, you may wish to accelerate the timeline for dealing with the issues raised by Yvette.

Adam

---

**From:** Adam Clermont <aclermont@attorneyapc.com>
**Sent:** Thursday, July 10, 2025 10:39 PM
**To:** Rooney, Glenn (DFS) <Glenn.Rooney@mass.gov>
**Subject:** Re: Yvette Digan

Glenn,

I understand and appreciate your thoughts. I look forward to speaking with you, but I think you understand the problem given the facts leading up to Yvette's "accident." I am not suggesting the DFS was remiss in its duties, and I understand what was in its report. However, I think it is your office that needs to lead the efforts to contact the relevant agencies, not my clients, who were quite angry to learn of the Lakeville incident. Additionally, the public comments of the Deputy Fire Chief of Lakeville, to the effect of, that it was a freak accident perhaps attributable to a gust of wind and that the individuals involved took all reasonable precautions does not exactly instill confidence in the ability of the Commonwealth to provide suitable fire education to the public.

Having said that, my clients ONLY wish to ensure that this never happens again. I'm sure if we put our heads together we can determine how to accomplish that goal, but, quite frankly, I have moved mountains in the span of a month. I cannot shoulder this burden alone anymore. I trust you understand my clients are only acting with the best of intentions and in the interest of public safety. It should not be lost upon you that a 22-year-old minority, foreign girl who was on her first trip to the U.S. and injured in an entirely preventable incident only 3 days after her arrival has now taken up the charge to protect the Commonweath's citizens.

I look forward to speaking with you, but I am only interested in steps your agency will take to ensure Everclear is removed from sale in the Commonwealth as soon as possible. A discussion revolving around we do not have the power or its outside the scope of our mission will only serve to anger the Digan's further and will not be entertained. Perhaps, you should reach out to the AG's office and the ABCC prior to Wednesday's discussion to determine whether they me be of assitance in this regard.

Adam

---

**From:** Rooney, Glenn (DFS) <<u>Glenn.Rooney@mass.gov</u>>
**Sent:** Thursday, July 10, 2025 10:17 PM
**To:** Adam Clermont <<u>aclermont@attorneyapc.com</u>>
**Subject:** RE: Yvette Digan

Adam,

I am happy to discuss the Department of Fire Services, including the resources, education and support we provide, both generally and more specifically, to fire departments across the Commonwealth, as well as to members of the public. I'm also glad to hear your proposals and help determine whether they fall within the jurisdiction of the Office of the State Fire Marshal, DFS and/or the Massachusetts Fire Code. That said, depending on the nature of your request(s)/proposals, it's possible that the appropriate authority may rest with another agency, board, or commission. As you gain a clearer understanding of DFS's role and jurisdiction, I believe that may help guide your efforts moving forward.

Regarding the records request that has already been submitted by your co-counsel, if it was directed to my office, I will review any potentially responsive materials in advance of our discussion to determine whether they are subject to public disclosure.



**Glenn M. Rooney, Esq.**
*General Counsel*
Department of Fire Services

P.O. Box 1025 – 1 State Road
Stow, MA 01775

Phone :(978)-567-3183

<u>www.mass.gov/dfs</u>

---

**From:** Adam Clermont <<u>aclermont@attorneyapc.com</u>>
**Sent:** Thursday, July 10, 2025 10:03 AM
**To:** Rooney, Glenn (DFS) <<u>Glenn.Rooney@mass.gov</u>>
**Subject:** Re: Yvette Digan

CAUTION: This email originated from a sender outside of the Commonwealth of Massachusetts mail system.  Do not click on links or open attachments unless you recognize the sender and know the content is safe.

Glenn,

I will but just so we are clear, I am looking to determine exactly what steps you intend to take moving forward to protect the lives and safety of the public from a product which should not be permitted for sale in the Commonwealth for another minute.

If you are not prepared to commit to such actions, then I don't think there would be any benefit to discussing this matter. My co-counsel has sent a records request for all documents relating to the Lakeville incident and the Worcester incident. I shall prepare a request for those document as well as any other documents involving grain alcohol fires in the past 3 years.

Thank you for your understanding.

Adam


Sent from my iPhone


> On Jul 10, 2025, at 9:57 PM, Rooney, Glenn (DFS) <Glenn.Rooney@mass.gov> wrote:
>
> Adam,
>
> In preparation for next week's call, please send me any specific record or information requests in advance. This will allow me to review any potentially responsive materials ahead of time and ensure that our discussion is as efficient and productive as possible.



**Glenn M. Rooney, Esq.**
*General Counsel*
Department of Fire Services

P.O. Box 1025 – 1 State Road
Stow, MA 01775

Phone :(978)-567-3183

www.mass.gov/dfs

---

**From:** Adam Clermont <aclermont@attorneyapc.com>
**Sent:** Thursday, July 10, 2025 9:00 AM

**To:** Rooney, Glenn (DFS) <Glenn.Rooney@mass.gov>
**Subject:** Re: Yvette Digan

CAUTION: This email originated from a sender outside of the Commonwealth of Massachusetts mail system.  Do not click on links or open attachments unless you recognize the sender and know the content is safe.

I am assuming EST. Enjoy the rest of your time off and I look forward to speaking with you.

**From:** Rooney, Glenn (DFS) <Glenn.Rooney@mass.gov>
**Sent:** Thursday, July 10, 2025 8:59 PM
**To:** Adam Clermont <aclermont@attorneyapc.com>
**Subject:** Re: Yvette Digan

I will reach out next Wednesday at 10am.

Glenn M. Rooney, Esq.
General Counsel
Department of Fire Services
P.O. Box 1025 - 1 State Road
Stow, MA 01775
978-567-3183

On Jul 10, 2025, at 8:30 AM, Adam Clermont
<aclermont@attorneyapc.com> wrote:

CAUTION: This email originated from a sender outside of the Commonwealth of Massachusetts mail system.  Do not click on links or open attachments unless you recognize the sender and know the content is safe.

Glenn,

You can generally reach me anytime by texting (413) 841-1270 and I will call you back if available. You can also download WhatsApp and add my Hong Kong number +856 9086 3191, which would be the best way to communicate with me.

I hope you appreciate my effots and the podcast. This case is something quite extraordinary. And again, I stress that Yvette and her family are **ONLY**interested in preventing another incident and are very appreciative of everyone who works tirelessly to keep the public safe.

Adam

---

**From:** Rooney, Glenn (DFS) <Glenn.Rooney@mass.gov>
**Sent:** Thursday, July 10, 2025 8:24 PM
**To:** Adam Clermont <aclermont@attorneyapc.com>
**Subject:** Re: Yvette Digan

Adam,

What is your best contact number? Let's aim for Wednesday the 16th at 10 AM.

Glenn M. Rooney, Esq.
General Counsel
Department of Fire Services
P.O. Box 1025 - 1 State Road
Stow, MA 01775
978-567-3183

> On Jul 10, 2025, at 8:12 AM, Adam Clermont <aclermont@attorneyapc.com> wrote:

> CAUTION: This email originated from a sender outside of the Commonwealth of Massachusetts mail system. Do not click on links or open attachments unless you recognize the sender and know the content is safe.

Glenn,

Assuming I am still in HK next week, usually between 7-11 am and 7-11 pm your time is best for me.

As for what I have so far, if you have not already done so, please see the materials in this LinkedIn Post. https://www.linkedin.com/posts/adam-clermont_93a-demand-letter-to-luxco-inc-activity-7348333630143823872-9-F6?utm_source=share&utm_medium=member_desktop&rcm=ACoAAAMiNkcBVfcyF00qSWm1sCv5zADxm56iegI

I think the easiest way to digest the material is simply tp listen to one of the podcasts accessible in the post.

Thank you, I am happy someone touched base and

look forward to connecting with you.

Adam

---

**From:** Rooney, Glenn (DFS) <Glenn.Rooney@mass.gov>
**Sent:** Thursday, July 10, 2025 8:09 PM
**To:** Adam Clermont <aclermont@attorneyapc.com>
**Subject:** Re: Yvette Digan

Adam,

I am out of the office the rest of this week. Please send me your availability for next week and we can connect thank you.

Glenn M. Rooney, Esq.
General Counsel
Department of Fire Services
P.O. Box 1025 - 1 State Road
Stow, MA 01775
978-567-3183

> On Jul 10, 2025, at 7:57 AM, Adam Clermont <aclermont@attorneyapc.com> wrote:

CAUTION: This email originated from a sender outside of the Commonwealth of Massachusetts mail system. Do not click on links or open attachments unless you recognize the sender and know the content is safe.

Glenn,

What can you tell me about the investigation? And what do you need from me to assist you in your efforts?

Adam

---

**From:** Davine, Jon (DFS) <Jon.Davine@mass.gov>
**Sent:** Thursday, July 10, 2025 7:52 PM
**To:** Adam Clermont

<aclermont@attorneyapc.com>
**Cc:** Rooney, Glenn (DFS)
<Glenn.Rooney@mass.gov>
**Subject:** Yvette Digan

Hi Adam,

Thank you very much for your email. Given that it relates to active litigation, I'm forwarding it to DFS General Counsel Glenn Rooney. He is copied on this email and will be your best point of contact for this and related matters moving forward.


Best wishes,

Jon

# EXHIBIT 2

 Outlook

---

**URGENT: Deadly product causing severe burn injuries - Everclear explosion in Worcester**

---

**From** Adam Clermont <aclermont@attorneyapc.com>
**Date** Fri 5/30/2025 11:48 PM
**To** Amy.Karangekis@state.ma.us <Amy.Karangekis@state.ma.us>
**Cc** Pieropan, Joseph (BER) <joseph.a.pieropan@mass.gov>

📎 2 attachments (12 MB)
Incident Video 1.mp4; APC:LTRtoAG:30May2025.pdf;

Dear Attorney Karangekis,

We've corresponded previously about an unrelated matter, but I'm reaching out directly to you today regarding an extremely dangerous product being sold throughout Massachusetts that recently caused a catastrophic injury.

On May 13, 2025, at the Zeta Psi fraternity house in Worcester, a fraternity member poured Everclear 190-proof grain alcohol, manufactured by Luxco, Inc., near an open flame during a social gathering, triggering an explosive fireball that engulfed Yvette Digan, a 22-year-old exchange student from Hong Kong attending Boston University. The attached security camera footage demonstrates the violent and instantaneous nature of this explosion. This letter details the extreme and ongoing danger posed by the continued sale of this highly flammable product, widely available across Massachusetts, to the public.

I'm bypassing normal complaint channels due to the extreme and imminent danger this product poses. What makes this situation particularly alarming is that Luxco deliberately removed explicit safety warnings from this product in 2018 while simultaneously marketing it for kitchen and household uses where open flames are common. The product is essentially 95% alcohol , as flammable than gasoline, yet carries fewer safety warnings than many standard fire-starting products.

The young woman injured in this incident suffered catastrophic burns and remains hospitalized at Mass General. Her family is thousands of miles away in Hong Kong, devastated and struggling to navigate this crisis. Her promising future has been derailed by injuries that were entirely preventable had proper warnings remained on the product.

Every day this product remains on shelves without adequate warnings is another day someone else's child could suffer the same fate.  Given its extreme flammability and lack of warnings, the question is not if another tragedy will occur, but when.

I've prepared detailed documentation of the violations involved and would be grateful for the opportunity to discuss this matter with you directly.

Thank you for your attention to this urgent public safety matter.

Adam Clermont
APC Law
6 Liberty Square, PMB 226
Boston, MA
Phone: (413) 841-1270
Email: aclermont@attorneyapc.com

Confidentiality Notice: This email and any attachments may contain confidential or privileged information. If you are not the intended recipient, please delete the email and notify the sender immediately.



**Adam P. Clermont, Esq.**

May 30, 2025

Office of the Attorney General
Consumer Protection Division
One Ashburton Place
Boston, MA 02108

RE: **Imminent Public Safety Hazard and Unfair/Deceptive Practices by Luxco, Inc.**

Dear  Attorney General:

I write to bring to your immediate attention a grave and ongoing public safety hazard involving Everclear 190-proof grain alcohol, manufactured by Luxco, Inc., a producer and marketer of distilled beverages based in St. Louis, Missouri, and to urge your office to investigate and take prompt regulatory action. This product, widely available in Massachusetts, is being marketed and sold under circumstances that create a catastrophic and imminent risk of fire, explosion, and severe burns to citizens of the Commonwealth.

On May 13, 2025, a tragic incident that was entirely foreseeable and preventable occurred at the Zeta Psi fraternity house in Worcester. During a social gathering, a fraternity member poured Everclear 190-proof grain alcohol near or onto an open flame in the backyard. The result was an explosive fireball that engulfed Yvette Digan, a university student from Hong Kong, who was slated to begin an exchange program at Boston University, setting her clothing aflame and causing devastating burn injuries. Video evidence shows the sudden and violent nature of the fireball, which resulted directly from the ignition of vapor and liquid, a mechanism well documented in scientific literature. Peer-reviewed studies confirm that pouring high-proof ethanol near flame can ignite vapor inside the container, causing an explosive pressure wave and projecting burning liquid. This accident is not a freak occurrence; rather, it is an inevitable outcome of the way Luxco now labels and markets this extremely hazardous product.

### Marketing and Labeling of Everclear: A Catastrophic Public Safety Hazard

Luxco's 190-proof Everclear product already had a well-documented history of involvement in student deaths from alcohol poisoning and has been identified as a "date rape facilitator" due to its odorless, colorless, and extremely potent nature. Not content with this notorious legacy, Luxco made the calculated decision to make its product even more dangerous by: (1) deliberately removing explicit and prominently displayed safety warnings from Everclear 190-proof grain alcohol bottles that previously warned against

6 LIBERTY SQUARE
PMB 226
BOSTON, MA 02109
TEL: (617) 202-3794
FAX: (617) 202-3852
EMAIL: ACLERMONT@ATTORNEYAPC.COM

the exact conduct that caused Ms. Digan's injuries; (2) failing to install flame arrestors on bottles, an industry-standard safety feature with minimal implementation cost that would have prevented this exact type of accident; and (3) actively marketing this extremely flammable product for household and kitchen uses, including use near open flames.

Luxco's dual strategy of expanding marketed uses, explicitly instructing consumers to use Everclear in kitchen applications like flavor extraction, baking, and frying, where open flames from stoves, ovens, and candles are ubiquitous, while simultaneously removing critical safety warnings created an extraordinary dangerous situation where consumers were encouraged to use this 95% alcohol product near ignition sources. Having actively encouraged such hazardous uses, Luxco had a heightened duty to maintain and enhance warnings about Everclear's extreme flammability, particularly its propensity to ignite or explode near open flames, rather than deliberately stripping away such warnings, including the pre-2018 caution "**DO NOT APPLY TO OPEN FLAME**" and "**CONTENTS MAY IGNITE OR EXPLODE.**" This exact scenario, pouring Everclear near or onto an open fire, resulting in an explosive fireball, was specifically warned against in Luxco's long-standing pre-2018 label but deliberately removed despite Luxco's extensive and well-documented knowledge of this precise danger.

### Violations of the Federal Hazardous Substance Act (FHSA)

In addition to the violations of state law described above, Luxco has violated the Federal Hazardous Substances Act (FHSA), 15 U.S.C. §§ 1261-1278, and its implementing regulations under 16 C.F.R. Part 1500, specifically 16 C.F.R. § 1500.121. These violations constitute per se unfair and deceptive acts under M.G.L. c. 93A.

Everclear 190-proof qualifies as a "hazardous substance" under the FHSA due to:

1. Its flammability (flash point of 59.0-68.0°F), classifying it as a "flammable" substance under 16 C.F.R. § 1500.3(c)(6)(ii);

2. Its 95% ethanol content, presenting significant toxicity hazards; and

3. Luxco's deliberate marketing of Everclear for numerous non-beverage household uses, including but not limited to:

   - Kitchen Applications: Flavor extraction, baking aid ("PREVENTS gluten formation in dough"), frying helper ("PREVENTS excess oil absorption");

   - Cleaning & Household Products: DIY disinfectant wipes, lemon basil glass cleaner, jewelry cleaner, laundry additive ("Brighter Whites"), stain removal; and

   - Cosmetic & Personal Care Products: Natural deodorant spray, DIY perfume, reed diffuser, essential oil base.

While alcoholic beverages are regulated primarily by the Alcohol and Tobacco Tax and Trade Bureau (TTB), which has primary regulatory authority over the labeling and advertising of distilled spirits under the Federal Alcohol Administration Act (FAA Act), 27 U.S.C. § 201 et seq., the FHSA provides overlapping jurisdiction when products present specific hazards like extreme flammability. The FHSA's primary purpose is to protect consumers from unreasonable risks, regardless of a product's primary categorization. Everclear 190-proof's extreme flammability (flash point well below room temperature) creates precisely the type of hazard the FHSA was designed to address. Any jurisdictional ambiguity was resolved when Luxco deliberately marketed Everclear as a dual-use product for consumption and household applications, thereby triggering FHSA requirements for hazard warnings.

Luxco has violated the FHSA in the following specific ways:

1. **Failure to Place Required Warnings on Principal Display Panel**: 16 C.F.R. § 1500.121(b)(2) mandates that the signal word, statement of principal hazard, and instructions to read additional cautionary material must appear on the principal display panel. Luxco's post-2018 flammability warning ("**WARNING: FLAMMABLE LIQUID. HANDLE WITH CARE**") appears only on the back label in violation of this requirement.

2. **Inadequate Precautionary Measures**: 16 C.F.R. § 1500.121(b)(2)(ii) requires specific precautionary measures "describing the action to be followed or avoided." The vague instruction to "**HANDLE WITH CARE**" fails to specify critical actions to avoid, such as keeping away from open flames, information that was included in Luxco's pre-2018 warning.

3. **Lack of Prominence and Conspicuousness**: 16 C.F.R. § 1500.121(c) requires warnings to be prominently placed and conspicuous. Relegating the flammability warning to a small rectangle on the rear label fails to meet this standard.

4. **Failure to Include Safety Features**: Industry standards for highly flammable products, as evidenced by Bacardi 151's incorporation of a flame arrestor before its 2016 discontinuation, demonstrate that such safety features are reasonable and necessary. Luxco's failure to include similar protections, despite Everclear's higher alcohol content (95% vs. 75.5%), constitutes an unreasonable risk under the FHSA's safety objectives.

These violations of federal regulations directly contributed to Ms. Digan's catastrophic injuries. Had Luxco maintained FHSA-compliant labeling, specifically warning against application to open flames as required by 16 C.F.R. § 1500.121(b)(2)(ii), and as was present in its pre-2018 labeling, the incident would have been prevented.

Even if one were to disregard these FHSA regulations entirely, Luxco's conduct independently constitutes unfair and deceptive acts or practices under M.G.L. c. 93A, § 2 based on the deliberate removal of critical safety warnings, coupled with the aggressive marketing of an extraordinarily dangerous product for household uses, represents an extreme violation of Massachusetts consumer protection standards regardless of which regulatory framework is applied.

### Violations of TTB Regulations

In addition to the state law violations described above, we allege that Luxco violated TTB regulations under the Federal Alcohol Administration Act (FAA Act), 27 U.S.C. § 201 et seq. Specifically, 27 CFR § 5.122 prohibits labels containing false or misleading statements that create a misleading impression about a product's characteristics, including its safety, stating that labels "may not contain any statement or representation, irrespective of falsity, that is misleading to consumers."

While the TTB regulations do not specifically reference safety statements[1], the broad language prohibiting statements that are "misleading to consumers as to the... characteristics of the distilled spirits" reasonably encompasses safety characteristics, which are essential product attributes that consumers rely upon when selecting and using alcoholic beverages. The regulatory language is deliberately comprehensive to protect consumers from all forms of deceptive labeling practices.

Luxco's conduct violates these TTB regulations in several specific ways:

1. **Creation of a Misleading Safety Impression**: By drastically reducing safety warnings from a prominent front-label caution to a minimal back-label notice, while simultaneously promoting Everclear for kitchen and cleaning applications near open flames, Luxco created a deceptive impression about the product's safety, violating 27 CFR § 5.122.

---

[1] While Everclear's labels were approved by the TTB through its Certificate of Label Approval (COLA) process, this approval does not shield Luxco from liability for inadequate safety warnings. The TTB approval process primarily checks for compliance with specific regulatory requirements related to content statements, alcohol percentage, and certain prohibited statements. It does not comprehensively evaluate whether labels contain proper safety warnings commensurate with the product's actual hazards, particularly when marketed for non-beverage uses. The TTB explicitly acknowledges in its procedures and on its instructions for form TTB F 5100.31, which Luxco submitted with its application for approval of the new Everclear labels, that its approval "does not relieve the certificate holder from liability for violations of the Federal Alcohol Administration Act, the Alcoholic Beverage Labeling Act, the Federal Food, Drug and Cosmetic Act, or any other applicable federal or state law or regulation." In Luxco's September 8, 2017 application for approval of the Everclear labels, John Rempe, a master distiller and blender with Luxco, certified that he had read, understood and complied with the instructions. This regulatory gap makes Luxco's deliberate removal of critical safety warnings all the more egregious, as the company exploited this limitation in federal oversight while simultaneously marketing a highly dangerous product for household uses where ignition sources are prevalent.

2. **Misleading Omission**: The deliberate removal of explicit warnings against applying Everclear to open flames that appeared on pre-2018 labels created a misleading impression about the product's safety characteristics. This omission is particularly egregious given that the company continued to include these critical warnings on chemically identical products sold under different brand names (Golden Grain and Crystal Clear). When the three brands are compared side-by-side, a reasonable consumer would logically conclude that Everclear, the only product lacking prominent explosion warnings, was the safest of the three products, when in fact all three contain identical chemical compositions with identical explosive properties. This inconsistent labeling approach created a dangerous false impression precisely where clarity about safety risks is most crucial.

3. **False Impression of Suitability**: By marketing Everclear for kitchen applications that foreseeably involve proximity to heat sources and open flames, while simultaneously removing explicit warnings about flammability hazards, Luxco created a false impression about the product's suitability for such uses in violation of 27 CFR § 5.122.

4. **Inconsistent Safety Information**: The maintenance of comprehensive safety warnings on some products (Golden Grain and Crystal Clear) while removing those warnings from the chemically identical Everclear product constitutes a misleading practice under TTB regulations, as it falsely suggests different safety profiles for identical products.

While the TTB's primary focus is on protecting consumers from economic harm through deceptive practices, the regulations also serve a significant safety function by ensuring accurate and complete product information. By removing critical safety warnings while simultaneously promoting Everclear for kitchen and household uses, Luxco violated both the letter and spirit of TTB regulations designed to prevent, deceptive marketing practices. The violations of federal regulations provide additional evidence of Luxco's unfair and deceptive practices under M.G.L. c. 93A, § 2.

### Violations of 15 U.S.C. § 1263 and 15 U.S.C. § 1264

Luxco violated 15 U.S.C. § 1263 by introducing a misbranded hazardous substance into interstate commerce. Everclear 190-proof is a "hazardous substance" under 15 U.S.C. § 1261(a) due to its extreme flammability. The post-2018 label lacks prominent placement of flammability warnings on the principal display panel and provides an inadequate precautionary statement, violating mandatory standards. This misbranding foreseeably contributed to Ms. Digan's catastrophic injuries by failing to alert consumers to the product's explosive risks, constituting a per se unfair and deceptive act under M.G.L. c. 93A, § 2.

Additionally, Luxco's conduct violates 15 U.S.C. § 1264, which provides for criminal and civil penalties for knowingly and willfully violating FHSA requirements. Luxco's deliberate removal of critical safety warnings previously present on their labels, while maintaining those same warnings on chemically identical products sold under different brand names, demonstrates a knowing and willful violation of the FHSA. The evidence of this knowing violation is particularly compelling: Luxco's "Golden Grain" and "Crystal Clear" brands retained the comprehensive warnings about fire hazards while the rebranded Everclear product eliminated these warnings, apparently for marketing purposes. This deliberate dual-labeling practice creates irrefutable evidence that Luxco was fully aware of FHSA requirements but chose to disregard them for the Everclear brand, subjecting the company to enhanced penalties under 15 U.S.C. § 1264, including potential criminal sanctions and significant civil penalties.

Luxco's official website and social media accounts provide additional compelling evidence of these willful violations by actively promoting Everclear for non-beverage household applications while failing to provide FHSA compliant labelling. This deliberate marketing strategy, encouraging kitchen uses near ignition sources without adequate warnings, demonstrates a knowing and willful violation of 15 U.S.C. § 1264.

### Violations of 940 CMR 3.16

Luxco's conduct constitutes multiple violations of the Massachusetts Attorney General's regulations at 940 CMR 3.16, which provide that an act or practice violates M.G.L. c. 93A, § 2 if:

1. **It is oppressive or otherwise unconscionable in any respect** (940 CMR 3.16(1)): Luxco's calculated decision to remove critical safety warnings from Everclear 190-proof and recommend that it be used around open flames for purely marketing-driven reasons constitutes unconscionable business conduct.

2. **It fails to disclose to a buyer or prospective buyer any fact, the disclosure of which may have influenced the buyer not to enter into the transaction** (940 CMR 3.16(2)): Luxco's failure to adequately disclose the extreme flammability hazards of Everclear 190-proof, particularly the danger of explosive fireballs when applied to open flames, concealed critical safety information that would have influenced consumer purchasing and usage decisions.

3. **It violates the Federal Trade Commission Act or other Federal consumer protection Statutes** (940 CMR 3.16(4)): Luxco has violated 15 U.S.C. § 1263, which prohibits the introduction of misbranded hazardous substances into interstate commerce. The misbranding occurs through Luxco's failure to comply with labelling requirements found in the FHSA's regulations at 16 C.F.R. § 1500.121. This statutory violation subjects Luxco to both criminal penalties and civil penalties

of up to $100,000 per violation under 15 U.S.C. § 1264. The Massachusetts SJC has consistently held that violations of federal statutes designed to protect public health and safety constitute per se Chapter 93A violations. *Klairmont v. Gainsboro Restaurant, Inc.*, 465 Mass. 165 (2013).

**Factual Background**

Prior to 2018, all sizes of Everclear bottles featured a prominent warning in a large red rectangle on the front label explicitly stating: "**CAUTION: DO NOT APPLY TO OPEN FLAME. KEEP AWAY FROM FIRE, HEAT AND OPEN FLAME - CONTENTS MAY IGNITE OR EXPLODE. DO NOT CONSUME IN EXCESSIVE QUANTITIES. NOT INTENDED FOR CONSUMPTION UNLESS MIXED WITH NON-ALCOHOLIC BEVERAGE.**" The front of the bottle contained two additional warnings providing: "**CAUTION!! EXTREMELY FLAMMABLE – HANDLE WITH CARE**," and "**WARNING OVERCONSUMPTION MAY ENDANGER YOUR HEALTH**."



**Pre-2018 Warnings**

In 2018, Luxco deliberately redesigned its Everclear packaging, drastically reducing this warning to merely "**WARNING: FLAMMABLE LIQUID. HANDLE WITH CARE**," relegating it to a small rectangle on the **REAR** label below the government warning[2]. This represents an 85% reduction in warning content with the critical instruction about open flames completely eliminated.



**Post-2018 Warning**

This drastic reduction in warnings coincided with Luxco's aggressive marketing campaign promoting Everclear for kitchen and household uses. Luxco's official website, (www.diywitheverclear.com), explicitly marketed Everclear as "a staple for any bar or kitchen" and promotes specific cooking applications such as "Flaky Pie Crust," stating: "Get effortless flaky pie by infusing your crust recipe with EVERCLEAR® Grain Alcohol. Everclear's high proof helps prevent gluten formation, which can toughen dough." The website also promoted household and cleaning applications, such as "Brighter Whites: Tired of your favorite white shirts not looking so bright? By adding a dash of EVERCLEAR® to your wash, you can make those faded white pop again." Similar claims

---

[2] The removal of the "**NOT INTENDED FOR CONSUMPTION UNLESS MIXED WITH NON-ALCOHOLIC BEVERAGE**" warning appears to have been a calculated attempt to reframe Everclear as a beverage, potentially to evade FHSA jurisdiction under the 'food' exemption (15 U.S.C. § 1261(f)(1)(B)), despite Luxco's simultaneous marketing of Everclear for non-beverage household uses, such as kitchen applications and cleaning, which subjects it to FHSA's stringent labeling requirements. Notably, Luxco maintained this critical warning on its chemically identical products "Golden Grain" and "Crystal Clear," further demonstrating that the company was fully aware of the need for this warning but deliberately removed it only from the Everclear brand as part of its strategic repositioning. This inconsistent approach to labelling identical products reveals Luxco's intent to manipulate regulatory classifications based on marketing considerations rather than safety concerns.

were made on its Instagram, Pinterest, YouTube and Facebook accounts. This targeted marketing as a kitchen and household product makes the removal of explicit warnings against open flames particularly egregious, as it specifically encourages consumers to introduce this highly flammable substance into environments with abundant ignition sources like gas stoves, ovens, and candles. Luxco has created a perfect storm of danger by simultaneously increasing exposure to ignition sources through its marketing while removing the very warnings that would alert consumers to this risk.

A July 9, 2020 New York Times article (https://archive.is/MG3BV) confirms this was part of a calculated rebranding strategy to shed the product's "notorious reputation" and reposition it with a "minimalist navy-and-gold label befitting a premium vodka" to appeal to craft cocktail enthusiasts. This rebranding purposefully obscured the product's extreme flammability risks in pursuit of marketplace acceptance and expanded consumer adoption.

The evidence reveals conduct by Luxco that is not only reckless but utterly unconscionable, surpassing the negligence seen in Ford Motor Company's infamous Pinto case, where Ford calculated that paying settlements to burn victims was cheaper than fixing a known design flaw. Unlike Ford, which failed to address an existing, unintentional defect, Luxco intentionally created a catastrophic danger through deliberate design and marketing choices for its Everclear 190-proof product, most shockingly by promoting its use in kitchens, where open flames from stoves, ovens, and grills are commonplace, while stripping away critical safety warnings and forgoing basic safety features, all to prioritize profits over human lives. Specifically, Luxco appears to have determined that:

- The potential profits from rebranding Everclear to appeal to premium spirits consumers and aggressively marketing it for kitchen uses would far outweigh the cost of inevitable lawsuits from consumers burned in foreseeable kitchen fires;

- Despite having explicit knowledge of the product's extreme flammability (as evidenced by the original warnings), Luxco deliberately removed these warnings to enhance marketability, creating a deadly risk of misuse where consumers were encouraged to use Everclear near open flames;

- The company consciously accepted that removing explicit warnings and promoting Everclear for kitchen applications, such as flavor extraction, baking aid ("PREVENTS gluten formation in dough"), and frying helper ("PREVENTS excess oil absorption"), would inevitably lead to catastrophic misuse, such as pouring a 95% alcohol product near gas burners or candles, effectively manufacturing a defect through its outrageous marketing strategy;

- Luxco chose not to install a flame arrestor, a stainless steel mesh designed to quench flames by dissipating heat and preventing ignition of flammable vapors inside the bottle, on its Everclear 190-proof product, despite knowing this simple, pennies-

per-bottle safety feature could prevent fires or explosions during foreseeable uses, such as in a kitchen where Luxco itself encouraged consumers to pour Everclear near heat sources; and

- Luxco prioritized aesthetic considerations and market repositioning, including its brazen promotion of Everclear as a kitchen staple, over consumer safety, knowingly transforming a highly flammable product into a ticking time bomb by removing warnings and forgoing safety features, despite its inherent 95% alcohol content making it one of the most dangerous consumer products available.

Luxco's promotion of Everclear for kitchen uses is nothing short of astonishing in its recklessness. Encouraging consumers to use a 190-proof (95% alcohol) liquid, more flammable than gasoline, in culinary applications like flavor extraction, baking, and frying, where gas stoves, ovens, or even lit candles are routine, defies all reason and safety. This is not mere negligence but a deliberate invitation to disaster, as Luxco's own pre-2018 warnings explicitly cautioned against exposure to open flames. In contrast to Ford's internal memos, which revealed a callous willingness to accept burn injuries rather than implement an $11 safety modification, Luxco's actions are exponentially more egregious: the company intentionally created a deadly defect by stripping away existing safety warnings, failing to incorporate a flame arrestor(costing mere cents per bottle, as evidenced by industry standards for similar safety devices in high-proof spirits like Bacardi 151 before its discontinuation), and actively marketing Everclear for kitchen and other household uses that virtually guaranteed exposure to open flames.

By dismantling critical safety measures and promoting Everclear as a kitchen essential, Luxco did not merely accept the risk of horrific burn injuries, it engineered the conditions for them, inviting consumers into harm's way for the sake of profit. This willful, knowing, and utterly unconscionable misconduct represents an unparalleled violation of consumer protection standards is unequivocally a unfair and deceptive business practice pursuant to M.G.L. c. 93A.

Luxco's decision is particularly indefensible given the scientifically documented danger of container explosions with high-proof alcohol. Peer-reviewed research published by Log and Moi, *International Journal of Environmental Research and Public Health*, 2018, 15, 2379, (2018) (Exhibit 1) explains the precise mechanism: "If liquid is then poured onto an ignition source, e.g., a burning flame, the poured heavy gas mixture and the liquid will catch fire. It is highly probable that the flame will propagate into the container and ignite the internal combustible air fuel gas mixture. As the internal gas volume ignites, the resulting volume expansion displaces the liquid in the bottom of the container which is then violently released through the container opening." This mechanism precisely describes how Ms. Digan was catastrophically injured when Everclear was poured onto an open fire at the fraternity house, a risk exponentially heightened by Luxco's unthinkable

promotion of Everclear for uses where open flames are ubiquitous.



**Demonstration of Ethanol Fire Hazard, Illustrating the Ignition Mechanism**

It should be noted that when the internal container vapor phase ignites, the violent and instantaneous nature of the reaction creates powerful forces that can cause the person holding the bottle to lose control of it entirely. As demonstrated in peer-reviewed research and safety demonstrations, the sudden ignition of the container's vapor space creates an explosive pressure wave and immediate backward thrust that typically acts below the hand grip. This violent reaction creates a rotational force around the horizontal axis of the container that even trained individuals cannot counteract. The combination of startling explosion, sudden pain from flames, involuntary reflexive muscle response, and powerful physical forces acting on the container make it virtually impossible for anyone to maintain deliberate control of the bottle once this chain reaction begins. What may appear to witnesses as a deliberate motion is, in reality, the predictable physical consequence of the container's vapor phase ignition, a reaction that has been scientifically documented in controlled demonstrations by fire safety experts. Even experienced professionals demonstrating this phenomenon under controlled conditions struggle to maintain control of the container once ignition occurs, as evidenced in the demonstration photos below showing the powerful and unpredictable nature of these forces.



**Demonstration of an ethanol container gas phase igniting at room temperature**

A single 750ml bottle of Everclear 190-proof contains 15.05 megajoules of energy. Thus, by way of example, one bottle holds enough energy to completely charge about 420 smartphones from empty to full, heat an average-sized living room in winter for 2-3 hours, lift a 150-pound person to the top of a 70-story skyscraper, or drive a small car about 3-4 miles When that energy is released rapidly through combustion, as it was in this instance, it generates a fireball that can reach temperatures of 800-900°F (427-482°C), can flash-ignite clothing instantaneously, causing third-degree burns within seconds.

Additionally, the explosive pressure wave from an ignited bottle vapor space can propel burning liquid 15-20 feet and the heat produced can cause full-thickness (third-degree) burns almost immediately upon contact. What makes Everclear particularly dangerous is not just this energy content, but how quickly and completely it can release that energy during combustion. Unlike gasoline which burns with lots of smoke and soot, Everclear burns with an almost invisible flame that's nearly pure heat energy.

**Deceptive Dual Branding with Inconsistent Safety Warnings**

Perhaps most damning of all, Luxco continues to manufacture and sell the identical 190-proof grain alcohol product under different brand names that ___DO___ retain the comprehensive safety warnings, while deliberately removing these warnings from the Everclear-branded product. Specifically:

1. Luxco manufactures and sells "Golden Grain" 190-proof alcohol, which is chemically identical to Everclear 190-proof, but features the original prominent warning in a large red rectangle on the front label explicitly stating: "**CAUTION: DO NOT APPLY TO OPEN FLAME. KEEP AWAY FROM FIRE, HEAT AND OPEN FLAME - CONTENTS MAY IGNITE OR EXPLODE ….**" Another label appeared on the neck of the bottle with the warning: "**CAUTION!!! – EXTREMELY FLAMMABLE – SEE FRONT & BACK LABELS.**" The back label contained two warning signs as well as a warning stating: "**WARNING – FLAMMABLE LIQUID**."





**Golden Grain Warning Labels**

2. Luxco also manufactures and sells "Crystal Clear" 190-proof alcohol, again chemically identical to Everclear 190-proof, which also retains the comprehensive safety warning regarding open flames.



**Crystal Clear Warning Label**

This dual-branding practice provides irrefutable evidence that:

1. Luxco is fully aware of the necessity of prominent warnings against open flames for 190-proof alcohol products, as they maintain these warnings on their economical/utility branded versions of the exact same product;

2. The company deliberately chose to remove these warnings ONLY from the premium-branded Everclear product as part of its strategic marketing repositioning;

3. The decision to include comprehensive safety warnings on some brands while removing them from others selling the identical product demonstrates that the warning removal was not based on any legitimate safety reassessment, but rather on purely marketing-driven considerations; and

4. Luxco acknowledges through its own practices that 190-proof alcohol requires explicit warnings against open flames, yet selectively removes these warnings from products targeting demographics they perceive as more profitable.

What makes Luxco's conduct particularly egregious is the mind-boggling contradiction in their business practices: it deliberately removed explicit warnings against open flame application from Everclear, the very product it actively marketed for kitchen and culinary uses where open flame are omnipresent; while maintaining these critical warnings on budget brands Golden Grain and Crystal Clear, which it does not market for kitchen or other household applications.

This perverse inversion of safety logic defies rational explanation: Luxco has stripped safety warnings from the product most likely to be used near ignition sources while preserving warnings from the product most likely to be used near ignition sources while preserving warnings on products less likely to encounter such hazards. The only conceivable explanation for this dangerous inconsistency is that Luxco prioritized the aesthetic appeal and marketability of Everclear's "premium" branding over consumer safety, making a calculated decision that warnings about explosion risks would detract from their rebranding strategy targeting upscale consumers. This unconscionable practice demonstrates not merely negligence but a deliberate and knowing creation of unnecessary risk that directly led to Ms. Digan's catastrophic injuries.

**Scientific Properties and Danger**

According to the standard Safety Data Sheet (SDS) for 95% ethanol, this product presents exceptional and unique fire hazards when compared to lower proof alcohol:

1. Flash Point: 59.0-68.0°F (15.0-20.0°C) - This means the liquid produces ignitable vapors at room temperature, making it extraordinarily dangerous near any ignition source.

2. Hazard Classification: "Category 2 Flammable Liquid" with the signal word "DANGER" - The highest hazard classification for consumer products.

3. Flammability Limits: Lower 3.3%, Upper 19% - This wide flammable range means vapors can ignite across a broad spectrum of concentrations.

4. Auto-ignition Temperature: 685.4°F (363°C) - The temperature at which the product will spontaneously ignite without an external flame source.

5. Specific Hazards: The SDS explicitly states "Vapors may form explosive mixtures with air" and "Vapors may travel considerable distance to a source of ignition and flash back."

These properties create a uniquely dangerous product that requires explicit warnings about use near open flame hazards, precisely the warnings Luxco deliberately removed from its product. As documented in peer-reviewed research by Log and Moi in the *International Journal of Environmental Research and Public Health* (2018), at normal room temperatures (22-25°C), the fuel-to-air ratio of ethanol vapor is very close to the stoichiometric composition, the most easily ignited composition that results in the worst-case scenarios regarding explosion strength.

The extreme danger of Everclear 190-proof is dramatically illustrated by comparing it to standard 80-proof vodka or other typical spirits. When 80-proof vodka (40% alcohol) is exposed to an open flame, it will burn with a relatively controlled, low-intensity flame due to its high water content (60%). The water acts as a natural fire suppressant, limiting flame spread and temperature. In contrast, Everclear 190-proof (95% alcohol) contains almost no water (only 5%), causing it to behave more like industrial solvents or commercial fire accelerants when exposed to flame. Pure ethanol flames, under real world conditions, typically reach temperatures of approximately 800-900°F (427-482°C), significantly hotter than the flames produced by lower-proof alcohols.

This extreme flammability creates additional dangers not present with typical alcoholic beverages, including the potential for rapid flame spread, flashback ignition of vapors, and explosive combustion when applied to an existing fire. The near-absence of water means there is no natural moderating agent to prevent rapid combustion or limit flame temperature, making 190-proof alcohol inherently more dangerous when exposed to ignition sources.

This behavioral difference explains why products specifically designed to start fires, such as charcoal lighter fluid, fire starter gel, and camping fire starters, are typically sold with comprehensive warning labels, child-resistant caps, flame arrestor screens, and explicit instructions against pouring onto active flames. These safety features are standard in the industry for highly flammable consumer products, as outlined in American National Standards Institute (ANSI) safety standards and Consumer Product Safety Commission (CPSC) guidelines.

Ironically, Luxco's Everclear 190-proof alcohol, which is significantly more flammable than many fire-starting products due to its high alcohol content and low flash point, now carries fewer safety warnings than many standard consumer fire-starting products, despite being substantially more dangerous when used in the same manner. Had Luxco maintained its previous comprehensive warnings or included safety features common to products with similar flammability profiles, Ms. Digan's injuries would likely have been prevented.

Luxco's decision to reduce warnings on Everclear 190-proof is particularly egregious when compared to how other manufacturers handle similar products. In 2016, Bacardi discontinued its 151 proof rum (75.5% alcohol) due to safety concerns. Despite Bacardi 151 being significantly lower proof than Everclear 190 (75.5% vs. 95% alcohol), Bacardi recognized the inherent dangers and took the following safety measures before ultimately discontinuing the product:

1. Featured a warning on the front label stating, "**WARNING, FLAMMABLE, SEE BACK LABEL**";



**Front Warning Label**

2. Dedicated almost an entire back label exclusively to warning consumers about the unique dangers posed by high-proof alcohol;



**Back Warning Label**

3. Incorporated a fire arrestor to prevent flames from igniting the contents; and



**Various Fire Arrestors – Bacardi 151 Top Left Corner**

4.  Ultimately removed the product from the market entirely despite its popularity and profitability because it was unreasonably dangerous.

Luxco has taken the opposite approach with a substantially more dangerous product. Rather than following industry trends toward enhanced warnings and safety features for high-proof spirits, Luxco deliberately removed existing warnings from Everclear 190-proof, which at 95% alcohol is significantly more volatile and dangerous than the discontinued Bacardi 151.

This comparison demonstrates that:

- Luxco's conduct falls well below industry standards for high-proof spirits, as evidenced by Bacardi's use of prominent front-label warnings, detailed back-label instructions, and a flame arrestor for its less flammable 151 proof rum (75.5% alcohol) before its discontinuation;

- Luxco had constructive and actual knowledge of industry recognition of flammability dangers, given Bacardi's well-documented safety measures and the broader industry's adoption of American National Standards Institute (ANSI) and Consumer Product Safety Commission (CPSC) guidelines for flammable consumer products;

- Luxco fell below even its own internal safety standards, as it continued to maintain comprehensive warnings about open flame hazards on chemically identical products sold under different brand names (Golden Grain and Crystal Clear), demonstrating its recognition of the necessity of such warnings while selectively removing them from Everclear;

- The extreme danger of high-proof alcohol was widely recognized in the industry, as shown by Bacardi's decision to discontinue its 151 proof rum due to safety concerns, despite its profitability, and the standard inclusion of flame arrestors in fire-starting products with similar flammability profiles; and

- Luxco deliberately moved in the opposite direction of industry safety trends by removing FHSA-compliant warnings, including "**DO NOT APPLY TO OPEN FLAME**" and "**NOT INTENDED FOR CONSUMPTION UNLESS MIXED WITH NON-ALCOHOLIC BEVERAGE**," and recommending Everclear's use in areas where open flames were prevalent, such as in kitchens for cleaning and cooking applications like flavor extraction, baking, and frying, thereby creating a foreseeable and catastrophic risk of fire and explosion, as occurred in Ms. Digan's case.

**Unfair and Deceptive Business Practices**

Luxco's actions constitute unfair and deceptive practices under M.G.L. c. 93A § 2, as defined by 940 CMR 3.16, through a pattern of corporate misconduct that directly caused Ms. Digan's catastrophic burn injuries. These practices, detailed throughout this letter, include violations of the Federal Hazardous Substances Act (FHSA), and Massachusetts warranty laws, as well as deceptive marketing and deliberate safety omissions. Luxco engaged in unfair and deceptive acts, including, but not limited to, the following:

- **Deliberate Removal of Critical Safety Warnings**: Luxco possessed specific and long-term knowledge of Everclear 190-proof's extreme flammability, as evidenced by its pre-2018 warning explicitly stating, "**CAUTION: DO NOT APPLY TO OPEN FLAME. KEEP AWAY FROM FIRE, HEAT AND OPEN FLAME - CONTENTS MAY IGNITE OR EXPLODE**…." In 2018, Luxco deliberately removed this warning, reducing it to a vague "**WARNING: FLAMMABLE LIQUID. HANDLE WITH CARE**" on the rear label, solely to enhance marketability and appeal to premium spirits consumers, as confirmed by a July 9, 2020, New York Times article (Exhibit 1). This unconscionable act (940 CMR 3.16(1)) concealed critical safety information that would have influenced consumer behavior (940 CMR 3.16(2)), foreseeably leading to the misuse that caused Ms. Digan's injuries.

- **Failure to Include Industry-Standard Safety Features**: Luxco failed to incorporate a flame arrestor, a low-cost safety feature used by Bacardi 151 (75.5% alcohol) before its 2016 discontinuation, despite Everclear's higher 95% alcohol content and greater flammability (flash point 59.0-68.0°F, Category 2 Flammable Liquid). This omission falls below industry standards and creates an unreasonable risk of injury, constituting an unconscionable practice under 940 CMR 3.16(1).

- **Deceptive Marketing for Non-Beverage Household Uses**: Luxco actively marketed Everclear for non-beverage uses, including kitchen applications (e.g., flavor extraction, baking aid), cleaning products (e.g., disinfectant wipes, glass cleaner), and cosmetics (e.g., deodorant, perfume). By promoting Everclear as a "must-have in every household" with "extracting, disinfecting, and solvent properties," Luxco encouraged uses foreseeably involving ignition sources, such as cooking or cleaning near open flames, without adequate warnings. This deceptive practice, adopted by retailers nationwide, including Kappy's Fine Wines & Spirits in Medford, Massachusetts, which advertises Everclear as "ideal for cooking to extract the flavors of the food," on its website[3] mirrors Luxco's marketing materials (e.g., website and social media accounts) and violates M.G.L. c. 93A § 2 by failing

---

[3] https://kappys.com/shop/product/everclear-grain-alcohol/56caaf777562752ed5461600?option-id=1c0e46dc6bf7d6e8a8b7c4d5a012888f9fa57c93e003c916af9df431c2c20962

to disclose flammability risks (940 CMR 3.16(2)).[4]

- **Violations of Federal Consumer Protection Laws**: Luxco has also violated 16 C.F.R. § 1500.121 and federal statutes prohibiting the introduction of misbranded hazardous substances into interstate commerce and knowingly violating the FHSA (15 U.S.C. §§ 1263, 1264). These statutory violations, which carry both criminal penalties and civil penalties, constitute per se unfair and deceptive acts under 940 CMR 3.16(4). The fact that these federal violations include potential criminal sanctions underscores the severity of Luxco's misconduct.

- **Deceptive Dual Branding with Inconsistent Warnings**: Luxco sells chemically identical 190-proof alcohol under "Golden Grain" and "Crystal Clear" brands with prominent flammability warnings, while removing these warnings from Everclear for marketing purposes. This selective warning practice, prioritizing aesthetics over safety, demonstrates willful deception and unconscionable conduct (940 CMR 3.16(1)).

- **Cost-Benefit Analysis Prioritizing Profits Over Safety**: Luxco engaged in a cost-benefit analysis, akin to Ford's Pinto case, calculating that profits from rebranding Everclear would outweigh the costs of foreseeable burn injuries. This callous prioritization of marketability over consumer safety, despite known risks, is unconscionable under 940 CMR 3.16(1) and M.G.L. c. 93A § 9(3).

- **Reckless Visual Promotions on Official Platforms**: Luxco's official website and Instagram account not only verbally promote kitchen uses of Everclear but also showcase highly dangerous practices through photographs and videos. These platforms depict Everclear being used near gas stoves with open flames and, more alarmingly, show Everclear being poured into cooking pans with flames inches from the bottle.

This visual marketing actively demonstrates the precise hazardous behavior that caused Ms. Digan's injuries, far exceeding mere suggestion. Most concerning, Luxco's website and social media accounts feature videos where an open flame is applied directly to a solution containing Everclear, the exact scenario explicitly warned against in Luxco's pre-2018 safety labeling. Such reckless visual demonstrations violate deceptive marketing regulations (940 CMR 3.16(2)) by portraying inherently dangerous activities as safe and

---

[4] By marketing Everclear as a dual-use product for both beverage and non-beverage household applications, Luxco violated multiple regulations designed to protect employees and the public, including but not limited to: The Massachusetts Comprehensive Fire Safety Code (527 CMR 1.00), incorporating NFPA 30 (Flammable and Combustible Liquids Code) and NFPA 1 (Fire Code), which require clear flammability warnings and safe handling practices; and OSHA's Hazard Communications Standard (29 C.F.R. § 1910.1299), mandating proper labelling and safety data for hazardous chemicals in workplaces.

routine, directly contradicting the safety warnings on Luxco's chemically identical Golden Grain product.



**Various Photographs from Everclear's Official Instagram Account**

These practices collectively created a false sense of safety, presenting Everclear as a versatile household product akin to less dangerous solvents, charcoal lighter fluid and household cleaners, while concealing its explosive properties. Had Luxco maintained its pre-2018 warnings, included a flame arrestor, or refrained from promoting non-beverage uses for the product, the use of Everclear on an open fire, precisely the scenario Luxco originally warned against, would have been prevented, sparing Ms. Digan her devastating injuries.

Luxco's conduct in this matter defies both logic and basic human decency. The company deliberately removed explicit warnings against applying Everclear to open flames, warnings that specifically prohibited the exact conduct that maimed Ms. Digan, then turned around and aggressively marketed this same explosive substance for cooking and household cleaning applications where consumers would predictably encounter open flames, stoves, and other ignition sources.

### Preventable Catastrophic Injuries

Ms. Digan, a 22-year-old raised with faith, love, and discipline, is an enthusiastic, cheerful, and hopeful individual with dreams of a legal career and a passion for singing and music. Her acceptance into the summer exchange program between City University of Hong Kong and Boston University marked a significant step toward her academic and professional goals, boosting her confidence. Known for leadership, organization, meticulousness, and analytical skills, she is a loving, thoughtful daughter and friend, always striving to learn and grow despite human imperfections.

On May 13, 2025, Luxco's unfair and deceptive practices caused Ms. Digan catastrophic burn injuries, shattering her bright future. She remains hospitalized at Massachusetts General Hospital, with no clear discharge date, unable to start her Boston University

summer exchange program. Post-discharge, she must stay in the U.S. for ongoing specialist treatment, delaying her return to City University of Hong Kong and pursuit of her Law degree. She suffered:

- Multiple surgeries, with more anticipated;

- Prolonged hospitalization, including ICU treatment, intubated and motionless;

- Permanent scarring and disfigurement;

- Extreme physical pain and emotional suffering;

- Withdrawal from her scheduled Boston University exchange program;

- Unlikelihood of resuming studies at City University of Hong Kong soon due to U.S.-based treatment;

- Projected lifetime medical and psychiatric expenses;

- Loss of educational and career opportunities, including her Law degree;

- Diminished ability to pursue her musical talents;

- Permanent limitation of physical and social activities.

This life-altering accident has devastated Ms. Digan's confidence and emotional well-being, requiring long-term psychiatric treatment for trauma that may persist lifelong. Her parents, thousands of miles away in Hong Kong, endured despair, fear, and emotional imbalance during her critical ICU days, unable to sleep or eat while working daily. The distance prevented immediate support, compounding their anguish and nearly extinguishing hope. The family faces significant financial burdens, including ongoing medical costs, future treatments, U.S. accommodation for treatment, and travel expenses to be with Ms. Digan, threatening their stability. Despite these challenges, they prioritize Yvette's well-being, relying on faith for strength.

### Conclusion and Request for Immediate Action

The continued sale and promotion of Everclear 190-proof grain alcohol, as currently labeled and marketed, poses a clear and present danger to the public. The removal of explicit warnings, aggressive promotion for high-risk uses, and the failure to comply with federal and state safety regulations represent an egregious and actionable threat to public safety. I respectfully urge your office to immediately investigate Luxco, Inc.'s marketing, labeling, and sale of Everclear 190-proof in Massachusetts, to issue a public health advisory warning consumers about the severe and explosive flammability risk posed by this product, and to seek injunctive relief requiring the restoration of explicit, prominent front-label warnings, the cessation of marketing Everclear for kitchen or household uses, and the implementation of appropriate safety features such as flame arrestors.

I urgently request that your office seek the immediate removal of Everclear 190-proof from Massachusetts retail shelves until Luxco complies with federal and state safety regulations. The Commonwealth has both the authority and a pressing duty to act swiftly to prevent further catastrophic injuries. Luxco's willful disregard for consumer safety turned a preventable hazard into a life-altering tragedy for Yvette Digan, demanding decisive action to protect the public.

If you have any questions or would like further information, please do not hesitate to contact me.

Respectfully,

Adam Clermont

# EXHIBIT 1



International Journal of
*Environmental Research and Public Health*



*Article*

# Ethanol and Methanol Burn Risks in the Home Environment

**Torgrim Log** [1,*] and **Asgjerd Litlere Moi** [2,3]

1   Department of Fire Safety and HSE Engineering, Glöð R&D, Western Norway University of Applied Sciences, 5528 Haugesund, Norway
2   Department of Health and Caring Sciences, Western Norway University of Applied Sciences, Inndalsveien 28, 5063 Bergen, Norway; Asgjerd.Litlere.Moi@hvl.no
3   Department of Plastic Surgery and Burn Center, Haukeland University Hospital, Jonas Lies vei 65, 5021 Bergen, Norway
*   Correspondence: torgrim.log@hvl.no; Tel.: +47-900-500-01

Received: 9 October 2018; Accepted: 23 October 2018; Published: 26 October 2018



**Abstract:** Biofuel heaters and fireplaces have in recent years been introduced for indoor and outdoor use. Due to their simplicity, they are usually equipped with few or no safety features. Worldwide, incidents resulting in major skin burn injury and long hospitalization periods have occurred when using such biofuel units. The present study analyses the characteristics of the liquids ethanol and methanol to get a scientific background for understanding related accidents. The comparably heavy vapors, especially from ethanol, may generate a pillow of combustible gas in the vicinity of the unit, particularly in quiescent indoor air conditions. It is also revealed that these fuels represent a potential severe risk, since the equilibrium vapor pressures are close to the stoichiometric fuel–air composition at normal room temperatures. Selected incidents were reviewed to understand the mechanisms involved when severe burns were received by the users. It turns out that the most severe incidents were related to refilling operations and included ignition of the fuel container vapor phase. When ignited, the container gas phase expansion propelled burning fuel from the bottle or container onto the user or other persons in the vicinity. Similar incidents involving refilling methanol for chemistry demonstrations and ethanol for endodontic (dentistry) treatment were also studied and it was shown that these accidents followed similar accident mechanisms. It may be concluded that the main contributors to burn risk are the near-stoichiometric vapor pressure of these liquids at room temperature and the close proximity of the fuel container to burning fuel. Research needs and possible technical barriers are suggested to reduce this risk for the future.

**Keywords:** biofuel fireplaces; biofuel heaters; methanol; ethanol; burn injuries

## 1. Introduction

Burn injuries are a concern worldwide, with approximately 265,000 burn related deaths every year. Burns are a common injury in all societies and may be a result of hot liquid or hot food spills, contact with hot surfaces, exposure to flames and hot gases, and thermal radiation. In Bangladesh, about 173,000 children under 18 suffer burn-related injuries yearly [1]. In the United States, yearly about half a million patients seek medical treatment at hospital emergency departments in addition to burn injuries treated at clinics, local health centers, and by private institutions [2]. In Norway, the number of fatalities in fires has been reduced significantly during the last 30–40 years. The number of burn victims is, however, according to Smolle et al. [3] not decreasing. Severe burn injuries may result in very long hospitalization periods, and in addition to the physical injury result in major psychological consequences such as body image dissatisfaction, self-harm, post-traumatic stress disorder, anxiety, and depression [4–6].

*Int. J. Environ. Res. Public Health* **2018**, *15*, 2379

Stimulating the healing of severe burns is difficult. Burn injury treatment therefore has received much research interest [7–9]. Improved knowledge about thermal skin injury development, the mechanisms involved, and possible injury-limiting measures are therefore much appreciated. Understanding the situations that may result in burn risks, limiting the likelihood of burns and/or consequences (burn severity), and the promotion of healing processes are therefore necessary measures.

Due to the many burn wounds experienced by the soldiers in the World War II, a systematic approach to studying thermal skin burns was initiated following the war. A series of seminal burn studies was then published in The American Journal of Pathology. These studies included heat transport to and through porcine skin [10], the importance of time and surface temperature in developing cutaneous burns [11], and the pathology and pathogenesis of cutaneous burns on pigs [8]. It was revealed that the degree of burns was dependent on both the temperature and exposure time. A threshold temperature for skin injury was suggested. Several researchers refer to temperature >44 °C for causing burns [12,13]. For hot liquids, others refer to 43 °C for the onset of skin injury [14]. Skin models have also been built for simulating "skin" temperatures during controlled heat flux exposure [15]. It is assumed that the injury develops linearly with time and exponentially with absolute temperature, i.e., an Arrhenius type of injury development.

Human skin pain receptors are located at approximately 0.1 mm depth and the pain temperature threshold is 44.8 °C [16,17]. This is above the assumed threshold temperatures for slow injury development. As burns usually involve much higher basal layer temperatures, the pain signal gives a suitable warning about excessive skin surface heating. In flame exposure scenarios, such as the exposure to the flames from burning biofuel, the skin heating is quite instantaneous, i.e., the damage develops even though the victim is warned of the ongoing process. This is especially dangerous when the victim wears very thin clothing, combustible clothing, or is exposed to burning liquids. Injuries caused by flames, from e.g., kerosene-fueled kitchens/stoves/heaters, represent the most common etiology of burns in adults needing treatment at specialized burn intensive care units [18].

About 20 years ago, bioethanol design fireplaces were introduced in the consumer market. These units typically release combustion products in the indoor air, raising concerns about indoor climate quality [19–21]. These units were generally advertised as being ecologically friendly and with a do-it-yourself installation. However, soon after their introduction, patients injured while handling these units showed up at local burn treatment units. One of the first studies regarding these burn injury incidents was an overview of this new recreational fire threat published by Kraemer et al. [22], who warned about an underestimated fire risk among the uninformed customers. Later on, several other research groups also reported that bioethanol design fireplaces were involved in severe burn injuries [23–27]. Many of these incidents were related to refilling operations, and it was reported that burning liquid fuel exposed persons several meters away. Similar incidents have also been reported in dentist offices [28] as well as in educational demonstrations [29] alerting the U.S. Chemical Safety Board (CSB, Washington, DC, USA) about accidents similar to the biofuel incidents [30].

The purpose of the present work is to analyze the hazardous conditions associated with biofuel fireplaces (and heaters) that may result in flame and/or burning fuel exposure to persons operating, and in the vicinity of, these units. Cases reported in the literature are reviewed and analyzed based on the physical and chemical properties of the fuels involved, i.e., methanol and ethanol. Similar incidents involving technically produced methylated liquid fuel products, for educational or professional purposes, are also included in the analysis. Fuel characteristics, such as the lower flammability limit (LFL) and upper flammability limit (UFL), ignition temperatures, and minimum ignition energy (MIE), as well as typical fuel container designs and refueling methods, are analyzed. Typical accident situations as well as fire/explosion risk perception regarding environmentally friendly fuels are discussed. The study is unique in analyzing the whole process, including technical issues regarding the heaters and fuel containers, the clothing when being exposed, and the environmentally friendly, but still very dangerous, fuels involved.

*Int. J. Environ. Res. Public Health* **2018**, *15*, 2379                                                                3 of 15

The motivation for publishing this work is to provide information about the possible accident mechanisms and the victims' risk perception prior to the incidents as a background for future work for preventing similar accidents. The paper starts with explaining challenges and research on burns and biofuel burns in particular (Section 1). Selected cases from the literature are presented in Section 2. Then the theory of ignition, combustion and heat transfer is presented as well as possible temperature and damage modeling (Section 3). Then, the results based on the previous sections are presented (Section 4) before the results are discussed (Section 5) followed by the conclusions (Section 6). A full analysis as presented in this paper has not been found elsewhere in the literature.

## 2. Physical, Chemical and Fire Related Properties of Methanol and Ethanol

### 2.1. Methanol and Ethanol Vapor Density Relative to Air

The molar masses of methanol and ethanol, $M_m$ and $M_e$, are 0.03204 kg/mol and 0.04607 g/mol, respectively. The molar mass of dry air, $M_a$, is 0.02897 g/mol. The density of gases, or gas mixtures, may be calculated by:

$$\rho = \frac{P \cdot M}{R \cdot T} \left( kg/m^3 \right),$$ (1)

where $P$ (101,325 Pa) is the ambient pressure, $M$ (kg/mol) is the molar mass of the actual gas or the average molar mass of the gas mixture, and $R$ (J/molK) is the universal gas constant. Since the density is proportional to the molar mass, Equation (1) demonstrates than the density of methanol, and especially ethanol, is higher than the air. A release of these gases may accumulate at lower levels if there is no mixing by e.g., wind or indoor air circulation.

### 2.2. Chemical Reaction with Air and Minimum Ignition Energy (MIE)

It is well known that methanol and ethanol are combustible liquids. For simplicity, assuming that the air consists of 21 mol% $O_2$ and 79 mol% $N_2$ (3.76 mol $N_2$ per mol $O_2$), the stoichiometric combustion reaction for methanol in air is given by:

$$CH_3OH + 1.5\,O_2 + 5.64\,N_2 = CO_2 + 2\,H_2O + 5.64\,N_2,$$ (2)

and for ethanol it is given by:

$$C_2H_5OH + 3\,O_2 + 11.28\,N_2 = 2\,CO_2 + 3\,H_2O + 11.28\,N_2,$$ (3)

with heat of combustion, $\Delta H_c$, 635 kJ/mol (19.83 MJ/kg) and 1232 kJ/mol (26.78 MJ/kg), respectively [31].

Generally, gas–air mixtures ignite most easily at, or close to, the stoichiometric concentrations. For methanol, it may be seen from Equation (1) that this corresponds to 1/8.14 = 12.29% and for ethanol this corresponds to 1/15.28 = 6.54%.

The heat required for igniting an air methanol or an air ethanol gas mixture at just above stoichiometric conditions, i.e., minimum ignition energy (MIE), is respectively 0.14 mJ and 0.28 mJ. This number is recorded for electrical sparks, but indicates that any burning flame will easily ignite such fuel–air mixtures. It is on the same level as the MIE for familiar flammable hydrocarbons such as propane, gasoline, etc.

Vapors of combustible liquids may also ignite when in contact with hot surfaces. The auto ignition temperature (AIT) is recorded for stoichiometric concentrations. The AITs for methanol and ethanol are 470 °C and 365 °C, respectively [31]. These liquids are therefore not as easily ignited by hot surfaces as long chained hydrocarbon, e.g., diesel with an AIT of 210 °C.

*Int. J. Environ. Res. Public Health* **2018**, *15*, 2379

### 2.3. Vapor Pressures and Flammability Limits in Air

The lower explosion limits (LEL) for methanol and ethanol in air are 6.7% and 3.3%, respectively [31]. The respective upper explosion limits are 36% and 19%. The hydrogen bonds between the molecule OH-groups makes these liquids harder to vaporize than their equivalent alkanes, giving heat of vaporization 1.1 MJ/kg and 0.84 MJ/kg, respectively. The vapor pressure of methanol and ethanol as a function of temperature may be expressed by [31]:

$$\log_{10}(p^o) \ = \ \left(-\frac{0.2185E}{T}\right) + F, \tag{4}$$

where $p^o$ (torr) is the equilibrium vapor pressure. For methanol, the values of the constants are: $E = 8978.8$ K and $F = 8.6398$, while for ethanol the constants are: $E = 9673.9$ K and $F = 8.8274$. The vapor pressure for these liquids is shown in Figure 1.



**Figure 1.** Vapor pressure of methanol and ethanol as a function of temperature (Equation (4)).

The vapor pressure normalized by the LEL is shown in Figure 2, i.e., where the LEL is represented by the dashed black line. Despite the differences in vapor pressure (Figure 1), these liquids display very similar behavior regarding flammability as a function of temperature. It may be seen from Figure 2 that an air vapor phase at temperatures from about 10–12 °C in equilibrium with any one of these liquids is highly flammable. This is reflected by flash points at around 10–12 °C.

It should be noted that bioethanol products sold to the consumers also contains 5–10% isopropanol and 1–5% butanone to prevent inadvertent consumption. Isopropanol, i.e., $CH_3CH(OH)CH_3$, has a flash point of 10 °C, i.e., very similar to methanol. Butanone, also known as methyl ethyl ketone (MEK) $CH_3C(O)CH_2CH_3$, has a flash point of −9 °C. There is also some water content. These "impurities" do not significantly change the flash point or the ignition properties of the liquid or vapor, but may give some luminosity to the flames compared to the pure alcohols. The main conclusion is that these liquids produce highly flammable vapors at normal room temperatures.

Dividing the stoichiometric concentrations for methanol and ethanol, i.e., 12.29% and 6.54%, by the LEL concentrations, i.e., 6.7% and 3.3%, gives 1.83 and 1.98, respectively. These values are marked in Figure 1 and it is seen that the stoichiometric compositions, i.e., where the combustion is most severe, corresponds to normal room temperatures.

The molar mass of a mixture of air dry air and methanol at e.g., C/LEL = 2, i.e., 13.4%, is 0.02938, which is 1.4% more than dry air. The molar mass of a mixture of air dry air and ethanol at e.g., C/LEL = 2, i.e., 6.6%, is 0.03010 which is 3.9% more than dry air. This means that these gas-air

*Int. J. Environ. Res. Public Health* **2018**, *15*, 2379

mixtures are a few % heavier than the air and may therefore drain from a container and create a combustible atmosphere close to the unit being refilled.



**Figure 2.** Vapor pressure (concentration, C) normalized by the respective lower flammability limit concentration (LFL) for methanol and ethanol as a function of temperature.

*2.4. Thermal Expansion When Ignited, Density and Fluid Dynamics*

In Equations (1) and (2), the number of gas molecules after combustion to the number of gas molecules prior to combustion is close to unity. Ignoring this minor change in number of molecules, the resulting immediate volume after ignition may then, in accordance to the ideal gas law, be estimated by the temperature change:

$$V_f \approx V_o \frac{T_f}{T_o}, \tag{5}$$

where $V_o$ (m$^3$) is the flammable vapor volume at ambient temperature, and $T_o$ (K) and $T_f$ (K) are the resulting flame temperatures after combustion, i.e., before any heat losses take place. Usually, the LFL corresponds to an adiabatic limiting temperature of 1500–1600 K [31]. At room temperature of 23 °C (295 K), this corresponds to a 5–6 fold volume expansion.

Assuming now that a half-full methanol or ethanol fuel container has been kept at a this temperature, the gas air mixture inside the container will soon approach a concentration close to C/LFL ≈ 2, i.e., well within the flammable region and close to the stoichiometric worst case conditions. If liquid is then poured onto an ignition source, e.g., a burning flame, the poured heavy gas mixture and the liquid will catch fire. It is highly probable that the flame will propagate into the container and ignite the internal combustible air fuel gas mixture. As the internal gas volume ignites, the resulting volume expansion displaces the liquid in the bottom of the container which is then violently released through the container opening. The reaction force is acting below the hands of the person pouring liquid. The container will then be accelerated and rotate around the horizontal axis releasing even more burning liquid. Flames and burning liquid propelled out from the container may expose persons in the vicinity and inflict severe burns. This sequence, as demonstrated by a fire fighter, is shown in Figure 3. A video showing a chemical tornado in a real-life demonstration going wrong at a museum in Reno, Nevada, injuring 13 children, reveals the hazards involved [30].

It should be noted that also with bottle shaped containers, the reaction force usually works below the hand wrist. Given a similar ignition as demonstrated in Figure 3, it is most likely that a 1-L bottle will release its content in a similar way, i.e., propelling the liquid fuel several meters and/or rotating onto the person holding the bottle. The ignition is fast and the resulting reaction forces are probably

*Int. J. Environ. Res. Public Health* **2018**, *15*, 2379

so strong that it is not possible for an unaware person to compensate the involved reaction forces. Victims exposed to this danger neither have time, nor possibility, to direct the dangerous burning liquid in a safe direction.



**Figure 3.** Demonstration of a 4 L ethanol container gas phase igniting at room temperature. The time sequence is about 0.5 s, i.e. (**a**) $t$ = 0.1 s, (**b**) $t$ = 0.2 s, (**c**) $t$ = 0.3 s, (**d**) $t$ = 0.4 s, (**e**) $t$ = 0.5 s, (**f**) $t$ = 0.6 s. (The Norwegian Directorate for Civil Protection (*DSB*) [32], reproduced with permission.).

### 2.5. The Fire Plume Behavior

While a flame as shown in Figure 3f develops, it is generally known that the hot flames and combustion gases will rise as a result of buoyancy forces due to their low density. Since the average molar mass of the gas mixture does not change much during the combustion, i.e., nitrogen is the dominating gas species, the relative change in density may be estimated by the temperature change. Based on Equation (1), the density after combustion may be calculated by:

$$\rho_c \approx \rho_o \frac{T_o}{T_f},\qquad(6)$$

where $T_o$ and $T_f$ are the ambient temperature and the flame temperature, respectively. The hot flames of low density start rising relative to the ambient cold and heavy air. The rising hot gas plume is associated with lower internal pressures resulting in air entrainment [33]. If, however, there is a solid object, i.e., a person, close to this rising plume, the plume cannot entrain the object and is instead pulling itself toward the object, i.e., toward the person [31]. A person in the proximity to an ignited gas

*Int. J. Environ. Res. Public Health* **2018**, *15*, 2379

cloud at low levels may therefore tend to cling to a person while the flames rise, resulting in extended heat exposure.

### 2.6. Burning Characteristics and Heat Flux to Exposed Objects

Liquid fuels, such as propane, butane, naphtha, petrol, kerosene, etc. all burn with a luminous flame resulting from glowing soot particles. Pure methanol and ethanol generally burn cleanly with a bluish flame color and very limited luminosity. In daylight, it may be difficult to spot such flames. Since water has a lower vapor pressure than methanol and ethanol, the liquid left in the burner unit will be enriched in water especially during the terminal phase of the combustion. This may result in very small and invisible flames during the last minutes before flame out. It may therefore be anticipated that tiny flames may persist in a seemingly extinguished bioethanol heater or fire place. The user may be unaware of these flames representing an ignition source during refueling.

The heat flux to an object exposed to hot flames may be expressed by:

$$\dot{Q}'' = h\left(T_f - T_s\right) + \phi \varepsilon_f \sigma T_f^4 \left(\text{W/m}^2\right), \tag{7}$$

where $h$ (W/m K) is the convective heat transfer coefficient, $T_f$ (K) is the temperature of the flame, $T_s$ (K) is the temperature of the exposed surface, $\phi$ is the view factor, $\varepsilon$ is the flame emissivity, and $\sigma$ ($5.67 \times 10^{-8}$ W/m$^2$ K$^4$) is the Stefan–Boltzmann constant. The emissivity of the flames is given by:

$$\varepsilon_f = 1 - \exp(-KL), \tag{8}$$

where $K$ (1/m) is the extinction coefficient and $L$ (m) is the optical flame thickness.

Methanol and ethanol burns very clean and is associated with very low extinction coefficients, typically about 0.37 [31]. This is an order of magnitude less than for other hydrocarbons. For small flame thicknesses, i.e., less than a foot, the emissivity as given by Equation (8) will be low and the heat transfer (Equation (7)) will be dominated by convection. Due to the lower radiant heat losses, i.e., low emissivity, the flame temperature is generally higher for the clean burning methanol and ethanol than for other hydrocarbons. Estimating the heat transfer coefficient may be difficult. However, the range of 20–30 W/m$^2$K may be appropriate for this type of natural convection [34]. Assuming a flame temperature of 1500 K and a skin temperature of 310 K, this typically results in a convective heat flux of $\approx$30 kW/m$^2$. Exposing naked skin to this heat flux quickly heats the skin surface, and the basal layer, to temperatures associated with burn injuries [35]. If combustible clothing textiles are exposed to flames of this heat flux or hit by burning liquid, the fabric is pilot-ignited almost instantaneously. Burning liquid in direct contact with the body may prolong the period of high heat fluxes and result in very severe burns.

Clean burning, with slightly bluish low-emissivity methanol and ethanol flames, makes small flames appear quite invisible (especially in daylight), representing a very characteristic threat. Being generally accustomed to luminous yellow and red flames, the users may be unaware of this invisible ignition source, which is characteristic of the ethanol and methanol flames.

### 3. Analysis of Selected Cases Described in the Literature

Several researchers have reported on skin burns as a result of accidents involving biofuel heaters [22–27]. During the literature study, some similar incidents were also found at educational demonstrations [29,30] and in dentist office treatments [28]. These involved methanol, which is in many ways a quite similar type of fuel, resulting in fire exposure and severe burns. Since these incidents shed light on similar risks as biofuel heater and fireplace accidents, they are included in the analysis.

*Int. J. Environ. Res. Public Health* **2018**, *15*, 2379

## 3.1. The Selected Biofuel Burn Case Studies

The study by Kraemer et al. [22] presents two cases of patients presented to their intensive care unit in Germany succeeding burns related to bioethanol fuel. The first patient was a 45-year-old female with 30% total body surface area (TBSA) deep partial- and full-thickness flame burns involving the face, neck, right chest, thighs, and both arms and hands. The accident took place when the patient should refill a still burning design fireplace with bioethanol. A flash fire then occurred and the flame instantly set the patient and her clothing on fire. The patient was admitted for 14 days to their intensive care unit. The duration of the in-hospital stay until discharge was 4 weeks [22]. This burn accident clearly demonstrates the dangers of trying to refill the bioethanol fireplace while it is still burning. It is, however, not clear whether this incident involved ignition of the vapor phase in the refilling bottle.

The second case described by Kraemer et al. [22] involved a 46-year-old female patient who also prepared to refill her fireplace with bioethanol while it was still burning. With the bottle lid removed, and the bottle in her hand, she tripped and sprayed liquid onto the burning fireplace. A flash fire followed, and resulted in an explosion of the internal bottle gas volume, exposing the patient to the fire. This patient suffered partial-thickness burns to the face, left arm, both hands, and the entire right leg, affecting a TBSA of 12%. The patient was admitted to their intensive care unit for 4 days. The duration of the in-hospital stay until discharge was 2 weeks [22]. This burn accident also demonstrates the dangers of approaching the fireplace for refilling while it was still burning. In this case it was also evident that the container vapor phase ignition contributed to the severity of the accident.

A study by Heald and Muller [24] reported on five burn victims in Australia in 2014. All incidents involved biofuel heaters and occurred while refueling the units. The first incident involved refueling a table top heater which was believed to have been extinguished for 20–30 min. During refilling, a large fireball and explosion occurred, which exposed two patients sitting opposite the table top heater. The first patient, a 28-year-old male, sustained 43% TBSA deep partial- and full-thickness burns to the face, neck, anterior and posterior trunk, arms, legs and left foot. The patient was in the intensive care unit for 26 days and was discharged from hospital after 57 days. A 22-year-old female was involved in the same incident. She sustained 31% TBSA deep partial- and full-thickness burns to the face, neck, anterior and posterior trunk, arms, and left leg. She was discharged from hospital after 78 days. This incident clearly demonstrates the dangers related to refueling a burning unit and clearly involved container vapor phase ignition and explosion.

The third patient described by Heald and Muller [24] experienced an explosion while refilling an outdoor biofuel heater. It was unclear whether the flame was extinguished or not, or whether the unit was still warm. The burn victim suffered 45.5% TBSA deep partial- and full-thickness burns to the face, neck, trunk, arms, hands, and legs and was discharged from hospital after 8 days. The fourth patient described by Heald and Muller [24] was refilling an indoor coffee table biofuel heater which, according to the patient, had been extinguished for at least 40 min. The fuel was methylated spirit, and when refilling, he and the fuel container he was holding were engulfed in flames. This burn victim suffered 10% TBSA superficial and deep partial-thickness burns to the face, neck, right arm and hand, and right leg. He was discharged after 6 days hospital admission. The fifth patient described by Heald and Muller [24] was sitting at an outdoor table 1.5 m away from a table top heater to be refilled after being extinguished for nearly 20 min. When the reservoir was refilled, a large fireball engulfed her. This burn victim suffered 4% TBSA superficial and deep partial-thickness burns to the face, neck, and left hand. She was discharged from hospital after 5 days. It is evident that for all these last three patients, the container vapor phase was involved in the combustion process. The fireballs described cannot be explained by the 5–6 fold gas phase expansion during combustion, i.e., expelled liquid must have been involved, as shown in Figure 4.

*Int. J. Environ. Res. Public Health* **2018**, *15*, 2379



**Figure 4.** Hazard communication pictograms for bioethanol (**left** fire risk, **right** health risk).

The study by Jaehn et al. [27] presents a case study regarding a 42-year-old female suffering severe burns after improper handling of liquid bioethanol. The patient suffered burns to 55% of the TBSA; 28% were deep partial- and full-thickness burns. The patient was in the intensive care unit for 7 weeks, with a 2-month hospital stay followed by several weeks of rehabilitation treatment for heavy burn injuries.

### 3.2. The Selected Biofuel Group Studies

The study by Van Zoonen et al. [23] presents a summary of two burn victims in the Netherlands in 2010 and 29 burn victims in 2011. First, three experts on bioethanol burners were questioned for framing non steering semi-instructed interviews of 14 bioethanol burn victims. They found that for eight of these incidents, bioethanol was misused as an accelerant for lighting a fire or a barbeque, and not for the intended use, i.e., bioethanol burners. They also found that all the interviewees had poor knowledge about the fuel and conditions of use. Many of the bioethanol bottles were half-full and internal gas phase explosion was concluded as a major contributor to the severe outcomes. In all the cases, flames were present when adding new bioethanol fuel. Van Zoonen et al. [23] concluded that the inexpensive and easily obtainable product may have created an image of an innocent product rather than a product that might result in severe burn incidents. This series of burn incidents clearly demonstrates the risks associated with the application of bioethanol when there is a flame in place. It was also evident that vapor phase ignition contributed to the severity of several of the accidents.

The study by Neubrech et al. [25] analyzed 12 patients (7 males and 5 females, 19 to 53 years of age) suffering bioethanol-associated burn injuries in Ludwigshafen, Germany, in the period 2010–2014. The incidents resulted in burns to an average of 17% (±9% SD) of the TBSA, commonly involving the face and the hands. The median length of hospitalization was 20 days (range 3 to 121). Intensive care unit treatment was required 1 to 64 days (median 4.5 days). In most cases, these injuries took place while starting the fire (3) or refilling (7), and happened even though the safety instructions were followed. The authors concluded that bioethanol-fueled fireplaces for home decoration represent potential sources for severe burns even when used as intended [25]. This study clearly demonstrates the dangers of both firing and refilling of the biofuel units. There are no details regarding involvement of the container or bottle vapor phase, but that is quite likely, at least for the most severe incidents.

### 3.3. The Selected Methanol Burn Incidents

The U.S. Chemical Safety and Hazard Investigation Board (CSB) usually engages in major industrial accidents. In special circumstances it may, however, also engage in civil sector incidents. For example, two accidents related to demonstrations for children (one at a school and one at a museum) involved methanol, and caught the attention of the CSB, who issued a safety bulletin for key lessons [30]. In both these cases, a burning flame ignited the vapor phase of a methanol container during refilling. In the first incident, an internal container gas phase explosion propelled burning methanol and caused burns to children at a school chemistry demonstration. In the second incident, a similar situation resulted in burns for 13 children during a chemical demonstration at a museum. The CSB stressed several safety measures in order to prevent similar incidents in the future [30]. A cellular phone video clearly demonstrates the severity of the accident [29]. Both incidents involved an internal container gas volume explosion propelling burning liquid at the children.

*Int. J. Environ. Res. Public Health* **2018**, *15*, 2379

The study by Sohal et al. [28] presents a case study of a rare burn mishap involving a 46-year-old female during endodontic treatment. The incident happened during obturation with Gutta–Percha (GP). Whilst condensing the GP, the assistant was instructed to add methylated spirit (methanol) into the gallipot to keep the flame burning. The gallipot burner was about 2 feet from the patient while the methanol was added. An explosion knocked the gallipot burner onto the patient, inflicting burns to the right cheek, right lateral neck, and on the upper right arm, causing a second-degree burn injury covering 9% of the TBSA. She was discharged from the hospital after two weeks with minimum esthetic impairment. In order to get the explosion force moving the galipot as described in this case, the internal bottle gas volume must have been involved in the combustion process.

### 3.4. Summary of the Studied Burn Injuries

In most of the cases studied, ignition of the container gas phase was an important part of the accident mechanism. This may happen only when there is an ignition source, which in most, if not all, cases were a persistent burning flame. Such a flame may, as explained in Section 2, be quite invisible, especially when close to the point of extinction. Some few cases were, however, also related to the first time the unit was set alight [25]. These may be due to heavy methanol gas being spilled from the container and ignited when the intention was to ignite the burner.

Guillaume et al. [26] highlight two families of risks related to biofuel heaters, i.e., heat injuries during use or refill and the effect on air quality. They recorded heat release rate and tank temperatures during use as well as after extinction. It was noted that the highest tank temperatures, reaching above 100 °C, were recorded well after the flames had died out.

Since ethanol has higher molecular mass than air, 46.07 g/mol versus 28.97 g/mol, the ethanol vapor produced will, regardless of being warmer than the ambient air, be heavy and therefore not rise buoyantly. Computational fluid dynamics (CFD) modeling was used by Guillaume et al. [26] to model the flammable vapor cloud during refilling, clearly demonstrating that for the particular unit investigated, a person refilling the unit was at severe risk of burns if refilling and reigniting the unit when still warm. If ignited, the produced vapor cloud may severely burn the person operating the unit. There is also a risk that he/she will not remove the refilling container, which may be involved in a fire scenario.

## 4. Possible Risk Reducing Measures

### 4.1. Heat Fluxes Associated with Burning Liquid on Fabric

In general, there is very limited research available regarding spills of flammable liquids on clothing regarding spilled methanol or ethanol. This has, however, been studied for spills on carpets by Ma et al. [36]. Studies of spills on vertical fabric and heat fluxes to a body mannequin could reveal important information about the heat transfer and possible preventive measures such as prompt removal of the soaked fabric, etc.

### 4.2. General Safety Education

Professionals may properly understand hazard pictograms for dangerous chemicals. However, based on the standard hazard pictograms for bioethanol (and methanol), as depicted in Figure 4, lay people may probably not understand that the liquid under quite normal circumstances represents an explosion threat.

General safety courses with emphasis on flammable liquids may help preventing future accidents. In such teaching, one may possibly include videos showing real accidents, such as the one in Reno, Nevada, resulting in 13 children with burn injuries [29]. Video demonstrations, such as the one shared by The Norwegian National Directorate of Civil Protection [32], may also be valuable. It is

generally recommended that such videos should be backed up by scientific explanations tailored to the audience at hand.

As the units considered in the present study are used by nonprofessionals, it may, however, be difficult to reach out to the new customers as well as ensuring that the risk is still understood and remembered when using the unit several years later. A search for robust technical barriers should be compulsory.

### 4.3. Possible Technical Barriers

A good safety measure would be to prevent ignition of gas or liquid during refilling operations. There may be several ways of achieving this. Some bio heater and fireplace units are equipped with a thermostat giving a sound when sufficiently cold to be refueled. However, the unit may not burn as intended if put on a sloping surface or when distorted/buckled by previous heat exposure. Small flames may then persist in parts of the unit, i.e., not heating the thermostat. The thermostat may therefore not be recognized as robust barrier [26].

It is well known in the safety community that flames cannot travel through small openings. The minimum distance, which is called minimum experimental safe gap (MESG), is dependent on the gas type and the gas air ratio. The MESG is smallest for concentrations of gas slightly richer than the stoichiometric ratio. For methanol and ethanol, the MESG is 0.92 mm and 0.89 mm, respectively [37].

Equipping the refilling bottle or container with a strainer with openings smaller than the MESG would prevent the propagation of an external flame into the container gas phase. Prolonged heating of a strainer may, at least in the theory, result in flame propagation through the strainer. A deeper slid, e.g., X-shaped, to support fluid flow out of the container and air ingress into the container, may be a safer alternative. This would also limit the flow of heavy gas out of the container while filling or refilling fuel. This technical barrier could indeed limit most of the severe accidents related to these biofuel heaters studied in the present work.

### 4.4. Quickly Cooling Heat Exposed Skin

If the skin has been exposed to flames or burning liquid, it is well known among safety and health worker professionals that prompt cooling of the skin by tempered water may limit the burn consequences significantly [8,14,34,38,39]. Cooling the burned skin with tempered water is generally beneficial for up to 20 min, while cooling of the patient as such should be avoided [39]. The best way to achieve prompt cooling would be to strengthen the general first aid education by including prompt cooling of any overheated skin, e.g., flame exposure, liquid scalding, food scalding, contact with hot objects, etc.

## 5. Discussion

In the present study, the physical and chemical characteristics of methanol and ethanol (bioethanol) have been outlined. It has been demonstrated that the vapor pressures of these liquids at normal room temperatures create highly combustible gas-air mixtures when in equilibrium with the liquid phase. At 22–25 °C, the fuel-to-air ratio is very close to the stoichiometric composition. This is also the most easily ignited composition, either by static electricity or an open flame, and results in the worst case scenarios regarding explosion strength.

The ethanol-air mixture is heavier than air and may pour out of a container and result in a combustible gas air pillow which may ignite when trying to light a biofuel fireplace or heater unit. The gas is invisible, and the operator may probably not be aware of this situation. It has been shown that the container or bottle gas phase may likely become ignited when refilling a biofuel fireplace or biofuel heater which is still burning.

It has been outlined why such fuels may burn with a flame that is quite invisible in day light, especially the last period before the flame self-extinguishes. This persistent flame, thought by the user to be extinguished, represents a very dangerous ignition source, especially when refilling the unit.

*Int. J. Environ. Res. Public Health* **2018**, *15*, 2379                                    12 of 15

It may quite likely ignite the vapors being poured out of the refilling container or bottle. During this process, it is quite likely that explosive container gas volume will be ignited, resulting in violent explosion propelling burning liquid out of the container or bottle. The operator, as well as people several meters away, may then be engulfed in flames and soaked with burning liquid exposing naked skin or setting the clothing fabric on fire.

A number of severe bioethanol burn incidents are presented in the literature [22,24,26–28] and two group studies [23,25] were analyzed based on the outlined possible accident mechanisms. Three cases involving very similar, and severe burn, incidents with methanol were also included [28–30]. Two of the methanol burn incidents injured several children at science demonstrations. For all these burn incidents, it turned out that the most severe accidents involved ignition of the container gas phase resulting in a violent explosion expelling burning liquid from the container. Since the auto ignition temperatures (AITs) of methanol and ethanol are quite high, i.e., respectively 470 °C and 365 °C, respectively, it is not likely that hot surfaces without a flame represented the ignition source. A persistent flame, unnoticed by the operator, was likely the ignition source in most, if not all, of these incidents. A minority of the incidents represented ignition of the vapor cloud that had been poured from the liquid container or bottle without involving the container or the bottle.

Based on the knowledge that flames cannot travel though small openings, it is suggested to develop bottles and containers with openings less than the maximum experimental safe gap (MESG). Openings less than about 0.9 mm would ensure that no flame could propagate into the container to involve the internal gas phase. Such a restriction may also limit the amount of heavy gas air mixture being poured out of the container while filling or refilling a bio heater or fireplace unit. It is suggested that research is performed on this issue to develop safer containers and bottles, and safer refilling possibilities preventing extensive evaporation if refilling a still warm unit.

Van Zoonen et al. [23] discovered through interviews with burn victims that they a poor understanding of the hazards involved. The fuel is easily available to a low cost and it does have an odor associated with typically highly flammable long-chained non-oxidized hydrocarbons, e.g., gasoline or naphtha. In may therefore not be associated with any recognizable danger. In order to mitigate this, safety courses may be updated with videos [29,32] and information brochures explaining the risks associated with bioethanol and methanol. It is also necessary to focus on mitigating measures, such as prompt and cooling if a burn incident has happened. In order to develop efficient safety courses, it is therefore recommended to analyze the present level of risk understanding in the public in order to find at which level the teaching should start.

The heat exposure may also be a result of hot liquid scalding in combination with flame exposure, which has been expensively researched for hot beverage and hot food spills. The injury mechanisms may therefore be quite complicated as both flame exposure and hot liquid scalding due to wetted fabric contribute to the resulting heat injury. Promptly removing clothing is therefore vital to get the overheated skin cooled by tempered water [8,34,39–41].

The bottles and containers are marked as flammable and with a health risk. The pictograms indicating the hazards of methanol and bioethanol fuels do not, however, give any indication of an explosion risk. This risk may be understood by professionals. It may, however, be questioned whether communicating flammability and health risk is sufficient for the public to gain the proper understanding of the risks involved when handling these liquids.

Recently, infrared (IR) cameras have been developed for finding gas leakages in e.g., the oil and gas industry [42]. For future research on methanol and ethanol burn incidents, such equipment, which detects the C–H bonds in the methane and long-chained hydrocarbon molecules, may be tested for methanol and ethanol. It is quite likely that doing research with this equipment may reveal and make visible some of the mechanisms outlined in the present work. It is suggested that such research be initiated to gain understanding as well as to produce material for better public safety courses.

*Int. J. Environ. Res. Public Health* **2018**, *15*, 2379

13 of 15

It is important to be aware of accidents related to dislocation of the units, i.e., units detaching from wall mounts, being interfered with, or falling from tables. These fireplaces/heaters can be dangerous for children who may experience large-TBSA burns even when exposed to comparably small fires.

## 6. Conclusions

In the present study, the possible mechanisms leading to accidental fires involving methanol and ethanol/bioethanol liquid and vapor phase have been outlined. Burn accidents previously described in the literature have been analyzed based on the outlined accident mechanisms. It turns out that equilibrium vapor pressure close to the stoichiometric fuel–air composition represents a very severe risk when handling these liquids. Some accidents have been related to the ethanol/bioethanol fuel–air mixture being poured out of the container, resulting in a combustible cloud accumulating close to the unit to be filled. Similar clouds have also been accumulated when refilling a warm unit. When approaching the unit for ignition, this vapor cloud ignites and engulfs the operator in flames, typically on the chest, face, and arms.

Ignition of the vapor phase resulting in an internal explosion expelling burning liquid resulted in the most of the accidents and generally resulted in the most severe burns. Not only the operators but also people several meters away were exposed to flames and soaked in burning fuel. The ignition source was in most, if not all these burn incidents, most likely a small invisible flame from previous use of the unit.

By understanding the mechanisms involved and analyzing accidents, several risk-reducing measures are suggested for further research in order to reduce this very severe burn risk.

**Author Contributions:** Conceptualization, T.L.; Methodology, Validation, Formal Analysis, Investigation, Resources, T.L. and A.L.M.; Data Curation, A.L.M.; Writing—Original Draft Preparation, T.L.; Writing—Review and Editing, T.L. and A.L.M.; Visualization, T.L.; Project Administration and Funding Acquisition, T.L.

**Funding:** This study was partly funded by the Norwegian Fire Safety Association burn prevention program "*Sky ilden*" (In English, "Shy the fire").

**Acknowledgments:** The authors appreciate valuable discussions with Kenneth Wangen, of the Norwegian Burn Victims Association, and Tor Erik Skaar, of the Norwegian Fire Safety Association. The openness of the burn victims consulted in the present work is also appreciated. The anonymous reviewers' suggestions for improvements from are much appreciated.

**Conflicts of Interest:** The authors declare no conflict of interest.

## References

1. He, S.; Alonge, O.; Agrawal, P.; Sharmin, S.; Islam, I.; Mashreky, S.R.; Arifeen, S.E. Epidemiology of burns in rural Bangladesh: An update. *Int. J. Environ. Res. Public Health* **2017**. [CrossRef] [PubMed]
2. Burn Incidence and Treatment in the United States: 2016. Available online: http://www.ameriburn.org/resources_factsheet.php (accessed on 30 September 2017).
3. Smolle, C.; Cambiaso-Daniel, J.; Forbes, A.A.; Wurzer, P.; Hundeshagen, G.; Branski, L.K.; Huss, F.; Kamolz, L.P. Recent trends in burn epidemiology worldwide: A systematic review. *Burns* **2017**, *43*, 249–257. [CrossRef] [PubMed]
4. Esselman, P.C.; Thombs, B.D.; Magyar-Russell, G.; Fauerbach, J.A. Burn rehabilitation: State of the science. *Am. J. Phys. Med. Rehab.* **2006**, *85*, 383–413. [CrossRef] [PubMed]
5. Weast, R.C. (Ed.) *Handbook of Chemistry and Physics*, 54th ed.; Chemical Rubber Company: Cleveland, OH, USA, 1974.
6. Mason, S.A.; Nathens, A.B.; Byrne, J.P.; Ellis, J.; Fowler, R.A.; Gonzalez, A.; Karanicolas, P.J.; Moineddin, R.; Jeschke, M.G. Association between Burn Injury and Mental Illness among Burn Survivors: A Population-Based, Self-Matched, Longitudinal Cohort Study. *J. Am. Coll. Surg.* **2017**, *225*, 516–524. [CrossRef] [PubMed]
7. Jeschke, M.G.; Finnerty, C.C.; Shahrokhi, S.; Branski, L.K.; Dibildox, M. Wound Coverage Technologies in Burn Care: Novel Techniques. *J. Burn Care Res.* **2013**, *34*, 612–620. [CrossRef] [PubMed]

*Int. J. Environ. Res. Public Health* **2018**, *15*, 2379

8.  Harish, V.; Tiwari, N.; Fisher, O.M.; Li, Z.; Maitz, P.K.M. First aid improves clinical outcomes in burn injuries: Evidence from a cohort study of 4918 patients. *Burns* **2018**, 7. [CrossRef] [PubMed]

9.  Kearney, L.; Francis, E.C.; Clover, A.J.P. New technologies in global burn care—A review of recent advances. *Int. J. Burn Trauma* **2018**, *8*, 77–87.

10. Henriques, F.C.; Moritz, A.R. Studies of thermal injury, I: The conduction of heat to and through skin and the temperatures attained therein: A theoretical and an experimental investigation. *Am. J. Pathol.* **1947**, *23*, 530–549. [PubMed]

11. Moritz, A.; Henriques, F.C. Studies of thermal injury, II: The relative importance of time and surface temperature in the causation of cutaneous burns. *Am. J. Pathol.* **1947**, *23*, 695–720. [PubMed]

12. Moritz, A.R. Studies of thermal injury, III: The pathology and pathogenesis of cutaneous burns: An experimental study. *Am. J. Pathol.* **1947**, *23*, 915–941. [PubMed]

13. Fu, M.; Weng, W.G.; Yuan, H.Y. Numerical simulation of the effects of blood perfusion, water diffusion, and vaporization on the skin temperature and burn injuries. *Numer. Heat Transfer Part A Appl.* **2014**, *65*, 1187–1203. [CrossRef]

14. Tobalem, M.; Harder, Y.; Tschanz, E.; Speidel, V.; Pittet-Cuénod, B.; Wettstein, R. First-aid with warm water delays burn progression and increases skin survival. *J. Plast. Reconstr. Aesthet. Surg.* **2013**, *66*, 260–266. [CrossRef] [PubMed]

15. Johnson, N.N.; Abraham, J.P.; Helgeson, Z.I.; Minkowycz, W.J.; Sparrow, E.M. An archive of skin-layer thicknesses and properties and calculations of scald burns with comparisons to experimental observations. *J. Therm. Sci. Eng. Appl.* **2011**. [CrossRef]

16. Monds, J.R.; McDonald, A.G. Determination of skin temperature distribution and heat flux during simulated fires using Green's functions over finite-length scales. *Appl. Therm. Eng.* **2013**, *50*, 593–603. [CrossRef]

17. Buettner, K. Effects of extreme heat and cold on human skin, II. Surface temperature, pain and heat conductivity in experiments with radiant heat. *J. Appl. Physiol.* **1951**, *3*, 703–713. [CrossRef] [PubMed]

18. Moi, A.L.; Nilsen, R.M. Pathways leading to self-perceived general health and overall quality of life in burned adults. *Burns* **2012**, *38*, 1157–1164. [CrossRef] [PubMed]

19. Scovronick, N.; Wilkinson, P. Health impacts of liquid biofuel production and use: A review. *Glob. Environ. Change* **2014**, *24*, 155–164. [CrossRef]

20. Schripp, T.; Salthammer, T.; Wientzek, S.; Wensing, M. Chamber Studies on Nonvented Decorative Fireplaces Using Liquid or Gelled Ethanol Fuel. *Environ. Sci Technol.* **2014**, *48*, 3583–3590. [CrossRef] [PubMed]

21. Nozza, E.; Capelli, L.; Eusebio, L.; Derudi, M.; Nano, G.; Del Rosso, R.; Sironi, S. The role of bioethanol flueless fireplaces on indoor air quality: Focus on odour emissions. *Build. Environ.* **2016**, *98*, 98–106. [CrossRef]

22. Kraemer, R.; Knobloch, K.; Lorenzen, J.; Breuing, K.H.; Koennecker, S.; Rennekampff, H.O.; Vogt, P.M. Severe Burn Injuries Caused by Bioethanol-Design Fireplaces-An Overview on Recreational Fire Threats. *J. Burn Care Res.* **2011**, *32*, 173–177. [CrossRef] [PubMed]

23. Van Zoonen, E.; van Eck, I.; van Baar, M. The cause of burn accidents by the use of bioethanol. *Inj. Prev.* **2016**, *22*, 416. [CrossRef]

24. Heald, A.; Muller, M. Severe burns due to biofuel heater injury: A case series. *Burns* **2016**, *42*, E13–E17. [CrossRef] [PubMed]

25. Neubrech, F.; Kiefer, J.; Schmidt, V.J.; Bigdeli, A.K.; Hernekamp, J.F.; Kremer, T.; Kneser, U.; Radu, C.A. Domestic bioethanol-fireplaces—A new source of severe burn accidents. *Burns* **2016**, *42*, 209–214. [CrossRef] [PubMed]

26. Guillaume, E.; Loferme-Pedespan, N.; Duclerget-Baudequin, A.; Raguideau, A.; Fulton, R.; Lieval, L. Ethanol fireplaces: Safety matters. *Saf. Sci.* **2013**, *57*, 243–253. [CrossRef]

27. Jaehn, T.; Muller, L.K.; Hauer, N.; Blank, B.; Kaiser, M.; Reichert, B. Secondary plastic and reconstructive measures following deep-dermal burn injuries. Negligent use of bioethanol. *Unfallchirurg* **2017**, *120*, 167–170. [CrossRef] [PubMed]

28. Sohal, K.S.; Kalyanyama, M.B.; Owibingire, S.S. Burn Injury—A Rare Mishap of Endodontic Treatment: A Case Report. *Int. J. Case Rep. Short Rev.* **2018**, *4*, 24–26.

29. A Chemical Tornados Demonstration, Reno, Nevada, USA, 5 September 2014. Available online: https://www.nbcnews.com/video/video-shows-dangerous-accident-at-childrens-museum-325405251630 (accessed on 8 July 2018).

*Int. J. Environ. Res. Public Health* **2018**, *15*, 2379

30. CSB. Key Lessons for Preventing Incidents from Flammable Chemicals in Educational Demonstrations, U.S. Chemical Safety and Hazard Investigation Board. Safety Bulletin. 2014, 14p. Available online: https://www.csb.gov/key-lessons-for-preventing-incidents-from-flammable-chemicals-in-educational-demonstrations/ (accessed on 11 July 2018).

31. Drysdale, D. *An Introduction to Fire Dynamics*, 2nd ed.; John Wiley: New York, NY, USA, 1999; p. 446. ISBN 0-471-97291-6.

32. DSB (Norwegian Directorate for Civil Protection). 2012. Available online: www.youtube.com/watch?v=BWImkef48gs (accessed on 10 July 2018).

33. Log, T.; Heskestad, G. Temperatures of Restricted Turbulent Fire Plumes. *Fire Saf. J.* **1998**, *31*, 101–115. [CrossRef]

34. Log, T. Skin temperatures of a pre-cooled wet person exposed to engulfing flames. *Fire Saf. J.* **2017**, *89*, 1–6. [CrossRef]

35. Log, T. Modeling Skin Injury from Hot Rice Porridge Spills. *Int. J. Environ. Res. Public Health* **2018**, *15*, 808. [CrossRef] [PubMed]

36. Ma, T.; Olenick, S.M.; Klassen, M.S.; Roby, R.J.; Torero, J.L. Burning Rate of Liquid Fuel on Carpet (Porous Media). *Fire Technol.* **2004**, *40*, 227–246. [CrossRef]

37. Groh, H. *Explosion Protection*, 1st ed.; Elsevier Butterworth-Heinemann: Oxford, MA, USA, 2004; p. 14. ISBN 0 7506 4777 9.

38. Bourdon, R.T.; Nelson-Cheeseman, B.B.; Abraham, J.P. Prediction, identification, and initial treatment guide for scald injuries. *Aust. J. Emerg. Crit. Care Med.* **2016**, *3*, 1043.

39. Wood, F.M.; Phillips, M.; Jovic, T.; Cassidy, J.T.; Cameron, P.; Edgar, D.W. Water First Aid Is Beneficial In Humans Post Burn: Evidence from a Bi-National Cohort Study. *PLoS ONE* **2016**, *11*, e0147259. [CrossRef] [PubMed]

40. Log, T. Modeling Skin Injury from Hot Spills on Clothing. *Int. J. Environ. Res. Public Health* **2017**, *14*, 1374. [CrossRef] [PubMed]

41. Lau, E.Y.K; Tam, Y.-Y.M.; Chiu, T.W. Importance of clothing removal in scalds. *Hong Kong Med. J.* **2016**, *22*, 152–157. [CrossRef] [PubMed]

42. Ravikumar, A.P.; Wang, J.; Brandt, A.R. Are Optical Gas Imaging Technologies Effective for Methane Leak Detection? *Environ. Sci. Technol.* **2017**, *51*, 718–724. [CrossRef] [PubMed]

 © 2018 by the authors. Licensee MDPI, Basel, Switzerland. This article is an open access article distributed under the terms and conditions of the Creative Commons Attribution (CC BY) license (http://creativecommons.org/licenses/by/4.0/).

# EXHIBIT 3

Outlook

## Request for ABCC's Position on Everclear's Dangers

**From** Adam Clermont <aclermont@attorneyapc.com>

**Date** Sun 6/29/2025 7:33 PM

**To**  Gill, Kyle E. (TRE) <kyle.e.gill@tre.state.ma.us>

**Cc**  McCormick, Katherine G. (TRE) <katherine.g.mccormick@tre.state.ma.us>

Dear Counsel,

As you know, on May 13, 2025, a catastrophic fire fueled by Everclear, a 190-proof alcohol with a flash point below room temperature, severely injured Yvette, a 22-year-old law student from Hong Kong, at a Worcester Polytechnic Institute fraternity event. As counsel for Yvette, I am preparing to file a complaint and seek a preliminary injunction to restrict the distribution of this dangerously flammable product in Massachusetts. I write to fulfill my obligations to my client and the court by respectfully requesting the Alcoholic Beverages Control Commission's position on this matter.

The Court will likely inquire whether this issue falls within the ABCC's purview, whether it has been reported, and, given Everclear's evident risks, why no regulatory action has been taken. The product's volatility, capable of igniting with a single spark, has left a trail of devastation, with Yvette's scars, physical and emotional, bearing witness to its dangers. My client's case, alongside a growing public outcry, underscores the urgent need to address Everclear's availability, particularly on college campuses where its misuse is all too common.

To ensure a transparent and informed judicial process, I respectfully ask the ABCC to state its position on Everclear's risks and its regulatory status. Your insight will clarify whether the Commission views this product as a public safety concern warranting action, especially in light of its role in preventable tragedies. This request is not an accusation but merely an effort to insure that the Court if fully informed in what surely will be a most unprecedented request.

Thank you in advance for your anticipated cooperation.

Adam Clermont
APC Law
6 Liberty Square, PMB 226
Boston, MA
Phone: (413) 841-1270
Email: aclermont@attorneyapc.com

Confidentiality Notice: This email and any attachments may contain confidential or privileged information. If you are not the intended recipient, please delete the email and notify the sender immediately.

# EXHIBIT 4



**Adam P. Clermont, Esq.**

June 26, 2025

**VIA CERTIFIED MAIL NO.: 9589 0710 5270 1156 1379 13**

Luxco, Inc.
5050 Kemper Avenue
Saint Louis, MO 63139

## 30-DAY WRITTEN DEMAND FOR RELIEF PURSUANT TO M.G.L. c. 93A, THE MASSACHUSETTS CONSUMER PROTECTION ACT

Dear Sir or Madam:

I, along with Jeremia Pollard of Hannon Lerner, represent Ms. Yvette Digan, a 22-year-old law student, singer, and musician raised in Hong Kong, who suffered catastrophic burn injuries on May 13, 2025, when Luxco, Inc.'s Everclear 190-proof grain alcohol ignited and formed an explosive fireball at a social gathering in Worcester, Massachusetts. The explosion caused second- and third-degree burns over 30% of her body. After spending a month in intensive care at Massachusetts General Hospital and undergoing multiple surgeries, Yvette now faces permanent disfigurement, loss of her musical abilities, and extensive rehabilitation as a direct result of Luxco's recklessness.

This preventable tragedy stems from Everclear's unique hazards: its 95% ethanol content forms explosive vapor concentrations at room temperature, unlike ordinary vodka (40% ethanol). Luxco knew of this danger, as evidenced by its pre-2018 warnings on Everclear bottles, along with ongoing warnings on identical products (Golden Grain, Crystal Clear) it also manufactures. Yet, in 2018, Luxco engaged in unfair and deceptive acts by removing these prominent warnings only from the Everclear bottles and marketing Everclear as a multi-purpose product safe for use near stoves and open flames, resulting in an inevitable explosion that seriously injured Yvette.

Accordingly, pursuant to M.G.L. c. 93A, we demand full compensation for Yvette's catastrophic injuries, medical expenses, pain and suffering, permanent disfigurement, loss of her musical abilities, and related damages caused by Luxco's unfair and deceptive practices in removing warnings and marketing Everclear as safe for use around open flames, as detailed below. We request a response within 30 days to resolve this matter or we will pursue legal action, including treble damages and attorney's fees under c. 93A.

6 LIBERTY SQUARE
PMB 226
BOSTON, MA 02109
TEL: (413) 841-1270
HONG KONG TEL: +852 9086 3191
EMAIL: ACLERMONT@ATTORNEYAPC.COM

## Yvette Digan

Yvette Digan, a 22-year-old law student, was thriving academically and artistically before the May 13 incident, embodying determination and talent that made her exceptional among her peers.

In Hong Kong, Yvette maintained a 3.2 GPA while pursuing her Bachelor of Laws at the City University of Hong Kong (CityU), where she was selected to participate in a prestigious summer exchange program with Boston University, a testament to her academic excellence. This opportunity represented a significant milestone in her educational journey and career aspirations. Yvette had arrived in the United States just days before the accident, filled with excitement about immersing herself in a new academic environment and culture.

Beyond her formal education, Yvette developed impressive professional experience through internships and positions that demonstrated her versatility and work ethic, including roles in communication, design, and administration. What truly distinguished Yvette, however, was her remarkable musical talent. A gifted singer and musician, she carefully balanced her legal studies with her passion for music, which was not merely a hobby but a fundamental part of her identity and future aspirations.

Her parents describe her as "enthusiastic, cheerful, and full of hope," a young woman "full of dreams" who worked diligently to "harness her talent in singing and music while studying hard to finish her law degree in flying colors." This summer exchange program was meant to be one step closer to achieving her academic goals, but instead, mere days after her arrival in Massachusetts, she became the victim of a preventable tragedy.

The accident on May 13, 2025, cruelly interrupted this trajectory of achievement and promise. The severe burns covering 30% of her body have not only caused immediate physical trauma but have fundamentally altered the course of her life. As we will detail in subsequent sections, the injuries Yvette sustained due to Luxco's recklessness have devastated her ability to pursue her musical passion, continue her education without interruption, and maintain the confidence and emotional well-being that were hallmarks of her character.

## Everclear's Unique Danger

Everclear is an ultra-high alcohol content grain spirit bottled by Luxco, accounting for over 80% of all grain alcohol sales in the United States. Unlike conventional spirits, such as vodka, whisky or rum, that typically contain 40% ethanol (80-proof), Everclear contains 95% ethanol (190-proof), making it one of the most potent distilled alcoholic beverages legally available for consumer purchase in the United States. Its strength places it in a fundamentally different risk category than ordinary consumer alcoholic beverages, with properties more closely resembling laboratory-grade ethanol or industrial solvents than those of typical 80-proof spirits. Indeed, 95% ethanol is available for purchase from a number of chemical supply companies specifically for use as an industrial solvent.

Yvette's catastrophic injuries were the direct result of fundamental chemical properties unique to high-proof alcoholic spirits like Everclear. According to the standard Safety Data

Sheet (SDS) for 95% ethanol (**Exhibit 1**), Everclear presents exceptional and unique fire hazards when compared to lower proof spirits:

1. Flash Point: 57.2°F (14.0°C)[1] - This means the liquid produces ignitable vapors at room temperature, making it extraordinarily dangerous near any ignition source.

2. Hazard Classification: "Category 2 Flammable Liquid" with the signal word "**DANGER**"- The highest hazard classification for consumer products.

3. Flammability Limits: Lower 3.3%, Upper 19% - This wide flammable range means vapors can ignite across a broad spectrum of concentrations.

4. Auto-ignition Temperature: 685.4°F (363°C) - The temperature at which the product will spontaneously ignite without an external flame source.

5. Specific Hazards: The SDS explicitly states "***Vapors may form explosive mixtures with air***" and "***Vapors may travel considerable distance to a source of ignition and flash back***" (emphasis added).

The extreme danger of Everclear is starkly evident when compared to standard 80-proof spirits. An 80-proof spirit (40% ethanol, 60% water) burns with a relatively low-intensity flame when exposed to an open fire, as its high water content acts as a natural fire suppressant, reducing flame spread, flare, intensity and temperature. In contrast, Everclear (95% ethanol, 5% water) behaves like industrial solvents or commercial fire accelerants due to its minimal water content. Under real-world conditions, 95% ethanol flames typically reach temperatures of 800–1000°C (1472–1832°F), significantly hotter than the cooler flames of lower-proof alcohols, which burn at cooler temperatures due to their high water content. Moreover, while 80-proof spirits pose minimal risk of vapor ignition and explosion when poured on an open fire due to their higher flash point and water content, Everclear's low flashpoint (14.0°C/57.2°F) allows its vapors to ignite readily, causing explosive combustion.

High-proof spirits like Everclear (95% ethanol) pose unique, non-obvious dangers compared to typical 40% ethanol spirits, including invisible flames, flame jetting when ignited in a container, rapid flame spread and explosive combustion. Peer-reviewed research published by Log and Moi in the *International Journal of Environmental Research and Public Health* (2018) (**Exhibit 2)** explains what happens once ethanol poured from a container ignites: "If liquid is then poured onto an ignition source, e.g., a burning flame, the poured heavy gas mixture and the liquid will catch fire. It is highly probable that the flame will propagate into the container and ignite the internal combustible air fuel gas mixture. As the internal gas volume ignites, the resulting volume expansion displaces the liquid in the bottom of the container which is then violently released through the container opening."

---

[1] It should be noted that the flashpoint of a 95% ethanol solution may vary by a few degrees but ranges between 14-17°C. According to weather data, the temperature in Worcester at the time of the accident was approximately 16°C.



**Demonstration of Ethanol Fire Hazard, Illustrating the Ignition Mechanism**

This precise ignition sequence demonstrated above occurred during the May 13, 2025 incident, directly inflicting the catastrophic burns sustained by Yvette. The scientific basis for these hazards, flash point, flame jetting, flammability limits, and explosive combustion is well established and easily meets Daubert standards.

### Luxco's Knowledge of Everclear's Unique Danger

While an ordinary consumer would not be aware of Everclear's unique danger, Luxco was fully aware of the extreme flammability hazards posed by Everclear, as evidenced by multiple sources that demonstrate the company's longstanding knowledge of these risks. For example, Mr. John Rempe, Luxco's master distiller and blender, possesses specialized knowledge far beyond that of an ordinary person regarding the explosive properties of high-proof alcohol. With a bachelor's degree in biology from Saint Louis University, certification as a Food Scientist, and over 25 years of experience at Luxco, Rempe has extensive expertise in the chemical properties and safety risks of high-proof ethanol.

Master distillers undergo extensive training in organic chemistry, fermentation science, and the physical properties of ethanol at various concentrations. As a professional in this field, Rempe would have been intimately familiar with the fact that 95% ethanol:

1. Has a flash point of approximately 57.2°F, meaning it produces highly flammable vapors at room temperature;

2. Creates vapor heavier than air that will flow downward, creating invisible "pools" of highly combustible gas;

3. Forms near-stoichiometric mixtures with air at normal room temperatures, creating optimal conditions for violent, explosive combustion;

4. Burns with a nearly invisible flame, increasing the risk of accidental ignition; and

5. Can produce container explosions and/or flame jetting when ignited, as flames can travel back into a container and cause a violent eruption of burning liquid.

The extreme flammability risks of ethanol are well-established throughout the distilling industry. In 2022, a devastating fire at Beam Suntory's Jim Beam facility in Kentucky destroyed approximately 45,000 barrels of bourbon when ethanol ignited after a lightning strike, causing an environmental disaster that killed thousands of fish in the Kentucky River. Similar incidents occurred at Heaven Hill Distillery in 1996, destroying 90,000 barrels and seven warehouses, and at Wild Turkey in 2000, where 17,000 barrels were lost. These incidents demonstrate the industry's acute awareness of ethanol's fire hazards, with major distilleries implementing extensive safety protocols, including specialized electrical equipment, vapor monitoring, and rigorous handling procedures specifically designed to prevent ignition of ethanol vapors. Such industry-wide knowledge further underscores Luxco's recklessness in removing explicit warnings against open flame use while simultaneously marketing Everclear for applications near ignition sources.

Additionally, for decades prior to 2018, all Everclear bottles featured a prominent warning in a large red rectangle on the front label explicitly stating: "**CAUTION: DO NOT APPLY TO OPEN FLAME. KEEP AWAY FROM FIRE, HEAT AND OPEN FLAME - CONTENTS MAY IGNITE OR EXPLODE. DO NOT CONSUME IN EXCESSIVE QUANTITIES. NOT INTENDED FOR CONSUMPTION UNLESS MIXED WITH NON-ALCOHOLIC BEVERAGE.**" The front of the bottle also contained additional warnings to alert consumers to the hazardous nature of the product, providing: "**CAUTION!! EXTREMELY FLAMMABLE – HANDLE WITH CARE,**" and "**WARNING OVERCONSUMPTION MAY ENDANGER YOUR HEALTH**."



**Old Everclear Label**

Luxco's other 190-proof products, such as Golden Grain and Crystal Clear, both containing 95% ethanol, also carried identical warnings in prominent red rectangles. Golden Grain's

label, in use since 2002, also included additional back-label warnings: "**WARNING: FLAMMABLE LIQUID,**" "**DO NOT USE THIS PRODUCT FOR FLAMING DISHES OR DRINKS,**" "**ALL 190-PROOF ALCOHOL MAY FLARE UP AND CONTINUE TO BURN WHEN IGNITED, POSSIBLY WITH AN INVISIBLE FLAME,**" and "**DO NOT POUR DIRECTLY FROM THE BOTTLE NEAR THE FLAME OR INTENSE HEAT AS PRODUCT MAY EXPLODE.**"



**Crystal Clear Labels**



**Golden Grain Labels**

These consistent, explicit warnings across Luxco's product line further confirm the company's longstanding knowledge of the severe flammability risks associated with Everclear and its equivalent products, especially when used near an open flame, and the need to warn consumers of its unique and hazardous characteristics.

There is also no denying that Rempe had extensive knowledge of the unique hazards of ethanol, including the likelihood of explosion if exposed to an open flame. On October 11, 2010, Rempe personally signed the TTB Form 5100.31 (**Exhibit 3**) Certificate of Label Approval Application (COLA) for Crystal Clear, certifying under penalty of perjury that the representations on the labels, including the comprehensive warnings about flammability and explosion risks, "truly and correctly represent the content of the containers to which these labels will be applied." This document proves that Rempe had

specific, personal knowledge of the necessity of these explicit warnings on 190-proof ethanol products for at least several decades prior to Yvette suffering catastrophic burn injuries.

## The Rebranding: A Calculated Risk-Benefit Analysis

On July 2, 2014, Luxco launched its "Make it Your Own" campaign, marking the beginning of a deliberate effort to transform Everclear from a notorious high-proof spirit into a versatile, mainstream product suitable for non-beverage uses, including household and culinary applications. This campaign, which encouraged creative uses of Everclear, laid the groundwork for Luxco's 2018 decision to remove critical flammability warnings from Everclear labels and begin promoting its use in inherently dangerous contexts. Marketing materials reveal that this rebranding was part of a deliberate strategy to transform Everclear from a notorious high-proof alcohol into a mainstream product.

For decades, Everclear has been notorious as one of the most dangerous consumer alcohol products on the market. With its 190-proof (95% ethanol) formulation, it has been banned in multiple states due to its extreme potency and risk profile. It has also been implicated in multiple deaths of college students as a result of alcohol poisoning. As confirmed in a July 9, 2020 New York Times article, Everclear was long known as "the bartender's equivalent of jet fuel," infamous for "generations of fraternity parties," and described by musicians like Art Alexakis of the band Everclear as "pure white evil."

This notorious reputation is well-documented in media coverage spanning decades. Throughout the late 20th century and early 21st century, Everclear frequently appeared in news reports associated with serious crimes and tragedies: as the favorite beverage of a murderous gang in Tampa; as one of the scant possessions of an outlaw along with his gun; as part of college fraternity hazing rituals gone awry; in reports of intoxicated individuals committing homicides; in numerous accounts of fatal alcohol poisonings; and in countless sexual assaults. Former University of Virginia President Teresa Sullivan equated Everclear to a "date rape" drug and even its former brand manager, Ashley Ulkus, questioned publicly how the company could responsibly talk about Everclear, knowing the reputation it had. Yet rather than responding responsibly to this concerning pattern, Luxco chose to "shed its notoriety" through marketing rather than through enhanced safety measures.

Corporate marketing materials reveal that as early as 2015, Luxco was tracking non-beverage uses of Everclear, with internal data showing consumers using Everclear for making personal care items, as a general cleaning agent, for cleaning inhalation devices, for making perfume or other fragrances, fuel and furniture restoration. According to the documents, twelve percent of consumers who purchased Everclear once a month or more used Everclear for fuel. By 2017, Luxco had developed its plan to expand its "Make It Your Own" branding, accelerating after 2018. This marketing research directly informed Luxco's 2018 decision to relabel Everclear and remove safety warnings, as the company had identified the commercial potential of alternative uses but recognized explicit warnings about flammability and explosions would undermine this marketing strategy.

Despite the well-documented dangers of 190-proof ethanol, including its propensity to explode when used near an open flame, Luxco unconscionably removed critical warnings in 2018 to enhance marketability. Rather than improving safety features, such as making warnings more prominent, adding additional warnings to mirror those on Golden Grain or equipping bottles with flame arrestors, Luxco deliberately stripped away the critical and prominent safety warnings from its Everclear bottles, including the warning against applying the product to or using it near open flames.

Before 2018, Everclear bottles featured a prominent warning in a large red rectangle on the front label explicitly stating: "**CAUTION: DO NOT APPLY TO OPEN FLAME. KEEP AWAY FROM FIRE, HEAT AND OPEN FLAME - CONTENTS MAY IGNITE OR EXPLODE. DO NOT CONSUME IN EXCESSIVE QUANTITIES. NOT INTENDED FOR CONSUMPTION UNLESS MIXED WITH NON-ALCOHOLIC BEVERAGE.**" The bottles contained two additional warnings on the front, providing: "**CAUTION!! EXTREMELY FLAMMABLE – HANDLE WITH CARE,**" and "**WARNING OVERCONSUMPTION MAY ENDANGER YOUR HEALTH**."

By 2018, Luxco had drastically reduced this warning and relegated it to a small rectangle on the REAR label below the government warning, which read, "WARNING: FLAMMABLE LIQUID. HANDLE WITH CARE," an 85% reduction in warning content. The warning's relegation to the back label was made even more dangerous by its design. The new back label featured a primarily white and blue color scheme, with the warning placed in a small red rectangle. The visual design of the label caused this small warning to blend into the overall aesthetic rather than stand out as a critical safety message. This design choice further obscured the already inadequate warning, making unlikely to be noticed.



**Post-2018 Everclear Labels**

UPBrand, Luxco's then branding and advertising agency, confirmed that this aesthetic decision was deliberate, noting that they "redefined the brand identity with an art deco color palette, crisp photography and blank canvas textures that plussed up the endless possibility that Everclear promises." The agency acknowledged the challenge of "reestablishing Everclear as a DIY ingredient without positioning it as a completely unconsumable product," which they described as requiring "nuance." This remarkable admission reveals that Luxco was aware it was repositioning Everclear as a non-beverage product with the intent of "getting consumers to look past the drink's college party days' baggage."

Perhaps most damning of all is that the person who certified this dangerous label change was Rempe, Luxco's master distiller and blender, the very individual who possessed the most specialized knowledge of ethanol's explosive properties. On September 8, 2017, Rempe personally signed the COLA for approval of the new Everclear labels that drastically reduced safety warnings, certifying under penalty of perjury that he had "read, understood and complied with the conditions and instructions" attached to the form (**Exhibit 4**).

As a master distiller with extensive expertise in the chemical properties of high-proof spirits, Rempe was intimately familiar with the extreme flammability of 95% ethanol, its propensity to create explosive fireballs when exposed to flame, and the specific dangers of container vapor ignition. However, despite extensive knowledge of these hazards, he deliberately approved the removal of warnings about these precise dangers from Everclear labels.

This was not an oversight or mistake, the COLA Rempe signed specifically displayed the new labels with their drastic reduction in warning content, relegation of the remaining warning to the back label, and color scheme that further diminished the warning's prominence. In contrast, when signing the COLA for Crystal Clear, Rempe certified labels that contained comprehensive safety warnings about explosion risks and prohibitions against use near open flames.

Notably, Luxco made no changes to the warnings on Crystal Clear or Golden Grain, which is striking given that these products, identical in composition to Everclear, were not promoted for uses beyond consumption as alcoholic beverages, and then only after appropriate dilution. This decision further demonstrates Luxco's longstanding knowledge of the hazards of high-proof ethanol and the critical need to warn consumers of its unique flammability risks.

The timing is particularly significant: Luxco's decision to drastically reduce safety warnings coincided precisely with the launch of its campaign to begin repositioning Everclear for non-beverage DIY uses, many of which would foreseeably place the product near ignition sources, such as using Everclear as fuel. This was not a coincidence but rather a calculated business decision to make the product more marketable for these expanded uses, even at the cost of consumer safety.

## Promoting Everclear for Dangerous Uses

After stripping the pre-2018 warnings of Everclear's severe flammability and propensity to explode, Luxco brazenly increased its marketing for uses near ignition sources through a deliberate, multi-stage campaign. Beginning with social media promotions following the 2018 label change, Luxco systematically expanded its marketing of Everclear for non-beverage applications, initially through its existing website and social media accounts. The company accelerated these efforts in 2020-2021 (around the time of MGP Ingredients, Inc.'s acquisition of Luxco), launching a dedicated website ([www.diywitheverclear.com](http://www.diywitheverclear.com)) in 2021 to replace its previous website, creating a platform exclusively focused on promoting Everclear for dangerous alternative uses, such as ink paints, laundry detergent, skin scrub, disinfectant, perfume, shower spray, jewelry cleaner, glass cleaner, deodorant spray, and to make extractions and tinctures. The website also promoted Everclear for general-purpose use around the house, claiming it "**DISINFECTS** and **DISSOLVES** dirt and grime," and "**DEGREASES AND BONDS** to oils on fabrics as a natural stain remover." This deceptive campaign even promoted federally illegal cannabis processing.



**Promotion of General-Purposes Uses on Everclear's Website**

Luxco also recklessly promoted Everclear for culinary and other household uses where open flames from gas stoves, ovens, and candles are common. Its marketing included recipes like cherry jubilee, instructing consumers to light undiluted Everclear with a match. Its social media accounts featured photos and videos showing Everclear poured into cooking pans near gas stove flames and used in fondue pots with open candle flames, often with the bottle inches from ignition sources. Most alarmingly, one video depicted a lighter igniting a candle fueled by Everclear, falsely suggesting the product was safe to use as a fuel and to handle near open flames.



**Various Marketing Photographs from Everclear's Official Instagram Account**

Another damning example of Luxco's deceptive practices can be found in the below social media post promoting Everclear as a candle fuel. A virtually imperceptible disclaimer is contained in the post, stating: "DISCLAIMER: High-proof alcohol is flammable. Handle carefully and keep away from open flames until ready to ignite. Follow all safety precautions. Keep out of the reach of children and pets." This "warning" was rendered nearly invisible by using a font color almost identical to the background and employing a minuscule font size that makes it practically impossible for viewers to notice, much less read. This deliberately obscured disclaimer reveals Luxco's actual knowledge of the extreme dangers of using Everclear near open flames while simultaneously demonstrating the company's calculated efforts to minimize these warnings to the point of invisibility. The stark contradiction between this hidden disclaimer warning and the actual promoted use (as a fuel) encapsulates the company's cynical approach to consumer safety: technically include warnings while ensuring they remain functionally ineffective.



**Social Media Post With Imperceptible Warning**

Equally disturbing was Luxco's systematic campaign to promote Everclear within the cannabis community, a strategy that specifically encouraged uses presenting severe fire and explosion hazards. Despite full awareness of the product's explosive properties when exposed to flames, Luxco engaged in paid promotional partnerships with cannabis publications and influencers to promote Everclear for cannabis tinctures, cleaning cannabis accessories, cooking with cannabis, and other marijuana-related applications, which increased the perception that Everclear was safe to use around ignition sources.

As documented in multiple sponsored articles in Cannabis Now magazine, Luxco sponsored a 12-part DIY series content explicitly promoting Everclear for cannabis uses. This promotion included:

1. "How to Make Cannabis Tinctures With Everclear Grain Alcohol" (February 12, 2023);

2. "5 Ways to Eliminate Cannabis Odor With Everclear Grain Alcohol" (November 14, 2023);

3. "How to Clean Glassware With Everclear" (May 16, 2023);

4. "Cook With Everclear This Thanksgiving" (November 23, 2022); and

5. "Everclear & Cannabis Now: A New DIY Series" (August 26, 2022).

These sponsored articles specifically promoted Everclear as "perfect for creating a wide range of cannabis products, including cocktails, edibles, infusions and tinctures" and "one of the best choices for making tinctures." Another article encouraged using Everclear to clean cannabis pipes, bongs, and other accessories that are routinely exposed to flames. Luxco also engaged a number of social media influencers to promote these illicit uses for Everclear.

Luxco's actions demonstrate a blatant disregard for consumer safety and basic human decency. The company deliberately removed explicit warnings from Everclear's labels that cautioned against applying the product to open flames, warnings that directly addressed the conduct that caused Yvette's severe and life-altering injuries. Simultaneously, Luxco aggressively marketed this highly flammable substance for cooking, multi-purpose household use and drug manufacturing, applications where consumers would foreseeably encounter open flames, stoves, and other ignition sources. This conduct constitutes reckless indifference to the known dangers of 190-proof ethanol. As the Supreme Judicial Court of Massachusetts has held, a manufacturer acts recklessly when it knowingly fails to warn of an unreasonable risk of death or grave bodily injury despite clear awareness of such risks, a standard Luxco indisputably meets in this case. Rafferty v. Merck & Co., Inc., 479 Mass. 141 (2018).

### **Prior Incidents and Notice**

This incident is not the first case where individuals have been seriously burned while Everclear was being used around an open flame since Luxco's rebranding of the product. In August 2024, a highly and internationally publicized incident occurred at Twisted Trick

bar in Dallas, Texas, where Ms. Abigael Hance-Briscoe and Mr. Dustin Johnson suffered second- and third-degree burns on their faces, necks, arms and chests when a "Flaming Pineapple" cocktail made with Everclear exploded. Ms. Hance-Briscoe was hospitalized for seven weeks at Parkland Health's burn unit and required multiple skin grafts.

This incident received international news coverage, including reporting by the Daily Mail and other major news outlets, which describe how the bartender "poured even more Everclear into the drink … causing the glass to explode." Given the extensive media coverage of this incident, Luxco was undoubtedly on notice of the serious dangers associated with using Everclear around open flames.

Several incidents preceded Everclear's rebranding, including a 2016 University of Toledo party where Everclear ignited, engulfing a student in flames and causing severe burns over approximately 50% of her body. Another occurred in 2014 when a large vase containing Everclear broke next to a candle, igniting and causing serious injuries to a bartender.

### May 13, 2025

Yvette's journey to the United States was driven by her ambition and academic excellence. As a 22-year-old law student at the City University of Hong Kong (CityU), Yvette was selected for a prestigious summer exchange program with Boston University through CityU's Global Engagement Program. This opportunity was a testament to her 3.2 GPA and her dedication to her Bachelor of Laws Degree, marking a significant step toward her goal of an international legal career.

On May 13, 2025, Yvette's promising future was shattered by Luxco's reckless conduct. Having arrived in Massachusetts days earlier for the Boston University exchange program, the 22-year-old law student attended a social gathering at the Zeta Psi fraternity in Worcester to connect with peers. "I was invited to Zeta Psi to socialize and meet people because I was new in the area," Yvette recalls. "I met up with my friend Tim Lopes whom I met when he was visiting Hong Kong. We were minding our own business and having our own conversation" when the unthinkable happened.

During the event, Mr. Henry Pharris, a Zeta Psi member, poured Everclear, which Luxco marketed as a fuel, onto or near a fire on a stump, which may have appeared extinguished. Everclear's 95% ethanol content and low flash point created an explosive fireball that engulfed the bottle's contents and propelled burning liquid outward, consistent with the mechanism described in Log and Moi (2018) (**Exhibit 2**). A security camera captured the incident, showing the explosion that engulfed Yvette, causing her catastrophic injuries.

You will note in the below photograph and the previously provided security video that there was only a small flame immediately prior to the explosion, which may not have been visible to Pharris because ethanol fires can be invisible to the human eye. However, a security camera may capture the flames due to the enhanced sensitivity of its imaging sensors to infrared and low-light conditions. Although difficult to discern, it appears as though Pharris is making a pouring motion, with the bottle oriented horizontal toward the fire, which we know from Log and Moi is the ideal position to cause ignition, flame jetting and explosive combustion.



**Enhanced Photograph Depicting Pharris Seconds Before Explosion**

In Yvette's own words: "Out of nowhere I was set on fire and screaming. Multiple boys tackled me to take the fire out and then they called the ambulance." The aftermath was a nightmare of pain and confusion. "I was lying on the ground in so much pain until the ambulance came," Yvette recounts. Alone in a foreign country and severely injured, she desperately sought a familiar face. "I demanded James (her friend) come with me as I didn't know many other people and after an argument they let him come with us."

The severity of Yvette's burns necessitated immediate and aggressive pain management. "The paramedics put a needle in my arm to give me pain meds. I was in unbelievable pain so they kept giving me more, whilst simultaneously asking where I'm from, etc. It all became blurry and I felt like I couldn't feel my body or speak." In her final moments of consciousness before she was intubated because of the severe injury to her neck, Yvette recalls, "I vaguely remember arriving at the hospital and when I got to a room with doctors they cut my clothes off. After that, I remember waking up days later in a different hospital with burns all over my body and horribly disfigured."

## <u>Liability</u>

This traumatic experience, the sudden engulfment in flames, the excruciating pain while waiting for medical help, the disorientation and fear as paramedics treated her, was the direct and foreseeable result of Luxco's deliberate decision to remove critical safety warnings from Everclear, which constitutes recklessness under <u>Rafferty v. Merck & Co., Inc.</u>, 479 Mass 141 (2018), and actively promote its use in situations where it could come into contact with open flames. However, there are a host of other regulations and industry standards that Luxco violated that give rise to liability, including under M.G.L. c. 93A.

As noted earlier, Rempe, Luxco's master distiller, certified the 2018 label changes via TTB Form 5100.31, submitted on September 8, 2017, and approved on September 20, 2017. Despite his extensive knowledge of 95% ethanol's explosive properties, Rempe approved a drastic reduction in warning content, eliminating explicit cautions against use near open flames and relegating a diminished warning, "WARNING: FLAMMABLE LIQUID. HANDLE WITH CARE", to an inconspicuous back-label rectangle that blended in with the product's coloring scheme.

The TTB Form 5100.31, or COLA, is required by the Alcohol and Tobacco Tax and Trade Bureau (TTB) under the Federal Alcohol Administration Act (FAA Act) to ensure alcohol beverage labels comply with federal labeling regulations, such as accurate product descriptions and mandatory health warnings. The COLA process does not evaluate or ensure compliance with safety regulations, including the adequacy of hazard warnings for flammable substances like 190-proof ethanol. The form explicitly states that certification "does not relieve [the applicant] from liability for violations" of federal laws or regulations, meaning Luxco remains fully responsible for ensuring its labels adequately warn of Everclear's unique flammability risks.

The Everclear labels, despite TTB approval, violate federal labeling regulations, including 27 C.F.R. § 5.122[2], which states, "Distilled spirits labels, containers, or packaging may not contain any statement or representation, irrespective of falsity, that is misleading to consumers as to the age, origin, identity, or other characteristics of the distilled spirits, or with regard to any other material factor. (§ 5.122(a)). "A statement or representation is prohibited, irrespective of falsity, if it directly creates a misleading impression, or if it does so indirectly through ambiguity, omission, inference, or by the addition of irrelevant, scientific, or technical matter. For example, an otherwise truthful statement may be misleading because of the omission of material information, the disclosure of which is necessary to prevent the statement from being misleading." (§ 5.122(b)(1)).

The present Everclear labels mislead consumers in violation of 27 C.F.R.§ 5.122 by, among other things:

1. Creating a Misleading Safety Impression: By reducing the pre-2018 prominent front-label warnings ("**CAUTION: DO NOT APPLY TO OPEN FLAME. KEEP AWAY FROM FIRE, HEAT AND OPEN FLAME - CONTENTS MAY IGNITE OR EXPLODE. DO NOT CONSUME IN EXCESSIVE QUANTITIES. NOT INTENDED FOR CONSUMPTION UNLESS MIXED WITH NON-ALCOHOLIC BEVERAGE,**" "**CAUTION!! EXTREMELY FLAMMABLE – HANDLE WITH CARE,**" and "**WARNING OVERCONSUMPTION MAY ENDANGER YOUR HEALTH**") to a vague back-label notice: ("WARNING: FLAMMABLE LIQUID. HANDLE WITH CARE"), Luxco created a false impression of safety, particularly when promoting

---

[2] It is our position that the general provisions of the regulations promulgated under the authority of the FAA Act that prohibit misleading and deceptive labels give way to the more specific regulations promulgated under the Federal Hazardous Substance Act, especially when Everclear was being marketed and used for purposes other than consumption.

Everclear for multi-purposes uses, such as a cleaner, solvent and degreaser suitable for uses near ignition sources (e.g. gas stoves, candles).

2. Misleading Omission: Luxco's removal of pre-2018 explosion warnings, while retaining identical warnings on its chemically equivalent Golden Grain and Crystal Clear products, falsely implies that Everclear is safer for use around ignition sources. The lack of a reasonable basis for omitting these warnings is further evidenced by Luxco's own prior acknowledgment of the risks (pre-2018 labels) and industry standards, which will be described more fully below.

### Violations of the Federal Hazardous Substances Act

Luxco has violated the Federal Hazardous Substances Act (FHSA), 15 U.S.C. §§ 1261-1278, and its implementing regulations under 16 C.F.R. Part 1500, specifically 16 C.F.R. § 1500.121, which mandates prominent cautionary labelling for hazardous substances. Everclear meets the definition of a "hazardous substance" under the FHSA due to:

1. Its flammability (flash point of 57.2°F), classifying it as a "flammable" substance under 16 C.F.R. § 1500.3(c)(6)(ii);

2. Its 95% ethanol content, presenting significant toxicity hazards;

3. It is unsuitability for human consumption unless diluted, Historical labels stating "not intended for consumption unless mixed with non-alcoholic beverage" indicate Everclear is not a "Food" under the FDCA (21 U.S.C. § 321(f)), negating any potential argument that the FHSA's food exemption (15 U.S.C. § 1261(f)(2)) is applicable; and

4. Luxco's deliberate marketing of Everclear for numerous non-beverage uses, including but not limited to:

   - Household - Cleaning Uses: Everclear's website (www.diywitheverclear.com) and social media accounts promoted Everclear as a disinfectant, degreaser, glass cleaner, jewelry cleaner, laundry detergent and stain remover, encouraging use around gas stoves, ovens and candles.

   - Culinary applications: Sponsored content, including Cannabis Now articles (e.g., "Cook with Everclear this Thanksgiving," November 23, 2022 and social media posts, depicted Everclear used in cooking pans near gas stove flames and fondue pots with open candles, falsely implying safety near ignition sources.

   - Cannabis-Related Uses: Luxco's paid promotions in Cannabis Now (e.g., "How to Make Cannabis Tinctures with Everclear," February 12, 2023; "How to Clean Glassware with Everclear," May 16, 2023) and influencer campaigns encouraged using Everclear for cannabis tinctures, edibles and cleaning cannabis accessories routinely exposed to flames.

- Fuel and Other Uses: Luxco's marketing, including social media videos on its official Instagram account, encouraged using Everclear as a fuel, falsely suggesting it is safe for applications involving open flames. Additional promotions on www.diywitheverclear.com, promoted using Everclear for ink paints, perfume and deodorant spray, applications that increase the risk of exposure to potential ignition sources.

The appropriate test to see whether a product falls within the ambit of the FHSA's labelling requirements is not what the manufacturer intends, but whether its use as a household product is reasonably foreseeable. Barnes v. Litton Indus. Products, Inc., 555 F.2d 1184 (4ᵗʰ Cir. 1977); Canty v. Ever-Last Supply Co., 296 N.J. Super 68 (1996). Not only was the use of Everclear for household purposes foreseeable, it was encouraged by Everclear.

While Brown-Forman Distillers Corp. v. Matthews, 435 F.Supp. 5 (W.D. Ky. 1976) held that the TTB has exclusive jurisdiction over traditional alcoholic beverage labeling concerns, this exclusivity is fundamentally limited and, in any event, does not extend to physical hazards created by non-beverage uses that Luxco actively promotes. The court's reasoning in Brown-Forman relied on a fundamental principle of statutory interpretation: "where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one." Id. at 13 (quoting Morton v. Mancari, 417 U.S. 535, 550-551 (1974)). The court found that Congress's specific grant of authority to the Treasury Department (now TTB) regarding traditional beverage labeling demonstrated Congressional intent for that agency, not the FDA, to promulgate regulations in that area.

However, Congress has granted specific authority to the Consumer Product Safety Commission (CPSC) to regulate physical hazards in consumer products through the FHSA. The Consumer Product Safety Act explicitly established the CPSC as the agency with the primary responsibility "to protect the public against unreasonable risks of injury associated with consumer products." 15 U.S.C. § 2051(b)(1). Congress transferred the administration of the FHSA to the CPSC in 1973 precisely to create a specialized agency with explicit authority over physical hazards in household products.

When applying the same statutory interpretation principle from Brown-Forman, the FHSA is the specific statute addressing physical hazards in household products, while the Federal Alcohol Administrative Act is specific to alcoholic beverage labeling, and even then only with respect to such as alcohol content, character of the alcohol, ingredients, and similar beverage-specific information. In any event, when a manufacturer deliberately markets a product for non-beverage household uses that create physical hazards, there can be no question that the FHSA becomes the more specific regulatory framework for those particular uses.

Although the FHSA contains a food exemption in 15 U.S.C. § 1261(f)(2) [3] which arguably applies to alcoholic beverages, Luxco's own pre-2018 labels warned users not to consume Everclear unless mixed with a non-alcoholic beverage, suggesting in its undiluted form,

---

[3] The Federal Hazardous Substances Act, 15 U.S.C. §§ 1261-1278, does not independently define "food." Instead, it incorporates the definition of "food" from the Federal Food, Drug, and Cosmetic Act.

Everclear was not marketed as a conventional food product. Thus, at the outset, Everclear does not appear to meet the definition of a food. However, any question of whether Everclear is exempted from the FHSA under its food exemption, was resolved when Luxco began marketing Everclear for non-beverages uses, including as a fuel. By doing so Luxco took Everclear squarely outside the food exemption under 15 U.S.C. § 1261(f)(2), placing it squarely within the ambit of the FHSA. See Nutrilab, Inc. v. Schweiker, 713 F.2d 335 (1983) (Holding that whether an item meets the FDCA's definition of "Food" ("articles used for food and drink for man or other animals," 21 U.S.C. § 321(f)) depends on the intended use of a product, as determined by its labeling, marketing, and actual use by consumers).

A review of Luxco's dedicated website (www.diywitheverclear.com) reveals that a significant portion, if not the majority, of content is devoted to promoting non-beverage uses of Everclear. The website's main navigation prominently features sections for "DIY" and "Extractions" alongside "Cooking" and "Cocktails," placing emphasis on non-beverage applications. Featured content includes using Everclear for non-consumption purposes such as alcohol ink paints, body scrubs, laundry additives, disinfectant wipes, clothing dyes, perfume, shower sprays, bath bombs, hand sanitizer, jewelry cleaner, glass cleaner, deodorant spray, and diffusers.



**Everclear's Promoted Uses on Official Website**

Additionally, as discussed previously, Luxco's own marketing materials confirm that Everclear should not qualify for the food exemption under the FHSA, as doing so would absurdly shield Luxco's deceptive marketing of this widely used industrial-grade solvent as a safe consumer product for non-beverage uses.

Luxco has violated the FHSA in the following specific ways:

1. Failure to Place Required Warnings on Principal Display Panel: 16 C.F.R. § 1500.12(b)(2) mandates that the signal word, statement of principal hazard, and instructions to read additional cautionary material must appear on the principal display panel. Luxco's post-2018 warning appears only on the back label in violation of this requirement.

2. Inadequate Precautionary Measures: 16 C.F.R. § 1500.12(b)(2)(ii) requires specific precautionary measures "describing the action to be followed or avoided." The vague instruction to "HANDLE WITH CARE" fails to specify critical actions to avoid, such as keeping away from open flames, information that was included in Luxco's pre-2018 warning.

3. Lack of Prominence and Conspicuousness: 16 C.F.R. 1500.121(c) requires warnings to be prominently placed and conspicuous. Relegating the flammability warning to a small rectangle on the rear label fails to meet this standard.

Luxco's awareness of these requirements is demonstrated by their continued use of comprehensive warnings on chemically identical products (Golden Grain and Crystal Clear) while selectively removing them from Everclear. This inconsistent labeling approach creates a dangerous false impression that Everclear is safer than these identical products, when in fact all contain the same explosive hazards.

Ironically, Luxco's Everclear 190-proof alcohol, which is significantly more flammable than many fire-starting products and industrial solvents due to its high alcohol content and low flash point, carries fewer safety warnings than the aforementioned products, despite being substantially more dangerous when used in the same manner. This regulatory inconsistency creates a dangerous false impression in that consumers may reasonably assume that products with fewer warnings are safer, when in fact Everclear poses extreme fire and explosion hazards.



**Proper FHSA Warning Label for 95% Ethanol Marketed for Tincture, Perfume and Cosmetic Use**

By introducing Everclear, a misbranded hazardous substance, into interstate commerce with inadequate warnings while marketing it for use, among other things, as a fuel, Luxco violated 15 U.S.C. § 1263, subjecting it to potential civil and criminal liability under 15 U.S.C. § 1264.

## Common Law Duty to Warn

Even if we were to assume for the sake of argument, that the FHSA does not apply to Everclear, Luxco is still liable under Massachusetts law for its failure to warn. Under Massachusetts common law, Luxco also has a duty to warn consumers of Everclear's inherent dangers. It is trite law that manufacturers must warn foreseeable users of risks they know or should know about, which are not obvious to ordinary users. MacDonald v. Ortho Pharm. Corp., 394 Mass. 131 (1985) (holding manufacturers liable for warning foreseeable users of known or reasonably discoverable dangers). This duty extends beyond immediate purchasers, requiring warnings that are comprehensible to the average user and convey the nature and extent of risks to a reasonably prudent person. Id. at 140. Everclear's post-2018 labels fail to meet this standard for the reasons described above.

This tragic incident represents the precise danger that Luxco's pre-2018 warnings explicitly addressed. The original warnings directly cautioned against the exact behavior that caused Yvette's injuries. Under Massachusetts law adequate warnings are presumed effective if provided., if provided. Cottam v. CVS Pharmacy, 436 Mass. 316, 327 (2002). Had Luxco maintained this explicit warning, Pharris would have been adequately warned against pouring Everclear onto or near a fire, and this catastrophic incident would not have occurred. Instead, by deliberately removing this specific warning while simultaneously marketing Everclear for uses near ignition sources, Luxco created the conditions that made this tragedy not just possible but inevitable.

## Federal Preemption Under the ABLA Does Not Apply to Flammability Warnings Under Massachusetts Law

Federal preemption under the Alcoholic Beverage Labeling Act (ABLA) does not shield Luxco from liability for physical safety hazards unrelated to alcoholic beverages and health.

The ABLA's preemption provision in 27 U.S.C. § 216 specifically addresses only "statement[s] relating to alcoholic beverages and health." As the California Supreme Court held in Bronco Wine Co. v. Jolly, 33 Cal.4th 943 (2004), this language should be interpreted narrowly to cover only "statements regarding health risks associated with consuming or abusing alcohol." See also Cuevas v. United Brands Co., 2012 WL 760403 (S.D. Cal. 2012) (holding preemption under 27 U.S.C. § 216 only applies to statements regarding the health risks of consuming alcohol). Everclear's flammability, a physical hazard distinct from health risks, falls outside this ambit, leaving Luxco subject to Massachusetts state law liability.

Furthermore, Luxco has deliberately positioned Everclear as a multi-purpose high-proof ethanol solution through its dedicated website (www.diywitheverclear.com) and extensive marketing campaigns for non-beverage uses. This marketing strategy takes the product outside the scope of federal preemption for alcoholic beverages. The TTB's jurisdiction has limits, particularly when products are promoted for purposes beyond traditional beverage consumption.

By marketing Everclear for non-beverage purposes, including illicit purposes involving cannabis, Luxco has positioned the product as a multi-purpose chemical solution, not merely as an alcoholic beverage. This strategy positions Everclear beyond the scope of federal preemption for alcoholic beverages, as the TTB's jurisdiction is limited when products are promoted for purposes other than traditional consumption. In targeting non-beverage uses, Luxco has effectively reclassified Everclear as a chemical solution, further exposing it to state law oversight.

## Voluntary Assumption of Duty Even if Preemption Applied

Even if federal preemption were to apply (which it demonstrably does not), Luxco voluntarily assumed a duty to warn about flammability by including a flammability warning on its back label and a barely perceptible warning on a social media post encouraging consumers to use Everclear as a fuel. Under Cottam v. CVS Pharmacy, 436 Mass. 316, 323-24 (2004), a defendant who voluntarily assumes a duty is liable for any failure to exercise due care in performing that duty.

By including some form of flammability warning on post-2018 Everclear bottles, Luxco clearly acknowledged its duty to warn consumers of this hazard, but then negligently performed this voluntarily assumed duty by drastically reducing the warning's content, removing critical information about open flames and explosions, and relegating the diminished warning to an inconspicuous position on the back label.

This principle applies with even greater force given that Luxco maintained comprehensive warnings on its chemically identical products (Golden Grain and Crystal Clear). Luxco's

selective warning practices, maintaining robust warnings on some 190-proof products while removing them from others, demonstrates that Luxco recognized its duty to warn but deliberately failed to fulfill it for Everclear specifically, prioritizing marketing aesthetics over consumer safety. This inconsistency in warning practice across identical products is compelling evidence of Luxco's negligent performance of its voluntarily assumed duty to warn.

Having chosen to warn about flammability, Luxco had a duty to provide a complete and adequate warning that would properly inform consumers of the true nature and extent of the danger. The minimal warning on the rear label failed to adequately convey the extreme nature of the danger. Everclear is not merely "Flammable" like many household products and lower-proof spirits; it is highly combustible with properties similar to gasoline, capable of producing explosive fireballs when exposed to ignition sources. These deliberate omissions constitute a breach of Luxco's common law duty under Massachusetts law.

### Deviation from Industry Standards and Internal Practices

Luxco's handling of Everclear safety warnings represents a significant and deliberate deviation from both established industry standards for high-proof spirits and the company's own internal safety practices for identical products. This deviation demonstrates Luxco's conscious prioritization of marketing aesthetics over well-established safety protocols, creating an unreasonable and foreseeable risk of catastrophic injuries.

Luxco's decision to reduce warnings on Everclear 190-proof is particularly egregious when compared to how other manufacturers handled similar products. In 2016, Bacardi discontinued its 151 proof rum (75.5% alcohol) due to safety concerns.[4] Despite Bacardi 151 being significantly lower proof than Everclear 190 (75.5% vs. 95% alcohol), Bacardi recognized the inherent dangers and took the following safety measures before its discontinuation:

1. Featured a warning on the front label stating, "**WARNING, FLAMMABLE, SEE BACK LABEL**";



**Front Warning Label**

---

[4] Although Bacardi bottles contained ample warnings and flame arrestors, at least one court held that it was not sufficient to escape liability as Bacardi, much like Luxco, promoted its product for pyrotechnic uses. Sclafani v. Brothers BBQ, Inc., et al., 930 N.Y.S. 2d 556 (2011).

2. Dedicated almost an entire back label exclusively to warning consumers about the unique dangers posed by high-proof alcohol; and



**Back Warning Label**

3. Incorporated a fire arrestor to prevent flames from igniting the contents.



**Various Flame Arrestors – Bacardi 151 Top Left Corner**

Luxco has taken the opposite approach with a substantially more dangerous product. Rather than following industry trends toward enhanced warnings and safety features for high-proof spirits, Luxco deliberately removed the existing prominent warnings from Everclear, which at 95% ethanol is significantly more volatile and dangerous than Bacardi 151, which was discontinued due to safety reasons.

Even more damning than Luxco's deviation from industry standards is the company's inconsistency in its own safety practices. While stripping away critical warnings from Everclear, Luxco simultaneously maintained comprehensive safety warnings on chemically identical products marketed under the Golden Grain and Crystal Clear brand names.

This inconsistent approach to labeling identical products creates an irrefutable demonstration that Luxco was fully aware of the necessity of explicit warnings for 190-proof ethanol products. By maintaining these warnings on some brands while removing them from others selling the identical product, Luxco acknowledges through its own practices that 190-proof ethanol requires explicit warnings against open flames.

What makes Luxco's conduct particularly egregious is the mind-boggling contradiction in their business practices: they deliberately removed explicit warnings against open flame application from Everclear, the very product they actively marketed for kitchen and other uses where open flames are omnipresent; while maintaining these critical warnings on Golden Grain and Crystal Clear, which they do not market for kitchen or other non-beverage applications.

### **Failure to Apply Established Safety Engineering Principles**

In addressing product hazards, established safety engineering principles prescribe a clear hierarchy of controls that manufacturers should follow to protect consumers. This hierarchy, widely recognized in product safety engineering and embraced by organizations such as the National Safety Council and OSHA, outlines three fundamental approaches in descending order of effectiveness:

1. Elimination or Substitution (Design Out the Hazard): The most effective approach is to design the hazard out of the product entirely or substitute with a less hazardous alternative. While Luxco cannot eliminate the flammability of 190-proof ethanol without fundamentally changing the product, they could have offered lower-proof alternatives that present significantly reduced fire hazards for uses where extreme alcohol concentration is unnecessary. Put simply, there is no need for a 190-proof ethanol beverage as it cannot be consumed without diluting the product and it is unreasonably dangerous.

2. Engineering Controls (Guard Against the Hazard): When hazards cannot be eliminated, they should be guarded against through engineering controls that create a physical barrier between the user and the danger. In the case of high-proof alcohols, flame arrestors represent a proven and effective engineering control. These simple devices, which Bacardi incorporated in their 151-proof rum (which contains significantly less alcohol than Everclear), prevent flames from

traveling back into bottles and causing explosive fireballs. Luxco's failure to incorporate this established safety feature, despite being fully aware of the explosion risks associated with 95% ethanol, represents a fundamental violation of basic product safety principles.

3. Warnings (Alert Users to Unavoidable Hazards): The least effective but still necessary safety measure is to provide clear, comprehensive warnings about hazards that cannot be designed out or guarded against. Even if Luxco determined that neither product reformulation nor flame arrestors were feasible, they still had an obligation to provide adequate warnings commensurate with the severe risks of their product. Instead, they deliberately removed explicit warnings against open flame application from Everclear labels, drastically reducing warning content by approximately 85%, and relegating the diminished warning to an inconspicuous position on the back label.

Luxco's actions demonstrate a complete disregard for this established hierarchy of safety controls. The company failed at every level: they marketed their most hazardous formulation (95% ethanol) for uses near ignition sources rather than promoting safer alternatives; they omitted proven engineering controls (flame arrestors) that could have prevented Yvette's catastrophic injuries; and they deliberately removed comprehensive warnings that explicitly addressed the exact danger that caused Yvette's life-altering burns.

This hierarchy of controls approach is not merely theoretical but represents the consensus standard in product safety engineering, codified in guidelines from organizations such as the National Safety Council, the American National Standards Institute (ANSI), and the Occupational Safety and Health Administration (OSHA). Luxco's complete failure to implement any level of this hierarchy, from elimination to engineering controls to adequate warnings, demonstrated a systematic disregard for established safety principles that far exceeds ordinary negligence. This pattern of disregard is precisely the type of conduct that Chapter 93A was designed to deter and punish.

## No Viable Misuse Defense

Luxco cannot successfully claim using Everclear near an open flame constitutes "misuse" of their product that relieves them of liability. This anticipated defense is directly contradicted by established precedent regarding foreseeable product uses. Under Massachusetts law, the "misuse" defense only applies when a plaintiff has used a product in a manner that could not have been reasonably foreseen by the manufacturer. As the First Circuit explained in Cigna Insurance Co. v. Oy Saunatec, Ltd., 241 F.3d 1 (1st Cir. 2001), Unforeseeable misuse concerns the question of whether the defendant could have reasonably foreseen that the plaintiff would misuse the product in the way he did. Id. at 16. The court emphasized that to justify a misuse defense, a manufacturer must show that the use was genuinely unforeseeable, such as using a sauna heater "to grill steaks," an example cited during that trial. Id. at 18.

In stark contrast, Luxco not only could foresee an individual using Everclear near open flames or for that matter, applying Everclear to a fire, it actively encouraged such use through its extensive marketing campaigns. Luxco's dedicated website, social media posts,

and sponsored content explicitly promoted using Everclear for cooking applications near gas stoves and as a fuel. Luxco's marketing depicted a lighter being applied in close proximity to a candle fueled by Everclear with a deliberately obscured warning. It also recommended applying a lit match to Everclear directly in recipes on its website and in YouTube videos. As Everclear encouraged these activities, there was misuse of the product even if we were to assume Pharris was using Everclear as a fuel. Luxco not only knew consumers were engaging in this practice as early as 2015, but also encouraged this activity to increase sales and took active steps to conceal the danger from consumers, such as removing prominent warning labels from Everclear bottles and concealing flammability warnings in social media posts.

The security video and pre-explosion Texas incident photo below demonstrate that Pharris, previously burned as a child and thus cautious, was not reckless. Although difficult to discern, the video shows Pharris making a pouring motion with the bottle oriented horizontally toward the fire, a position identified by Log and Moi (2018) as ideal for causing ignition, flame jetting, and explosive combustion. The visual records reveal only a small flame immediately prior to the explosion, which may not have been visible to Pharris because ethanol fires can be invisible to the human eye. The security camera's enhanced sensitivity of its imaging sensors to infrared and low-light conditions allowed it to capture this flame, underscoring the hidden danger that Pharris could not have reasonably perceived. This action aligns with Luxco's encouraged practices rather than constituting unforeseeable misuse.

Further corroborating this analysis, a photograph from the seconds before the fire in the August 2024 Texas incident, previously provided as evidence, depicts a bartender holding an Everclear bottle in an identical horizontal position seconds before that accident. This parallel demonstrates that Pharris' behavior was not an isolated act of recklessness but a foreseeable response to Luxco's inadequate warnings and promotional guidance. Luxco not only knew consumers were engaging in this practice as early as 2015 but also encouraged it to increase sales, taking active steps to conceal the danger from consumers, such as removing prominent warning labels from Everclear bottles and concealing flammability warnings in social media posts.



**Texas Bar Incident Photo**

Any attempt by Luxco to invoke the misuse defense is doomed to failure as a matter of law because the use of Everclear near open flames was not only foreseeable but actively encouraged by Luxco's own marketing. Their deliberate removal of warnings about this specific danger while simultaneously promoting such uses represents precisely the type of unconscionable conduct that M.G.L. c. 93A was designed to prevent.

### Federal Legal Issues with Luxco's Cannabis Marketing

Luxco's aggressive marketing of Everclear for cannabis applications not only created serious safety risks but also violated federal law, further demonstrating the company's reckless disregard for legal and safety standards.

Marijuana remains classified as a Schedule I controlled substance under the federal Controlled Substances Act (21 U.S.C. § 841), rendering its manufacture, distribution, and possession illegal, despite state-level legalization for medical or recreational use. Federal law also prohibits aiding or conspiring to commit these offenses (18 U.S.C. § 2; 21 U.S.C. § 846). Luxco's promotion for Everclear for cannabis processing, through targeting marketing and instructions, violated federal law, exacerbating the deceptive practices that led to Yvette's injuries.

By actively promoting Everclear specifically for cannabis applications through paid partnerships with cannabis publications and detailed instructions for cannabis-related uses, Luxco was:

1. Aiding and abetting the use of a controlled substance by providing specialized tools and instructions designed specifically for cannabis processing; and

2. Engaging in conspiracy by coordinating marketing efforts with cannabis-focused publications to promote illegal activities.

The marketing materials specifically promote Everclear as "one of the best choices for making [cannabis] tinctures," explaining that "the higher the alcohol percentage, the more effectively it dissolves the plant's compounds" to create "a more efficacious end product." Additionally, a common method to extract tetrahydrocannabinol from marijuana involves heating Everclear, which provides a likely explanation as to why Luxco removed its prominent warning labels and engaged in a marketing strategy that created the false, and very dangerous perception, that Everclear was safe to handle around heat and open flames.

This puts Luxco in a paradoxical position: either they were knowingly promoting illegal activities in violation of federal law, or they were attempting to exploit a perceived legal loophole while encouraging dangerous uses of their product. In either case, this marketing strategy demonstrates a profound disregard for both legal compliance and consumer safety and directly led to Yvette's serious injuries and permanent disfigurement.

The illegality of these promotions adds yet another layer to Luxco's unconscionable conduct. Not only did the company, who sought to increase sales of Everclear by marketing it for non-consumption purposes, deliberately remove critical safety warnings while encouraging dangerous uses of their product, but did so in pursuit of profits from activities

that remain federally prohibited, a truly extraordinary demonstration of corporate irresponsibility.

## Unfair and Deceptive Business Practices

Luxco's actions constitute unfair and deceptive practices under M.G.L. c. 93A § 2, as defined by 940 CMR 3.16, through a pattern of corporate misconduct that directly caused Yvette's catastrophic burn injuries. These practices, detailed thoroughly above, include violations of the FHSA, and Massachusetts warranty laws, as well as deceptive marketing and deliberate safety omissions. Luxco engaged in unfair and deceptive acts, including, but not limited to, the following:

- Deliberate Removal of Critical Safety Warnings: Luxco possessed specific and long-term knowledge of Everclear 190-proof's extreme flammability, as evidenced by its pre-2018 warning explicitly stating, "**CAUTION: DO NOT APPLY TO OPEN FLAME. KEEP AWAY FROM FIRE, HEAT AND OPEN FLAME - CONTENTS MAY IGNITE OR EXPLODE….**" In 2018, Luxco deliberately removed the warning, reducing it to a vague "WARNING: FLAMMABLE LIQUID. HANDLE WITH CARE" on the rear label, solely to enhance marketability and appeal to premium spirits consumers, including for illegal uses related to marijuana. This unconscionable act (940 CMR 3.16(1)) concealed critical safety information that would have influenced consumer behavior (940 CMR 3.16(2)), foreseeably leading to the misuse that caused Yvette's injuries.

- Failure to Include Industry-Standard Safety Features: Luxco failed to incorporate a flame arrestor, a low-cost safety feature used by Bacardi 151 (75.5% ethanol) before its 2016 discontinuation, despite Everclear's higher 95% alcohol content and greater flammability (flash point 57.2°F, Category 2 Flammable Liquid). This omission falls below industry standards and creates an unreasonable risk of injury, constituting an unconscionable practice under 940 CMR 3.16(1).

- Deceptive Marketing for Non-Beverage Household Uses: Luxco actively marketed Everclear for non-beverage uses, including kitchen applications (e.g., flavor extraction, baking aid), cleaning products (e.g., disinfectant wipes, glass cleaner), and cosmetics (e.g., deodorant, perfume). By promoting Everclear as a "must-have in every household" with "extracting, disinfecting, and solvent properties," Luxco encouraged uses involving ignition sources, such as cooking or cleaning near open flames, without adequate warnings. This deceptive practice, adopted by retailers nationwide, including Town Wine & More in Shrewsbury where the Everclear that caused Yvette's injuries was purchased and which advertises Everclear as "ideal for cooking to extract the flavors of the food," on its website mirrors Luxco's marketing materials (e.g., website and social media accounts) and violates M.G.L. c. 93A § 2 by failing to accurately disclose flammability risks (940 CMR 3.16(2)).

- Violations of Federal Consumer Protection Laws: Luxco has also violated 27 C.F.R. § 5.122, 16 C.F.R. § 1500.121 and federal statutes prohibiting the

introduction of misbranded hazardous substances into interstate commerce and knowingly violating the FHSA (15 U.S.C. §§ 1263, 1264). These statutory violations, which carry both criminal penalties and civil penalties, constitute per se unfair and deceptive acts under 940 CMR 3.16(4). The fact that these federal violations include potential criminal sanctions underscores the severity of Luxco's misconduct.

- Violation of the Controlled Substances Act: Luxco's marketing of Everclear for cannabis processing violated federal law, as marijuana remains a Schedule 1 controlled substance under the Controlled Substances Act (21 U.S.C. § 841). By promoting Everclear for illegal cannabis applications through targeted marketing, Luxco aided and abetted (18 U.S.C. § 2) and conspired to commit (21 U.S.C. § 846) federal drug offenses. This unlawful promotion, which encouraged heating Everclear, contributed to the dangerous perception that it was safe near flames, exacerbating the deceptive practices that led to Yvette's injuries. (940 CMR 3.16(1).

- Violation of the regulations of the Massachusetts Alcoholic Beverages Control Commission. Specifically, 204 CMR 2.03 and 2.06 by making deceptive and misleading statements and omissions about Everclear's safety profile and suitability for use near open flames. (940 CMR 3.16(2,3)).

- Deceptive Dual Branding with Inconsistent Warnings: Luxco sells chemically identical 190-proof alcohol under "Golden Grain" and "Crystal Clear" brands with prominent flammability warnings, while removing these warnings from Everclear for marketing purposes. This selective warning practice, prioritizing aesthetics over safety, demonstrates willful deception and unconscionable conduct (940 CMR 3.16(1)).

- Reckless Visual Promotions on Official Platforms: Luxco's official website and Instagram account not only promote kitchen uses of Everclear but also showcase highly dangerous practices through photographs and videos. These platforms depict Everclear being used near gas stoves with open flames and, more alarmingly, show Everclear being poured into cooking pans with flames inches from the bottle. Such reckless visual demonstrations violate deceptive marketing regulations (940 CMR 3.16(2)) by portraying inherently dangerous activities as safe and routine, directly contradicting the safety warnings on Luxco's chemically identical Golden Grain product.

- Deliberately Obscured Social Media Warnings: In a particularly egregious example of deceptive practice, Luxco included a disclaimer on its Instagram post promoting Everclear as fuel which stated "DISCLAIMER: High-proof alcohol is flammable. Handle carefully and keep away from open flames until ready to ignite. Follow all safety precautions. Keep out of the reach of children and pets." However, this critical safety information was deliberately rendered virtually invisible by using a font color nearly identical to the background and employing a minuscule font size. This calculated design choice effectively nullified the warning while creating a deceptive paper trail suggesting Luxco had provided

adequate safety information. This practice violates 940 CR 3.16(2) by failing to "disclose to a buyer or prospective buyer and fact, the disclosure of which may have influenced the buyer or prospective buyer from entering into the transaction." The deliberate obscuring of this warning demonstrates Luxco's knowledge of the danger combined with their intentional effort to prevent consumers from appreciating that risk.

Luxco also breached the implied warranty of merchantability (M.G.L. c. 106 § 2-314) and the implied warranty of fitness for a particular purpose (M.G.L. c. 106 § 2-315), which constitute per se violations of Chapter 93A. See <u>Maillet v. ATF-Davidson Co.</u>, 407 Mass. 185, 193 (1990) (holding that breach of warranty constitutes a Chapter 93A violation). Specifically:

- Implied Warranty of Merchantability: Everclear was unmerchantable and unfit for ordinary use because it lacked essential safety features such as a flame arrestor, contained inadequate warnings for its marketed uses near ignition sources, and deviated from industry standards for high-proof spirits and the other uses intended by Luxco, such as a fuel. Through its "Make it Your Own" campaign, Luxco deliberately established new "ordinary purposes" for Everclear beyond beverage consumption (including fuel, solvent/cleaner, and DIY applications involving ignition sources) while failing to ensure the product was safe for these purposes. It should be noted that the product itself is unreasonably dangerous, as evidenced by approximately a dozen states prohibiting its sale.

- Implied Warranty of Fitness for Particular Purpose: Luxco knew or had reason to know that consumers were purchasing Everclear for particular purposes that Luxco actively promoted, including use as a fuel and solvent for DIY projects. Luxco's marketing explicitly represented Everclear as "perfect" for these applications, knowing consumers would rely on Luxco's specialized knowledge as a distiller and bottler.

- Deceptive Warranty Practices: Luxco's warranty breaches were particularly deceptive because Luxco possessed internal research showing 12% of month purchasers used Everclear as fuel, yet deliberately stripped away warnings specifically addressing this use while continuing to promote it. This direct contradiction between knowledge and action demonstrates willful deception about the product's fitness for the very purposes Luxco was actively promoting.

## Willful and Knowing Violations Justifying Multiple Damages

Luxco's unfair and deceptive practices, as detailed above, were willful and knowing, entitling Yvette to double or triple damages under M.G.L. c. 93A § 9. Luxco deliberately removed critical flammability warnings in 2018, promoted Everclear for high-risk and illegal uses such as cannabis processing and cooking near open flames, and failed to implement remedial measures like flame arrestors. These intentional acts, coupled with selective warning practices on chemically identical brands and violations of state and federal law, demonstrate a calculated strategy to prioritize profits over consumer safety,

while fully aware of the risks that led to Yvette's life-threatening injuries and permanent disfigurement.

The obscured Instagram disclaimer, using a font color nearly identical to the background and minuscule size to render warnings virtually invisible while promoting Everclear as a fuel, provides irrefutable evidence of willful and knowing violations. This calculated design choice shows Luxco recognized the need for warnings about keeping Everclear away from open flames (implicitly acknowledging the explosive hazard) while simultaneously ensuring consumers would not notice these warnings. This duplicitous approach, technically including warnings while making them functionally invisible, demonstrates not just negligence but a deliberate strategy to deceive consumers about known dangers while creating a superficial defense against liability.

Luxco's willful and knowing violations of Chapter 93A are further demonstrated by their complete failure to take any corrective action after receiving direct notice of the sever dangers posed by their product. On May 26, 2025, immediately following Yvette's catastrophic injuries, counsel for Yvette sent a detailed letter to Luxco explicitly warning them about the extreme dangers of Everclear and urging immediate action to prevent further tragedies.

This letter specifically notified Luxco that:

1. Its product had just caused catastrophic burn injuries through the exact mechanism their pre-2018 warnings had cautioned against;

2. The scientific mechanism of how Everclear's 95% ethanol content creates explosive fireballs when exposed to ignition sources;

3. Its deliberate removal of explicit warnings against applying the product to open flames directly contributed to this tragedy;

4. It continued to maintain comprehensive warnings on chemically identical products (Golden Grain and Crystal Clear), demonstrating their knowledge of the necessity of such warnings; and

5. Their marketing campaign was actively promoting dangerous uses around ignition sources.

The letter urged Luxco to take immediate safety measures, including restoring the original safety warnings, issuing urgent public safety notices, notifying distributors and retailers to cease promoting dangerous uses, ceasing all marketing suggesting Everclear is suitable for household uses near ignition sources, and implementing safety features like flame arrestor screens. Despite this direct explicit notice of ongoing danger to consumers, Luxco has taken no visible action in response. It has not recalled the product, issued warnings, modified their marketing, or implemented safety features. This complete disregard for consumer safety after being explicitly informed of a life-threatening hazard is further evidence of willful and knowing misconduct under Chapter 93A.

This egregious conduct, marked by knowing deception and reckless indifference, far exceeds mere negligence and justifies multiple damages to compensate Yvette and deter future misconduct. It should be noted that even after learning of Yvette's injuries, Luxco made no effort to warn consumers of the dangers of Everclear or remove all advertising from its websites and social media accounts suggesting Everclear was suitable for use in cooking and around open flames. Luxco's conscious choices to mislead reasonable consumers about Everclear's safety, perpetuated through ongoing deceptive marketing, constitutes a profound breach of legal and ethical standards, warranting the maximum penalties available under M.G.L. c. 93A, including treble damages and reasonable attorney's fees.

## Yvette Injuries and Ongoing Medical Consequences

When Everclear's explosive vapors ignited, creating the fireball that engulfed her, Yvette suffered full-thickness burns covering approximately 30% of her total body surface area. These catastrophic injuries required immediate life-saving intervention and fundamentally altered every aspect of her existence.

Upon arrival at Massachusetts General Hospital in the early morning hours of May 14, 2025, Yvette's condition was critical. Her initial assessment revealed the devastating extent of her injuries: severe burns affecting her bilateral legs, neck, left hand and breasts, including her nipples. The majority of her burns were classified as full-thickness (third-degree), meaning they had destroyed not only the epidermis and dermis but had penetrated into the subcutaneous tissue, destroying hair follicles, sweat glands, and nerve endings.

The burns to Yvette's breasts and nipples represent some of the most sensitive and psychologically devastating injuries a young woman can sustain. These intimate areas of her body, fundamental to her feminine identity and future maternal aspirations, were severely damaged by the explosive fireball. The breast tissue, being particularly delicate and vascular, suffered extensive damage.

Burn injuries are among the most severe traumatic injury one can sustain. As the amount of body surface burned increases, there is a corresponding increase in hypermetabolism. The hypermetabolism results from increased stress and inflammatory mediators in response to toxic chemicals released from damaged collagen and fat. The physiological demands to maintain this energy production require large amounts of glucose, which are maintained through gluconeogenesis in the liver. If left untreated, the hypermetabolic response increase liver and cardiac work, impairs muscle function, increases the risk of sepsis and alters hormone levels.

Yvette's initial vital signs reflected the severity of her trauma. Her blood pressure dropped to dangerous levels (93/54 mmHg by June 10, 2025), requiring constant monitoring and intervention. Her hemoglobin levels plummeted from 16.7 g/dL on admission to as low as 7.2 g/dL on May 28, indicating severe blood loss and the body's inability to maintain adequate oxygen transport. Her white blood cell count spiked to 22.18 K/uL on May 21, nearly double the normal range, reflecting her body's desperate fight against infection and the massive inflammatory response to her burns.

Yvette was intubated prior to arrival, as evidenced by the chest X-rays showing an endotracheal tube positioned 3 cm above the carina. She remained on mechanical ventilation until May 14, when she was finally extubated, marking the beginning of a long and uncertain recovery. Her oxygen saturation levels required careful monitoring, and she needed supplemental oxygen at 30% concentration during her most critical period.

Yvette's treatment required multiple complex surgical procedures that were excruciatingly painful over the course of her hospitalization. The medical team performed extensive debridement procedures on May 16, 21, and 27, 2025, surgically removing dead and damaged tissue to prevent infection and prepare the wound beds for grafting. These procedures are among the most painful in medical practice, requiring the surgical removal of burned tissue down to viable layers.

On May 16, 2025, Dr. John Schulz performed the first allograft procedure, implanting multiple tissue grafts from LIFENET HEALTH to begin the reconstruction process. The medical records document the placement of specialized burn repair grafts including:

- Right leg: SK-M tissue graft (Serial #2217410-9005) measuring 1/4 square foot;

- Left leg: Two separate SK-M tissue grafts (Serial #2510875-9005 and #2214126-9011);

- Neck: SK-M tissue graft (Serial #2417133-9005) implanted on May 21 by Dr. Jeremy Goverman; and

- Left hand: SK-M tissue graft (Serial #2217285-9002) also implanted on May 21 by Dr. Jeremy Goverman.

On May 27, 2025, the medical team performed an autograft procedure, taking healthy skin from Yvette's own body to create permanent coverage for the burn areas. This procedure, while necessary for healing, created additional wounds at the donor sites, effectively increasing her injured body surface area.

The severity of Yvette's pain required an extensive regimen of powerful medications. Hospital records reveal that Yvette received multiple high-potency opioids and anesthetics including morphine, fentanyl (with multiple administrations), hydromorphone (both as injections and in a patient-controlled analgesia pump), and ketamine (a powerful dissociative anesthetic typically reserved for the most severe pain). She also received propofol (a general anesthetic), midazolam (a potent sedative), and various other powerful analgesics. Despite this aggressive multi-modal pain management approach combining the strongest available opioids with adjuvant medications, Yvette continued to experience excruciating pain. The necessity for such powerful medications, many typically reserved for surgical procedures or trauma cases, underscores the extreme nature of the pain associated with her burn injuries. The medical team also prescribed quetiapine (Seroquel) for insomnia, reflecting the severe psychological impact of her trauma. Her prescription for escitalopram (Lexapro), an antidepressant started on June 11, 2025, indicates the development of depression and anxiety related to her injuries.

The psychological impact of Yvette's experience cannot be overstated. In her own words, she recalls "waking up days later in a different hospital with burns all over my body and horribly disfigured." This traumatic awakening to a fundamentally altered reality represents the beginning of what will likely be a lifelong struggle with body image, self-confidence, and post-traumatic stress disorder.

Yvette's medical records reveal multiple ongoing complications typical of severe burn injuries. Her laboratory values throughout her hospitalization show persistent anemia, with hemoglobin levels consistently below normal ranges (as low as 7.2 g/dL compared to the normal 12.0-16.0 g/dL range). Her platelet counts became dangerously elevated, reaching 743 K/uL (normal range 150-450), indicating her body's hyperactive response to injury and potential risk for blood clots.

Electrolyte imbalances plagued her recovery, with calcium levels frequently dropping below normal (as low as 7.4 mg/dL compared to normal 8.5-10.5 mg/dL range) and phosphorus levels often abnormally low. These imbalances required constant monitoring and supplementation, reflecting her body's disrupted metabolism and the massive fluid shifts that occur with severe burns.

Most concerning was the development of a urinary tract infection with Proteus mirabilis, documented on May 18, 2025, demonstrating her increased susceptibility to infection due to her compromised immune system and the invasive nature of her medical care.

The location and extent of Yvette's burns have resulted in permanent, visible disfigurement that affects her daily life and self-image. The burns to her bilateral legs have created significant scarring that will require ongoing scar management, including pressure garments, physical therapy, and likely additional reconstructive surgeries in the future. The neck burns are particularly devastating from a cosmetic standpoint, as they are in a highly visible area that cannot be easily concealed.

The burns to her left hand present the most significant functional challenges. Hand burns commonly result in contractures, loss of range of motion, and decreased grip strength. For someone who aspired to be a musician, these limitations are particularly devastating. The medical records show she required ongoing treatment with hydroxyzine for itching, indicating the persistent discomfort and irritation that burn survivors experience as their wounds heal and scar tissue forms.

Perhaps the most heartbreaking aspect of Yvette's injuries is the impact on her musical aspirations. As her parents described, Yvette was working to "harness her talent in singing and music while studying hard to finish her Law degree in flying colors." The burns to her neck have affected her vocal capabilities, while the injury to her left hand has undoubtedly impacted her ability to play musical instruments.

The psychological trauma of her disfigurement has also affected her confidence to perform, a critical component of any musical career. The young woman who was once "enthusiastic, cheerful and full of hope" now faces daily reminders of her trauma in the mirror and must rebuild not only her physical capabilities but also her sense of self-worth and confidence.

The use of cadaver skin for several of Yvette's grafts has added a profound layer of psychological distress to her already traumatic experience. The knowledge that her body incorporated tissue from a deceased donor has caused significant emotional turmoil, compounding her struggles with body image and self-identity. Yvette has expressed feelings of alienation and discomfort in knowing that part of her physical recovery depended on foreign tissue. This distress is not merely transient but contributes to her ongoing psychological challenges, including anxiety and depression.

Yvette's discharge on June 10, 2025, marked not the end of her medical journey, but rather its transition to long-term management. Her discharge medications reflect the ongoing nature of her care: pain management with oxycodone and gabapentin, mental health support with escitalopram, and antihistamines for the persistent itching that plagues burn survivors.

Yvette had a follow-up appointment with the Burn Associates clinic on June 18, 2025, the first of what will likely be many follow-up appointments over the coming years. Burn survivors typically require ongoing care for years after their initial injury, including scar revision surgeries, physical therapy, occupational therapy, and psychological counseling.

Based on the extent and location of Yvette's burns, she faces a lifetime of medical management and functional limitations. Burn scars continue to evolve for years after the initial injury, often becoming tighter and more restrictive over time. She will likely require multiple revision surgeries to maintain function and appearance, particularly in areas like her hands and neck where mobility is critical.

The psychological impact of her injuries extends far beyond the initial trauma. Studies show that burn survivors have significantly higher rates of depression, anxiety, and post-traumatic stress disorder compared to the general population. The visible nature of many of Yvette's burns means she will face daily reminders of her trauma and potentially uncomfortable social interactions for the rest of her life.

Her educational and career trajectory has been permanently altered. The promising law student who arrived in Massachusetts with dreams of international legal practice now faces an uncertain future, with her academic program interrupted and her musical aspirations likely forever changed.

The totality of Yvette's injuries represents not just physical trauma, but the destruction of a young woman's carefully planned future and the infliction of lifelong pain, disfigurement, and limitation. These catastrophic consequences flow directly from Luxco's conscious decision to prioritize marketing aesthetics over consumer safety, making this case a clear example of how corporate recklessness can destroy individual lives and dreams.

### Life Expectancy and Future Impact

According to the "United States Life Tables, 2022" from the National Vital Statistics Reports (Vol. 74, No. 2, April 8, 2025), the plaintiff, a Filipino female born on March 3, 2003 (currently 22 years old as of June 2025), has a significant life expectancy ahead of her. Based on Table 10 for the Asian, non-Hispanic population, and interpolating between the figures for ages 20 and 25, a 22-year-old female can expect to live an additional 64.9

years. This means Yvette will likely live until approximately 2090, enduring the consequences of her injuries for the next 65 years.

This sobering reality cannot be overstated: for the remainder of her natural life, more than six decades, Yvette will bear the physical and emotional scars of this traumatic event. Every morning for the next 65 years, she will wake up to the sight of her scarred body in the mirror, a daily reminder of the trauma she endured. Simple activities most take for granted, trying on clothes, going swimming, or even wearing a sleeveless top on a hot summer day, will forever be colored by self-consciousness and the unwanted attention her scars may attract.

The burns and subsequent scarring to her chest area have profoundly affected an intimate part of her femininity. For the rest of her life, she will experience self-consciousness and potential physical discomfort in what should be her most private and tender moments. More devastatingly, as she enters the years when she might wish to become a mother, she faces the heartbreaking reality that the scarring will interfere with her ability to breastfeed a child, robbing her of one of the most profound bonding experiences between mother and infant. This is not a temporary loss but one that will affect her during what should be one of the most joyful chapters of her life.

Yvette's musical aspirations, once central to her identity and future plans, have been permanently altered. Her hands and neck, crucial instruments for her musical expression, now bear the limitations imposed by her injuries. Each time she attempts to sing or play as she once did, she will confront these limitations anew, not just for a few years, but for her entire adult life.

For the next six decades, every new relationship, romantic, professional, or social, will begin with the unavoidable reality of her visible scars and the internal struggle of reconciling her identity. She will face countless situations where she must explain her injuries or endure the discomfort of others' reactions, from well-meaning questions to uncomfortable stares.

The physical discomfort from her scarring and injuries will not be confined to the immediate recovery period but will accompany her through middle age, into her senior years, and to the end of her life. As she ages, these injuries may compound other health challenges, creating a cascading effect of physical limitations and discomfort.

The psychological impact, traumatic stress, anxiety, and depression, represents not a temporary adjustment but a fundamental alteration to her emotional landscape. For most of her adult life, she will manage these conditions, seeking a measure of peace that others take for granted.

Perhaps the most piercing irony in this case is that by deliberately rendered its warning about flammability "nearly invisible" in its social media post, using a font color almost identical to the background and minuscule font size, Luxco made Yvette's injuries permanently and unavoidably visible. The very company that worked to hide crucial safety warnings in the pursuit of profit has ensured that Yvette can never hide the consequences of its recklessness and complete indifference to human life. Unlike Luxco's deliberately

obscured disclaimer that was "practically impossible for viewers to notice," Yvette's scars will be impossible not to notice, for the next 65 years of her life. The company that took such care to minimize the visibility of danger warnings has maximized the visibility of what happens when those dangers materialize.

The damages sought reflect the gravity of imposing these burdens on a young woman for what will likely be more than six decades of her life. They acknowledge that the consequences of her injuries will still be present when she celebrates her 30th, 50th, and 80th birthdays, and during deeply personal milestones like marriage and motherhood. The compensation requested is not merely for what happened on a single day, but for how that day has irrevocably altered the thousands of days that will follow.

### Injunctive Relief

In addition to monetary compensation, we demand that Luxco immediately restore the pre-2018 warnings to Everclear bottles and cease all marketing and promotion of Everclear for non-beverage purposes. The need for urgent injunctive relief is compelling and necessary to prevent further catastrophic injuries. These types of ethanol-related burn incidents are alarmingly common and invariably result in severe, life-altering injuries. As documented in Log and Moi (2018), high-proof alcohol incidents frequently involve children and unsuspecting adults who have no reason to anticipate the extreme danger.

The devastating consequences of these incidents were tragically illustrated in 2014 at the Nevada Discovery Museum, when a similar high-proof alcohol demonstration involving methanol resulted in 13 children suffering severe burns. In that incident, which was captured on cell phone video and investigated by the U.S. Chemical Safety Board, a museum presenter was using methanol (which has similar flammability properties to ethanol) in a demonstration when vapors ignited, causing a flash fire that engulfed children as far as 15 feet away. The children, ranging from 8 to 12 years old, suffered second and third-degree burns to their faces, necks, arms and hands. What makes this incident particularly relevant is that it involved the exact same mechanism of injury as Yvette's case, the container gas phase ignition that propelled burning liquid outward, creating an explosive fireball.



**Methanol Igniting During Incident**

Most alarmingly, just days ago, on June 23, 2025, 4-year-old Ryker Corona suffered serious burns to 15% of his body during an incident at the Jasmine Moran Children's Museum in Oklahoma. According to eyewitness Daycee Phillips, the fire was caused when "a bottle of alcohol, near an open flame at the s'mores making station, was ignited." Phillips described hearing "a loud boom" followed by "huge flames on the table," and noted that

"water was not putting out the alcohol fire," a characteristic specific to high-proof alcohol fires. The child sustained first and second-degree burns with blisters all over his face. This incident, occurring just days before this letter, demonstrates the imminent and ongoing danger posed by high-proof alcohols like Everclear, especially when used for non-beverage purposes around open flames, precisely the usage scenarios that Luxco actively promotes.



**Ryker Corona**

A similar incident occurred at Beacon High School in New York City in 2014, where student Alonzo Yanes, then 16 years old, was catastrophically injured when the gas phase of a methanol container ignited during a "Rainbow Flame" demonstration. The parallels to Yvette's case are striking and significant. Yanes sustained third-degree burns over 31% of his body, nearly identical to Yvette's injuries, with severe damage to his face, ears, neck, arms, and hands. Like Yvette, he suffered degloving injuries and required extensive skin grafts that left him permanently disfigured. The court record describes in detail how Yanes "felt trapped in his own body" and "completely helpless" during the incident, experiencing "the worst pain he had ever felt in his entire life" with unceasing, excruciating physical pain throughout his hospital stay that was "minimally alleviated, if at all, with pain medication," a description that exactly mirrors Yvette's own experience.

Although a jury returned a verdict of $60 million, New York courts ultimately awarded Yanes $29 million ($12 million for past pain and suffering and $17 million for future pain and suffering). Just as in Yvette's case, Yanes lost sensation in the burned areas, could no longer regulate his body temperature due to destroyed sweat glands, and suffered profound psychological trauma that dramatically altered his life. These incidents were so alarming that the CSB issued a special safety bulletin[5] specifically addressing the dangers of high-proof alcohols in container ignition scenarios.

The Consumer Product Safety Commission (CPSC) has recently taken decisive action against similar hazards by recalling numerous firepits and firepit gel fuels due to burn risks. Most notably, in 2023, the CPSC recalled approximately 20,000 Solo Stove Mesa Tabletop Firepits with Pellet Adapters due to similar fire and burn hazards. It is highly probable that Everclear, which Luxco actively markets as a fuel, has been involved in some of these incidents, given that internal marketing data shows 12% of monthly purchasers use Everclear specifically as a fuel. The parallels between these recalled products and Everclear marketed as a fuel are striking, both involve flammable substances that can create explosive fireballs when ignited. Yet while the CPSC has acted to protect consumers from

---

[5] As part of the bulletin the CSB made a entitled After the Rainbow, which can be viewed at https://www.csb.gov/videos/after-the-rainbow/.

commercially marketed fuel products, Everclear continues to be promoted for identical uses without adequate warnings or safety features.

Furthermore, despite my May 26, 2025, letter urging Luxco to cease its dangerous practices, it has maintained the status quo. Additionally, when I emailed Robert Shaffer, who is the General Counsel of the retailer that sold the Everclear, asking him to contact me to discuss implementing measures to prevent further injuries, he responded, stating the only thing he could discern from the security video and a letter outlining the safety issue was someone injuring Yvette "through unforeseen and reckless acts." Mr. Shaffer also questioned what we could possibly discuss. As of the date of this letter, the product remains on sale by the merchant.

Mr. Schaffer's dismissive response is particularly telling. Despite being fully informed of the product's dangers and Yvette's catastrophic injuries, the retailer has made a calculated business decision to continue selling Everclear without additional warnings or safety measures. Their refusal to implement subsequent remedial measures, which could potentially weaken our case but protect future consumers, speaks volumes about their priorities. This deliberate choice to prioritize profits over human safety, even after receiving explicit notice of the severe risks, further demonstrates the willful and knowing nature of their conduct and strengthens our case for injunctive relief. Without court intervention, these parties will continue to knowingly distribute a dangerous product that has already caused life-altering injuries.

The CPSC has recently taken decisive action against similar hazards by recalling dangerous alcohol-burning products. Most recently, in October 2024, the CPSC recalled approximately 89,500 Colsen-branded fire pits due to the precise danger at issue in this case: "flame jetting." The CPSC explicitly described this hazard as occurring "when fire flashes back to the alcohol container and suddenly propels burning alcohol out of the container and onto people nearby," the exact mechanism of injury that caused Yvette's burns. A video produced by the CPSC showing the phenomenon can be viewed at https://www.youtube.com/shorts/dW1y0UF_zLg.

The recall notice specifically warns that "alcohol flames can be invisible" and that these incidents "can lead to injury quickly and unexpectedly, causing burns in less than one second, that can be serious and deadly." The CPSC reported 31 incidents resulting in 19 burn injuries, including "two incidents [that] resulted in third degree burns to more than 40% of victims' bodies" and "at least six incidents [that] have involved surgery, prolonged medical treatment, admission to burn treatment facilities, short-term disability, loss of function, physical therapy, or permanent disfigurement."

While the recall doesn't specify which alcohol fuel was used in these fire pits, Everclear is frequently recommended online for such applications given its high proof and "clean burning" properties that Luxco actively promotes. In fact, Luxco's marketing materials and social media content specifically encourage using Everclear as a fuel source for various applications, and internal marketing data confirms that 12% of monthly purchasers use Everclear specifically as a fuel.

The parallels between these recalled fire pits and Everclear marketed as a fuel are striking, both involve highly flammable alcohols that can create explosive fireballs when ignited through the same flame-jetting mechanism. Yet Everclear continues to be promoted for identical uses without adequate warnings or safety features.

Therefore, we demand that Luxco immediately restore the pre-2018 warnings to all Everclear bottles and cease all marketing and promotion of Everclear for non-beverage purposes, including, but not limited to its use as a cleaning agent, fuel, or in cannabis tinctures, particularly any applications that may result in exposure to ignition sources. This includes discontinuing all related content on www.diywitheverclear.com, social media platforms such as Instagram, and third-party publications like Cannabis Now, as well as prohibiting retailers from advertising Everclear for such purposes.

If Luxco does not agree to implement these changes, my client intends to seek a preliminary and permanent injunction. Massachusetts General Laws Chapter 93A, Section 9(1) expressly authorizes courts to grant equitable relief, stating that "any person... may bring an action... for damages and such equitable relief, including an injunction, as the court deems to be necessary and proper." The Massachusetts courts have consistently recognized that injunctive relief under 93A is appropriate to enjoin unfair and deceptive business practices when the following four essential factors are present:

First, Yvette has demonstrated an overwhelming likelihood of success on the merits. The evidence establishes that Luxco deliberately removed critical safety warnings while simultaneously promoting dangerous non-beverage uses of Everclear, a deceptive practice that violates M.G.L. c. 93A. The facts surrounding Yvette's catastrophic injuries, coupled with Luxco's knowledge of the dangers and deliberate marketing choices, present a textbook case of unfair and deceptive trade practices.

Second, there is an imminent danger of irreparable harm to the public. As demonstrated by the June 2025 Jasmine Moran Children's Museum incident involving 4-year-old Ryker Corona, the October 2024 CPSC recall of 89,500 fire pits due to "flame jetting," and the documented cases in Log and Moi (2018), these incidents continue to occur with alarming frequency and devastating consequences. The CPSC has explicitly warned that these injuries occur "quickly and unexpectedly, causing burns in less than one second, that can be serious and deadly." Without immediate intervention, more unsuspecting consumers will suffer catastrophic burn injuries.

Third, the balance of harms weighs decisively in favor of granting injunctive relief. The "harm" to Luxco, adding back safety warnings and ceasing marketing for dangerous uses, is minimal and entirely reasonable. In contrast, the harm to consumers like Yvette is catastrophic, life-altering, and permanent. The New York courts' $29 million award to Alonzo Yanes for nearly identical injuries underscores the extreme gravity of these harms.

Fourth, the public interest overwhelmingly favors injunctive relief. The CPSC has taken decisive action against similar hazards, recognizing the compelling public interest in preventing these devastating injuries. The fact that the CPSC ordered a complete market withdrawal of Colsen fire pits, which pose the exact same flame-jetting hazard as Everclear

when used as promoted by Luxco, demonstrates the seriousness with which federal safety regulators view this danger.

These injunctive relief measures are essential to prevent similar catastrophic injuries to others and are expressly authorized under M.G.L. c. 93A, Section 9(1), which empowers courts to enjoin unfair or deceptive practices to protect the public. The Supreme Judicial Court has consistently held that the "equitable relief" provision of Chapter 93A should be broadly construed to effectuate the statute's consumer protection purposes. There can be no dispute here that such action is needed to prevent similar catastrophic injuries to others.

Given the urgent nature of this safety hazard and the ongoing risk to public safety, as evidenced by the Ryker Corona incident just days ago, please be advised that Yvette may not wait for the full 30-day presentment period to expire before filing suit and applying for a preliminary injunction. The imminent danger posed by Everclear's continued sale and marketing for dangerous uses may necessitate immediate court intervention to prevent further catastrophic injuries while the Chapter 93A claim is being resolved.

## **Demand**

We hereby demand $56,795,000 as a full and final settlement of Yvette's claims. As outlined in the Damages Summary Table at the end of this letter, we have calculated Yvette's compensatory damages to be at least $18,915,000. This figure represents a thorough assessment of her extensive past and future medical expenses, pain and suffering, lost earnings capacity, loss of enjoyment of life (particularly her musical abilities), permanent disfigurement, emotional distress, and educational impacts.

Even if one were to substantially discount many of the damages categories in our assessment (which would not be warranted given the severity and permanence of Yvette's injuries), the floor for compensatory damages in this case would still be $5-7 million at an absolute minimum. This conservative floor is based solely on Yvette's documented medical expenses, objectively verifiable future medical needs, and the indisputable pain and suffering associated with third-degree burns over 30% of her body.

Massachusetts juries have consistently returned verdicts in this range even for less severe burn injuries and without the kind of egregious corporate conduct present in this case. In the Alonzo Yanes case described above, a jury awarded him $60 million for third-degree burns over 30% of his body which was caused by a high-proof alcohol ignition, with $29,585,000 allocated for past pain and suffering and $29,585,000 for future pain and suffering over an estimated 54 years, injuries nearly identical to Yvette's in extent and impact. <u>Yanes v City of New York</u>, 164 NYS3d 129 (1st Dept 2021).

With the addition of treble damages under Chapter 93A, which are clearly warranted by Luxco's willful and knowing violations of the statute detailed throughout this letter, the likely recovery, even using this extremely conservative floor, would be $9-15 million, plus attorney's fees and costs. When viewed in this context, our total demand of $56,795,000 represents a reasonable assessment that accounts for the true extent of Yvette's catastrophic injuries, the 65 years she will live with these permanent disabilities, and the overwhelming evidence of Luxco's willful and knowing misconduct.

In the interest of efficient resolution, we are willing to agree to mediate this case within 30 days with a mutually agreeable mediator based in Massachusetts. This offer to mediate demonstrates our good faith and willingness to engage in meaningful settlement discussions. However, should Luxco decline this opportunity for early resolution, we are fully prepared to pursue all available legal remedies, including seeking maximum treble damages under Chapter 93A and injunctive relief.

Please be advised that if Luxco fails to make a reasonable settlement offer within 30 days of receipt of this letter, Ms. Digan will assert claims against Luxco pursuant to M.G.L. c. 93A and other applicable laws. She will also seek a preliminary and permanent injunction to prohibit the above unfair and deceptive business practices. As detailed above, Luxco's willful and knowing unfair and deceptive practices, including the deliberate removal of critical safety warnings and deceptive marketing of Everclear for non-beverage uses, already entitles Ms. Digan to double or treble damages under M.G.L. c. 93A, § 9. Luxco's failure to extend a reasonable offer of settlement within 30 days of receipt of this letter will provide an additional basis for the court to award treble damages, together with attorney's fees and costs associated with the statutory action, as provided by M.G.L. c. 93A, § 9(3).

Responses should be sent via email to ACLERMONT@ATTORNEYAPC.COM, by unregistered mail to 6 LIBERTY SQUARE PMB 226 BOSTON, MA 02109 or by registered mail to HANNON LERNER, 184 MAIN STREET, LEE, MA 01238.

Respectfully,

Adam Clermont

## Photographs of Injuries





**Damages Summary Table**

| Category | Subcategory | Amount | Basis/Justification |
|---|---|---|---|
| **MEDICAL EXPENSES** | | | |
| | Past Medical Bills | $560,000 | Documented interim hospital bills from MGH |
| | Future Medical Care | $1,240,000 | Estimated ongoing care: revision surgeries, scar management, physical therapy, mental health treatment over lifetime |
| | **Medical Subtotal** | **$1,800,000** | |
| **PAIN & SUFFERING** | | | |
| | Past Pain & Suffering | $2,500,000 | Extreme pain from 30% body burns, multiple surgeries, month-long ICU stay, intubation |
| | Future Pain & Suffering | $5,000,000 | Lifelong pain from scarring, ongoing procedures, permanent disfigurement |
| | **Pain & Suffering Subtotal** | **$7,500,000** | |
| **LOST EARNINGS** | | | |
| | Past Lost Income | $5,000 | Summer employment/internship opportunities lost |
| | Future Lost Earning Capacity | $1,000,000 | Impaired legal career prospects due to disfigurement, interrupted education, lost musical income potential |
| | **Lost Earnings Subtotal** | **$1,005,000** | |

| Category | Subcategory | Amount | Basis/Justification |
|---|---|---|---|
| **LOSS OF ENJOYMENT** | | | |
| | Loss of Musical Abilities | $1,500,000 | Permanent loss of singing/musical performance capacity due to neck/hand burns |
| | Loss of Normal Activities | $2,000,000 | Swimming, sports, social activities limited by scarring and mobility issues |
| | **Loss of Enjoyment Subtotal** | **$3,500,000** | |
| **DISFIGUREMENT** | | | |
| | Permanent Scarring | $2,000,000 | Visible scars on neck, legs, hand affecting appearance and self-esteem |
| | Permanent Scarring | $1,000,000 | Scars on both breasts and burns to nipples affecting femininity/maternity |
| | **Disfigurement Subtotal** | **$3,000,000** | |
| **EMOTIONAL DISTRESS** | | | |
| | PTSD/Anxiety | $800,000 | Documented Lexapro prescription, ongoing mental health needs |
| | Depression | $800,000 | Loss of identity, career dreams, social isolation |
| | Distress From Cadaver Skin | $500,000 | |
| | **Emotional Distress Subtotal** | **$2,100,000** | |

| Category | Subcategory | Amount | Basis/Justification |
|---|---|---|---|
| **EDUCATIONAL IMPACT** | | | |
| | Interrupted Studies | $10,000 | Delayed exchange program, delayed graduation, additional education costs |
| | **Educational Impact Subtotal** | **$10,000** | |
| **TOTAL COMPENSATORY DAMAGES** | | **$18,915,000** | |
| **CHAPTER 93A MULTIPLIER** | | | |
| | Treble Damages (3x) | **$55,745,000** | Available under M.G.L. c. 93A for willful/knowing violations |
| **ATTORNEY'S FEES** | | $150,000 | Estimated fees incurred to date (additional to treble damages) |
| **TOTAL DEMAND** | | **$56,795,000** | |

Copies of Yvette's interim medical bills are attached hereto as **Exhibit 5**.

# EXHIBIT 1



# Safety Data Sheet

# Ethyl Alcohol 95%, 190 Proof, Non-Denatured ACS/USP

## 1. PRODUCT AND COMPANY IDENTIFICATION

**Product Name:** Ethyl Alcohol 95%, 190 Proof, Non-Denatured ACS/USP

**Synonyms/Generic Names:** Ethanol, grain alcohol, EtOH

**Product Number:** 2014

**Product Use:** Industrial, Manufacturing or Laboratory use

**Manufacturer:** Columbus Chemical Industries, Inc.
N4335 Temkin Rd.
Columbus, WI. 53925

**For More Information:** 920-623-2140 (Monday-Friday 8:00-4:30)
www.columbuschemical.com

**In Case of Emergency Call:** CHEMTREC - 800-424-9300 or 703-527-3887 (24 Hours/Day, 7 Days/Week)

## 2. HAZARDS IDENTIFICATION

**Signal Words:** Danger

**Pictograms**



**GHS Classification:**

| Flammable liquids | Category 2 |
|---|---|

Columbus Chemical Industries, Inc.                    Ethyl Alcohol 95%, 190 Proof, Non-Denatured ACS/USP, 2014

| Skin irritation | Category 2 |
| Eye irritation | Category 2B |

**GHS Label Elements, including precautionary statements:**

**Hazard Statements:**

| H225 | Highly flammable liquid and vapor. |
| H315+H320 | Causes skin and eye irritation. |

**Precautionary Statements:**

| P210 | Keep away from heat/sparks/open flames/hot surfaces. No smoking. |
| P233 | Keep container tightly closed. |
| P240 | Ground/Bond container and receiving equipment. |
| P241 | Use explosion-proof electrical/ventilating/lighting/equipment. |
| P242 | Use only non-sparking tools. |
| P243 | Take precautionary measures against static discharge. |
| P264 | Wash hands thoroughly after handling. |
| P270 | Do not eat, drink or smoke when using this product. |
| P280 | Wear protective gloves/protective clothing/eye protection/face protection. |
| P301+P312 | IF SWALLOWED: Call a POISON CENTER/doctor/physician if you feel unwell. |
| P305+P351+P338 | IF IN EYES: Rinse cautiously with water for several minutes. Remove contact lenses, if present and easy to do. Continue rinsing. |
| P312 | Call a POISON CENTER/doctor/physician if you feel unwell. |
| P330 | Rinse mouth. |
| P332+P313 | If skin irritation occurs: Get medical advice/attention. |
| P337+P313 | If eye irritation persists: Get medical advice/attention. |
| P362+P364 | Take off contaminated clothing and wash it before reuse. |
| P370+P378 | In case of fire: Use dry chemical, carbon dioxide or alcohol resistant foam to extinguish. |
| P403+P235 | Store in a well-ventilated place. Keep cool. |
| P405 | Store locked up. |
| P501 | Dispose of contents/container in accordance with local regulations. |

**Potential Health Effects**

| Eyes | Causes eye irritation |
| Inhalation | May be harmful if inhaled. Causes respiratory tract irritation. |
| Skin | Toxic if absorbed through skin. Causes skin irritation. |
| Ingestion | Toxic if swallowed. |

**NFPA Ratings**                                        **HMIS Ratings**

| Health | 1 |
| Flammability | 3 |
| Reactivity | 0 |

| Health | 2 |
| Fire | 3 |
| Reactivity | 0 |

Columbus Chemical Industries, Inc.                                   Ethyl Alcohol 95%, 190 Proof, Non-Denatured ACS/USP, 2014

| Specific hazard | Not Available |
|---|---|

## 3. COMPOSITION/INFORMATION ON INGREDIENTS

| Component | Weight % | CAS # | EINECS# / ELINCS# | Formula | Molecular Weight |
|---|---|---|---|---|---|
| Ethyl Alcohol | 95 | 64-17-5 | 200-578-6 | $C_2H_5OH$ | 46.07 g/mol |
| Water | Balance | 7732-18-5 | 231-791-2 | $H_2O$ | 18.00 g/mol |

## 4. FIRST-AID MEASURES

| | |
|---|---|
| Eyes | Rinse with plenty of water for at least 15 minutes and seek medical attention. |
| Inhalation | Move casualty to fresh air and keep at rest. If breathing is difficult, give oxygen. If not breathing, give artificial respiration. Get medical attention. |
| Skin | Flush with plenty of water for at least 15 minutes and wash using soap. Get medical attention. |
| Ingestion | **Do Not Induce Vomiting!** Never give anything by mouth to an unconscious person. If conscious, wash out mouth with water. Get medical attention. |

## 5. FIRE-FIGHTING MEASURES

| | |
|---|---|
| **Suitable (and unsuitable) extinguishing media** | Flammable liquid. Use alcohol foam, carbon dioxide, or water spray when fighting fires involving this material. Cool unopened containers with water. |
| **Special protective equipment and precautions for firefighters** | Wear self-contained, approved breathing apparatus and full protective clothing, including eye protection and boots. Material can react violently with water (spattering and misting) and react with metals to produce flammable hydrogen gas. |

Columbus Chemical Industries, Inc.                    Ethyl Alcohol 95%, 190 Proof, Non-Denatured ACS/USP, 2014

| Specific hazards arising from the chemical | Emits toxic fumes (carbon oxides) under fire conditions. Vapors can travel to a source of ignition and flash back. Containers may explode in a fire. Cool containers from a distance using water spray. SENSITIVE TO STATIC DISCHARGE. (See also Stability and Reactivity section) |
| --- | --- |

# 6. ACCIDENTAL RELEASE MEASURES

| Personal precautions, protective equipment and emergency procedures | See section 8 for recommendations on the use of personal protective equipment. |
| --- | --- |
| Environmental precautions | Prevent spillage from entering drains. Any release to the environment may be subject to federal/national or local reporting requirements. |
| Methods and materials for containment and cleaning up | Absorb spill with vermiculite or other noncombustible absorbent material, then place in a suitable container for disposal. Clean surfaces thoroughly with water to remove residual contamination. Dispose of all waste and cleanup materials in accordance with regulations. |

# 7. HANDLING AND STORAGE

**Precautions for safe handling**
Use with adequate ventilation and grounding. Wash thoroughly after using. Keep container closed when not in use.  Keep away from sources of ignition.  No smoking.  Take measure to prevent the buildup of electrostatic charge.

**Conditions for safe storage, including any incompatibilities**
Store in tightly closed, original containers in a cool, dry, well ventilated area. Store between 55-100°F for product stability. Do not store with strong oxidizing agents, strong acids, peroxides, aldehydes, halogens, ammonia, acid anhydrides or alkali metals.

# 8. EXPOSURE CONTROLS / PERSONAL PROTECTION

**Occupational exposure controls:** Ventilation and appropriate grounding of containers.

| Component | Exposure Limits | Basis | Entity |
| --- | --- | --- | --- |
| Ethyl Alcohol | 1000 ppm 1900 mg/m$^3$ | REL | NIOSH |
| | 1000 ppm 1900 mg/m$^3$ | PEL | OSHA |

| | 1000 ppm 1880 mg/m$^3$ | STEL | ACGIH |
| --- | --- | --- | --- |
| | 3300 ppm | IDLH | OSHA |

TWA: Time Weighted Average over 8 hours of work.
TLV: Threshold Limit Value over 8 hours of work.
REL: Recommended Exposure Limit
PEL: Permissible Exposure Limit
STEL: Short Term Exposure Limit during x minutes.
IDLH: Immediately Dangerous to Life or Health
WEEL: Workplace Environmental Exposure Levels
CEIL: Ceiling

**Personal Protection**

| Eyes | Wear chemical safety glasses or goggles. Use face shield if splashing is likely to occur. |
| --- | --- |
| Inhalation | Provide local exhaust, preferably mechanical.  If exposure levels are excessive, use an approved respirator. |
| Skin | Wear nitrile or rubber gloves, apron or lab coat. The type of protective equipment must be selected according to the concentration and amount of the dangerous substance at the specific workplace. |
| Other | Not Available |

**Other Recommendations**
Provide eyewash stations, quick-drench showers and washing facilities accessible to areas of use and handling.

## 9. PHYSICAL AND CHEMICAL PROPERTIES

| Appearance (physical state, color, etc.) | Clear, colorless liquid |
| --- | --- |
| Odor | Mild alcohol |
| Odor threshold | Not Available |
| pH | Not Available |
| Melting point/freezing point | -144°C (-227.2°F) |
| Initial boiling point and boiling range | 78°C (172.4°F) to 80°C (174°F) |
| Flash point | 14°C (57.2°F) |
| Evaporation rate | Not Available |
| Flammability (solid, gas) | Flammable |
| Upper/lower flammability or explosive limit | 3.3-19% |
| Vapor pressure | (@ 20°C)  44.6 mmHg |
| Vapor density | (air=1)  1.6 |
| Relative density | Not Available |
| Solubility (ies) | Completely soluble in water |
| Partition coefficient: n-octanol/water | Not Available |
| Auto-ignition temperature | 363°C (685.4°F) |

Columbus Chemical Industries, Inc.                    Ethyl Alcohol 95%, 190 Proof, Non-Denatured ACS/USP, 2014

| Decomposition temperature | Not Available |
|---|---|

# 10. STABILITY AND REACTIVITY

| Chemical Stability | Stable |
|---|---|
| Possibility of Hazardous Reactions | Will not occur. |
| Conditions to Avoid | Keep away from heat, flame and sparks. |
| Incompatible Materials | Alkali metals, Ammonia, Oxidizing agents, peroxides. |
| Hazardous Decomposition Products | Carbon oxides. |

# 11. TOXICOLOGICAL INFORMATION

**Acute Toxicity**  *Ethyl Alcohol*

| Skin | Not Available |
|---|---|
| Eyes | Not Available |
| Respiratory | LC50 Inhalation – rat – 10 h – 20000 ppm |
| Ingestion | LD50 Oral – rat – 7,060 mg/kg |

**Carcinogenicity**

| IARC | No components of this product present at levels greater than or equal to 0.1% is identified as probable, possible or confirmed human carcinogen by IARC. |
|---|---|
| ACGIH | A3: Confirmed animal carcinogen with unknown relevance to humans.  (Ethyl Alcohol) |
| NTP | No components of this product present at levels greater than or equal to 0.1% is identified as a known or anticipated carcinogen by NTP. |
| OSHA | No components of this product present at levels greater than or equal to 0.1% is identified as a carcinogen or potential carcinogen by OSHA. |

**Signs & Symptoms of Exposure**

| Skin | Irritation, redness, itchiness. |
|---|---|
| Eyes | Irritation, redness, watering eyes, itchiness. |
| Respiratory | Irritation, coughing, wheezing, dizziness, drowsiness. |
| Ingestion | Irritation, nausea, vomiting, diarrhea, dizziness, drowsiness. |

| Chronic Toxicity | Ingestion may cause blindness. |
|---|---|
| Teratogenicity | Not Available |
| Mutagenicity | Not Available |
| Embryotoxicity | Pre-and Post-implant mortality. |
| Specific Target Organ Toxicity | Nerves, Liver, Heart. |

Columbus Chemical Industries, Inc.                    Ethyl Alcohol 95%, 190 Proof, Non-Denatured ACS/USP, 2014

| Reproductive Toxicity | Not Available |
|---|---|
| Respiratory/Skin Sensitization | Not Available |

# 12. ECOLOGICAL INFORMATION

**Ecotoxicity**
*Ethyl Alcohol*

| Aquatic Vertebrate | LC50 (96 hours): 13,000 mg/L Oncorhynchus mykiss (Rainbow Trout) |
|---|---|
| Aquatic Invertebrate | Not Available |
| Terrestrial | Not Available |

| Persistence and Degradability | Not Available |
|---|---|
| Bioaccumulative Potential | Will not accumulate |
| Mobility in Soil | Not Available |
| PBT and vPvB Assessment | Not Available |
| Other Adverse Effects | Not Available |

# 13. DISPOSAL CONSIDERATIONS

| Waste Product or Residues | Users should review their operations in terms of the applicable federal/national or local regulations and consult with appropriate regulatory agencies if necessary before disposing of waste product or residue. |
|---|---|
| Product Containers | Users should review their operations in terms of the applicable federal/national or local regulations and consult with appropriate regulatory agencies if necessary before disposing of waste product container. |

The information offered in section 13 is for the product as shipped. Use and/or alterations to the product may significantly change the characteristics of the material and alter the waste classification and proper disposal methods.

# 14. TRANSPORTATION INFORMATION

| US DOT | UN1170, Ethanol solutions, 3, pg II |
|---|---|

Columbus Chemical Industries, Inc.                    Ethyl Alcohol 95%, 190 Proof, Non-Denatured ACS/USP, 2014

| TDG | UN1170, ETHANOL SOLUTIONS, 3, pg II |
|---|---|
| IMDG | UN1170, ETHANOL SOLUTIONS, 3, pg II |
| Marine Pollutant | No |
| IATA/ICAO | UN1170, Ethanol solutions, 3, pg II |

## 15. REGULATORY INFORMATION

| TSCA Inventory Status | All ingredients are listed on the TSCA Active inventory. |
|---|---|
| DSL / NDSL | All ingredients are listed on the DSL inventory. |
| California Proposition 65 | Listed: Ethyl Alcohol |
| Rhode Island: Hazardous Substance List | Listed: Ethyl Alcohol |
| Massachusetts: Toxic or Hazardous Substance List, Right to Know | Listed: Ethyl Alcohol |
| Pennsylvania: Hazardous Substance List | Listed: Ethyl Alcohol |
| New Jersey: Right to Know Hazardous Substance List | Listed: Ethyl Alcohol |
| SARA 302 | Not Listed |
| SARA 304 | Not Listed |
| SARA 311 | Fire Hazard, Acute Health Hazard. |
| SARA 312 | Fire Hazard, Acute Health Hazard. |
| SARA 313 | Not Listed |
| WHMIS Canada | Class B: Flammable and combustible material – Flammable liquid. Class D2B: Poisonous and infectious material – Other effects – Toxic. |

## 16. OTHER INFORMATION

| Revision | Date |
|---|---|
| Original | 08/15/20211 |
| Revision 1 | 04/01/2014 |
| Revision 2 | 05/22/2015 |
| Revision 3 | 10/01/2021 |

Columbus Chemical Industries, Inc.                          Ethyl Alcohol 95%, 190 Proof, Non-Denatured ACS/USP, 2014

Disclaimer: The information provided in this Safety Data Sheet ("SDS") is correct to the best of our knowledge, information, and belief at the date of publication. The information in this SDS relates only to the specific Product identified under Section 1, and does not relate to its use in combination with other materials or products, or its use as to any particular process. Those handling, storing, or using the Product should satisfy themselves that they have current information regarding the particular way the Product is handled, stored or used and that the same is done in accordance with federal, state and local law. WE DO NOT MAKE ANY WARRANTY, EXPRESS OR IMPLIED, INCLUDING (WITHOUT LIMITATION) WARRANTIES WITH RESPECT TO THE COMPLETENESS OR CONTINUING ACCURACY OF THE INFORMATION CONTAINED HEREIN OR WITH RESPECT TO FITNESS FOR ANY PARTICULAR USE.   WE DO NOT ASSUME RESPOSIBILITY AND EXPRESSLY DISCLAIM LIABILITY FOR LOSS, INJURY, DAMAGE OR EXPENSE ARISING OUT OF OR IN ANY WAY CONNECTED WITH THE HANDLING, STORAGE, USE OR DISPOSAL OF THIS PRODUCT.

# EXHIBIT 2



International Journal of
*Environmental Research
and Public Health*



*Article*

# Ethanol and Methanol Burn Risks in the Home Environment

**Torgrim Log [1,*]** and **Asgjerd Litlere Moi [2,3]**

1   Department of Fire Safety and HSE Engineering, Glöð R&D, Western Norway University of Applied Sciences, 5528 Haugesund, Norway
2   Department of Health and Caring Sciences, Western Norway University of Applied Sciences, Inndalsveien 28, 5063 Bergen, Norway; Asgjerd.Litlere.Moi@hvl.no
3   Department of Plastic Surgery and Burn Center, Haukeland University Hospital, Jonas Lies vei 65, 5021 Bergen, Norway
*   Correspondence: torgrim.log@hvl.no; Tel.: +47-900-500-01



Received: 9 October 2018; Accepted: 23 October 2018; Published: 26 October 2018

**Abstract:** Biofuel heaters and fireplaces have in recent years been introduced for indoor and outdoor use. Due to their simplicity, they are usually equipped with few or no safety features. Worldwide, incidents resulting in major skin burn injury and long hospitalization periods have occurred when using such biofuel units. The present study analyses the characteristics of the liquids ethanol and methanol to get a scientific background for understanding related accidents. The comparably heavy vapors, especially from ethanol, may generate a pillow of combustible gas in the vicinity of the unit, particularly in quiescent indoor air conditions. It is also revealed that these fuels represent a potential severe risk, since the equilibrium vapor pressures are close to the stoichiometric fuel–air composition at normal room temperatures. Selected incidents were reviewed to understand the mechanisms involved when severe burns were received by the users. It turns out that the most severe incidents were related to refilling operations and included ignition of the fuel container vapor phase. When ignited, the container gas phase expansion propelled burning fuel from the bottle or container onto the user or other persons in the vicinity. Similar incidents involving refilling methanol for chemistry demonstrations and ethanol for endodontic (dentistry) treatment were also studied and it was shown that these accidents followed similar accident mechanisms. It may be concluded that the main contributors to burn risk are the near-stoichiometric vapor pressure of these liquids at room temperature and the close proximity of the fuel container to burning fuel. Research needs and possible technical barriers are suggested to reduce this risk for the future.

**Keywords:** biofuel fireplaces; biofuel heaters; methanol; ethanol; burn injuries

## 1. Introduction

Burn injuries are a concern worldwide, with approximately 265,000 burn related deaths every year. Burns are a common injury in all societies and may be a result of hot liquid or hot food spills, contact with hot surfaces, exposure to flames and hot gases, and thermal radiation. In Bangladesh, about 173,000 children under 18 suffer burn-related injuries yearly [1]. In the United States, yearly about half a million patients seek medical treatment at hospital emergency departments in addition to burn injuries treated at clinics, local health centers, and by private institutions [2]. In Norway, the number of fatalities in fires has been reduced significantly during the last 30–40 years. The number of burn victims is, however, according to Smolle et al. [3] not decreasing. Severe burn injuries may result in very long hospitalization periods, and in addition to the physical injury result in major psychological consequences such as body image dissatisfaction, self-harm, post-traumatic stress disorder, anxiety, and depression [4–6].

*Int. J. Environ. Res. Public Health* **2018**, *15*, 2379

Stimulating the healing of severe burns is difficult. Burn injury treatment therefore has received much research interest [7–9]. Improved knowledge about thermal skin injury development, the mechanisms involved, and possible injury-limiting measures are therefore much appreciated. Understanding the situations that may result in burn risks, limiting the likelihood of burns and/or consequences (burn severity), and the promotion of healing processes are therefore necessary measures.

Due to the many burn wounds experienced by the soldiers in the World War II, a systematic approach to studying thermal skin burns was initiated following the war. A series of seminal burn studies was then published in The American Journal of Pathology. These studies included heat transport to and through porcine skin [10], the importance of time and surface temperature in developing cutaneous burns [11], and the pathology and pathogenesis of cutaneous burns on pigs [8]. It was revealed that the degree of burns was dependent on both the temperature and exposure time. A threshold temperature for skin injury was suggested. Several researchers refer to temperature >44 °C for causing burns [12,13]. For hot liquids, others refer to 43 °C for the onset of skin injury [14]. Skin models have also been built for simulating "skin" temperatures during controlled heat flux exposure [15]. It is assumed that the injury develops linearly with time and exponentially with absolute temperature, i.e., an Arrhenius type of injury development.

Human skin pain receptors are located at approximately 0.1 mm depth and the pain temperature threshold is 44.8 °C [16,17]. This is above the assumed threshold temperatures for slow injury development. As burns usually involve much higher basal layer temperatures, the pain signal gives a suitable warning about excessive skin surface heating. In flame exposure scenarios, such as the exposure to the flames from burning biofuel, the skin heating is quite instantaneous, i.e., the damage develops even though the victim is warned of the ongoing process. This is especially dangerous when the victim wears very thin clothing, combustible clothing, or is exposed to burning liquids. Injuries caused by flames, from e.g., kerosene-fueled kitchens/stoves/heaters, represent the most common etiology of burns in adults needing treatment at specialized burn intensive care units [18].

About 20 years ago, bioethanol design fireplaces were introduced in the consumer market. These units typically release combustion products in the indoor air, raising concerns about indoor climate quality [19–21]. These units were generally advertised as being ecologically friendly and with a do-it-yourself installation. However, soon after their introduction, patients injured while handling these units showed up at local burn treatment units. One of the first studies regarding these burn injury incidents was an overview of this new recreational fire threat published by Kraemer et al. [22], who warned about an underestimated fire risk among the uninformed customers. Later on, several other research groups also reported that bioethanol design fireplaces were involved in severe burn injuries [23–27]. Many of these incidents were related to refilling operations, and it was reported that burning liquid fuel exposed persons several meters away. Similar incidents have also been reported in dentist offices [28] as well as in educational demonstrations [29] alerting the U.S. Chemical Safety Board (CSB, Washington, DC, USA) about accidents similar to the biofuel incidents [30].

The purpose of the present work is to analyze the hazardous conditions associated with biofuel fireplaces (and heaters) that may result in flame and/or burning fuel exposure to persons operating, and in the vicinity of, these units. Cases reported in the literature are reviewed and analyzed based on the physical and chemical properties of the fuels involved, i.e., methanol and ethanol. Similar incidents involving technically produced methylated liquid fuel products, for educational or professional purposes, are also included in the analysis. Fuel characteristics, such as the lower flammability limit (LFL) and upper flammability limit (UFL), ignition temperatures, and minimum ignition energy (MIE), as well as typical fuel container designs and refueling methods, are analyzed. Typical accident situations as well as fire/explosion risk perception regarding environmentally friendly fuels are discussed. The study is unique in analyzing the whole process, including technical issues regarding the heaters and fuel containers, the clothing when being exposed, and the environmentally friendly, but still very dangerous, fuels involved.

*Int. J. Environ. Res. Public Health* **2018**, *15*, 2379

3 of 15

The motivation for publishing this work is to provide information about the possible accident mechanisms and the victims' risk perception prior to the incidents as a background for future work for preventing similar accidents. The paper starts with explaining challenges and research on burns and biofuel burns in particular (Section 1). Selected cases from the literature are presented in Section 2. Then the theory of ignition, combustion and heat transfer is presented as well as possible temperature and damage modeling (Section 3). Then, the results based on the previous sections are presented (Section 4) before the results are discussed (Section 5) followed by the conclusions (Section 6). A full analysis as presented in this paper has not been found elsewhere in the literature.

## 2. Physical, Chemical and Fire Related Properties of Methanol and Ethanol

### 2.1. Methanol and Ethanol Vapor Density Relative to Air

The molar masses of methanol and ethanol, $M_m$ and $M_e$, are 0.03204 kg/mol and 0.04607 g/mol, respectively. The molar mass of dry air, $M_a$, is 0.02897 g/mol. The density of gases, or gas mixtures, may be calculated by:

$$\rho = \frac{P \cdot M}{R \cdot T} \left( kg/m^3 \right),\qquad(1)$$

where $P$ (101,325 Pa) is the ambient pressure, $M$ (kg/mol) is the molar mass of the actual gas or the average molar mass of the gas mixture, and $R$ (J/molK) is the universal gas constant. Since the density is proportional to the molar mass, Equation (1) demonstrates than the density of methanol, and especially ethanol, is higher than the air. A release of these gases may accumulate at lower levels if there is no mixing by e.g., wind or indoor air circulation.

### 2.2. Chemical Reaction with Air and Minimum Ignition Energy (MIE)

It is well known that methanol and ethanol are combustible liquids. For simplicity, assuming that the air consists of 21 mol% $O_2$ and 79 mol% $N_2$ (3.76 mol $N_2$ per mol $O_2$), the stoichiometric combustion reaction for methanol in air is given by:

$$CH_3OH + 1.5\,O_2 + 5.64\,N_2 = CO_2 + 2\,H_2O + 5.64\,N_2,\qquad(2)$$

and for ethanol it is given by:

$$C_2H_5OH + 3\,O_2 + 11.28\,N_2 = 2\,CO_2 + 3\,H_2O + 11.28\,N_2,\qquad(3)$$

with heat of combustion, $\Delta H_c$, 635 kJ/mol (19.83 MJ/kg) and 1232 kJ/mol (26.78 MJ/kg), respectively [31].

Generally, gas–air mixtures ignite most easily at, or close to, the stoichiometric concentrations. For methanol, it may be seen from Equation (1) that this corresponds to 1/8.14 = 12.29% and for ethanol this corresponds to 1/15.28 = 6.54%.

The heat required for igniting an air methanol or an air ethanol gas mixture at just above stoichiometric conditions, i.e., minimum ignition energy (MIE), is respectively 0.14 mJ and 0.28 mJ. This number is recorded for electrical sparks, but indicates that any burning flame will easily ignite such fuel–air mixtures. It is on the same level as the MIE for familiar flammable hydrocarbons such as propane, gasoline, etc.

Vapors of combustible liquids may also ignite when in contact with hot surfaces. The auto ignition temperature (AIT) is recorded for stoichiometric concentrations. The AITs for methanol and ethanol are 470 °C and 365 °C, respectively [31]. These liquids are therefore not as easily ignited by hot surfaces as long chained hydrocarbon, e.g., diesel with an AIT of 210 °C.

*Int. J. Environ. Res. Public Health* **2018**, *15*, 2379

4 of 15

### 2.3. Vapor Pressures and Flammability Limits in Air

The lower explosion limits (LEL) for methanol and ethanol in air are 6.7% and 3.3%, respectively [31]. The respective upper explosion limits are 36% and 19%. The hydrogen bonds between the molecule OH-groups makes these liquids harder to vaporize than their equivalent alkanes, giving heat of vaporization 1.1 MJ/kg and 0.84 MJ/kg, respectively. The vapor pressure of methanol and ethanol as a function of temperature may be expressed by [31]:

$$\log_{10}(p^o) \;=\; \left(-\frac{0.2185E}{T}\right) + F, \qquad (4)$$

where $p^o$ (torr) is the equilibrium vapor pressure. For methanol, the values of the constants are: $E$ = 8978.8 K and $F$ = 8.6398, while for ethanol the constants are: $E$ = 9673.9 K and $F$ = 8.8274. The vapor pressure for these liquids is shown in Figure 1.



**Figure 1.** Vapor pressure of methanol and ethanol as a function of temperature (Equation (4)).

The vapor pressure normalized by the LEL is shown in Figure 2, i.e., where the LEL is represented by the dashed black line. Despite the differences in vapor pressure (Figure 1), these liquids display very similar behavior regarding flammability as a function of temperature. It may be seen from Figure 2 that an air vapor phase at temperatures from about 10–12 °C in equilibrium with any one of these liquids is highly flammable. This is reflected by flash points at around 10–12 °C.

It should be noted that bioethanol products sold to the consumers also contains 5–10% isopropanol and 1–5% butanone to prevent inadvertent consumption. Isopropanol, i.e., $CH_3CH(OH)CH_3$, has a flash point of 10 °C, i.e., very similar to methanol. Butanone, also known as methyl ethyl ketone (MEK) $CH_3C(O)CH_2CH_3$, has a flash point of −9 °C. There is also some water content. These "impurities" do not significantly change the flash point or the ignition properties of the liquid or vapor, but may give some luminosity to the flames compared to the pure alcohols. The main conclusion is that these liquids produce highly flammable vapors at normal room temperatures.

Dividing the stoichiometric concentrations for methanol and ethanol, i.e., 12.29% and 6.54%, by the LEL concentrations, i.e., 6.7% and 3.3%, gives 1.83 and 1.98, respectively. These values are marked in Figure 1 and it is seen that the stoichiometric compositions, i.e., where the combustion is most severe, corresponds to normal room temperatures.

The molar mass of a mixture of air dry air and methanol at e.g., C/LEL = 2, i.e., 13.4%, is 0.02938, which is 1.4% more than dry air. The molar mass of a mixture of air dry air and ethanol at e.g., C/LEL = 2, i.e., 6.6%, is 0.03010 which is 3.9% more than dry air. This means that these gas-air

*Int. J. Environ. Res. Public Health* **2018**, *15*, 2379

mixtures are a few % heavier than the air and may therefore drain from a container and create a combustible atmosphere close to the unit being refilled.



**Figure 2.** Vapor pressure (concentration, C) normalized by the respective lower flammability limit concentration (LFL) for methanol and ethanol as a function of temperature.

### 2.4. Thermal Expansion When Ignited, Density and Fluid Dynamics

In Equations (1) and (2), the number of gas molecules after combustion to the number of gas molecules prior to combustion is close to unity. Ignoring this minor change in number of molecules, the resulting immediate volume after ignition may then, in accordance to the ideal gas law, be estimated by the temperature change:

$$V_f \approx V_o \frac{T_f}{T_o}, \qquad (5)$$

where $V_o$ (m$^3$) is the flammable vapor volume at ambient temperature, and $T_o$ (K) and $T_f$ (K) are the resulting flame temperatures after combustion, i.e., before any heat losses take place. Usually, the LFL corresponds to an adiabatic limiting temperature of 1500–1600 K [31]. At room temperature of 23 °C (295 K), this corresponds to a 5–6 fold volume expansion.

Assuming now that a half-full methanol or ethanol fuel container has been kept at a this temperature, the gas air mixture inside the container will soon approach a concentration close to C/LFL ≈ 2, i.e., well within the flammable region and close to the stoichiometric worst case conditions. If liquid is then poured onto an ignition source, e.g., a burning flame, the poured heavy gas mixture and the liquid will catch fire. It is highly probable that the flame will propagate into the container and ignite the internal combustible air fuel gas mixture. As the internal gas volume ignites, the resulting volume expansion displaces the liquid in the bottom of the container which is then violently released through the container opening. The reaction force is acting below the hands of the person pouring liquid. The container will then be accelerated and rotate around the horizontal axis releasing even more burning liquid. Flames and burning liquid propelled out from the container may expose persons in the vicinity and inflict severe burns. This sequence, as demonstrated by a fire fighter, is shown in Figure 3. A video showing a chemical tornado in a real-life demonstration going wrong at a museum in Reno, Nevada, injuring 13 children, reveals the hazards involved [30].

It should be noted that also with bottle shaped containers, the reaction force usually works below the hand wrist. Given a similar ignition as demonstrated in Figure 3, it is most likely that a 1-L bottle will release its content in a similar way, i.e., propelling the liquid fuel several meters and/or rotating onto the person holding the bottle. The ignition is fast and the resulting reaction forces are probably

*Int. J. Environ. Res. Public Health* **2018**, *15*, 2379

so strong that it is not possible for an unaware person to compensate the involved reaction forces. Victims exposed to this danger neither have time, nor possibility, to direct the dangerous burning liquid in a safe direction.



**Figure 3.** Demonstration of a 4 L ethanol container gas phase igniting at room temperature. The time sequence is about 0.5 s, i.e. (**a**) $t$ = 0.1 s, (**b**) $t$ = 0.2 s, (**c**) $t$ = 0.3 s, (**d**) $t$ = 0.4 s, (**e**) $t$ = 0.5 s, (**f**) $t$ = 0.6 s. (The Norwegian Directorate for Civil Protection (*DSB*) [32], reproduced with permission.).

### 2.5. The Fire Plume Behavior

While a flame as shown in Figure 3f develops, it is generally known that the hot flames and combustion gases will rise as a result of buoyancy forces due to their low density. Since the average molar mass of the gas mixture does not change much during the combustion, i.e., nitrogen is the dominating gas species, the relative change in density may be estimated by the temperature change. Based on Equation (1), the density after combustion may be calculated by:

$$\rho_c \approx \rho_o \frac{T_o}{T_f}, \tag{6}$$

where $T_o$ and $T_f$ are the ambient temperature and the flame temperature, respectively. The hot flames of low density start rising relative to the ambient cold and heavy air. The rising hot gas plume is associated with lower internal pressures resulting in air entrainment [33]. If, however, there is a solid object, i.e., a person, close to this rising plume, the plume cannot entrain the object and is instead pulling itself toward the object, i.e., toward the person [31]. A person in the proximity to an ignited gas

cloud at low levels may therefore tend to cling to a person while the flames rise, resulting in extended heat exposure.

### 2.6. Burning Characteristics and Heat Flux to Exposed Objects

Liquid fuels, such as propane, butane, naphtha, petrol, kerosene, etc. all burn with a luminous flame resulting from glowing soot particles. Pure methanol and ethanol generally burn cleanly with a bluish flame color and very limited luminosity. In daylight, it may be difficult to spot such flames. Since water has a lower vapor pressure than methanol and ethanol, the liquid left in the burner unit will be enriched in water especially during the terminal phase of the combustion. This may result in very small and invisible flames during the last minutes before flame out. It may therefore be anticipated that tiny flames may persist in a seemingly extinguished bioethanol heater or fire place. The user may be unaware of these flames representing an ignition source during refueling.

The heat flux to an object exposed to hot flames may be expressed by:

$$\dot{Q}'' = h\left(T_f - T_s\right) + \phi\varepsilon_f\sigma T_f^4 \left(\text{W/m}^2\right), \tag{7}$$

where $h$ (W/m K) is the convective heat transfer coefficient, $T_f$ (K) is the temperature of the flame, $T_s$ (K) is the temperature of the exposed surface, $\phi$ is the view factor, $\varepsilon$ is the flame emissivity, and $\sigma$ ($5.67 \times 10^{-8}$ W/m$^2$ K$^4$) is the Stefan–Boltzmann constant. The emissivity of the flames is given by:

$$\varepsilon_f = 1 - \exp(-KL), \tag{8}$$

where $K$ (1/m) is the extinction coefficient and $L$ (m) is the optical flame thickness.

Methanol and ethanol burns very clean and is associated with very low extinction coefficients, typically about 0.37 [31]. This is an order of magnitude less than for other hydrocarbons. For small flame thicknesses, i.e., less than a foot, the emissivity as given by Equation (8) will be low and the heat transfer (Equation (7)) will be dominated by convection. Due to the lower radiant heat losses, i.e., low emissivity, the flame temperature is generally higher for the clean burning methanol and ethanol than for other hydrocarbons. Estimating the heat transfer coefficient may be difficult. However, the range of 20–30 W/m$^2$K may be appropriate for this type of natural convection [34]. Assuming a flame temperature of 1500 K and a skin temperature of 310 K, this typically results in a convective heat flux of $\approx$30 kW/m$^2$. Exposing naked skin to this heat flux quickly heats the skin surface, and the basal layer, to temperatures associated with burn injuries [35]. If combustible clothing textiles are exposed to flames of this heat flux or hit by burning liquid, the fabric is pilot-ignited almost instantaneously. Burning liquid in direct contact with the body may prolong the period of high heat fluxes and result in very severe burns.

Clean burning, with slightly bluish low-emissivity methanol and ethanol flames, makes small flames appear quite invisible (especially in daylight), representing a very characteristic threat. Being generally accustomed to luminous yellow and red flames, the users may be unaware of this invisible ignition source, which is characteristic of the ethanol and methanol flames.

## 3. Analysis of Selected Cases Described in the Literature

Several researchers have reported on skin burns as a result of accidents involving biofuel heaters [22–27]. During the literature study, some similar incidents were also found at educational demonstrations [29,30] and in dentist office treatments [28]. These involved methanol, which is in many ways a quite similar type of fuel, resulting in fire exposure and severe burns. Since these incidents shed light on similar risks as biofuel heater and fireplace accidents, they are included in the analysis.

Case 4:25-cv-40091     Document 1     Filed 07/13/25     Page 157 of 204

### 3.1. The Selected Biofuel Burn Case Studies

The study by Kraemer et al. [22] presents two cases of patients presented to their intensive care unit in Germany succeeding burns related to bioethanol fuel. The first patient was a 45-year-old female with 30% total body surface area (TBSA) deep partial- and full-thickness flame burns involving the face, neck, right chest, thighs, and both arms and hands. The accident took place when the patient should refill a still burning design fireplace with bioethanol. A flash fire then occurred and the flame instantly set the patient and her clothing on fire. The patient was admitted for 14 days to their intensive care unit. The duration of the in-hospital stay until discharge was 4 weeks [22]. This burn accident clearly demonstrates the dangers of trying to refill the bioethanol fireplace while it is still burning. It is, however, not clear whether this incident involved ignition of the vapor phase in the refilling bottle.

The second case described by Kraemer et al. [22] involved a 46-year-old female patient who also prepared to refill her fireplace with bioethanol while it was still burning. With the bottle lid removed, and the bottle in her hand, she tripped and sprayed liquid onto the burning fireplace. A flash fire followed, and resulted in an explosion of the internal bottle gas volume, exposing the patient to the fire. This patient suffered partial-thickness burns to the face, left arm, both hands, and the entire right leg, affecting a TBSA of 12%. The patient was admitted to their intensive care unit for 4 days. The duration of the in-hospital stay until discharge was 2 weeks [22]. This burn accident also demonstrates the dangers of approaching the fireplace for refilling while it was still burning. In this case it was also evident that the container vapor phase ignition contributed to the severity of the accident.

A study by Heald and Muller [24] reported on five burn victims in Australia in 2014. All incidents involved biofuel heaters and occurred while refueling the units. The first incident involved refueling a table top heater which was believed to have been extinguished for 20–30 min. During refilling, a large fireball and explosion occurred, which exposed two patients sitting opposite the table top heater. The first patient, a 28-year-old male, sustained 43% TBSA deep partial- and full-thickness burns to the face, neck, anterior and posterior trunk, arms, legs and left foot. The patient was in the intensive care unit for 26 days and was discharged from hospital after 57 days. A 22-year-old female was involved in the same incident. She sustained 31% TBSA deep partial- and full-thickness burns to the face, neck, anterior and posterior trunk, arms, and left leg. She was discharged from hospital after 78 days. This incident clearly demonstrates the dangers related to refueling a burning unit and clearly involved container vapor phase ignition and explosion.

The third patient described by Heald and Muller [24] experienced an explosion while refilling an outdoor biofuel heater. It was unclear whether the flame was extinguished or not, or whether the unit was still warm. The burn victim suffered 45.5% TBSA deep partial- and full-thickness burns to the face, neck, trunk, arms, hands, and legs and was discharged from hospital after 84 days. The fourth patient described by Heald and Muller [24] was refilling an indoor coffee table biofuel heater which, according to the patient, had been extinguished for at least 40 min. The fuel was methylated spirit, and when refilling, he and the fuel container he was holding were engulfed in flames. This burn victim suffered 10% TBSA superficial and deep partial-thickness burns to the face, neck, right arm and hand, and right leg. He was discharged after 6 days hospital admission. The fifth patient described by Heald and Muller [24] was sitting at an outdoor table 1.5 m away from a table top heater to be refilled after being extinguished for nearly 20 min. When the reservoir was refilled, a large fireball engulfed her. This burn victim suffered 4% TBSA superficial and deep partial-thickness burns to the face, neck, and left hand. She was discharged from hospital after 5 days. It is evident that for all these last three patients, the container vapor phase was involved in the combustion process. The fireballs described cannot be explained by the 5–6 fold gas phase expansion during combustion, i.e., expelled liquid must have been involved, as shown in Figure 4.

*Int. J. Environ. Res. Public Health* **2018**, *15*, 2379



**Figure 4.** Hazard communication pictograms for bioethanol (**left** fire risk, **right** health risk).

The study by Jaehn et al. [27] presents a case study regarding a 42-year-old female suffering severe burns after improper handling of liquid bioethanol. The patient suffered burns to 55% of the TBSA; 28% were deep partial- and full-thickness burns. The patient was in the intensive care unit for 7 weeks, with a 2-month hospital stay followed by several weeks of rehabilitation treatment for heavy burn injuries.

### 3.2. The Selected Biofuel Group Studies

The study by Van Zoonen et al. [23] presents a summary of two burn victims in the Netherlands in 2010 and 29 burn victims in 2011. First, three experts on bioethanol burners were questioned for framing non steering semi-instructed interviews of 14 bioethanol burn victims. They found that for eight of these incidents, bioethanol was misused as an accelerant for lighting a fire or a barbeque, and not for the intended use, i.e., bioethanol burners. They also found that all the interviewees had poor knowledge about the fuel and conditions of use. Many of the bioethanol bottles were half-full and internal gas phase explosion was concluded as a major contributor to the severe outcomes. In all the cases, flames were present when adding new bioethanol fuel. Van Zoonen et al. [23] concluded that the inexpensive and easily obtainable product may have created an image of an innocent product rather than a product that might result in severe burn incidents. This series of burn incidents clearly demonstrates the risks associated with the application of bioethanol when there is a flame in place. It was also evident that vapor phase ignition contributed to the severity of several of the accidents.

The study by Neubrech et al. [25] analyzed 12 patients (7 males and 5 females, 19 to 53 years of age) suffering bioethanol-associated burn injuries in Ludwigshafen, Germany, in the period 2010–2014. The incidents resulted in burns to an average of 17% (±9% SD) of the TBSA, commonly involving the face and the hands. The median length of hospitalization was 20 days (range 3 to 121). Intensive care unit treatment was required 1 to 64 days (median 4.5 days). In most cases, these injuries took place while starting the fire (3) or refilling (7), and happened even though the safety instructions were followed. The authors concluded that bioethanol-fueled fireplaces for home decoration represent potential sources for severe burns even when used as intended [25]. This study clearly demonstrates the dangers of both firing and refilling of the biofuel units. There are no details regarding involvement of the container or bottle vapor phase, but that is quite likely, at least for the most severe incidents.

### 3.3. The Selected Methanol Burn Incidents

The U.S. Chemical Safety and Hazard Investigation Board (CSB) usually engages in major industrial accidents. In special circumstances it may, however, also engage in civil sector incidents. For example, two accidents related to demonstrations for children (one at a school and one at a museum) involved methanol, and caught the attention of the CSB, who issued a safety bulletin for key lessons [30]. In both these cases, a burning flame ignited the vapor phase of a methanol container during refilling. In the first incident, an internal container gas phase explosion propelled burning methanol and caused burns to children at a school chemistry demonstration. In the second incident, a similar situation resulted in burns for 13 children during a chemical demonstration at a museum. The CSB stressed several safety measures in order to prevent similar incidents in the future [30]. A cellular phone video clearly demonstrates the severity of the accident [29]. Both incidents involved an internal container gas volume explosion propelling burning liquid at the children.

*Int. J. Environ. Res. Public Health* **2018**, *15*, 2379

The study by Sohal et al. [28] presents a case study of a rare burn mishap involving a 46-year-old female during endodontic treatment. The incident happened during obturation with Gutta–Percha (GP). Whilst condensing the GP, the assistant was instructed to add methylated spirit (methanol) into the gallipot to keep the flame burning. The gallipot burner was about 2 feet from the patient while the methanol was added. An explosion knocked the gallipot burner onto the patient, inflicting burns to the right cheek, right lateral neck, and on the upper right arm, causing a second-degree burn injury covering 9% of the TBSA. She was discharged from the hospital after two weeks with minimum esthetic impairment. In order to get the explosion force moving the galipot as described in this case, the internal bottle gas volume must have been involved in the combustion process.

### 3.4. Summary of the Studied Burn Injuries

In most of the cases studied, ignition of the container gas phase was an important part of the accident mechanism. This may happen only when there is an ignition source, which in most, if not all, cases were a persistent burning flame. Such a flame may, as explained in Section 2, be quite invisible, especially when close to the point of extinction. Some few cases were, however, also related to the first time the unit was set alight [25]. These may be due to heavy methanol gas being spilled from the container and ignited when the intention was to ignite the burner.

Guillaume et al. [26] highlight two families of risks related to biofuel heaters, i.e., heat injuries during use or refill and the effect on air quality. They recorded heat release rate and tank temperatures during use as well as after extinction. It was noted that the highest tank temperatures, reaching above 100 °C, were recorded well after the flames had died out.

Since ethanol has higher molecular mass than air, 46.07 g/mol versus 28.97 g/mol, the ethanol vapor produced will, regardless of being warmer than the ambient air, be heavy and therefore not rise buoyantly. Computational fluid dynamics (CFD) modeling was used by Guillaume et al. [26] to model the flammable vapor cloud during refilling, clearly demonstrating that for the particular unit investigated, a person refilling the unit was at severe risk of burns if refilling and reigniting the unit when still warm. If ignited, the produced vapor cloud may severely burn the person operating the unit. There is also a risk that he/she will not remove the refilling container, which may be involved in a fire scenario.

## 4. Possible Risk Reducing Measures

### 4.1. Heat Fluxes Associated with Burning Liquid on Fabric

In general, there is very limited research available regarding spills of flammable liquids on clothing regarding spilled methanol or ethanol. This has, however, been studied for spills on carpets by Ma et al. [36]. Studies of spills on vertical fabric and heat fluxes to a body mannequin could reveal important information about the heat transfer and possible preventive measures such as prompt removal of the soaked fabric, etc.

### 4.2. General Safety Education

Professionals may properly understand hazard pictograms for dangerous chemicals. However, based on the standard hazard pictograms for bioethanol (and methanol), as depicted in Figure 4, lay people may probably not understand that the liquid under quite normal circumstances represents an explosion threat.

General safety courses with emphasis on flammable liquids may help preventing future accidents. In such teaching, one may possibly include videos showing real accidents, such as the one in Reno, Nevada, resulting in 13 children with burn injuries [29]. Video demonstrations, such as the one shared by The Norwegian National Directorate of Civil Protection [32], may also be valuable. It is

*Int. J. Environ. Res. Public Health* **2018**, *15*, 2379

generally recommended that such videos should be backed up by scientific explanations tailored to the audience at hand.

As the units considered in the present study are used by nonprofessionals, it may, however, be difficult to reach out to the new customers as well as ensuring that the risk is still understood and remembered when using the unit several years later. A search for robust technical barriers should be compulsory.

### 4.3. Possible Technical Barriers

A good safety measure would be to prevent ignition of gas or liquid during refilling operations. There may be several ways of achieving this. Some bio heater and fireplace units are equipped with a thermostat giving a sound when sufficiently cold to be refueled. However, the unit may not burn as intended if put on a sloping surface or when distorted/buckled by previous heat exposure. Small flames may then persist in parts of the unit, i.e., not heating the thermostat. The thermostat may therefore not be recognized as robust barrier [26].

It is well known in the safety community that flames cannot travel through small openings. The minimum distance, which is called minimum experimental safe gap (MESG), is dependent on the gas type and the gas air ratio. The MESG is smallest for concentrations of gas slightly richer than the stoichiometric ratio. For methanol and ethanol, the MESG is 0.92 mm and 0.89 mm, respectively [37].

Equipping the refilling bottle or container with a strainer with openings smaller than the MESG would prevent the propagation of an external flame into the container gas phase. Prolonged heating of a strainer may, at least in the theory, result in flame propagation through the strainer. A deeper slid, e.g., X-shaped, to support fluid flow out of the container and air ingress into the container, may be a safer alternative. This would also limit the flow of heavy gas out of the container while filling or refilling fuel. This technical barrier could indeed limit most of the severe accidents related to these biofuel heaters studied in the present work.

### 4.4. Quickly Cooling Heat Exposed Skin

If the skin has been exposed to flames or burning liquid, it is well known among safety and health worker professionals that prompt cooling of the skin by tempered water may limit the burn consequences significantly [8,14,34,38,39]. Cooling the burned skin with tempered water is generally beneficial for up to 20 min, while cooling of the patient as such should be avoided [39]. The best way to achieve prompt cooling would be to strengthen the general first aid education by including prompt cooling of any overheated skin, e.g., flame exposure, liquid scalding, food scalding, contact with hot objects, etc.

## 5. Discussion

In the present study, the physical and chemical characteristics of methanol and ethanol (bioethanol) have been outlined. It has been demonstrated that the vapor pressures of these liquids at normal room temperatures create highly combustible gas-air mixtures when in equilibrium with the liquid phase. At 22–25 °C, the fuel-to-air ratio is very close to the stoichiometric composition. This is also the most easily ignited composition, either by static electricity or an open flame, and results in the worst case scenarios regarding explosion strength.

The ethanol-air mixture is heavier than air and may pour out of a container and result in a combustible gas air pillow which may ignite when trying to light a biofuel fireplace or heater unit. The gas is invisible, and the operator may probably not be aware of this situation. It has been shown that the container or bottle gas phase may likely become ignited when refilling a biofuel fireplace or biofuel heater which is still burning.

It has been outlined why such fuels may burn with a flame that is quite invisible in day light, especially the last period before the flame self-extinguishes. This persistent flame, thought by the user to be extinguished, represents a very dangerous ignition source, especially when refilling the unit.

*Int. J. Environ. Res. Public Health* **2018**, *15*, 2379

It may quite likely ignite the vapors being poured out of the refilling container or bottle. During this process, it is quite likely that explosive container gas volume will be ignited, resulting in violent explosion propelling burning liquid out of the container or bottle. The operator, as well as people several meters away, may then be engulfed in flames and soaked with burning liquid exposing naked skin or setting the clothing fabric on fire.

A number of severe bioethanol burn incidents are presented in the literature [22,24,26–28] and two group studies [23,25] were analyzed based on the outlined possible accident mechanisms. Three cases involving very similar, and severe burn, incidents with methanol were also included [28–30]. Two of the methanol burn incidents injured several children at science demonstrations. For all these burn incidents, it turned out that the most severe accidents involved ignition of the container gas phase resulting in a violent explosion expelling burning liquid from the container. Since the auto ignition temperatures (AITs) of methanol and ethanol are quite high, i.e., respectively 470 °C and 365 °C, respectively, it is not likely that hot surfaces without a flame represented the ignition source. A persistent flame, unnoticed by the operator, was likely the ignition source in most, if not all, of these incidents. A minority of the incidents represented ignition of the vapor cloud that had been poured from the liquid container or bottle without involving the container or the bottle.

Based on the knowledge that flames cannot travel though small openings, it is suggested to develop bottles and containers with openings less than the maximum experimental safe gap (MESG). Openings less than about 0.9 mm would ensure that no flame could propagate into the container to involve the internal gas phase. Such a restriction may also limit the amount of heavy gas air mixture being poured out of the container while filling or refilling a bio heater or fireplace unit. It is suggested that research is performed on this issue to develop safer containers and bottles, and safer refilling possibilities preventing extensive evaporation if refilling a still warm unit.

Van Zoonen et al. [23] discovered through interviews with burn victims that they a poor understanding of the hazards involved. The fuel is easily available to a low cost and it does have an odor associated with typically highly flammable long-chained non-oxidized hydrocarbons, e.g., gasoline or naphtha. In may therefore not be associated with any recognizable danger. In order to mitigate this, safety courses may be updated with videos [29,32] and information brochures explaining the risks associated with bioethanol and methanol. It is also necessary to focus on mitigating measures, such as prompt and cooling if a burn incident has happened. In order to develop efficient safety courses, it is therefore recommended to analyze the present level of risk understanding in the public in order to find at which level the teaching should start.

The heat exposure may also be a result of hot liquid scalding in combination with flame exposure, which has been expensively researched for hot beverage and hot food spills. The injury mechanisms may therefore be quite complicated as both flame exposure and hot liquid scalding due to wetted fabric contribute to the resulting heat injury. Promptly removing clothing is therefore vital to get the overheated skin cooled by tempered water [8,34,39–41].

The bottles and containers are marked as flammable and with a health risk. The pictograms indicating the hazards of methanol and bioethanol fuels do not, however, give any indication of an explosion risk. This risk may be understood by professionals. It may, however, be questioned whether communicating flammability and health risk is sufficient for the public to gain the proper understanding of the risks involved when handling these liquids.

Recently, infrared (IR) cameras have been developed for finding gas leakages in e.g., the oil and gas industry [42]. For future research on methanol and ethanol burn incidents, such equipment, which detects the C-H bonds in the methane and long-chained hydrocarbon molecules, may be tested for methanol and ethanol. It is quite likely that doing research with this equipment may reveal and make visible some of the mechanisms outlined in the present work. It is suggested that such research be initiated to gain understanding as well as to produce material for better public safety courses.

*Int. J. Environ. Res. Public Health* **2018**, *15*, 2379

It is important to be aware of accidents related to dislocation of the units, i.e., units detaching from wall mounts, being interfered with, or falling from tables. These fireplaces/heaters can be dangerous for children who may experience large-TBSA burns even when exposed to comparably small fires.

## 6. Conclusions

In the present study, the possible mechanisms leading to accidental fires involving methanol and ethanol/bioethanol liquid and vapor phase have been outlined. Burn accidents previously described in the literature have been analyzed based on the outlined accident mechanisms. It turns out that equilibrium vapor pressure close to the stoichiometric fuel–air composition represents a very severe risk when handling these liquids. Some accidents have been related to the ethanol/bioethanol fuel–air mixture being poured out of the container, resulting in a combustible cloud accumulating close to the unit to be filled. Similar clouds have also been accumulated when refilling a warm unit. When approaching the unit for ignition, this vapor cloud ignites and engulfs the operator in flames, typically on the chest, face, and arms.

Ignition of the vapor phase resulting in an internal explosion expelling burning liquid resulted in the most of the accidents and generally resulted in the most severe burns. Not only the operators but also people several meters away were exposed to flames and soaked in burning fuel. The ignition source was in most, if not all these burn incidents, most likely a small invisible flame from previous use of the unit.

By understanding the mechanisms involved and analyzing accidents, several risk-reducing measures are suggested for further research in order to reduce this very severe burn risk.

**Author Contributions:** Conceptualization, T.L.; Methodology, Validation, Formal Analysis, Investigation, Resources, T.L. and A.L.M.; Data Curation, A.L.M.; Writing—Original Draft Preparation, T.L.; Writing—Review and Editing, T.L. and A.L.M.; Visualization, T.L.; Project Administration and Funding Acquisition, T.L.

**Funding:** This study was partly funded by the Norwegian Fire Safety Association burn prevention program "*Sky ilden*" (In English, "Shy the fire").

**Acknowledgments:** The authors appreciate valuable discussions with Kenneth Wangen, of the Norwegian Burn Victims Association, and Tor Erik Skaar, of the Norwegian Fire Safety Association. The openness of the burn victims consulted in the present work is also appreciated. The anonymous reviewers' suggestions for improvements from are much appreciated.

**Conflicts of Interest:** The authors declare no conflict of interest.

## References

1. He, S.; Alonge, O.; Agrawal, P.; Sharmin, S.; Islam, I.; Mashreky, S.R.; Arifeen, S.E. Epidemiology of burns in rural Bangladesh: An update. *Int. J. Environ. Res. Public Health* **2017**. [CrossRef] [PubMed]
2. Burn Incidence and Treatment in the United States: 2016. Available online: http://www.ameriburn.org/resources_factsheet.php (accessed on 30 September 2017).
3. Smolle, C.; Cambiaso-Daniel, J.; Forbes, A.A.; Wurzer, P.; Hundeshagen, G.; Branski, L.K.; Huss, F.; Kamolz, L.P. Recent trends in burn epidemiology worldwide: A systematic review. *Burns* **2017**, *43*, 249–257. [CrossRef] [PubMed]
4. Esselman, P.C.; Thombs, B.D.; Magyar-Russell, G.; Fauerbach, J.A. Burn rehabilitation: State of the science. *Am. J. Phys. Med. Rehab.* **2006**, *85*, 383–413. [CrossRef] [PubMed]
5. Weast, R.C. (Ed.) *Handbook of Chemistry and Physics*, 54th ed.; Chemical Rubber Company: Cleveland, OH, USA, 1974.
6. Mason, S.A.; Nathens, A.B.; Byrne, J.P.; Ellis, J.; Fowler, R.A.; Gonzalez, A.; Karanicolas, P.J.; Moineddin, R.; Jeschke, M.G. Association between Burn Injury and Mental Illness among Burn Survivors: A Population-Based, Self-Matched, Longitudinal Cohort Study. *J. Am. Coll. Surg.* **2017**, *225*, 516–524. [CrossRef] [PubMed]
7. Jeschke, M.G.; Finnerty, C.C.; Shahrokhi, S.; Branski, L.K.; Dibildox, M. Wound Coverage Technologies in Burn Care: Novel Techniques. *J. Burn Care Res.* **2013**, *34*, 612–620. [CrossRef] [PubMed]

Case 4:25-cv-40091    Document 1    Filed 07/13/25    Page 163 of 204

*Int. J. Environ. Res. Public Health* **2018**, *15*, 2379
14 of 15

8.   Harish, V.; Tiwari, N.; Fisher, O.M.; Li, Z.; Maitz, P.K.M. First aid improves clinical outcomes in burn injuries: Evidence from a cohort study of 4918 patients. *Burns* **2018**, 7. [CrossRef] [PubMed]

9.   Kearney, L.; Francis, E.C.; Clover, A.J.P. New technologies in global burn care—A review of recent advances. *Int. J. Burn Trauma* **2018**, *8*, 77–87.

10.  Henriques, F.C.; Moritz, A.R. Studies of thermal injury, I: The conduction of heat to and through skin and the temperatures attained therein: A theoretical and an experimental investigation. *Am. J. Pathol.* **1947**, *23*, 530–549. [PubMed]

11.  Moritz, A.; Henriques, F.C. Studies of thermal injury, II: The relative importance of time and surface temperature in the causation of cutaneous burns. *Am. J. Pathol.* **1947**, *23*, 695–720. [PubMed]

12.  Moritz, A.R. Studies of thermal injury, III: The pathology and pathogenesis of cutaneous burns: An experimental study. *Am. J. Pathol.* **1947**, *23*, 915–941. [PubMed]

13.  Fu, M.; Weng, W.G.; Yuan, H.Y. Numerical simulation of the effects of blood perfusion, water diffusion, and vaporization on the skin temperature and burn injuries. *Numer. Heat Transfer Part A Appl.* **2014**, *65*, 1187–1203. [CrossRef]

14.  Tobalem, M.; Harder, Y.; Tschanz, E.; Speidel, V.; Pittet-Cuénod, B.; Wettstein, R. First-aid with warm water delays burn progression and increases skin survival. *J. Plast. Reconstr. Aesthet. Surg.* **2013**, *66*, 260–266. [CrossRef] [PubMed]

15.  Johnson, N.N.; Abraham, J.P.; Helgeson, Z.I.; Minkowycz, W.J.; Sparrow, E.M. An archive of skin-layer thicknesses and properties and calculations of scald burns with comparisons to experimental observations. *J. Therm. Sci. Eng. Appl.* **2011**. [CrossRef]

16.  Monds, J.R.; McDonald, A.G. Determination of skin temperature distribution and heat flux during simulated fires using Green's functions over finite-length scales. *Appl. Therm. Eng.* **2013**, *50*, 593–603. [CrossRef]

17.  Buettner, K. Effects of extreme heat and cold on human skin, II. Surface temperature, pain and heat conductivity in experiments with radiant heat. *J. Appl. Physiol.* **1951**, *3*, 703–713. [CrossRef] [PubMed]

18.  Moi, A.L.; Nilsen, R.M. Pathways leading to self-perceived general health and overall quality of life in burned adults. *Burns* **2012**, *38*, 1157–1164. [CrossRef] [PubMed]

19.  Scovronick, N.; Wilkinson, P. Health impacts of liquid biofuel production and use: A review. *Glob. Environ. Change* **2014**, *24*, 155–164. [CrossRef]

20.  Schripp, T.; Salthammer, T.; Wientzek, S.; Wensing, M. Chamber Studies on Nonvented Decorative Fireplaces Using Liquid or Gelled Ethanol Fuel. *Environ. Sci Technol.* **2014**, *48*, 3583–3590. [CrossRef] [PubMed]

21.  Nozza, E.; Capelli, L.; Eusebio, L.; Derudi, M.; Nano, G.; Del Rosso, R.; Sironi, S. The role of bioethanol flueless fireplaces on indoor air quality: Focus on odour emissions. *Build. Environ.* **2016**, *98*, 98–106. [CrossRef]

22.  Kraemer, R.; Knobloch, K.; Lorenzen, J.; Breuing, K.H.; Koennecker, S.; Rennekampff, H.O.; Vogt, P.M. Severe Burn Injuries Caused by Bioethanol-Design Fireplaces-An Overview on Recreational Fire Threats. *J. Burn Care Res.* **2011**, *32*, 173–177. [CrossRef] [PubMed]

23.  Van Zoonen, E.; van Eck, I.; van Baar, M. The cause of burn accidents by the use of bioethanol. *Inj. Prev.* **2016**, *22*, 416. [CrossRef]

24.  Heald, A.; Muller, M. Severe burns due to biofuel heater injury: A case series. *Burns* **2016**, *42*, E13–E17. [CrossRef] [PubMed]

25.  Neubrech, F.; Kiefer, J.; Schmidt, V.J.; Bigdeli, A.K.; Hernekamp, J.F.; Kremer, T.; Kneser, U.; Radu, C.A. Domestic bioethanol-fireplaces—A new source of severe burn accidents. *Burns* **2016**, *42*, 209–214. [CrossRef] [PubMed]

26.  Guillaume, E.; Loferme-Pedespan, N.; Duclerget-Baudequin, A.; Raguideau, A.; Fulton, R.; Lieval, L. Ethanol fireplaces: Safety matters. *Saf. Sci.* **2013**, *57*, 243–253. [CrossRef]

27.  Jaehn, T.; Muller, L.K.; Hauer, N.; Blank, B.; Kaiser, M.; Reichert, B. Secondary plastic and reconstructive measures following deep-dermal burn injuries. Negligent use of bioethanol. *Unfallchirurg* **2017**, *120*, 167–170. [CrossRef] [PubMed]

28.  Sohal, K.S.; Kalyanyama, M.B.; Owibingire, S.S. Burn Injury—A Rare Mishap of Endodontic Treatment: A Case Report. *Int. J. Case Rep. Short Rev.* **2018**, *4*, 24–26.

29.  A Chemical Tornados Demonstration, Reno, Nevada, USA, 5 September 2014. Available online: https://www.nbcnews.com/video/video-shows-dangerous-accident-at-childrens-museum-325405251630 (accessed on 8 July 2018).

*Int. J. Environ. Res. Public Health* **2018**, *15*, 2379

15 of 15

30. CSB. Key Lessons for Preventing Incidents from Flammable Chemicals in Educational Demonstrations, U.S. Chemical Safety and Hazard Investigation Board. Safety Bulletin. 2014, 14p. Available online: https://www.csb.gov/key-lessons-for-preventing-incidents-from-flammable-chemicals-in-educational-demonstrations/ (accessed on 11 July 2018).

31. Drysdale, D. *An Introduction to Fire Dynamics*, 2nd ed.; John Wiley: New York, NY, USA, 1999; p. 446. ISBN 0-471-97291-6.

32. DSB (Norwegian Directorate for Civil Protection). 2012. Available online: www.youtube.com/watch?v=BWImkef48gs (accessed on 10 July 2018).

33. Log, T.; Heskestad, G. Temperatures of Restricted Turbulent Fire Plumes. *Fire Saf. J.* **1998**, *31*, 101–115. [CrossRef]

34. Log, T. Skin temperatures of a pre-cooled wet person exposed to engulfing flames. *Fire Saf. J.* **2017**, *89*, 1–6. [CrossRef]

35. Log, T. Modeling Skin Injury from Hot Rice Porridge Spills. *Int. J. Environ. Res. Public Health* **2018**, *15*, 808. [CrossRef] [PubMed]

36. Ma, T.; Olenick, S.M.; Klassen, M.S.; Roby, R.J.; Torero, J.L. Burning Rate of Liquid Fuel on Carpet (Porous Media). *Fire Technol.* **2004**, *40*, 227–246. [CrossRef]

37. Groh, H. *Explosion Protection*, 1st ed.; Elsevier Butterworth-Heinemann: Oxford, MA, USA, 2004; p. 14. ISBN 0 7506 4777 9.

38. Bourdon, R.T.; Nelson-Cheeseman, B.B.; Abraham, J.P. Prediction, identification, and initial treatment guide for scald injuries. *Aust. J. Emerg. Crit. Care Med.* **2016**, *3*, 1043.

39. Wood, F.M.; Phillips, M.; Jovic, T.; Cassidy, J.T.; Cameron, P.; Edgar, D.W. Water First Aid Is Beneficial In Humans Post Burn: Evidence from a Bi-National Cohort Study. *PLoS ONE* **2016**, *11*, e0147259. [CrossRef] [PubMed]

40. Log, T. Modeling Skin Injury from Hot Spills on Clothing. *Int. J. Environ. Res. Public Health* **2017**, *14*, 1374. [CrossRef] [PubMed]

41. Lau, E.Y.K; Tam, Y.-Y.M.; Chiu, T.W. Importance of clothing removal in scalds. *Hong Kong Med. J.* **2016**, *22*, 152–157. [CrossRef] [PubMed]

42. Ravikumar, A.P.; Wang, J.; Brandt, A.R. Are Optical Gas Imaging Technologies Effective for Methane Leak Detection? *Environ. Sci. Technol.* **2017**, *51*, 718–724. [CrossRef] [PubMed]


© 2018 by the authors. Licensee MDPI, Basel, Switzerland. This article is an open access article distributed under the terms and conditions of the Creative Commons Attribution (CC BY) license (http://creativecommons.org/licenses/by/4.0/).

# EXHIBIT 3

OMB No. 1513-0020  (03/31/2012)

**DEPARTMENT OF THE TREASURY**
**ALCOHOL AND TOBACCO TAX AND TRADE BUREAU**
**APPLICATION FOR AND CERTIFICATION/EXEMPTION OF**
**LABEL/BOTTLE APPROVAL**
(See instructions and Paperwork Reduction Act Notice below)

TTB ID
10320-000-000014

1. REP. ID. NO. (if any)     CT  ✓ 49    OR  49

**PART I - APPLICATION**

2. PLANT REGISTRY/BASIC PERMIT/BREWER'S NO. (Required)
DSP-MO-16   MO-S-2

3. SOURCE OF PRODUCT (Required)
☒ Domestic    ☐ Imported

8. NAME AND ADDRESS OF APPLICANT AS SHOWN ON PLANT REGISTRY, BASIC PERMIT, OR BREWER'S NOTICE. INCLUDE APPROVED DBA OR TRADENAME IF USED ON THE LABEL  (Required)
Luxco, Inc.
5050 Kemper Avenue
St. Louis, MO 63139

4. SERIAL NUMBER  (Required)
YEAR
1 0 - 1 0 1 3

5. TYPE OF PRODUCT (Required)
☐ WINE
☒ DISTILLED SPIRITS
☐ MALT BEVERAGES

8a. MAILING ADDRESS, IF DIFFERENT

6. BRAND NAME  (Required)
Crystal Clear

7. FANCIFUL NAME  (if any)

9. E-MAIL ADDRESS
j.rompe@luxco.com

10. FORMULA/SOP NO. (if any)

11. LAB. NO. & DATE/PRE-IMPORT NO. & DATE (if any)

18. TYPE OF APPLICATION (Check applicable box(es))
a. ☒ CERTIFICATE OF LABEL APPROVAL
b. ☐ CERTIFICATE OF EXEMPTION FROM LABEL APPROVAL
"For use in _____ only" (Fill in State abbreviation)

12. NET CONTENTS
750mL, 1.0L, 1.75L

13. ALCOHOL CONTENT
95%

14. WINE APPELLATION (if on label)

c. ☐ DISTINCTIVE LIQUOR BOTTLE APPROVAL. TOTAL BOTTLE CAPACITY BEFORE CLOSURE _____ (Fill in amount)

15. WINE VINTAGE DATE (if on label)

16. PHONE NUMBER
314-772-2626

17. FAX NUMBER
314-772-6021

d. ☐ RESUBMISSION AFTER REJECTION TTB ID _____

19. SHOW ANY WORDING (a) APPEARING ON MATERIALS FIRMLY AFFIXED TO THE CONTAINER (e.g. caps, carafaels, corks, etc.) OTHER THAN THE LABELS AFFIXED BELOW, OR (b) BLOWN, BRANDED, OR EMBOSSED ON THE CONTAINER (e.g. net contents, etc.). THIS WORDING MUST BE NOTED HERE EVEN IF IT DUPLICATES PORTIONS OF THE LABELS AFFIXED BELOW. ALSO, PROVIDE TRANSLATIONS OF FOREIGN LANGUAGE TEXT APPEARING ON LABELS.

**PART II - APPLICANT'S CERTIFICATION**

Under the penalties of perjury, I declare: that all statements appearing on this application are true and correct to the best of my knowledge and belief; and, that the representations on the labels attached to this form, including supplemental documents, truly and correctly represent the content of the containers to which these labels will be applied. I also certify that I have read, understood, and complied with the conditions and instructions which are attached to an original TTB F 5100.31, Certificate/Exemption of Label/Bottle Approval.

20. DATE OF APPLICATION
10/11/2010

21. SIGNATURE OF APPLICANT OR AUTHORIZED AGENT
John F Rompe  Atty in Fact

22. PRINT NAME OF APPLICANT OR AUTHORIZED AGENT

**PART III - TTB CERTIFICATE**

This certificate is issued subject to applicable laws, regulations, and conditions as set forth in the instructions portion of this form.

23. DATE ISSUED
NOV 3 0 2010

24. AUTHORIZED SIGNATURE, ALCOHOL AND TOBACCO TAX AND TRADE BUREAU

**FOR TTB USE ONLY**

QUALIFICATIONS

EXPIRATION DATE (if any)



(6, and 7)

CRYSTAL CLEAR

CRYSTAL CLEAR Alcohol
95% ALC/VOL (U.S.P. 190 PROOF)
BOTTLED BY LUXCO INC.
ST. LOUIS, MO

DISTILLED FROM QUALITY GRAIN

LITER

# EXHIBIT 4

OMB No. 1513-0020

| FOR TTB USE ONLY | DEPARTMENT OF THE TREASURY |
|---|---|
| | ALCOHOL AND TOBACCO TAX AND TRADE BUREAU |

**APPLICATION FOR AND CERTIFICATION/EXEMPTION OF LABEL/BOTTLE APPROVAL**

(See Instructions and Paperwork Reduction Act Notice on Back)

TTB ID
17251001000267

1. REP. ID. NO. (If any) | CT 529 | OR 29

## PART I - APPLICATION

2. PLANT REGISTRY/BASIC PERMIT/BREWER'S NO. (Required)
DSP-MO-16
DSP-OH-22
DSP-OH-26

3. SOURCE OF PRODUCT (Required)
☐ Domestic
☐ Imported

3a. NAME AND ADDRESS OF APPLICANT AS SHOWN ON PLANT REGISTRY, BASIC PERMIT OR BREWER'S NOTICE. INCLUDE APPROVED DBA OR TRADENAME IF USED ON LABEL. (Required)

LUXCO, INC.
5050 KEMPER AVE

SAINT LOUIS MO 63139

4. SERIAL NUMBER (Required)
170057

5. TYPE OF PRODUCT (Required)
☐ WINE
☐ DISTILLED SPIRITS
☐ MALT BEVERAGE

6. BRAND NAME (Required)
EVERCLEAR

6a. MAILING ADDRESS, IF DIFFERENT

7. FANCIFUL NAME (If any)

9. FORMULA

10. GRAPE VARIETAL(S) (Wine Only)
N/A

14. TYPE OF APPLICATION (Check applicable box(es))

a. ☐ CERTIFICATE OF LABEL APPROVAL

11. WINE APPELLATION (If on label)

12. PHONE NUMBER
(314) 772-2626

13. EMAIL ADDRESS

b. ☐ CERTIFICATE OF EXEMPTION FROM LABEL APPROVAL "For sale in _____ only" (Fill in State abbreviation.)

c. ☐ DISTINCTIVE LIQUOR BOTTLE APPROVAL. TOTAL BOTTLE CAPACITY BEFORE CLOSURE _____ (Fill in amount)

d. ☐ RESUBMISSION AFTER REJECTION TTB ID. NO. _____

15. SHOW ANY INFORMATION THAT IS BLOWN, BRANDED, OR EMBOSSED ON THE CONTAINER (e.g., net contents) ONLY IF IT DOES NOT APPEAR ON THE LABELS AFFIXED BELOW. ALSO, SHOW TRANSLATIONS OF FOREIGN LANGUAGE TEXT APPEARING ON LABELS

## PART II - APPLICANT'S CERTIFICATION

Under the penalties of perjury, I declare: that all statements appearing on this application are true and correct to the best of my knowledge and belief; and, that the representations on the labels attached to this form, including supplemental documents, truly and correctly represent the content of the containers to which these labels will be applied. I also certify that I have read, understood and complied with the conditions and instructions which are attached to an original TTB F 5100.31, Certificate/Exemption of Label/Bottle Approval.

16. DATE OF APPLICATION
06/08/2017

17. SIGNATURE OF APPLICANT OR AUTHORIZED AGENT
(Application was e-filed)

18. PRINT NAME OF APPLICANT OR AUTHORIZED AGENT
JOHN REMPE

## PART III - TTB CERTIFICATE

This certificate is issued subject to applicable laws, regulations and conditions as set forth in the instructions portion of this form.

19. DATE ISSUED
06/20/2017

20. AUTHORIZED SIGNATURE, ALCOHOL AND TOBACCO TAX AND TRADE BUREAU

## FOR TTB USE ONLY

QUALIFICATIONS
TTB has not reviewed this label for type size, characters per inch or contrasting background. The responsible industry member must continue to ensure that the mandatory information on the actual labels is displayed in the correct type size, number of characters per inch, and on a contrasting background in accordance with the TTB labeling regulations. 27 CFR parts 4, 5, 7, and 16, as applicable.

EXPIRATION DATE (If any)

STATUS
THE STATUS IS APPROVED.

CLASS/TYPE DESCRIPTION
OTHER SPIRITS

AFFIX COMPLETE SET OF LABELS BELOW
Image Type:
Brand (front) or keg collar
Actual Dimensions: 4 inches W X 5 inches H



Image Type:
Neck
Actual Dimensions: 4.62 inches W X 2.34 inches H



Image Type:
Back
Actual Dimensions: 2.25 inches W X 2.72 inches H



TTB F 5100.31 (06-2016)    PREVIOUS EDITIONS ARE OBSOLETE

# EXHIBIT 5

# Massachusetts General Hospital
Founding Member, Mass General Brigham

Mass General Brigham
# Mass Eye and Ear

**MRN: 8812607**
**Patient Name:** Yuri Lanuza, Digan

**Payer: Insurance**

| Date of Service | Transaction Date | Transaction Description | Receipt | Hospital Inpatient | Hospital Outpatient | Professional Charges | Concierge Fees | Membership Fees | Other Charges |
|---|---|---|---|---|---|---|---|---|---|
| 5/14/2025 | 6/12/2025 | Charges | | | | | | | |
| | | | Account Totals | $518,206.99 | $0.00 | $42,598.00 | $0.00 | $0.00 | $0.00 |

Total Charges to-date: $560,804.99

Total Surcharges to-date: $0.00

Total Payments to-date: $0.00

Balance Due: $560,804.99

Notes:

**PLEASE NOTE THAT THE ABOVE CHARGES MAY NOT BE FINAL CHARGES**

Client Liaison: Sydney McSoley
Billing Coordinator:
Massachusetts General Hospital
55 Fruit Street | Blake 180
Boston, Massachusetts 02114
Tel: +1 617-726-2787 | Fax: +1 617-726-2543
Email: mghipc@mgh.harvard.edu

Date Printed: 6/23/2025 11:30:33 AM

Mass General Brigham
# Mass General Brigham



Mass General Brigham

399 Revolution Drive STE 410
Somerville, MA 02145-1462

Patient Name: Digan,Yvette Yuri

Account:      91943233
Letter Date:  06/23/25


Yvette Yuri Digan
9H BLK 1 KENSWOOD CT, KINGSWOOD VILLAS,
YUEN LONG, HONG KONG, Unavailable 34401
Hong Kong


Visit Coverages:
Aetna - Aetna Student Health / Chickering


This is an itemization of charges, payments and adjustments for:

| Patient: | Digan,Yvette Yuri | Admission Date: | 05/14/25 |
|---|---|---|---|
| Account: | 6352662973 | Discharge Date: | 06/10/25 |
| Location: | Massachusetts General Hospital | Department: | MGH EMERGENCY |

**Total Account Balance:** $518,206.99

**Hospital Charges**

| Date of Service | Rev Code | Procedure Code | Description | QTY | Amount |
|---|---|---|---|---|---|
| 05/14/2025 | 0207 | | HC R&B - INTENSIVE CARE - BURN CARE | 1 | 12,119.00 |
| 05/14/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 2 | 0.12 |
| 05/14/2025 | 0250 | | ACETAMINOPHEN 650 MG/20.3 ML SOLN | 1 | 4.66 |
| 05/14/2025 | 0250 | | ACETAMINOPHEN 650 MG/20.3 ML SOLN | 1 | 4.66 |
| 05/14/2025 | 0250 | | BACITRACIN 500 UNIT/GRAM OINT 28 G TUBE | 1 | 8.45 |
| 05/14/2025 | 0250 | | DOCUSATE 50 MG/5 ML LIQD | 1 | 4.42 |
| 05/14/2025 | 0250 | | DOCUSATE SODIUM 100 MG CAP | 1 | 0.14 |
| 05/14/2025 | 0250 | | FOLIC ACID 1 MG TAB | 1 | 0.06 |
| 05/14/2025 | 0250 | | MULTIVITAMIN WITH MINERALS TAB | 1 | 0.30 |
| 05/14/2025 | 0250 | | NOREPINEPHRINE 32 MCG/ML SOLN | 1 | 249.69 |
| 05/14/2025 | 0250 | | NOREPINEPHRINE 4 MG/250 ML (16 MCG/ML) SOLN | 1 | 197.63 |
| 05/14/2025 | 0250 | | OXYCODONE 5 MG TAB | 2 | 1.79 |
| 05/14/2025 | 0250 | | OXYCODONE 5 MG TAB | 2 | 1.79 |
| 05/14/2025 | 0250 | | OXYCODONE 5 MG/5 ML SOLN | 2 | 20.19 |
| 05/14/2025 | 0250 | | POTASSIUM PHOSPHATE 3 MMOL/ML SOLN 5 ML VIAL | 2 | 85.64 |

This is itemization of services for the time period indicated is provided at your request.  Please call 617-726-3884 if you have any questions or need assistance with your account.

GID: 91943233, 05/14/25

| Date of Service | Rev Code | Procedure Code | Description | QTY | Amount |
|---|---|---|---|---|---|
| 05/14/2025 | 0250 | | SODIUM HYPOCHLORITE 0.125 % SOLN 473 ML BOTTLE | 1 | 52.27 |
| 05/14/2025 | 0250 | | SODIUM HYPOCHLORITE 0.125 % SOLN 473 ML BOTTLE | 1 | 52.27 |
| 05/14/2025 | 0250 | | THIAMINE 100 MG TAB | 1 | 0.46 |
| 05/14/2025 | 0250 | J0613 | CALCIUM GLUCONATE 2 GRAM/100 ML SOLN | 200 | 69.70 |
| 05/14/2025 | 0250 | J0613 | CALCIUM GLUCONATE 2 GRAM/100 ML SOLN | 200 | 69.70 |
| 05/14/2025 | 0250 | J1171 | HYDROMORPHONE (PF) 0.5 MG/0.5 ML SYRG | 4 | 8.57 |
| 05/14/2025 | 0250 | J1171 | HYDROMORPHONE (PF) 0.5 MG/0.5 ML SYRG | 4 | 8.57 |
| 05/14/2025 | 0250 | J1171 | HYDROMORPHONE PER 4 MG | 10 | 10.16 |
| 05/14/2025 | 0250 | J1650 | ENOXAPARIN 40 MG/0.4 ML SYRG | 4 | 23.27 |
| 05/14/2025 | 0250 | J2405 | ONDANSETRON (PF) 4 MG/2 ML SOLN | 4 | 1.46 |
| 05/14/2025 | 0250 | J2598 | VASOPRESSIN 0.2 UNIT/ML SOLN | 20 | 147.48 |
| 05/14/2025 | 0250 | J2704 | PROPOFOL (DIPRIVAN) INFUSION 10 MG/ML EMUL | 100 | 36.98 |
| 05/14/2025 | 0250 | J2704 | PROPOFOL (DIPRIVAN) INFUSION 10 MG/ML EMUL | 100 | 34.85 |
| 05/14/2025 | 0250 | J2704 | PROPOFOL (DIPRIVAN) INFUSION 10 MG/ML EMUL | 100 | 34.85 |
| 05/14/2025 | 0250 | J2704 | PROPOFOL (DIPRIVAN) INFUSION 10 MG/ML EMUL | 100 | 34.85 |
| 05/14/2025 | 0250 | J2704 | PROPOFOL (DIPRIVAN) INFUSION 10 MG/ML EMUL | 100 | 34.85 |
| 05/14/2025 | 0250 | J3010 | FENTANYL PER 0.1 MG | 25 | 95.63 |
| 05/14/2025 | 0250 | J3010 | FENTANYL PER 0.1 MG | 25 | 95.63 |
| 05/14/2025 | 0250 | J3475 | MAGNESIUM SULFATE 2 GRAM/50 ML (4%) PGBK | 4 | 13.18 |
| 05/14/2025 | 0250 | J3475 | MAGNESIUM SULFATE 2 GRAM/50 ML (4%) PGBK | 4 | 13.18 |
| 05/14/2025 | 0250 | J3480 | POTASSIUM CHLORIDE PER 2 MEQ | 10 | 8.71 |
| 05/14/2025 | 0250 | J3480 | POTASSIUM CHLORIDE PER 2 MEQ | 10 | 20.40 |
| 05/14/2025 | 0250 | J3480 | POTASSIUM CHLORIDE PER 2 MEQ | 10 | 20.40 |
| 05/14/2025 | 0250 | J7050 | NS PER 250 ML J7050, PER 500 ML J7040, PER 1000 ML J7030 | 1 | 7.65 |
| 05/14/2025 | 0250 | J7999 | HYDROMORPHONE (PF) 1 MG/ML SOLN | 1 | 93.50 |
| 05/14/2025 | 0250 | P9045 | ALBUMIN HUMAN PER 50 ML | 1 | 146.63 |
| 05/14/2025 | 0250 | P9045 | ALBUMIN HUMAN PER 50 ML | 2 | 293.25 |
| 05/14/2025 | 0250 | P9045 | ALBUMIN HUMAN PER 50 ML | 2 | 293.25 |
| 05/14/2025 | 0250 | P9045 | ALBUMIN HUMAN PER 50 ML | 1 | 146.63 |
| 05/14/2025 | 0250 | P9045 | ALBUMIN HUMAN PER 50 ML | 2 | 293.25 |
| 05/14/2025 | 0250 | P9045 | ALBUMIN HUMAN PER 50 ML | 1 | 146.63 |
| 05/14/2025 | 0250 | P9045 | ALBUMIN HUMAN PER 50 ML | 1 | 146.63 |
| 05/14/2025 | 0250 | P9045 | ALBUMIN HUMAN PER 50 ML | 1 | 146.63 |
| 05/14/2025 | 0250 | P9045 | ALBUMIN HUMAN PER 50 ML | 1 | 146.63 |
| 05/14/2025 | 0300 | 80048 | HC BASIC METABOLIC PANEL CALCIUM TOTAL | 1 | 143.00 |
| 05/14/2025 | 0300 | 80048 | HC BASIC METABOLIC PANEL CALCIUM TOTAL | 1 | 143.00 |
| 05/14/2025 | 0300 | 80048 | HC BASIC METABOLIC PANEL CALCIUM TOTAL | 1 | 143.00 |
| 05/14/2025 | 0300 | 80048 | HC BASIC METABOLIC PANEL CALCIUM TOTAL | 1 | 143.00 |
| 05/14/2025 | 0300 | 80048 | HC BASIC METABOLIC PANEL CALCIUM TOTAL | 1 | 143.00 |
| 05/14/2025 | 0300 | 80076 | HC HEPATIC FUNCTION PANEL | 1 | 139.00 |
| 05/14/2025 | 0300 | 81003 | HC URNLS DIP STICK/TABLET RGNT AUTO W/O MICROSCOPY | 1 | 36.00 |
| 05/14/2025 | 0300 | 81025 | HC URINE PREGNANCY TEST VISUAL COLOR CMPRSN METHS | 1 | 102.00 |
| 05/14/2025 | 0300 | 82330 | HC CALCIUM IONIZED | 1 | 228.00 |
| 05/14/2025 | 0300 | 82330 | HC CALCIUM IONIZED | 1 | 228.00 |

This is itemization of services for the time period indicated is provided at your request.  Please call 617-726-3884 if you have any questions or need assistance with your account.

GID: 91943233, 05/14/25

| Date of Service | Rev Code | Procedure Code | Description | QTY | Amount |
|---|---|---|---|---|---|
| 05/14/2025 | 0300 | 82330 | HC CALCIUM IONIZED | 1 | 228.00 |
| 05/14/2025 | 0300 | 82803 | HC BLOOD GASES ANY COMBINATION PH PCO2 PO2 CO2 HCO3 | 1 | 327.00 |
| 05/14/2025 | 0300 | 82803 | HC BLOOD GASES ANY COMBINATION PH PCO2 PO2 CO2 HCO3 | 1 | 327.00 |
| 05/14/2025 | 0300 | 82803 | HC BLOOD GASES ANY COMBINATION PH PCO2 PO2 CO2 HCO3 | 1 | 327.00 |
| 05/14/2025 | 0300 | 82803 | HC BLOOD GASES ANY COMBINATION PH PCO2 PO2 CO2 HCO3 | 1 | 327.00 |
| 05/14/2025 | 0300 | 83605 | HC ASSAY OF LACTATE | 1 | 174.00 |
| 05/14/2025 | 0300 | 83605 | HC ASSAY OF LACTATE | 1 | 174.00 |
| 05/14/2025 | 0300 | 83605 | HC ASSAY OF LACTATE | 1 | 174.00 |
| 05/14/2025 | 0300 | 83605 | HC ASSAY OF LACTATE | 1 | 174.00 |
| 05/14/2025 | 0300 | 83735 | HC ASSAY OF MAGNESIUM | 1 | 104.00 |
| 05/14/2025 | 0300 | 83735 | HC ASSAY OF MAGNESIUM | 1 | 104.00 |
| 05/14/2025 | 0300 | 83735 | HC ASSAY OF MAGNESIUM | 1 | 104.00 |
| 05/14/2025 | 0300 | 83735 | HC ASSAY OF MAGNESIUM | 1 | 104.00 |
| 05/14/2025 | 0300 | 83735 | HC ASSAY OF MAGNESIUM | 1 | 104.00 |
| 05/14/2025 | 0300 | 83735 | HC ASSAY OF MAGNESIUM | 1 | 104.00 |
| 05/14/2025 | 0300 | 84100 | HC ASSAY OF PHOSPHORUS INORGANIC | 1 | 76.00 |
| 05/14/2025 | 0300 | 84100 | HC ASSAY OF PHOSPHORUS INORGANIC | 1 | 76.00 |
| 05/14/2025 | 0300 | 84100 | HC ASSAY OF PHOSPHORUS INORGANIC | 1 | 76.00 |
| 05/14/2025 | 0300 | 84100 | HC ASSAY OF PHOSPHORUS INORGANIC | 1 | 76.00 |
| 05/14/2025 | 0300 | 84100 | HC ASSAY OF PHOSPHORUS INORGANIC | 1 | 76.00 |
| 05/14/2025 | 0300 | 84100 | HC ASSAY OF PHOSPHORUS INORGANIC | 1 | 76.00 |
| 05/14/2025 | 0300 | 84478 | HC ASSAY OF TRIGLYCERIDES | 1 | 98.00 |
| 05/14/2025 | 0300 | 85027 | HC BLOOD COUNT COMPLETE AUTOMATED | 1 | 93.00 |
| 05/14/2025 | 0300 | 85027 | HC BLOOD COUNT COMPLETE AUTOMATED | 1 | 93.00 |
| 05/14/2025 | 0300 | 85027 | HC BLOOD COUNT COMPLETE AUTOMATED | 1 | 93.00 |
| 05/14/2025 | 0300 | 85027 | HC BLOOD COUNT COMPLETE AUTOMATED | 1 | 93.00 |
| 05/14/2025 | 0300 | 85027 | HC BLOOD COUNT COMPLETE AUTOMATED | 1 | 93.00 |
| 05/14/2025 | 0300 | 86850 | HC ANTIBODY SCREEN RBC EACH SERUM TECHNIQUE | 1 | 182.00 |
| 05/14/2025 | 0300 | 86900 | HC BLOOD TYPING SEROLOGIC ABO | 1 | 100.00 |
| 05/14/2025 | 0300 | 86901 | HC BLOOD TYPING RH D | 1 | 100.00 |
| 05/14/2025 | 0300 | 86923 | HC COMPATIBILITY EACH UNIT ELECTRONIC | 1 | 208.00 |
| 05/14/2025 | 0300 | 86923 | HC COMPATIBILITY EACH UNIT ELECTRONIC | 1 | 208.00 |
| 05/14/2025 | 0300 | 86923 | HC COMPATIBILITY EACH UNIT ELECTRONIC | 1 | 208.00 |
| 05/14/2025 | 0300 | 86923 | HC COMPATIBILITY EACH UNIT ELECTRONIC | 1 | 208.00 |
| 05/14/2025 | 0300 | 87081 | HC CUL PRSMPTV PTHGNC ORGANISM SCRN W/COLONY ESTIMJ | 1 | 112.00 |
| 05/14/2025 | 0300 | 87081 | HC CUL PRSMPTV PTHGNC ORGANISM SCRN W/COLONY ESTIMJ | 1 | 112.00 |
| 05/14/2025 | 0324 | 71045 | HC RADIOLOGIC EXAM CHEST SINGLE VIEW | 1 | 363.00 |
| 05/14/2025 | 0410 | 94002 | HC VENTILATION ASSIST & MGMT INPATIENT 1ST DAY | 1 | 2,474.00 |
| 05/14/2025 | 0730 | 93005 | HC ECG ROUTINE ECG W/LEAST 12 LDS TRCG ONLY W/O I&R | 1 | 324.00 |
| 05/15/2025 | 0207 |  | HC R&B - INTENSIVE CARE - BURN CARE | 1 | 12,119.00 |
| 05/15/2025 | 0250 |  | ACETAMINOPHEN 325 MG TAB | 2 | 0.12 |
| 05/15/2025 | 0250 |  | ACETAMINOPHEN 325 MG TAB | 2 | 0.12 |
| 05/15/2025 | 0250 |  | ACETAMINOPHEN 325 MG TAB | 3 | 0.18 |
| 05/15/2025 | 0250 |  | ACETAMINOPHEN 325 MG TAB | 3 | 0.18 |
| 05/15/2025 | 0250 |  | ASCORBIC ACID (VITAMIN C) 500 MG TAB | 1 | 0.12 |
| 05/15/2025 | 0250 |  | BACITRACIN 500 UNIT/GRAM OINT 28 G TUBE | 1 | 8.45 |
| 05/15/2025 | 0250 |  | DOCUSATE SODIUM 100 MG CAP | 1 | 0.14 |

This is itemization of services for the time period indicated is provided at your request.  Please call 617-726-3884 if you have any questions or need assistance with your account.

Page 3 of 26

GID: 91943233, 05/14/25

| Date of Service | Rev Code | Procedure Code | Description | QTY | Amount |
|---|---|---|---|---|---|
| 05/15/2025 | 0250 | | MULTIVITAMIN WITH MINERALS TAB | 1 | 0.30 |
| 05/15/2025 | 0250 | | OXYCODONE 5 MG TAB | 2 | 1.79 |
| 05/15/2025 | 0250 | | OXYCODONE 5 MG TAB | 2 | 1.79 |
| 05/15/2025 | 0250 | | OXYCODONE 5 MG TAB | 2 | 1.79 |
| 05/15/2025 | 0250 | | OXYCODONE 5 MG TAB | 3 | 2.69 |
| 05/15/2025 | 0250 | | OXYCODONE 5 MG TAB | 3 | 2.69 |
| 05/15/2025 | 0250 | | OXYCODONE 5 MG TAB | 3 | 2.69 |
| 05/15/2025 | 0250 | | PHENOL 1.4 % SPRA 177 ML BOTTLE | 1 | 10.53 |
| 05/15/2025 | 0250 | | POTASSIUM PHOSPHATE 3 MMOL/ML SOLN 5 ML VIAL | 2 | 85.64 |
| 05/15/2025 | 0250 | | POTASSIUM, SODIUM PHOSPHATES 280-160-250 MG PWPK | 2 | 4.22 |
| 05/15/2025 | 0250 | | POTASSIUM, SODIUM PHOSPHATES 280-160-250 MG PWPK | 2 | 4.22 |
| 05/15/2025 | 0250 | | POTASSIUM, SODIUM PHOSPHATES 280-160-250 MG PWPK | 2 | 4.22 |
| 05/15/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 2 | 1.71 |
| 05/15/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 1 | 0.71 |
| 05/15/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 2 | 1.71 |
| 05/15/2025 | 0250 | | SODIUM HYPOCHLORITE 0.125 % SOLN 473 ML BOTTLE | 1 | 52.27 |
| 05/15/2025 | 0250 | | ZINC SULFATE 50 MG ZINC (220 MG) CAP | 1 | 0.72 |
| 05/15/2025 | 0250 | J0613 | CALCIUM GLUCONATE 2 GRAM/100 ML SOLN | 200 | 69.70 |
| 05/15/2025 | 0250 | J0613 | CALCIUM GLUCONATE 2 GRAM/100 ML SOLN | 200 | 69.70 |
| 05/15/2025 | 0250 | J0613 | CALCIUM GLUCONATE 2 GRAM/100 ML SOLN | 200 | 69.70 |
| 05/15/2025 | 0250 | J1171 | HYDROMORPHONE (PF) 0.5 MG/0.5 ML SYRG | 4 | 8.57 |
| 05/15/2025 | 0250 | J1171 | HYDROMORPHONE (PF) 0.5 MG/0.5 ML SYRG | 4 | 8.57 |
| 05/15/2025 | 0250 | J1171 | HYDROMORPHONE (PF) 0.5 MG/0.5 ML SYRG | 4 | 8.57 |
| 05/15/2025 | 0250 | J1650 | ENOXAPARIN 40 MG/0.4 ML SYRG | 4 | 23.27 |
| 05/15/2025 | 0250 | J2272 | MORPHINE PER 10 MG | 1 | 9.12 |
| 05/15/2025 | 0250 | J2272 | MORPHINE PER 10 MG | 1 | 9.12 |
| 05/15/2025 | 0250 | J2272 | MORPHINE PER 10 MG | 1 | 9.12 |
| 05/15/2025 | 0250 | J2272 | MORPHINE PER 10 MG | 1 | 9.12 |
| 05/15/2025 | 0250 | J3475 | MAGNESIUM SULFATE 2 GRAM/50 ML (4%) PGBK | 4 | 11.05 |
| 05/15/2025 | 0250 | J3475 | MAGNESIUM SULFATE 2 GRAM/50 ML (4%) PGBK | 4 | 11.05 |
| 05/15/2025 | 0250 | J3480 | POTASSIUM CHLORIDE PER 2 MEQ | 10 | 20.40 |
| 05/15/2025 | 0250 | J3480 | POTASSIUM CHLORIDE PER 2 MEQ | 10 | 20.40 |
| 05/15/2025 | 0250 | J7050 | NS PER 250 ML J7050, PER 500 ML J7040, PER 1000 ML J7030 | 1 | 7.65 |
| 05/15/2025 | 0250 | P9045 | ALBUMIN HUMAN PER 50 ML | 1 | 146.63 |
| 05/15/2025 | 0300 | 80048 | HC BASIC METABOLIC PANEL CALCIUM TOTAL | 1 | 143.00 |
| 05/15/2025 | 0300 | 80048 | HC BASIC METABOLIC PANEL CALCIUM TOTAL | 1 | 143.00 |
| 05/15/2025 | 0300 | 80048 | HC BASIC METABOLIC PANEL CALCIUM TOTAL | 1 | 143.00 |
| 05/15/2025 | 0300 | 80076 | HC HEPATIC FUNCTION PANEL | 1 | 139.00 |
| 05/15/2025 | 0300 | 82330 | HC CALCIUM IONIZED | 1 | 228.00 |
| 05/15/2025 | 0300 | 82330 | HC CALCIUM IONIZED | 1 | 228.00 |
| 05/15/2025 | 0300 | 82803 | HC BLOOD GASES ANY COMBINATION PH PCO2 PO2 CO2 HCO3 | 1 | 327.00 |
| 05/15/2025 | 0300 | 83605 | HC ASSAY OF LACTATE | 1 | 174.00 |
| 05/15/2025 | 0300 | 83605 | HC ASSAY OF LACTATE | 1 | 174.00 |
| 05/15/2025 | 0300 | 83735 | HC ASSAY OF MAGNESIUM | 1 | 104.00 |
| 05/15/2025 | 0300 | 83735 | HC ASSAY OF MAGNESIUM | 1 | 104.00 |
| 05/15/2025 | 0300 | 83735 | HC ASSAY OF MAGNESIUM | 1 | 104.00 |

This is itemization of services for the time period indicated is provided at your request.  Please call 617-726-3884 if you have any questions or need assistance with your account.

GID: 91943233, 05/14/25

| Date of Service | Rev Code | Procedure Code | Description | QTY | Amount |
|---|---|---|---|---|---|
| 05/15/2025 | 0300 | 84100 | HC ASSAY OF PHOSPHORUS INORGANIC | 1 | 76.00 |
| 05/15/2025 | 0300 | 84100 | HC ASSAY OF PHOSPHORUS INORGANIC | 1 | 76.00 |
| 05/15/2025 | 0300 | 84100 | HC ASSAY OF PHOSPHORUS INORGANIC | 1 | 76.00 |
| 05/15/2025 | 0300 | 85027 | HC BLOOD COUNT COMPLETE AUTOMATED | 1 | 93.00 |
| 05/15/2025 | 0300 | 85027 | HC BLOOD COUNT COMPLETE AUTOMATED | 1 | 93.00 |
| 05/15/2025 | 0300 | 86140 | HC C-REACTIVE PROTEIN | 1 | 85.00 |
| 05/15/2025 | 0324 | 71045 | HC RADIOLOGIC EXAM CHEST SINGLE VIEW | 1 | 363.00 |
| 05/15/2025 | 0434 | 97166 | HC OCCUPATIONAL THERAPY EVALUATION, MODERATE COMPLEXITY | 1 | 621.00 |
| 05/16/2025 | 0207 | | HC R&B - INTENSIVE CARE - BURN CARE | 1 | 12,119.00 |
| 05/16/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.18 |
| 05/16/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.18 |
| 05/16/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.18 |
| 05/16/2025 | 0250 | | ASCORBIC ACID (VITAMIN C) 500 MG TAB | 1 | 0.12 |
| 05/16/2025 | 0250 | | ASCORBIC ACID (VITAMIN C) 500 MG TAB | 1 | 0.12 |
| 05/16/2025 | 0250 | | DEXMEDETOMIDINE IN 0.9 % NACL 20 MCG/5 ML (4 MCG/ML) SYRG | 2 | 72.68 |
| 05/16/2025 | 0250 | | DOCUSATE SODIUM 100 MG CAP | 1 | 0.14 |
| 05/16/2025 | 0250 | | KETAMINE 10 MG/ML SOLN | 1 | 19.19 |
| 05/16/2025 | 0250 | | MULTIVITAMIN WITH MINERALS TAB | 1 | 0.11 |
| 05/16/2025 | 0250 | | OXYCODONE 5 MG TAB | 3 | 2.69 |
| 05/16/2025 | 0250 | | OXYCODONE 5 MG TAB | 3 | 2.69 |
| 05/16/2025 | 0250 | | OXYCODONE 5 MG TAB | 3 | 2.69 |
| 05/16/2025 | 0250 | | OXYCODONE 5 MG TAB | 3 | 2.69 |
| 05/16/2025 | 0250 | | OXYCODONE 5 MG TAB | 3 | 2.69 |
| 05/16/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 2 | 1.71 |
| 05/16/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 2 | 1.71 |
| 05/16/2025 | 0250 | | ROCURONIUM 50 MG/5 ML (10 MG/ML) SYRG | 2 | 63.75 |
| 05/16/2025 | 0250 | | SENNA 8.6 MG TAB | 2 | 0.32 |
| 05/16/2025 | 0250 | | SODIUM HYPOCHLORITE 0.125 % SOLN 473 ML BOTTLE | 1 | 52.27 |
| 05/16/2025 | 0250 | | SODIUM HYPOCHLORITE 0.125 % SOLN 473 ML BOTTLE | 1 | 52.27 |
| 05/16/2025 | 0250 | | SODIUM HYPOCHLORITE 0.125 % SOLN 473 ML BOTTLE | 1 | 52.27 |
| 05/16/2025 | 0250 | | SUGAMMADEX 100 MG/ML SOLN | 1 | 528.01 |
| 05/16/2025 | 0250 | | ZINC SULFATE 50 MG ZINC (220 MG) CAP | 1 | 0.72 |
| 05/16/2025 | 0250 | J0171 | EPINEPHRINE 1 MG/ML SOLN 1 ML VIAL | 10 | 54.30 |
| 05/16/2025 | 0250 | J0613 | CALCIUM GLUCONATE 2 GRAM/100 ML SOLN | 200 | 69.70 |
| 05/16/2025 | 0250 | J0690 | CEFAZOLIN PER 500 MG | 4 | 7.39 |
| 05/16/2025 | 0250 | J1100 | DEXAMETHASONE PER 1 MG | 4 | 1.89 |
| 05/16/2025 | 0250 | J1171 | HYDROMORPHONE PER 4 MG | 10 | 13.27 |
| 05/16/2025 | 0250 | J1630 | HALOPERIDOL LACTATE PER 5 MG | 1 | 2.15 |
| 05/16/2025 | 0250 | J1650 | ENOXAPARIN 40 MG/0.4 ML SYRG | 4 | 23.27 |
| 05/16/2025 | 0250 | J2250 | MIDAZOLAM (PF) 1 MG/ML SOLN | 2 | 4.21 |
| 05/16/2025 | 0250 | J2272 | MORPHINE PER 10 MG | 1 | 9.12 |
| 05/16/2025 | 0250 | J2272 | MORPHINE PER 10 MG | 1 | 9.12 |
| 05/16/2025 | 0250 | J2272 | MORPHINE PER 10 MG | 1 | 9.12 |
| 05/16/2025 | 0250 | J2272 | MORPHINE PER 10 MG | 1 | 9.12 |
| 05/16/2025 | 0250 | J2272 | MORPHINE PER 10 MG | 1 | 9.12 |
| 05/16/2025 | 0250 | J2371 | PHENYLEPHRINE HCL IN 0.9% NACL 400 MCG/5 ML (80 MCG/ML) SYRG | 16 | 0.82 |
| 05/16/2025 | 0250 | J2405 | ONDANSETRON (PF) 4 MG/2 ML SOLN | 4 | 1.46 |
| 05/16/2025 | 0250 | J2405 | ONDANSETRON (PF) 4 MG/2 ML SOLN | 4 | 1.46 |

This is itemization of services for the time period indicated is provided at your request.  Please call 617-726-3884 if you have any questions or need assistance with your account.

GID: 91943233, 05/14/25

| Date of Service | Rev Code | Procedure Code | Description | QTY | Amount |
|---|---|---|---|---|---|
| 05/16/2025 | 0250 | J2704 | PROPOFOL (DIPRIVAN) INFUSION 10 MG/ML EMUL | 20 | 7.40 |
| 05/16/2025 | 0250 | J3475 | MAGNESIUM SULFATE 2 GRAM/50 ML (4%) PGBK | 4 | 11.05 |
| 05/16/2025 | 0250 | J7030 | NS PER 250 ML J7050, PER 500 ML J7040, PER 1000 ML J7030 | 1 | 7.65 |
| 05/16/2025 | 0250 | J7999 | PHENYLEPHRINE 80 MCG/ML SOLN | 1 | 10.57 |
| 05/16/2025 | 0274 | L3808 | HC WHFO, RIGID W/O JOINTS | 1 | 143.00 |
| 05/16/2025 | 0278 | C1889 | GRAFT ALLO 1 TO 1.5 MESHING 500CM HUMAN TISSUE SOFT MESH CRYOPRESERVEDRESSING BURRN REPAIR FROZEN | 1 | 3,571.54 |
| 05/16/2025 | 0278 | C1889 | GRAFT TISSUE 1/4 SQ FT MATRIX MESH CRYOPRESERVE BURRN REPAIR SOFT | 1 | 1,421.00 |
| 05/16/2025 | 0278 | C1889 | GRAFT TISSUE 1/4 SQ FT MATRIX MESH CRYOPRESERVE BURRN REPAIR SOFT | 1 | 1,421.00 |
| 05/16/2025 | 0300 | 80048 | HC BASIC METABOLIC PANEL CALCIUM TOTAL | 1 | 143.00 |
| 05/16/2025 | 0300 | 80048 | HC BASIC METABOLIC PANEL CALCIUM TOTAL | 1 | 143.00 |
| 05/16/2025 | 0300 | 80076 | HC HEPATIC FUNCTION PANEL | 1 | 139.00 |
| 05/16/2025 | 0300 | 82330 | HC CALCIUM IONIZED | 1 | 228.00 |
| 05/16/2025 | 0300 | 82330 | HC CALCIUM IONIZED | 1 | 228.00 |
| 05/16/2025 | 0300 | 82330 | HC CALCIUM IONIZED | 1 | 228.00 |
| 05/16/2025 | 0300 | 82803 | HC BLOOD GASES ANY COMBINATION PH PCO2 PO2 CO2 HCO3 | 1 | 327.00 |
| 05/16/2025 | 0300 | 82810 | HC GASES BLOOD O2 SATURATION ONLY DIRECT MEAS | 1 | 144.00 |
| 05/16/2025 | 0300 | 82947 | HC GLUCOSE QUANTITATIVE BLOOD XCPT REAGENT STRIP | 1 | 68.00 |
| 05/16/2025 | 0300 | 83605 | HC ASSAY OF LACTATE | 1 | 174.00 |
| 05/16/2025 | 0300 | 83605 | HC ASSAY OF LACTATE | 1 | 174.00 |
| 05/16/2025 | 0300 | 83735 | HC ASSAY OF MAGNESIUM | 1 | 104.00 |
| 05/16/2025 | 0300 | 83735 | HC ASSAY OF MAGNESIUM | 1 | 104.00 |
| 05/16/2025 | 0300 | 84100 | HC ASSAY OF PHOSPHORUS INORGANIC | 1 | 76.00 |
| 05/16/2025 | 0300 | 84100 | HC ASSAY OF PHOSPHORUS INORGANIC | 1 | 76.00 |
| 05/16/2025 | 0300 | 84132 | HC POTASSIUM SERUM PLASMA/WHOLE BLOOD | 1 | 77.00 |
| 05/16/2025 | 0300 | 84295 | HC SODIUM SERUM PLASMA OR WHOLE BLOOD | 1 | 80.00 |
| 05/16/2025 | 0300 | 85027 | HC BLOOD COUNT COMPLETE AUTOMATED | 1 | 93.00 |
| 05/16/2025 | 0300 | 85027 | HC BLOOD COUNT COMPLETE AUTOMATED | 1 | 93.00 |
| 05/16/2025 | 0300 | 87070 | HC CUL BACT XCPT URINE BLOOD/STOOL AEROBIC ISOL | 1 | 148.00 |
| 05/16/2025 | 0300 | 87075 | HC CULTURE BACTERIAL ANY SOURCE ANAEROBIC ISO&ID | 1 | 150.00 |
| 05/16/2025 | 0300 | 87077 | HC CUL BACT AEROBIC ADDL METHS DEFINITIVE EA ISOL | 1 | 87.00 |
| 05/16/2025 | 0300 | 87077 | HC CUL BACT AEROBIC ADDL METHS DEFINITIVE EA ISOL | 1 | 87.00 |
| 05/16/2025 | 0300 | 87102 | HC CULTURE FNGI MOLD/YEAST PRSMPTV OTH XCPT BLOOD | 1 | 136.00 |
| 05/16/2025 | 0300 | 87186 | HC SUSCEPTIBLTY STDY ANTIMICRBIAL MICRO/AGAR DILUTJ | 1 | 143.00 |
| 05/16/2025 | 0300 | 87186 | HC SUSCEPTIBLTY STDY ANTIMICRBIAL MICRO/AGAR DILUTJ | 1 | 143.00 |
| 05/16/2025 | 0300 | 87205 | HC SMR PRIM SRC GRAM/GIEMSA STAIN BCT FUNGI/CELL | 1 | 74.00 |
| 05/16/2025 | 0360 | | HC OPERATING ROOM T2 EACH ADDL 15 MIN | 7 | 27,741.00 |

This is itemization of services for the time period indicated is provided at your request.  Please call 617-726-3884 if you have any questions or need assistance with your account.

GID: 91943233, 05/14/25

| Date of Service | Rev Code | Procedure Code | Description | QTY | Amount |
|---|---|---|---|---|---|
| 05/16/2025 | 0360 | | HC OPERATING ROOM T2 FIRST 30 MIN | 1 | 8,340.00 |
| 05/16/2025 | 0370 | | HC ANESTHESIA TECHNICAL CHARGE PER 15 MIN (ENTERPRISE) | 8 | 3,624.00 |
| 05/16/2025 | 0370 | | HC ANESTHESIA TECHNICAL CHARGE PER 15 MIN (ENTERPRISE) | 1 | 453.00 |
| 05/16/2025 | 0430 | 97140 | HC MANUAL THERAPY TQS 1/> REGIONS EACH 15 MINUTES | 1 | 206.00 |
| 05/16/2025 | 0431 | 97760 | HC ORTHOTICS MGMT & TRAINJ INITIAL ENCTR EA 15 MINS | 1 | 255.00 |
| 05/17/2025 | 0207 | | HC R&B - INTENSIVE CARE - BURN CARE | 1 | 12,119.00 |
| 05/17/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.18 |
| 05/17/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.18 |
| 05/17/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.43 |
| 05/17/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.18 |
| 05/17/2025 | 0250 | | ASCORBIC ACID (VITAMIN C) 500 MG TAB | 1 | 0.12 |
| 05/17/2025 | 0250 | | ASCORBIC ACID (VITAMIN C) 500 MG TAB | 1 | 0.12 |
| 05/17/2025 | 0250 | | BACITRACIN 500 UNIT/GRAM OINT 28 G TUBE | 1 | 8.45 |
| 05/17/2025 | 0250 | | DOCUSATE SODIUM 100 MG CAP | 1 | 0.14 |
| 05/17/2025 | 0250 | | DOCUSATE SODIUM 100 MG CAP | 1 | 0.14 |
| 05/17/2025 | 0250 | | HYDROXYZINE 25 MG TAB | 1 | 0.59 |
| 05/17/2025 | 0250 | | MULTIVITAMIN WITH MINERALS TAB | 1 | 0.30 |
| 05/17/2025 | 0250 | | OXYCODONE 5 MG TAB | 3 | 2.69 |
| 05/17/2025 | 0250 | | OXYCODONE 5 MG TAB | 3 | 2.69 |
| 05/17/2025 | 0250 | | OXYCODONE 5 MG TAB | 2 | 1.79 |
| 05/17/2025 | 0250 | | OXYCODONE 5 MG TAB | 2 | 1.79 |
| 05/17/2025 | 0250 | | OXYCODONE 5 MG TAB | 2 | 1.79 |
| 05/17/2025 | 0250 | | POLYETHYLENE GLYCOL 17 GRAM PWPK | 1 | 3.77 |
| 05/17/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 2 | 0.52 |
| 05/17/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 2 | 0.52 |
| 05/17/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 2 | 0.52 |
| 05/17/2025 | 0250 | | SENNA 8.6 MG TAB | 2 | 0.32 |
| 05/17/2025 | 0250 | | SODIUM HYPOCHLORITE 0.125 % SOLN 473 ML BOTTLE | 1 | 52.27 |
| 05/17/2025 | 0250 | | ZINC SULFATE 50 MG ZINC (220 MG) CAP | 1 | 0.72 |
| 05/17/2025 | 0250 | J0613 | CALCIUM GLUCONATE 2 GRAM/100 ML SOLN | 200 | 69.70 |
| 05/17/2025 | 0250 | J1171 | HYDROMORPHONE (PF) 1 MG/ML BAG | 500 | 93.50 |
| 05/17/2025 | 0250 | J1650 | ENOXAPARIN 40 MG/0.4 ML SYRG | 4 | 23.27 |
| 05/17/2025 | 0250 | J2272 | MORPHINE PER 10 MG | 1 | 18.23 |
| 05/17/2025 | 0250 | J2272 | MORPHINE PER 10 MG | 1 | 18.23 |
| 05/17/2025 | 0300 | 80048 | HC BASIC METABOLIC PANEL CALCIUM TOTAL | 1 | 143.00 |
| 05/17/2025 | 0300 | 80076 | HC HEPATIC FUNCTION PANEL | 1 | 139.00 |
| 05/17/2025 | 0300 | 82330 | HC CALCIUM IONIZED | 1 | 228.00 |
| 05/17/2025 | 0300 | 83605 | HC ASSAY OF LACTATE | 1 | 174.00 |
| 05/17/2025 | 0300 | 83735 | HC ASSAY OF MAGNESIUM | 1 | 104.00 |
| 05/17/2025 | 0300 | 84100 | HC ASSAY OF PHOSPHORUS INORGANIC | 1 | 76.00 |
| 05/17/2025 | 0300 | 85027 | HC BLOOD COUNT COMPLETE AUTOMATED | 1 | 93.00 |
| 05/17/2025 | 0420 | 97530 | HC THERAPEUT ACTVITY DIRECT PT CONTACT EACH 15 MIN | 1 | 238.00 |
| 05/17/2025 | 0424 | 97162 | HC PHYSICAL THERAPY EVALUATION, MODERATE COMPLEXITY | 1 | 606.00 |
| 05/17/2025 | 0430 | 97140 | HC MANUAL THERAPY TQS 1/> REGIONS EACH 15 MINUTES | 2 | 412.00 |
| 05/18/2025 | 0207 | | HC R&B - INTENSIVE CARE - BURN CARE | 1 | 12,119.00 |
| 05/18/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.18 |

This is itemization of services for the time period indicated is provided at your request. Please call 617-726-3884 if you have any questions or need assistance with your account.

GID: 91943233, 05/14/25

| Date of Service | Rev Code | Procedure Code | Description | QTY | Amount |
|---|---|---|---|---|---|
| 05/18/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.18 |
| 05/18/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.57 |
| 05/18/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.57 |
| 05/18/2025 | 0250 | | ASCORBIC ACID (VITAMIN C) 500 MG TAB | 1 | 0.12 |
| 05/18/2025 | 0250 | | ASCORBIC ACID (VITAMIN C) 500 MG TAB | 1 | 0.12 |
| 05/18/2025 | 0250 | | DOCUSATE SODIUM 100 MG CAP | 1 | 0.14 |
| 05/18/2025 | 0250 | | KETAMINE 10 MG/ML SOLN | 1 | 190.83 |
| 05/18/2025 | 0250 | | LACTULOSE 10 GRAM/15 ML SOLN | 1 | 4.97 |
| 05/18/2025 | 0250 | | LORAZEPAM 0.5 MG TAB | 1 | 0.18 |
| 05/18/2025 | 0250 | | MULTIVITAMIN WITH MINERALS TAB | 1 | 0.30 |
| 05/18/2025 | 0250 | | OXYCODONE 5 MG TAB | 2 | 1.79 |
| 05/18/2025 | 0250 | | OXYCODONE 5 MG TAB | 2 | 1.79 |
| 05/18/2025 | 0250 | | POLYETHYLENE GLYCOL 17 GRAM PWPK | 1 | 3.77 |
| 05/18/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 2 | 0.52 |
| 05/18/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 2 | 0.52 |
| 05/18/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 2 | 0.52 |
| 05/18/2025 | 0250 | | SODIUM HYPOCHLORITE 0.125 % SOLN 473 ML BOTTLE | 1 | 52.27 |
| 05/18/2025 | 0250 | | SODIUM HYPOCHLORITE 0.125 % SOLN 473 ML BOTTLE | 1 | 52.27 |
| 05/18/2025 | 0250 | | SODIUM HYPOCHLORITE 0.125 % SOLN 473 ML BOTTLE | 1 | 52.27 |
| 05/18/2025 | 0250 | | SODIUM HYPOCHLORITE 0.125 % SOLN 473 ML BOTTLE | 1 | 52.27 |
| 05/18/2025 | 0250 | | ZINC SULFATE 50 MG ZINC (220 MG) CAP | 1 | 0.72 |
| 05/18/2025 | 0250 | J0613 | CALCIUM GLUCONATE 2 GRAM/100 ML SOLN | 200 | 69.70 |
| 05/18/2025 | 0250 | J1650 | ENOXAPARIN 40 MG/0.4 ML SYRG | 4 | 23.27 |
| 05/18/2025 | 0250 | J2405 | ONDANSETRON (PF) 4 MG/2 ML SOLN | 4 | 1.46 |
| 05/18/2025 | 0250 | J3475 | MAGNESIUM SULFATE 2 GRAM/50 ML (4%) PGBK | 4 | 11.05 |
| 05/18/2025 | 0250 | J3480 | POTASSIUM CHLORIDE PER 2 MEQ | 10 | 20.40 |
| 05/18/2025 | 0300 | 80048 | HC BASIC METABOLIC PANEL CALCIUM TOTAL | 1 | 143.00 |
| 05/18/2025 | 0300 | 80076 | HC HEPATIC FUNCTION PANEL | 1 | 139.00 |
| 05/18/2025 | 0300 | 81001 | HC URNLS DIP STICK/TABLET REAGENT AUTO MICROSCOPY | 1 | 48.00 |
| 05/18/2025 | 0300 | 82330 | HC CALCIUM IONIZED | 1 | 228.00 |
| 05/18/2025 | 0300 | 83605 | HC ASSAY OF LACTATE | 1 | 174.00 |
| 05/18/2025 | 0300 | 83735 | HC ASSAY OF MAGNESIUM | 1 | 104.00 |
| 05/18/2025 | 0300 | 84100 | HC ASSAY OF PHOSPHORUS INORGANIC | 1 | 76.00 |
| 05/18/2025 | 0300 | 85027 | HC BLOOD COUNT COMPLETE AUTOMATED | 1 | 93.00 |
| 05/18/2025 | 0300 | 87040 | HC CULTURE BACTERIAL BLOOD AEROBIC W/ID ISOLATES | 1 | 178.00 |
| 05/18/2025 | 0300 | 87040 | HC CULTURE BACTERIAL BLOOD AEROBIC W/ID ISOLATES | 1 | 178.00 |
| 05/18/2025 | 0300 | 87077 | HC CUL BACT AEROBIC ADDL METHS DEFINITIVE EA ISOL | 1 | 87.00 |
| 05/18/2025 | 0300 | 87086 | HC CULTURE BACTERIAL QUANTTATIVE COLONY COUNT URINE | 1 | 101.00 |
| 05/18/2025 | 0300 | 87186 | HC SUSCEPTIBLTY STDY ANTIMICRBIAL MICRO/AGAR DILUTJ | 1 | 143.00 |
| 05/18/2025 | 0420 | 97110 | HC THERAPEUTIC PX 1/> AREAS EACH 15 MIN EXERCISES | 1 | 221.00 |
| 05/18/2025 | 0420 | 97530 | HC THERAPEUT ACTVITY DIRECT PT CONTACT EACH 15 MIN | 1 | 238.00 |
| 05/19/2025 | 0207 | | HC R&B - INTENSIVE CARE - BURN CARE | 1 | 12,119.00 |

This is itemization of services for the time period indicated is provided at your request.  Please call 617-726-3884 if you have any questions or need assistance with your account.

Page 8 of 26

GID: 91943233, 05/14/25

| Date of Service | Rev Code | Procedure Code | Description | QTY | Amount |
|---|---|---|---|---|---|
| 05/19/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.43 |
| 05/19/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 1 | 0.15 |
| 05/19/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 2 | 0.38 |
| 05/19/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.57 |
| 05/19/2025 | 0250 | | ASCORBIC ACID (VITAMIN C) 500 MG TAB | 1 | 0.12 |
| 05/19/2025 | 0250 | | ASCORBIC ACID (VITAMIN C) 500 MG TAB | 1 | 0.12 |
| 05/19/2025 | 0250 | | BACITRACIN 500 UNIT/GRAM OINT 28 G TUBE | 1 | 8.45 |
| 05/19/2025 | 0250 | | BACITRACIN 500 UNIT/GRAM OINT 28 G TUBE | 1 | 8.45 |
| 05/19/2025 | 0250 | | HYDROXYZINE 25 MG TAB | 1 | 0.59 |
| 05/19/2025 | 0250 | | MAFENIDE 85 MG/G CREA 56.7 G TUBE | 1 | 280.98 |
| 05/19/2025 | 0250 | | MULTIVITAMIN WITH MINERALS TAB | 1 | 0.30 |
| 05/19/2025 | 0250 | | NITROFURANTOIN 100 MG CAP | 1 | 9.98 |
| 05/19/2025 | 0250 | | NITROFURANTOIN 100 MG CAP | 1 | 9.98 |
| 05/19/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 2 | 0.52 |
| 05/19/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 2 | 0.52 |
| 05/19/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 1 | 0.26 |
| 05/19/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 1 | 0.86 |
| 05/19/2025 | 0250 | | SODIUM HYPOCHLORITE 0.125 % SOLN 473 ML BOTTLE | 1 | 52.27 |
| 05/19/2025 | 0250 | | ZINC SULFATE 50 MG ZINC (220 MG) CAP | 1 | 0.72 |
| 05/19/2025 | 0250 | J0613 | CALCIUM GLUCONATE 2 GRAM/100 ML SOLN | 200 | 69.70 |
| 05/19/2025 | 0250 | J1171 | HYDROMORPHONE (PF) 1 MG/ML BAG | 500 | 93.50 |
| 05/19/2025 | 0250 | J1650 | ENOXAPARIN 40 MG/0.4 ML SYRG | 4 | 23.27 |
| 05/19/2025 | 0300 | 80048 | HC BASIC METABOLIC PANEL CALCIUM TOTAL | 1 | 143.00 |
| 05/19/2025 | 0300 | 80076 | HC HEPATIC FUNCTION PANEL | 1 | 139.00 |
| 05/19/2025 | 0300 | 82330 | HC CALCIUM IONIZED | 1 | 228.00 |
| 05/19/2025 | 0300 | 83605 | HC ASSAY OF LACTATE | 1 | 174.00 |
| 05/19/2025 | 0300 | 83735 | HC ASSAY OF MAGNESIUM | 1 | 104.00 |
| 05/19/2025 | 0300 | 84100 | HC ASSAY OF PHOSPHORUS INORGANIC | 1 | 76.00 |
| 05/19/2025 | 0300 | 85027 | HC BLOOD COUNT COMPLETE AUTOMATED | 1 | 93.00 |
| 05/19/2025 | 0420 | 97110 | HC THERAPEUTIC PX 1/> AREAS EACH 15 MIN EXERCISES | 1 | 221.00 |
| 05/19/2025 | 0420 | 97530 | HC THERAPEUT ACTVITY DIRECT PT CONTACT EACH 15 MIN | 1 | 238.00 |
| 05/19/2025 | 0430 | 97140 | HC MANUAL THERAPY TQS 1/> REGIONS EACH 15 MINUTES | 1 | 206.00 |
| 05/19/2025 | 0430 | 97530 | HC THERAPEUT ACTVITY DIRECT PT CONTACT EACH 15 MIN | 1 | 238.00 |
| 05/20/2025 | 0207 | | HC R&B - INTENSIVE CARE - BURN CARE | 1 | 12,119.00 |
| 05/20/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.57 |
| 05/20/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.57 |
| 05/20/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.57 |
| 05/20/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.57 |
| 05/20/2025 | 0250 | | ASCORBIC ACID (VITAMIN C) 500 MG TAB | 1 | 0.12 |
| 05/20/2025 | 0250 | | ASCORBIC ACID (VITAMIN C) 500 MG TAB | 1 | 0.12 |
| 05/20/2025 | 0250 | | BACITRACIN 500 UNIT/GRAM OINT 28 G TUBE | 1 | 8.45 |
| 05/20/2025 | 0250 | | BACITRACIN 500 UNIT/GRAM OINT 28 G TUBE | 1 | 8.45 |
| 05/20/2025 | 0250 | | DOCUSATE SODIUM 100 MG CAP | 1 | 0.14 |
| 05/20/2025 | 0250 | | DOCUSATE SODIUM 100 MG CAP | 1 | 0.14 |
| 05/20/2025 | 0250 | | HYDROXYZINE 25 MG TAB | 1 | 0.59 |
| 05/20/2025 | 0250 | | HYDROXYZINE 25 MG TAB | 1 | 0.59 |
| 05/20/2025 | 0250 | | MAFENIDE 85 MG/G CREA 56.7 G TUBE | 1 | 280.98 |
| 05/20/2025 | 0250 | | METHADONE 5 MG TAB | 1 | 1.54 |

This is itemization of services for the time period indicated is provided at your request.  Please call 617-726-3884 if you have any questions or need assistance with your account.

GID: 91943233, 05/14/25

| Date of Service | Rev Code | Procedure Code | Description | QTY | Amount |
|---|---|---|---|---|---|
| 05/20/2025 | 0250 | | METHADONE 5 MG TAB | 1 | 1.54 |
| 05/20/2025 | 0250 | | MULTIVITAMIN WITH MINERALS TAB | 1 | 0.30 |
| 05/20/2025 | 0250 | | NITROFURANTOIN 100 MG CAP | 1 | 9.98 |
| 05/20/2025 | 0250 | | OXYCODONE 5 MG TAB | 2 | 1.79 |
| 05/20/2025 | 0250 | | OXYCODONE 5 MG TAB | 2 | 1.79 |
| 05/20/2025 | 0250 | | POLYETHYLENE GLYCOL 17 GRAM PWPK | 1 | 3.77 |
| 05/20/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 2 | 1.71 |
| 05/20/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 2 | 1.71 |
| 05/20/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 2 | 1.71 |
| 05/20/2025 | 0250 | | SENNA 8.6 MG TAB | 2 | 0.32 |
| 05/20/2025 | 0250 | | SULFAMETHOXAZOLE-TRIMETHOPRIM 800-160 MG TAB | 1 | 0.49 |
| 05/20/2025 | 0250 | | SULFAMETHOXAZOLE-TRIMETHOPRIM 800-160 MG TAB | 1 | 0.49 |
| 05/20/2025 | 0250 | | ZINC SULFATE 50 MG ZINC (220 MG) CAP | 1 | 0.72 |
| 05/20/2025 | 0250 | J1650 | ENOXAPARIN 40 MG/0.4 ML SYRG | 4 | 23.27 |
| 05/20/2025 | 0300 | 80048 | HC BASIC METABOLIC PANEL CALCIUM TOTAL | 1 | 143.00 |
| 05/20/2025 | 0300 | 80076 | HC HEPATIC FUNCTION PANEL | 1 | 139.00 |
| 05/20/2025 | 0300 | 83735 | HC ASSAY OF MAGNESIUM | 1 | 104.00 |
| 05/20/2025 | 0300 | 84100 | HC ASSAY OF PHOSPHORUS INORGANIC | 1 | 76.00 |
| 05/20/2025 | 0300 | 85027 | HC BLOOD COUNT COMPLETE AUTOMATED | 1 | 93.00 |
| 05/20/2025 | 0430 | 97140 | HC MANUAL THERAPY TQS 1/> REGIONS EACH 15 MINUTES | 1 | 206.00 |
| 05/20/2025 | 0430 | 97530 | HC THERAPEUT ACTVITY DIRECT PT CONTACT EACH 15 MIN | 1 | 238.00 |
| 05/21/2025 | 0207 | | HC R&B - INTENSIVE CARE - BURN CARE | 1 | 12,119.00 |
| 05/21/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.57 |
| 05/21/2025 | 0250 | | ASCORBIC ACID (VITAMIN C) 500 MG TAB | 1 | 0.12 |
| 05/21/2025 | 0250 | | ASCORBIC ACID (VITAMIN C) 500 MG TAB | 1 | 0.12 |
| 05/21/2025 | 0250 | | DEXMEDETOMIDINE 80 MCG/20 ML (4 MCG/ML) SOLN | 1 | 40.12 |
| 05/21/2025 | 0250 | | DOCUSATE SODIUM 100 MG CAP | 1 | 0.14 |
| 05/21/2025 | 0250 | | DOCUSATE SODIUM 100 MG CAP | 1 | 0.14 |
| 05/21/2025 | 0250 | | HYDROXYZINE 25 MG TAB | 1 | 0.59 |
| 05/21/2025 | 0250 | | KETAMINE 10 MG/ML SOLN | 1 | 190.83 |
| 05/21/2025 | 0250 | | METHADONE 5 MG TAB | 1 | 1.54 |
| 05/21/2025 | 0250 | | METHADONE 5 MG TAB | 1 | 1.54 |
| 05/21/2025 | 0250 | | MULTIVITAMIN WITH MINERALS TAB | 1 | 0.30 |
| 05/21/2025 | 0250 | | OXYCODONE 5 MG TAB | 2 | 1.79 |
| 05/21/2025 | 0250 | | OXYCODONE 5 MG TAB | 2 | 1.79 |
| 05/21/2025 | 0250 | | OXYCODONE 5 MG TAB | 2 | 1.79 |
| 05/21/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 2 | 1.71 |
| 05/21/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 2 | 1.71 |
| 05/21/2025 | 0250 | | ROCURONIUM 50 MG/5 ML (10 MG/ML) SYRG | 3 | 70.13 |
| 05/21/2025 | 0250 | | ROCURONIUM 50 MG/5 ML (10 MG/ML) SYRG | 1 | 25.50 |
| 05/21/2025 | 0250 | | SENNA 8.6 MG TAB | 2 | 0.32 |
| 05/21/2025 | 0250 | | SUGAMMADEX 100 MG/ML SOLN | 1 | 528.01 |
| 05/21/2025 | 0250 | | SULFAMETHOXAZOLE-TRIMETHOPRIM 800-160 MG TAB | 1 | 0.49 |
| 05/21/2025 | 0250 | | SULFAMETHOXAZOLE-TRIMETHOPRIM 800-160 MG TAB | 1 | 0.49 |
| 05/21/2025 | 0250 | | ZINC SULFATE 50 MG ZINC (220 MG) CAP | 1 | 0.72 |
| 05/21/2025 | 0250 | J0171 | EPINEPHRINE 1 MG/ML SOLN 1 ML VIAL | 10 | 54.30 |

This is itemization of services for the time period indicated is provided at your request.  Please call 617-726-3884 if you have any questions or need assistance with your account.

GID: 91943233, 05/14/25

| Date of Service | Rev Code | Procedure Code | Description | QTY | Amount |
|---|---|---|---|---|---|
| 05/21/2025 | 0250 | J0613 | CALCIUM GLUCONATE 2 GRAM/100 ML SOLN | 200 | 69.70 |
| 05/21/2025 | 0250 | J0690 | CEFAZOLIN PER 500 MG | 4 | 7.39 |
| 05/21/2025 | 0250 | J1100 | DEXAMETHASONE PER 1 MG | 8 | 3.77 |
| 05/21/2025 | 0250 | J1171 | HYDROMORPHONE PER 4 MG | 5 | 6.64 |
| 05/21/2025 | 0250 | J1230 | METHADONE 1 MG/ML SOLN | 1 | 45.14 |
| 05/21/2025 | 0250 | J1630 | HALOPERIDOL LACTATE PER 5 MG | 1 | 2.15 |
| 05/21/2025 | 0250 | J1650 | ENOXAPARIN 40 MG/0.4 ML SYRG | 4 | 23.27 |
| 05/21/2025 | 0250 | J2250 | MIDAZOLAM 1 MG/ML SOLN | 2 | 1.12 |
| 05/21/2025 | 0250 | J2371 | PHENYLEPHRINE HCL IN 0.9% NACL 400 MCG/5 ML (80 MCG/ML) SYRG | 4 | 0.20 |
| 05/21/2025 | 0250 | J2405 | ONDANSETRON (PF) 4 MG/2 ML SOLN | 4 | 1.46 |
| 05/21/2025 | 0250 | J2704 | PROPOFOL (DIPRIVAN) INFUSION 10 MG/ML EMUL | 40 | 14.79 |
| 05/21/2025 | 0250 | J3010 | FENTANYL PER 0.1 MG | 1 | 9.28 |
| 05/21/2025 | 0250 | J3475 | MAGNESIUM SULFATE 2 GRAM/50 ML (4%) PGBK | 4 | 11.26 |
| 05/21/2025 | 0250 | J7040 | NS PER 250 ML J7050, PER 500 ML J7040, PER 1000 ML J7030 | 1 | 7.65 |
| 05/21/2025 | 0250 | J7999 | LIDOCAINE (PF) 2% SYRG | 1 | 19.06 |
| 05/21/2025 | 0250 | J7999 | LIDOCAINE (PF) 2% SYRG | 1 | 4.77 |
| 05/21/2025 | 0250 | P9045 | ALBUMIN HUMAN PER 50 ML | 2 | 293.25 |
| 05/21/2025 | 0272 | C1832 | RECELL GO PREPARATION KIT | 1 | 17,187.50 |
| 05/21/2025 | 0278 | C1889 | GRAFT TISSUE 1/4 SQ FT MATRIX MESH CRYOPRESERVE BURRN REPAIR SOFT | 1 | 1,421.00 |
| 05/21/2025 | 0278 | C1889 | GRAFT TISSUE 1/4 SQ FT MATRIX MESH CRYOPRESERVE BURRN REPAIR SOFT | 1 | 1,421.00 |
| 05/21/2025 | 0300 | 80048 | HC BASIC METABOLIC PANEL CALCIUM TOTAL | 1 | 143.00 |
| 05/21/2025 | 0300 | 80048 | HC BASIC METABOLIC PANEL CALCIUM TOTAL | 1 | 143.00 |
| 05/21/2025 | 0300 | 80076 | HC HEPATIC FUNCTION PANEL | 1 | 139.00 |
| 05/21/2025 | 0300 | 82330 | HC CALCIUM IONIZED | 1 | 228.00 |
| 05/21/2025 | 0300 | 83735 | HC ASSAY OF MAGNESIUM | 1 | 104.00 |
| 05/21/2025 | 0300 | 83735 | HC ASSAY OF MAGNESIUM | 1 | 104.00 |
| 05/21/2025 | 0300 | 84100 | HC ASSAY OF PHOSPHORUS INORGANIC | 1 | 76.00 |
| 05/21/2025 | 0300 | 84100 | HC ASSAY OF PHOSPHORUS INORGANIC | 1 | 76.00 |
| 05/21/2025 | 0300 | 85027 | HC BLOOD COUNT COMPLETE AUTOMATED | 1 | 93.00 |
| 05/21/2025 | 0300 | 86850 | HC ANTIBODY SCREEN RBC EACH SERUM TECHNIQUE | 1 | 182.00 |
| 05/21/2025 | 0300 | 86900 | HC BLOOD TYPING SEROLOGIC ABO | 1 | 100.00 |
| 05/21/2025 | 0300 | 86901 | HC BLOOD TYPING RH D | 1 | 100.00 |
| 05/21/2025 | 0300 | 86923 | HC COMPATIBILITY EACH UNIT ELECTRONIC | 1 | 208.00 |
| 05/21/2025 | 0300 | 86923 | HC COMPATIBILITY EACH UNIT ELECTRONIC | 1 | 208.00 |
| 05/21/2025 | 0300 | 86923 | HC COMPATIBILITY EACH UNIT ELECTRONIC | 1 | 208.00 |
| 05/21/2025 | 0320 | 74018 | HC RADIOLOGIC EXAM ABDOMEN 1 VIEW | 1 | 375.00 |
| 05/21/2025 | 0360 | | HC OPERATING ROOM T2 EACH ADDL 15 MIN | 8 | 31,704.00 |
| 05/21/2025 | 0360 | | HC OPERATING ROOM T2 FIRST 30 MIN | 1 | 8,340.00 |
| 05/21/2025 | 0370 | | HC ANESTHESIA TECHNICAL CHARGE PER 15 MIN (ENTERPRISE) | 9 | 4,077.00 |
| 05/21/2025 | 0370 | | HC ANESTHESIA TECHNICAL CHARGE PER 15 MIN (ENTERPRISE) | 1 | 453.00 |
| 05/21/2025 | 0420 | 97110 | HC THERAPEUTIC PX 1/> AREAS EACH 15 MIN EXERCISES | 1 | 221.00 |
| 05/21/2025 | 0420 | 97116 | HC THER PX 1/> AREAS EA 15 MIN GAIT TRAINJ W/STAIR | 1 | 191.00 |
| 05/21/2025 | 0420 | 97530 | HC THERAPEUT ACTVITY DIRECT PT CONTACT EACH 15 MIN | 1 | 238.00 |

This is itemization of services for the time period indicated is provided at your request.  Please call 617-726-3884 if you have any questions or need assistance with your account.

GID: 91943233, 05/14/25

| Date of Service | Rev Code | Procedure Code | Description | QTY | Amount |
|---|---|---|---|---|---|
| 05/21/2025 | 0430 | 97140 | HC MANUAL THERAPY TQS 1/> REGIONS EACH 15 MINUTES | 1 | 206.00 |
| 05/21/2025 | 0730 | 93005 | HC ECG ROUTINE ECG W/LEAST 12 LDS TRCG ONLY W/O I&R | 1 | 324.00 |
| 05/22/2025 | 0207 | | HC R&B - INTENSIVE CARE - BURN CARE | 1 | 12,119.00 |
| 05/22/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.57 |
| 05/22/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.57 |
| 05/22/2025 | 0250 | | ACETAMINOPHEN 325 MG/10.15 ML SUSP | 3 | 11.39 |
| 05/22/2025 | 0250 | | ASCORBIC ACID (VITAMIN C) 500 MG TAB | 1 | 0.12 |
| 05/22/2025 | 0250 | | ASCORBIC ACID (VITAMIN C) 500 MG TAB | 1 | 0.12 |
| 05/22/2025 | 0250 | | CALCIUM CARBONATE 500 MG (200 MG ELEMENTAL) CHEW | 1 | 0.06 |
| 05/22/2025 | 0250 | | DOCUSATE SODIUM 100 MG CAP | 1 | 0.14 |
| 05/22/2025 | 0250 | | HYDROXYZINE 25 MG TAB | 1 | 0.59 |
| 05/22/2025 | 0250 | | LACTULOSE 10 GRAM/15 ML SOLN | 1 | 4.97 |
| 05/22/2025 | 0250 | | METHADONE 5 MG TAB | 1 | 1.20 |
| 05/22/2025 | 0250 | | METHADONE 5 MG TAB | 1 | 1.20 |
| 05/22/2025 | 0250 | | MULTIVITAMIN WITH MINERALS TAB | 1 | 0.30 |
| 05/22/2025 | 0250 | | OXYCODONE 5 MG TAB | 2 | 1.79 |
| 05/22/2025 | 0250 | | OXYCODONE 5 MG TAB | 2 | 1.79 |
| 05/22/2025 | 0250 | | OXYCODONE 5 MG TAB | 2 | 1.79 |
| 05/22/2025 | 0250 | | OXYCODONE 5 MG TAB | 2 | 1.79 |
| 05/22/2025 | 0250 | | POLYETHYLENE GLYCOL 17 GRAM PWPK | 1 | 3.77 |
| 05/22/2025 | 0250 | | POTASSIUM, SODIUM PHOSPHATES 280-160-250 MG PWPK | 1 | 2.11 |
| 05/22/2025 | 0250 | | POTASSIUM, SODIUM PHOSPHATES 280-160-250 MG PWPK | 1 | 2.11 |
| 05/22/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 2 | 1.71 |
| 05/22/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 2 | 1.71 |
| 05/22/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 2 | 1.71 |
| 05/22/2025 | 0250 | | SULFAMETHOXAZOLE-TRIMETHOPRIM 800-160 MG TAB | 1 | 0.49 |
| 05/22/2025 | 0250 | | SULFAMETHOXAZOLE-TRIMETHOPRIM 800-160 MG TAB | 1 | 0.49 |
| 05/22/2025 | 0250 | | ZINC SULFATE 50 MG ZINC (220 MG) CAP | 1 | 0.72 |
| 05/22/2025 | 0250 | J0613 | CALCIUM GLUCONATE 2 GRAM/100 ML SOLN | 200 | 69.70 |
| 05/22/2025 | 0250 | J1650 | ENOXAPARIN 40 MG/0.4 ML SYRG | 4 | 23.27 |
| 05/22/2025 | 0250 | J2272 | MORPHINE PER 10 MG | 1 | 9.12 |
| 05/22/2025 | 0300 | 80048 | HC BASIC METABOLIC PANEL CALCIUM TOTAL | 1 | 143.00 |
| 05/22/2025 | 0300 | 80076 | HC HEPATIC FUNCTION PANEL | 1 | 139.00 |
| 05/22/2025 | 0300 | 82330 | HC CALCIUM IONIZED | 1 | 228.00 |
| 05/22/2025 | 0300 | 83735 | HC ASSAY OF MAGNESIUM | 1 | 104.00 |
| 05/22/2025 | 0300 | 84100 | HC ASSAY OF PHOSPHORUS INORGANIC | 1 | 76.00 |
| 05/22/2025 | 0300 | 85027 | HC BLOOD COUNT COMPLETE AUTOMATED | 1 | 93.00 |
| 05/22/2025 | 0420 | 97116 | HC THER PX 1/> AREAS EA 15 MIN GAIT TRAINJ W/STAIR | 2 | 382.00 |
| 05/22/2025 | 0420 | 97530 | HC THERAPEUT ACTVITY DIRECT PT CONTACT EACH 15 MIN | 1 | 238.00 |
| 05/23/2025 | 0120 | | HC R&B - SEMI-PRIVATE TWO BED (MEDICAL OR GENERAL) - GENERAL CLASSIFICATION | 1 | 5,449.00 |
| 05/23/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.57 |
| 05/23/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.57 |
| 05/23/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.57 |
| 05/23/2025 | 0250 | | ASCORBIC ACID (VITAMIN C) 500 MG TAB | 1 | 0.12 |

This is itemization of services for the time period indicated is provided at your request.  Please call 617-726-3884 if you have any questions or need assistance with your account.

GID: 91943233, 05/14/25

| Date of Service | Rev Code | Procedure Code | Description | QTY | Amount |
|---|---|---|---|---|---|
| 05/23/2025 | 0250 | | ASCORBIC ACID (VITAMIN C) 500 MG TAB | 1 | 0.12 |
| 05/23/2025 | 0250 | | BACITRACIN 500 UNIT/GRAM OINT 28 G TUBE | 3 | 25.35 |
| 05/23/2025 | 0250 | | BENZOCAINE-MENTHOL 15-2.6 MG LOZG 16 EACH BLIST PACK | 1 | 8.02 |
| 05/23/2025 | 0250 | | BENZOCAINE-MENTHOL 15-2.6 MG LOZG 16 EACH BLIST PACK | 1 | 8.02 |
| 05/23/2025 | 0250 | | KETAMINE 10 MG/ML SOLN | 1 | 190.83 |
| 05/23/2025 | 0250 | | METHADONE 5 MG TAB | 1 | 1.20 |
| 05/23/2025 | 0250 | | METHADONE 5 MG TAB | 1 | 1.20 |
| 05/23/2025 | 0250 | | METHADONE 5 MG TAB | 1 | 1.20 |
| 05/23/2025 | 0250 | | MULTIVITAMIN WITH MINERALS TAB | 1 | 0.30 |
| 05/23/2025 | 0250 | | OXYCODONE 5 MG TAB | 2 | 2.35 |
| 05/23/2025 | 0250 | | OXYCODONE 5 MG TAB | 2 | 1.79 |
| 05/23/2025 | 0250 | | OXYCODONE 5 MG TAB | 2 | 1.79 |
| 05/23/2025 | 0250 | | OXYCODONE 5 MG TAB | 3 | 3.52 |
| 05/23/2025 | 0250 | | POTASSIUM, SODIUM PHOSPHATES 280-160-250 MG PWPK | 1 | 2.11 |
| 05/23/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 2 | 1.71 |
| 05/23/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 2 | 1.71 |
| 05/23/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 2 | 1.71 |
| 05/23/2025 | 0250 | | SULFAMETHOXAZOLE-TRIMETHOPRIM 800-160 MG TAB | 1 | 0.49 |
| 05/23/2025 | 0250 | | SULFAMETHOXAZOLE-TRIMETHOPRIM 800-160 MG TAB | 1 | 0.49 |
| 05/23/2025 | 0250 | | ZINC SULFATE 50 MG ZINC (220 MG) CAP | 1 | 0.72 |
| 05/23/2025 | 0250 | J1650 | ENOXAPARIN 40 MG/0.4 ML SYRG | 4 | 23.27 |
| 05/23/2025 | 0250 | J1885 | KETOROLAC TROMETHAMINE PER 15 MG | 1 | 2.56 |
| 05/23/2025 | 0250 | J1885 | KETOROLAC TROMETHAMINE PER 15 MG | 1 | 2.56 |
| 05/23/2025 | 0250 | J2272 | MORPHINE PER 10 MG | 1 | 9.12 |
| 05/23/2025 | 0300 | 80048 | HC BASIC METABOLIC PANEL CALCIUM TOTAL | 1 | 143.00 |
| 05/23/2025 | 0300 | 80076 | HC HEPATIC FUNCTION PANEL | 1 | 139.00 |
| 05/23/2025 | 0300 | 83735 | HC ASSAY OF MAGNESIUM | 1 | 104.00 |
| 05/23/2025 | 0300 | 84100 | HC ASSAY OF PHOSPHORUS INORGANIC | 1 | 76.00 |
| 05/23/2025 | 0300 | 85027 | HC BLOOD COUNT COMPLETE AUTOMATED | 1 | 93.00 |
| 05/23/2025 | 0430 | 97140 | HC MANUAL THERAPY TQS 1/> REGIONS EACH 15 MINUTES | 2 | 412.00 |
| 05/23/2025 | 0730 | 93005 | HC ECG ROUTINE ECG W/LEAST 12 LDS TRCG ONLY W/O I&R | 1 | 324.00 |
| 05/24/2025 | 0120 | | HC R&B - SEMI-PRIVATE TWO BED (MEDICAL OR GENERAL) - GENERAL CLASSIFICATION | 1 | 5,449.00 |
| 05/24/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.57 |
| 05/24/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.57 |
| 05/24/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.57 |
| 05/24/2025 | 0250 | | ASCORBIC ACID (VITAMIN C) 500 MG TAB | 1 | 0.12 |
| 05/24/2025 | 0250 | | ASCORBIC ACID (VITAMIN C) 500 MG TAB | 1 | 0.12 |
| 05/24/2025 | 0250 | | BACITRACIN 500 UNIT/GRAM OINT 28 G TUBE | 1 | 8.45 |
| 05/24/2025 | 0250 | | BACITRACIN 500 UNIT/GRAM OINT 28 G TUBE | 4 | 33.80 |
| 05/24/2025 | 0250 | | METHADONE 5 MG TAB | 1 | 1.20 |
| 05/24/2025 | 0250 | | METHADONE 5 MG TAB | 1 | 1.20 |
| 05/24/2025 | 0250 | | METHADONE 5 MG TAB | 1 | 1.20 |
| 05/24/2025 | 0250 | | MULTIVITAMIN WITH MINERALS TAB | 1 | 0.30 |
| 05/24/2025 | 0250 | | OXYCODONE 5 MG TAB | 2 | 1.79 |
| 05/24/2025 | 0250 | | OXYCODONE 5 MG TAB | 3 | 2.69 |

This is itemization of services for the time period indicated is provided at your request.  Please call 617-726-3884 if you have any questions or need assistance with your account.

GID: 91943233, 05/14/25

| Date of Service | Rev Code | Procedure Code | Description | QTY | Amount |
|---|---|---|---|---|---|
| 05/24/2025 | 0250 | | OXYCODONE 5 MG TAB | 2 | 1.79 |
| 05/24/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 2 | 1.71 |
| 05/24/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 2 | 1.71 |
| 05/24/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 2 | 1.71 |
| 05/24/2025 | 0250 | | SULFAMETHOXAZOLE-TRIMETHOPRIM 800-160 MG TAB | 1 | 0.49 |
| 05/24/2025 | 0250 | | SULFAMETHOXAZOLE-TRIMETHOPRIM 800-160 MG TAB | 1 | 0.49 |
| 05/24/2025 | 0250 | | ZINC SULFATE 50 MG ZINC (220 MG) CAP | 1 | 0.72 |
| 05/24/2025 | 0250 | J1650 | ENOXAPARIN 40 MG/0.4 ML SYRG | 4 | 23.27 |
| 05/24/2025 | 0250 | J1885 | KETOROLAC TROMETHAMINE PER 15 MG | 1 | 2.56 |
| 05/24/2025 | 0250 | J1885 | KETOROLAC TROMETHAMINE PER 15 MG | 1 | 2.02 |
| 05/24/2025 | 0250 | J1885 | KETOROLAC TROMETHAMINE PER 15 MG | 1 | 2.02 |
| 05/24/2025 | 0250 | J1885 | KETOROLAC TROMETHAMINE PER 15 MG | 1 | 2.56 |
| 05/24/2025 | 0250 | J2272 | MORPHINE PER 10 MG | 1 | 9.12 |
| 05/24/2025 | 0250 | S0119 | ONDANSETRON PER 8 MG | 1 | 0.97 |
| 05/24/2025 | 0250 | S0119 | ONDANSETRON PER 8 MG | 1 | 0.97 |
| 05/24/2025 | 0300 | 80048 | HC BASIC METABOLIC PANEL CALCIUM TOTAL | 1 | 143.00 |
| 05/24/2025 | 0300 | 80076 | HC HEPATIC FUNCTION PANEL | 1 | 139.00 |
| 05/24/2025 | 0300 | 83735 | HC ASSAY OF MAGNESIUM | 1 | 104.00 |
| 05/24/2025 | 0300 | 84100 | HC ASSAY OF PHOSPHORUS INORGANIC | 1 | 76.00 |
| 05/24/2025 | 0300 | 85027 | HC BLOOD COUNT COMPLETE AUTOMATED | 1 | 93.00 |
| 05/24/2025 | 0420 | 97116 | HC THER PX 1/> AREAS EA 15 MIN GAIT TRAINJ W/STAIR | 1 | 191.00 |
| 05/24/2025 | 0420 | 97530 | HC THERAPEUT ACTVITY DIRECT PT CONTACT EACH 15 MIN | 1 | 238.00 |
| 05/24/2025 | 0730 | 93005 | HC ECG ROUTINE ECG W/LEAST 12 LDS TRCG ONLY W/O I&R | 1 | 324.00 |
| 05/24/2025 | 0730 | 93005 | HC ECG ROUTINE ECG W/LEAST 12 LDS TRCG ONLY W/O I&R | 1 | 324.00 |
| 05/25/2025 | 0120 | | HC R&B - SEMI-PRIVATE TWO BED (MEDICAL OR GENERAL) - GENERAL CLASSIFICATION | 1 | 5,449.00 |
| 05/25/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.57 |
| 05/25/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.57 |
| 05/25/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.57 |
| 05/25/2025 | 0250 | | ASCORBIC ACID (VITAMIN C) 500 MG TAB | 1 | 0.12 |
| 05/25/2025 | 0250 | | ASCORBIC ACID (VITAMIN C) 500 MG TAB | 1 | 0.12 |
| 05/25/2025 | 0250 | | BACITRACIN 500 UNIT/GRAM OINT 28 G TUBE | 3 | 25.35 |
| 05/25/2025 | 0250 | | BENZOCAINE-MENTHOL 15-2.6 MG LOZG 16 EACH BLIST PACK | 1 | 8.02 |
| 05/25/2025 | 0250 | | METHADONE 5 MG TAB | 1 | 1.20 |
| 05/25/2025 | 0250 | | METHADONE 5 MG TAB | 1 | 1.20 |
| 05/25/2025 | 0250 | | METHADONE 5 MG TAB | 1 | 1.20 |
| 05/25/2025 | 0250 | | MULTIVITAMIN WITH MINERALS TAB | 1 | 0.30 |
| 05/25/2025 | 0250 | | OXYCODONE 5 MG TAB | 3 | 2.69 |
| 05/25/2025 | 0250 | | OXYCODONE 5 MG TAB | 2 | 1.79 |
| 05/25/2025 | 0250 | | OXYCODONE 5 MG TAB | 2 | 1.79 |
| 05/25/2025 | 0250 | | OXYCODONE 5 MG TAB | 2 | 1.79 |
| 05/25/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 2 | 1.71 |
| 05/25/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 2 | 1.71 |
| 05/25/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 2 | 1.71 |
| 05/25/2025 | 0250 | | ZINC SULFATE 50 MG ZINC (220 MG) CAP | 1 | 0.72 |
| 05/25/2025 | 0250 | J1650 | ENOXAPARIN 40 MG/0.4 ML SYRG | 4 | 23.27 |
| 05/25/2025 | 0250 | J1885 | KETOROLAC TROMETHAMINE PER 15 MG | 1 | 2.56 |

This is itemization of services for the time period indicated is provided at your request.  Please call 617-726-3884 if you have any questions or need assistance with your account.

Page 14 of 26

GID: 91943233, 05/14/25

| Date of Service | Rev Code | Procedure Code | Description | QTY | Amount |
|---|---|---|---|---|---|
| 05/25/2025 | 0250 | J1885 | KETOROLAC TROMETHAMINE PER 15 MG | 1 | 2.56 |
| 05/25/2025 | 0300 | 80048 | HC BASIC METABOLIC PANEL CALCIUM TOTAL | 1 | 143.00 |
| 05/25/2025 | 0300 | 80076 | HC HEPATIC FUNCTION PANEL | 1 | 139.00 |
| 05/25/2025 | 0300 | 83735 | HC ASSAY OF MAGNESIUM | 1 | 104.00 |
| 05/25/2025 | 0300 | 84100 | HC ASSAY OF PHOSPHORUS INORGANIC | 1 | 76.00 |
| 05/25/2025 | 0300 | 85027 | HC BLOOD COUNT COMPLETE AUTOMATED | 1 | 93.00 |
| 05/25/2025 | 0430 | 97110 | HC THERAPEUTIC PX 1/> AREAS EACH 15 MIN EXERCISES | 2 | 442.00 |
| 05/25/2025 | 0730 | 93005 | HC ECG ROUTINE ECG W/LEAST 12 LDS TRCG ONLY W/O I&R | 1 | 324.00 |
| 05/26/2025 | 0120 | | HC R&B - SEMI-PRIVATE TWO BED (MEDICAL OR GENERAL) - GENERAL CLASSIFICATION | 1 | 5,449.00 |
| 05/26/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.57 |
| 05/26/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.57 |
| 05/26/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.57 |
| 05/26/2025 | 0250 | | ASCORBIC ACID (VITAMIN C) 500 MG TAB | 1 | 0.12 |
| 05/26/2025 | 0250 | | ASCORBIC ACID (VITAMIN C) 500 MG TAB | 1 | 0.12 |
| 05/26/2025 | 0250 | | BACITRACIN 500 UNIT/GRAM OINT 28 G TUBE | 1 | 8.45 |
| 05/26/2025 | 0250 | | METHADONE 5 MG TAB | 1 | 1.20 |
| 05/26/2025 | 0250 | | METHADONE 5 MG TAB | 1 | 1.20 |
| 05/26/2025 | 0250 | | METHADONE 5 MG TAB | 1 | 1.20 |
| 05/26/2025 | 0250 | | MULTIVITAMIN WITH MINERALS TAB | 1 | 0.30 |
| 05/26/2025 | 0250 | | OXYCODONE 5 MG TAB | 3 | 2.69 |
| 05/26/2025 | 0250 | | OXYCODONE 5 MG TAB | 3 | 4.51 |
| 05/26/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 2 | 1.42 |
| 05/26/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 2 | 1.71 |
| 05/26/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 2 | 1.42 |
| 05/26/2025 | 0250 | | ZINC SULFATE 50 MG ZINC (220 MG) CAP | 1 | 0.72 |
| 05/26/2025 | 0250 | J1650 | ENOXAPARIN 40 MG/0.4 ML SYRG | 4 | 23.27 |
| 05/26/2025 | 0300 | 80048 | HC BASIC METABOLIC PANEL CALCIUM TOTAL | 1 | 143.00 |
| 05/26/2025 | 0300 | 80076 | HC HEPATIC FUNCTION PANEL | 1 | 139.00 |
| 05/26/2025 | 0300 | 83735 | HC ASSAY OF MAGNESIUM | 1 | 104.00 |
| 05/26/2025 | 0300 | 84100 | HC ASSAY OF PHOSPHORUS INORGANIC | 1 | 76.00 |
| 05/26/2025 | 0300 | 85027 | HC BLOOD COUNT COMPLETE AUTOMATED | 1 | 93.00 |
| 05/26/2025 | 0420 | 97116 | HC THER PX 1/> AREAS EA 15 MIN GAIT TRAINJ W/STAIR | 1 | 191.00 |
| 05/26/2025 | 0420 | 97530 | HC THERAPEUT ACTVITY DIRECT PT CONTACT EACH 15 MIN | 1 | 238.00 |
| 05/26/2025 | 0430 | 97110 | HC THERAPEUTIC PX 1/> AREAS EACH 15 MIN EXERCISES | 1 | 221.00 |
| 05/26/2025 | 0430 | 97140 | HC MANUAL THERAPY TQS 1/> REGIONS EACH 15 MINUTES | 1 | 206.00 |
| 05/26/2025 | 0730 | 93005 | HC ECG ROUTINE ECG W/LEAST 12 LDS TRCG ONLY W/O I&R | 1 | 324.00 |
| 05/27/2025 | 0120 | | HC R&B - SEMI-PRIVATE TWO BED (MEDICAL OR GENERAL) - GENERAL CLASSIFICATION | 1 | 5,449.00 |
| 05/27/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.57 |
| 05/27/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.57 |
| 05/27/2025 | 0250 | | ASCORBIC ACID (VITAMIN C) 500 MG TAB | 1 | 0.12 |
| 05/27/2025 | 0250 | | BACITRACIN 500 UNIT/GRAM OINT 28 G TUBE | 1 | 8.45 |
| 05/27/2025 | 0250 | | DEXMEDETOMIDINE IN 0.9 % NACL 20 MCG/5 ML (4 MCG/ML) SYRG | 1 | 60.56 |
| 05/27/2025 | 0250 | | METHADONE 5 MG TAB | 1 | 1.20 |
| 05/27/2025 | 0250 | | METHADONE 5 MG TAB | 2 | 2.78 |

This is itemization of services for the time period indicated is provided at your request.  Please call 617-726-3884 if you have any questions or need assistance with your account.

Page 15 of 26

GID: 91943233, 05/14/25

| Date of Service | Rev Code | Procedure Code | Description | QTY | Amount |
|---|---|---|---|---|---|
| 05/27/2025 | 0250 | | MUPIROCIN 2 % OINT 22 G TUBE | 1 | 13.37 |
| 05/27/2025 | 0250 | | OXYCODONE 5 MG TAB | 3 | 2.69 |
| 05/27/2025 | 0250 | | OXYCODONE 5 MG TAB | 3 | 2.69 |
| 05/27/2025 | 0250 | | OXYCODONE 5 MG TAB | 3 | 2.69 |
| 05/27/2025 | 0250 | | OXYCODONE 5 MG TAB | 3 | 2.69 |
| 05/27/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 1 | 0.26 |
| 05/27/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 1 | 0.86 |
| 05/27/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 2 | 1.42 |
| 05/27/2025 | 0250 | | ROCURONIUM 50 MG/5 ML (10 MG/ML) SYRG | 4 | 127.50 |
| 05/27/2025 | 0250 | | SILVER NITRATE 0.5 % SOLN 960 ML BOTTLE | 1 | 1,195.44 |
| 05/27/2025 | 0250 | | SUGAMMADEX 100 MG/ML SOLN | 2 | 844.82 |
| 05/27/2025 | 0250 | | SUGAMMADEX 100 MG/ML SOLN | 1 | 211.21 |
| 05/27/2025 | 0250 | | TRANEXAMIC ACID 1,000 MG/10 ML (100 MG/ML) SOLN 10 ML VIAL | 1 | 8.97 |
| 05/27/2025 | 0250 | J0136 | ACETAMINOPHEN 1,000 MG/100 ML (10 MG/ML) SOLN | 100 | 23.80 |
| 05/27/2025 | 0250 | J0171 | EPINEPHRINE 1 MG/ML SOLN 1 ML VIAL | 10 | 54.30 |
| 05/27/2025 | 0250 | J0690 | CEFAZOLIN PER 500 MG | 4 | 7.39 |
| 05/27/2025 | 0250 | J1100 | DEXAMETHASONE PER 1 MG | 8 | 3.77 |
| 05/27/2025 | 0250 | J1171 | HYDROMORPHONE (PF) 0.5 MG/0.5 ML SYRG | 5 | 10.71 |
| 05/27/2025 | 0250 | J1171 | HYDROMORPHONE PER 4 MG | 20 | 26.55 |
| 05/27/2025 | 0250 | J1650 | ENOXAPARIN 40 MG/0.4 ML SYRG | 4 | 23.27 |
| 05/27/2025 | 0250 | J1815 | INSULIN LISPRO (HUMAN) PER 5 UNITS | 1 | 0.26 |
| 05/27/2025 | 0250 | J2003 | LIDOCAINE 2% SOLN | 60 | 1.48 |
| 05/27/2025 | 0250 | J2250 | MIDAZOLAM (PF) 1 MG/ML SOLN | 2 | 4.21 |
| 05/27/2025 | 0250 | J2270 | MORPHINE PER 10 MG | 1 | 9.65 |
| 05/27/2025 | 0250 | J2371 | PHENYLEPHRINE HCL IN 0.9% NACL 400 MCG/5 ML (80 MCG/ML) SYRG | 4 | 0.20 |
| 05/27/2025 | 0250 | J2405 | ONDANSETRON (PF) 4 MG/2 ML SOLN | 4 | 1.46 |
| 05/27/2025 | 0250 | J2704 | PROPOFOL (DIPRIVAN) INFUSION 10 MG/ML EMUL | 219 | 80.93 |
| 05/27/2025 | 0250 | J2704 | PROPOFOL (DIPRIVAN) INFUSION 10 MG/ML EMUL | 81 | 30.00 |
| 05/27/2025 | 0250 | J2795 | ROPIVACAINE-EPINEPHRINE (PF) 0.25%-1:400,000 SOLN | 150 | 64.77 |
| 05/27/2025 | 0250 | J3010 | FENTANYL PER 0.1 MG | 1 | 10.87 |
| 05/27/2025 | 0250 | J3010 | FENTANYL PER 0.1 MG | 3 | 32.62 |
| 05/27/2025 | 0250 | J7030 | NS PER 250 ML J7050, PER 500 ML J7040, PER 1000 ML J7030 | 1 | 7.65 |
| 05/27/2025 | 0250 | J7030 | NS PER 250 ML J7050, PER 500 ML J7040, PER 1000 ML J7030 | 1 | 7.65 |
| 05/27/2025 | 0250 | J7999 | PHENYLEPHRINE 80 MCG/ML SOLN | 1 | 1.82 |
| 05/27/2025 | 0272 | C1832 | RECELL GO PREPARATION KIT | 1 | 17,187.50 |
| 05/27/2025 | 0274 | L3702 | HC EO W/O JOINTS CUSTOM T1 | 1 | 39.00 |
| 05/27/2025 | 0300 | 80048 | HC BASIC METABOLIC PANEL CALCIUM TOTAL | 1 | 143.00 |
| 05/27/2025 | 0300 | 80076 | HC HEPATIC FUNCTION PANEL | 1 | 139.00 |
| 05/27/2025 | 0300 | 81025 | HC URINE PREGNANCY TEST VISUAL COLOR CMPRSN METHS | 1 | 102.00 |
| 05/27/2025 | 0300 | 83735 | HC ASSAY OF MAGNESIUM | 1 | 104.00 |
| 05/27/2025 | 0300 | 84100 | HC ASSAY OF PHOSPHORUS INORGANIC | 1 | 76.00 |
| 05/27/2025 | 0300 | 85027 | HC BLOOD COUNT COMPLETE AUTOMATED | 1 | 93.00 |
| 05/27/2025 | 0300 | 86850 | HC ANTIBODY SCREEN RBC EACH SERUM TECHNIQUE | 1 | 182.00 |
| 05/27/2025 | 0300 | 86900 | HC BLOOD TYPING SEROLOGIC ABO | 1 | 100.00 |
| 05/27/2025 | 0300 | 86901 | HC BLOOD TYPING RH D | 1 | 100.00 |

This is itemization of services for the time period indicated is provided at your request.  Please call 617-726-3884 if you have any questions or need assistance with your account.

GID: 91943233, 05/14/25

| Date of Service | Rev Code | Procedure Code | Description | QTY | Amount |
|---|---|---|---|---|---|
| 05/27/2025 | 0300 | 86923 | HC COMPATIBILITY EACH UNIT ELECTRONIC | 1 | 208.00 |
| 05/27/2025 | 0300 | 86923 | HC COMPATIBILITY EACH UNIT ELECTRONIC | 1 | 208.00 |
| 05/27/2025 | 0300 | 86923 | HC COMPATIBILITY EACH UNIT ELECTRONIC | 1 | 208.00 |
| 05/27/2025 | 0360 | | HC OPERATING ROOM T2 EACH ADDL 15 MIN | 16 | 63,408.00 |
| 05/27/2025 | 0360 | | HC OPERATING ROOM T2 FIRST 30 MIN | 1 | 8,340.00 |
| 05/27/2025 | 0370 | | HC ANESTHESIA TECHNICAL CHARGE PER 15 MIN (ENTERPRISE) | 17 | 7,701.00 |
| 05/27/2025 | 0370 | | HC ANESTHESIA TECHNICAL CHARGE PER 15 MIN (ENTERPRISE) | 1 | 453.00 |
| 05/27/2025 | 0430 | 97140 | HC MANUAL THERAPY TQS 1/> REGIONS EACH 15 MINUTES | 1 | 206.00 |
| 05/27/2025 | 0431 | 97760 | HC ORTHOTICS MGMT & TRAINJ INITIAL ENCTR EA 15 MINS | 1 | 255.00 |
| 05/27/2025 | 0710 | | HC RECOVERY ROOM CHARGE PER 60 MIN | 1 | 692.00 |
| 05/27/2025 | 0730 | 93005 | HC ECG ROUTINE ECG W/LEAST 12 LDS TRCG ONLY W/O I&R | 1 | 324.00 |
| 05/28/2025 | 0120 | | HC R&B - SEMI-PRIVATE TWO BED (MEDICAL OR GENERAL) - GENERAL CLASSIFICATION | 1 | 5,449.00 |
| 05/28/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.57 |
| 05/28/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.57 |
| 05/28/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.57 |
| 05/28/2025 | 0250 | | ASCORBIC ACID (VITAMIN C) 500 MG TAB | 1 | 0.12 |
| 05/28/2025 | 0250 | | ASCORBIC ACID (VITAMIN C) 500 MG TAB | 1 | 0.12 |
| 05/28/2025 | 0250 | | GABAPENTIN 300 MG CAP | 1 | 0.36 |
| 05/28/2025 | 0250 | | HYDROXYZINE 25 MG TAB | 1 | 0.59 |
| 05/28/2025 | 0250 | | KETAMINE 10 MG/ML SOLN | 1 | 190.83 |
| 05/28/2025 | 0250 | | METHADONE 5 MG TAB | 2 | 2.78 |
| 05/28/2025 | 0250 | | METHADONE 5 MG TAB | 2 | 2.78 |
| 05/28/2025 | 0250 | | METHADONE 5 MG TAB | 2 | 2.39 |
| 05/28/2025 | 0250 | | MULTIVITAMIN WITH MINERALS TAB | 1 | 0.30 |
| 05/28/2025 | 0250 | | MUPIROCIN 2 % OINT 22 G TUBE | 1 | 13.37 |
| 05/28/2025 | 0250 | | OXYCODONE 5 MG TAB | 3 | 2.69 |
| 05/28/2025 | 0250 | | OXYCODONE 5 MG TAB | 3 | 2.69 |
| 05/28/2025 | 0250 | | OXYCODONE 5 MG TAB | 3 | 2.69 |
| 05/28/2025 | 0250 | | OXYCODONE 5 MG TAB | 3 | 2.69 |
| 05/28/2025 | 0250 | | POTASSIUM, SODIUM PHOSPHATES 280-160-250 MG PWPK | 1 | 2.11 |
| 05/28/2025 | 0250 | | POTASSIUM, SODIUM PHOSPHATES 280-160-250 MG PWPK | 1 | 1.26 |
| 05/28/2025 | 0250 | | POTASSIUM, SODIUM PHOSPHATES 280-160-250 MG PWPK | 1 | 2.11 |
| 05/28/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 2 | 1.42 |
| 05/28/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 2 | 1.42 |
| 05/28/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 2 | 1.42 |
| 05/28/2025 | 0250 | | QUETIAPINE 25 MG TAB | 1 | 0.44 |
| 05/28/2025 | 0250 | | QUETIAPINE 25 MG TAB | 1 | 0.44 |
| 05/28/2025 | 0250 | | SILVER NITRATE 0.5 % SOLN 960 ML BOTTLE | 1 | 252.96 |
| 05/28/2025 | 0250 | | SILVER NITRATE 0.5 % SOLN 960 ML BOTTLE | 1 | 252.96 |
| 05/28/2025 | 0250 | | ZINC SULFATE 50 MG ZINC (220 MG) CAP | 1 | 0.72 |
| 05/28/2025 | 0250 | J1171 | HYDROMORPHONE (PF) 0.5 MG/0.5 ML SYRG | 5 | 10.71 |
| 05/28/2025 | 0250 | J1650 | ENOXAPARIN 40 MG/0.4 ML SYRG | 4 | 23.27 |
| 05/28/2025 | 0300 | 80048 | HC BASIC METABOLIC PANEL CALCIUM TOTAL | 1 | 143.00 |
| 05/28/2025 | 0300 | 83735 | HC ASSAY OF MAGNESIUM | 1 | 104.00 |

This is itemization of services for the time period indicated is provided at your request.  Please call 617-726-3884 if you have any questions or need assistance with your account.

Page 17 of 26

GID: 91943233, 05/14/25

| Date of Service | Rev Code | Procedure Code | Description | QTY | Amount |
|---|---|---|---|---|---|
| 05/28/2025 | 0300 | 84100 | HC ASSAY OF PHOSPHORUS INORGANIC | 1 | 76.00 |
| 05/28/2025 | 0300 | 85027 | HC BLOOD COUNT COMPLETE AUTOMATED | 1 | 93.00 |
| 05/28/2025 | 0390 | P9016 | HC RBC LEUKOCYTES REDUCED | 1 | 1,819.00 |
| 05/28/2025 | 0431 | 97763 | HC ORTHOTICS/PROSTH MGMT &/TRAINJ SBSQ ENCTR 15 MIN | 1 | 387.00 |
| 05/28/2025 | 0730 | 93005 | HC ECG ROUTINE ECG W/LEAST 12 LDS TRCG ONLY W/O I&R | 1 | 324.00 |
| 05/29/2025 | 0120 | | HC R&B - SEMI-PRIVATE TWO BED (MEDICAL OR GENERAL) - GENERAL CLASSIFICATION | 1 | 5,449.00 |
| 05/29/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.57 |
| 05/29/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.57 |
| 05/29/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.57 |
| 05/29/2025 | 0250 | | ASCORBIC ACID (VITAMIN C) 500 MG TAB | 1 | 0.12 |
| 05/29/2025 | 0250 | | ESCITALOPRAM OXALATE 20 MG TAB | 1 | 0.57 |
| 05/29/2025 | 0250 | | HYDROXYZINE 25 MG TAB | 1 | 0.59 |
| 05/29/2025 | 0250 | | METHADONE 5 MG TAB | 2 | 2.39 |
| 05/29/2025 | 0250 | | METHADONE 5 MG TAB | 2 | 2.39 |
| 05/29/2025 | 0250 | | METHADONE 5 MG TAB | 2 | 2.78 |
| 05/29/2025 | 0250 | | MULTIVITAMIN WITH MINERALS TAB | 1 | 0.30 |
| 05/29/2025 | 0250 | | MUPIROCIN 2 % OINT 22 G TUBE | 1 | 10.75 |
| 05/29/2025 | 0250 | | OXYCODONE 5 MG TAB | 3 | 2.69 |
| 05/29/2025 | 0250 | | OXYCODONE 5 MG TAB | 3 | 2.69 |
| 05/29/2025 | 0250 | | OXYCODONE 5 MG TAB | 2 | 1.79 |
| 05/29/2025 | 0250 | | OXYCODONE 5 MG TAB | 3 | 3.52 |
| 05/29/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 2 | 1.71 |
| 05/29/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 2 | 1.71 |
| 05/29/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 2 | 1.71 |
| 05/29/2025 | 0250 | | QUETIAPINE 25 MG TAB | 1 | 0.44 |
| 05/29/2025 | 0250 | | QUETIAPINE 25 MG TAB | 1 | 0.44 |
| 05/29/2025 | 0250 | | QUETIAPINE 25 MG TAB | 1 | 0.44 |
| 05/29/2025 | 0250 | J1650 | ENOXAPARIN 40 MG/0.4 ML SYRG | 4 | 23.27 |
| 05/29/2025 | 0300 | 80048 | HC BASIC METABOLIC PANEL CALCIUM TOTAL | 1 | 143.00 |
| 05/29/2025 | 0300 | 83735 | HC ASSAY OF MAGNESIUM | 1 | 104.00 |
| 05/29/2025 | 0300 | 84100 | HC ASSAY OF PHOSPHORUS INORGANIC | 1 | 76.00 |
| 05/29/2025 | 0300 | 85027 | HC BLOOD COUNT COMPLETE AUTOMATED | 1 | 93.00 |
| 05/29/2025 | 0420 | 97110 | HC THERAPEUTIC PX 1/> AREAS EACH 15 MIN EXERCISES | 1 | 221.00 |
| 05/29/2025 | 0420 | 97530 | HC THERAPEUT ACTVITY DIRECT PT CONTACT EACH 15 MIN | 1 | 238.00 |
| 05/29/2025 | 0730 | 93005 | HC ECG ROUTINE ECG W/LEAST 12 LDS TRCG ONLY W/O I&R | 1 | 324.00 |
| 05/30/2025 | 0120 | | HC R&B - SEMI-PRIVATE TWO BED (MEDICAL OR GENERAL) - GENERAL CLASSIFICATION | 1 | 5,449.00 |
| 05/30/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.57 |
| 05/30/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.57 |
| 05/30/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.57 |
| 05/30/2025 | 0250 | | ASCORBIC ACID (VITAMIN C) 500 MG TAB | 1 | 0.12 |
| 05/30/2025 | 0250 | | ASCORBIC ACID (VITAMIN C) 500 MG TAB | 1 | 0.12 |
| 05/30/2025 | 0250 | | ESCITALOPRAM OXALATE 20 MG TAB | 1 | 0.57 |
| 05/30/2025 | 0250 | | GABAPENTIN 300 MG CAP | 1 | 0.36 |
| 05/30/2025 | 0250 | | GABAPENTIN 300 MG CAP | 1 | 0.36 |
| 05/30/2025 | 0250 | | GABAPENTIN 300 MG CAP | 1 | 0.36 |
| 05/30/2025 | 0250 | | HYDROXYZINE 25 MG TAB | 1 | 0.59 |

This is itemization of services for the time period indicated is provided at your request.  Please call 617-726-3884 if you have any questions or need assistance with your account.

Page 18 of 26

| Date of Service | Rev Code | Procedure Code | Description | QTY | Amount |
|---|---|---|---|---|---|
| 05/30/2025 | 0250 | | HYDROXYZINE 25 MG TAB | 1 | 0.59 |
| 05/30/2025 | 0250 | | METHADONE 5 MG TAB | 2 | 2.78 |
| 05/30/2025 | 0250 | | METHADONE 5 MG TAB | 2 | 2.78 |
| 05/30/2025 | 0250 | | METHADONE 5 MG TAB | 2 | 2.78 |
| 05/30/2025 | 0250 | | MULTIVITAMIN WITH MINERALS TAB | 1 | 0.30 |
| 05/30/2025 | 0250 | | OMEPRAZOLE 20 MG CPDR | 1 | 0.18 |
| 05/30/2025 | 0250 | | OXYCODONE 5 MG TAB | 3 | 3.52 |
| 05/30/2025 | 0250 | | OXYCODONE 5 MG TAB | 3 | 3.52 |
| 05/30/2025 | 0250 | | OXYCODONE 5 MG TAB | 3 | 3.52 |
| 05/30/2025 | 0250 | | OXYCODONE 5 MG TAB | 2 | 2.35 |
| 05/30/2025 | 0250 | | OXYCODONE 5 MG TAB | 2 | 2.35 |
| 05/30/2025 | 0250 | | OXYCODONE 5 MG TAB | 2 | 2.35 |
| 05/30/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 2 | 1.71 |
| 05/30/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 2 | 1.71 |
| 05/30/2025 | 0250 | | QUETIAPINE 25 MG TAB | 1 | 0.44 |
| 05/30/2025 | 0250 | | QUETIAPINE 25 MG TAB | 2 | 1.05 |
| 05/30/2025 | 0250 | | SILVER NITRATE 0.5 % SOLN 960 ML BOTTLE | 1 | 1,195.44 |
| 05/30/2025 | 0250 | | WHITE PETROLATUM 41 % OINT 396 G JAR | 1 | 65.64 |
| 05/30/2025 | 0250 | | ZINC SULFATE 50 MG ZINC (220 MG) CAP | 1 | 0.72 |
| 05/30/2025 | 0250 | J1650 | ENOXAPARIN 40 MG/0.4 ML SYRG | 4 | 23.27 |
| 05/30/2025 | 0250 | J1885 | KETOROLAC TROMETHAMINE PER 15 MG | 1 | 2.56 |
| 05/30/2025 | 0250 | J1885 | KETOROLAC TROMETHAMINE PER 15 MG | 1 | 2.02 |
| 05/30/2025 | 0250 | J1885 | KETOROLAC TROMETHAMINE PER 15 MG | 1 | 2.56 |
| 05/30/2025 | 0300 | 80048 | HC BASIC METABOLIC PANEL CALCIUM TOTAL | 1 | 143.00 |
| 05/30/2025 | 0300 | 83735 | HC ASSAY OF MAGNESIUM | 1 | 104.00 |
| 05/30/2025 | 0300 | 84100 | HC ASSAY OF PHOSPHORUS INORGANIC | 1 | 76.00 |
| 05/30/2025 | 0300 | 85027 | HC BLOOD COUNT COMPLETE AUTOMATED | 1 | 93.00 |
| 05/30/2025 | 0420 | 97110 | HC THERAPEUTIC PX 1/> AREAS EACH 15 MIN EXERCISES | 1 | 221.00 |
| 05/30/2025 | 0420 | 97530 | HC THERAPEUT ACTVITY DIRECT PT CONTACT EACH 15 MIN | 1 | 238.00 |
| 05/30/2025 | 0730 | 93005 | HC ECG ROUTINE ECG W/LEAST 12 LDS TRCG ONLY W/O I&R | 1 | 324.00 |
| 05/31/2025 | 0120 | | HC R&B - SEMI-PRIVATE TWO BED (MEDICAL OR GENERAL) - GENERAL CLASSIFICATION | 1 | 5,449.00 |
| 05/31/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.57 |
| 05/31/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.57 |
| 05/31/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.57 |
| 05/31/2025 | 0250 | | ASCORBIC ACID (VITAMIN C) 500 MG TAB | 1 | 0.12 |
| 05/31/2025 | 0250 | | ASCORBIC ACID (VITAMIN C) 500 MG TAB | 1 | 0.12 |
| 05/31/2025 | 0250 | | ESCITALOPRAM OXALATE 20 MG TAB | 1 | 0.57 |
| 05/31/2025 | 0250 | | GABAPENTIN 300 MG CAP | 1 | 0.36 |
| 05/31/2025 | 0250 | | GABAPENTIN 300 MG CAP | 1 | 0.36 |
| 05/31/2025 | 0250 | | GABAPENTIN 300 MG CAP | 1 | 0.36 |
| 05/31/2025 | 0250 | | HYDROXYZINE 25 MG TAB | 1 | 0.59 |
| 05/31/2025 | 0250 | | METHADONE 5 MG TAB | 2 | 2.78 |
| 05/31/2025 | 0250 | | METHADONE 5 MG TAB | 2 | 2.78 |
| 05/31/2025 | 0250 | | METHADONE 5 MG TAB | 2 | 2.78 |
| 05/31/2025 | 0250 | | MULTIVITAMIN WITH MINERALS TAB | 1 | 0.30 |
| 05/31/2025 | 0250 | | OMEPRAZOLE 20 MG CPDR | 1 | 0.16 |
| 05/31/2025 | 0250 | | OXYCODONE 5 MG TAB | 2 | 1.79 |
| 05/31/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 2 | 1.71 |
| 05/31/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 2 | 1.71 |

This is itemization of services for the time period indicated is provided at your request.  Please call 617-726-3884 if you have any questions or need assistance with your account.

Page 19 of 26

GID: 91943233, 05/14/25

| Date of Service | Rev Code | Procedure Code | Description | QTY | Amount |
|---|---|---|---|---|---|
| 05/31/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 2 | 1.71 |
| 05/31/2025 | 0250 | | QUETIAPINE 25 MG TAB | 2 | 0.88 |
| 05/31/2025 | 0250 | | SILVER NITRATE 0.5 % SOLN 960 ML BOTTLE | 1 | 252.96 |
| 05/31/2025 | 0250 | | SILVER NITRATE 0.5 % SOLN 960 ML BOTTLE | 1 | 252.96 |
| 05/31/2025 | 0250 | | SILVER NITRATE 0.5 % SOLN 960 ML BOTTLE | 2 | 505.92 |
| 05/31/2025 | 0250 | | ZINC SULFATE 50 MG ZINC (220 MG) CAP | 1 | 0.72 |
| 05/31/2025 | 0250 | J1650 | ENOXAPARIN 40 MG/0.4 ML SYRG | 4 | 23.27 |
| 05/31/2025 | 0250 | J1885 | KETOROLAC TROMETHAMINE PER 15 MG | 1 | 2.56 |
| 05/31/2025 | 0250 | J1885 | KETOROLAC TROMETHAMINE PER 15 MG | 1 | 2.56 |
| 05/31/2025 | 0250 | J1885 | KETOROLAC TROMETHAMINE PER 15 MG | 1 | 2.02 |
| 05/31/2025 | 0250 | J1885 | KETOROLAC TROMETHAMINE PER 15 MG | 1 | 2.02 |
| 05/31/2025 | 0420 | 97110 | HC THERAPEUTIC PX 1/> AREAS EACH 15 MIN EXERCISES | 2 | 442.00 |
| 05/31/2025 | 0730 | 93005 | HC ECG ROUTINE ECG W/LEAST 12 LDS TRCG ONLY W/O I&R | 1 | 324.00 |
| 06/01/2025 | 0120 | | HC R&B - SEMI-PRIVATE TWO BED (MEDICAL OR GENERAL) - GENERAL CLASSIFICATION | 1 | 5,449.00 |
| 06/01/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.57 |
| 06/01/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.57 |
| 06/01/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.57 |
| 06/01/2025 | 0250 | | ASCORBIC ACID (VITAMIN C) 500 MG TAB | 1 | 0.12 |
| 06/01/2025 | 0250 | | ASCORBIC ACID (VITAMIN C) 500 MG TAB | 1 | 0.12 |
| 06/01/2025 | 0250 | | ESCITALOPRAM OXALATE 20 MG TAB | 1 | 0.57 |
| 06/01/2025 | 0250 | | GABAPENTIN 300 MG CAP | 1 | 0.36 |
| 06/01/2025 | 0250 | | GABAPENTIN 300 MG CAP | 1 | 0.36 |
| 06/01/2025 | 0250 | | GABAPENTIN 300 MG CAP | 1 | 0.36 |
| 06/01/2025 | 0250 | | HYDROXYZINE 25 MG TAB | 1 | 0.59 |
| 06/01/2025 | 0250 | | HYDROXYZINE 25 MG TAB | 1 | 0.59 |
| 06/01/2025 | 0250 | | HYDROXYZINE 25 MG TAB | 1 | 0.59 |
| 06/01/2025 | 0250 | | HYDROXYZINE 25 MG TAB | 1 | 0.59 |
| 06/01/2025 | 0250 | | METHADONE 5 MG TAB | 2 | 2.78 |
| 06/01/2025 | 0250 | | METHADONE 5 MG TAB | 2 | 2.78 |
| 06/01/2025 | 0250 | | METHADONE 5 MG TAB | 2 | 2.78 |
| 06/01/2025 | 0250 | | MULTIVITAMIN WITH MINERALS TAB | 1 | 0.30 |
| 06/01/2025 | 0250 | | OMEPRAZOLE 20 MG CPDR | 1 | 0.16 |
| 06/01/2025 | 0250 | | OXYCODONE 5 MG TAB | 2 | 2.35 |
| 06/01/2025 | 0250 | | OXYCODONE 5 MG TAB | 2 | 1.79 |
| 06/01/2025 | 0250 | | OXYCODONE 5 MG TAB | 2 | 1.79 |
| 06/01/2025 | 0250 | | OXYCODONE 5 MG TAB | 2 | 2.35 |
| 06/01/2025 | 0250 | | POLYETHYLENE GLYCOL 17 GRAM PWPK | 1 | 3.77 |
| 06/01/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 2 | 1.71 |
| 06/01/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 2 | 1.71 |
| 06/01/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 2 | 1.71 |
| 06/01/2025 | 0250 | | QUETIAPINE 25 MG TAB | 2 | 0.88 |
| 06/01/2025 | 0250 | | SILVER NITRATE 0.5 % SOLN 960 ML BOTTLE | 1 | 252.96 |
| 06/01/2025 | 0250 | | SILVER NITRATE 0.5 % SOLN 960 ML BOTTLE | 1 | 252.96 |
| 06/01/2025 | 0250 | | ZINC SULFATE 50 MG ZINC (220 MG) CAP | 1 | 0.72 |
| 06/01/2025 | 0250 | J1171 | HYDROMORPHONE (PF) 0.5 MG/0.5 ML SYRG | 5 | 10.71 |
| 06/01/2025 | 0250 | J1650 | ENOXAPARIN 40 MG/0.4 ML SYRG | 4 | 23.27 |
| 06/01/2025 | 0250 | J1885 | KETOROLAC TROMETHAMINE PER 15 MG | 1 | 2.56 |
| 06/01/2025 | 0250 | J1885 | KETOROLAC TROMETHAMINE PER 15 MG | 1 | 2.02 |
| 06/01/2025 | 0250 | J1885 | KETOROLAC TROMETHAMINE PER 15 MG | 1 | 2.02 |
| 06/01/2025 | 0250 | J1885 | KETOROLAC TROMETHAMINE PER 15 MG | 1 | 2.02 |

This is itemization of services for the time period indicated is provided at your request.  Please call 617-726-3884 if you have any questions or need assistance with your account.

GID: 91943233, 05/14/25

| Date of Service | Rev Code | Procedure Code | Description | QTY | Amount |
|---|---|---|---|---|---|
| 06/01/2025 | 0420 | 97110 | HC THERAPEUTIC PX 1/> AREAS EACH 15 MIN EXERCISES | 2 | 442.00 |
| 06/01/2025 | 0730 | 93005 | HC ECG ROUTINE ECG W/LEAST 12 LDS TRCG ONLY W/O I&R | 1 | 324.00 |
| 06/02/2025 | 0120 | | HC R&B - SEMI-PRIVATE TWO BED (MEDICAL OR GENERAL) - GENERAL CLASSIFICATION | 1 | 5,449.00 |
| 06/02/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.57 |
| 06/02/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.57 |
| 06/02/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.57 |
| 06/02/2025 | 0250 | | ASCORBIC ACID (VITAMIN C) 500 MG TAB | 1 | 0.12 |
| 06/02/2025 | 0250 | | ASCORBIC ACID (VITAMIN C) 500 MG TAB | 1 | 0.12 |
| 06/02/2025 | 0250 | | BACITRACIN 500 UNIT/GRAM OINT 28 G TUBE | 1 | 8.45 |
| 06/02/2025 | 0250 | | EPHEDRINE SULFATE IN NS 15 MG/3 ML (5 MG/ML) SYRG | 1 | 18.93 |
| 06/02/2025 | 0250 | | EPHEDRINE SULFATE IN NS 15 MG/3 ML (5 MG/ML) SYRG | 1 | 37.85 |
| 06/02/2025 | 0250 | | ESCITALOPRAM OXALATE 20 MG TAB | 1 | 0.57 |
| 06/02/2025 | 0250 | | GABAPENTIN 300 MG CAP | 1 | 0.36 |
| 06/02/2025 | 0250 | | GABAPENTIN 400 MG CAP | 1 | 0.58 |
| 06/02/2025 | 0250 | | GABAPENTIN 400 MG CAP | 1 | 0.47 |
| 06/02/2025 | 0250 | | HYDROXYZINE 25 MG TAB | 1 | 0.70 |
| 06/02/2025 | 0250 | | HYDROXYZINE 25 MG TAB | 1 | 0.59 |
| 06/02/2025 | 0250 | | HYDROXYZINE 25 MG TAB | 1 | 0.59 |
| 06/02/2025 | 0250 | | HYDROXYZINE 25 MG TAB | 1 | 0.59 |
| 06/02/2025 | 0250 | | METHADONE 5 MG TAB | 2 | 2.78 |
| 06/02/2025 | 0250 | | METHADONE 5 MG TAB | 2 | 2.39 |
| 06/02/2025 | 0250 | | METHADONE 5 MG TAB | 2 | 2.39 |
| 06/02/2025 | 0250 | | MULTIVITAMIN WITH MINERALS TAB | 1 | 0.30 |
| 06/02/2025 | 0250 | | OXYCODONE 5 MG TAB | 2 | 1.79 |
| 06/02/2025 | 0250 | | OXYCODONE 5 MG TAB | 2 | 1.79 |
| 06/02/2025 | 0250 | | OXYCODONE 5 MG TAB | 2 | 1.79 |
| 06/02/2025 | 0250 | | OXYCODONE 5 MG TAB | 2 | 1.79 |
| 06/02/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 2 | 1.71 |
| 06/02/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 2 | 1.71 |
| 06/02/2025 | 0250 | | QUETIAPINE 25 MG TAB | 2 | 0.88 |
| 06/02/2025 | 0250 | | ROCURONIUM 50 MG/5 ML (10 MG/ML) SYRG | 1 | 31.88 |
| 06/02/2025 | 0250 | | SUGAMMADEX 100 MG/ML SOLN | 1 | 528.01 |
| 06/02/2025 | 0250 | J0690 | CEFAZOLIN PER 500 MG | 4 | 7.39 |
| 06/02/2025 | 0250 | J1100 | DEXAMETHASONE PER 1 MG | 8 | 3.77 |
| 06/02/2025 | 0250 | J1630 | HALOPERIDOL LACTATE PER 5 MG | 1 | 2.15 |
| 06/02/2025 | 0250 | J1650 | ENOXAPARIN 40 MG/0.4 ML SYRG | 4 | 23.27 |
| 06/02/2025 | 0250 | J1885 | KETOROLAC TROMETHAMINE PER 15 MG | 1 | 2.02 |
| 06/02/2025 | 0250 | J2003 | LIDOCAINE 2% SOLN | 80 | 1.97 |
| 06/02/2025 | 0250 | J2250 | MIDAZOLAM (PF) 1 MG/ML SOLN | 2 | 4.21 |
| 06/02/2025 | 0250 | J2371 | PHENYLEPHRINE HCL IN 0.9% NACL 400 MCG/5 ML (80 MCG/ML) SYRG | 16 | 0.82 |
| 06/02/2025 | 0250 | J2405 | ONDANSETRON (PF) 4 MG/2 ML SOLN | 4 | 1.46 |
| 06/02/2025 | 0250 | J2704 | PROPOFOL (DIPRIVAN) INFUSION 10 MG/ML EMUL | 16 | 5.92 |
| 06/02/2025 | 0250 | J2704 | PROPOFOL (DIPRIVAN) INFUSION 10 MG/ML EMUL | 4 | 1.48 |
| 06/02/2025 | 0250 | J3010 | FENTANYL PER 0.1 MG | 1 | 10.87 |
| 06/02/2025 | 0250 | J7999 | PHENYLEPHRINE 80 MCG/ML SOLN | 1 | 7.51 |
| 06/02/2025 | 0300 | 80048 | HC BASIC METABOLIC PANEL CALCIUM TOTAL | 1 | 143.00 |

This is itemization of services for the time period indicated is provided at your request.  Please call 617-726-3884 if you have any questions or need assistance with your account.

GID: 91943233, 05/14/25

| Date of Service | Rev Code | Procedure Code | Description | QTY | Amount |
|---|---|---|---|---|---|
| 06/02/2025 | 0300 | 81025 | HC URINE PREGNANCY TEST VISUAL COLOR CMPRSN METHS | 1 | 102.00 |
| 06/02/2025 | 0300 | 83735 | HC ASSAY OF MAGNESIUM | 1 | 104.00 |
| 06/02/2025 | 0300 | 84100 | HC ASSAY OF PHOSPHORUS INORGANIC | 1 | 76.00 |
| 06/02/2025 | 0300 | 85027 | HC BLOOD COUNT COMPLETE AUTOMATED | 1 | 93.00 |
| 06/02/2025 | 0300 | 86850 | HC ANTIBODY SCREEN RBC EACH SERUM TECHNIQUE | 1 | 182.00 |
| 06/02/2025 | 0300 | 86900 | HC BLOOD TYPING SEROLOGIC ABO | 1 | 100.00 |
| 06/02/2025 | 0300 | 86901 | HC BLOOD TYPING RH D | 1 | 100.00 |
| 06/02/2025 | 0360 | | HC OPERATING ROOM T2 EACH ADDL 15 MIN | 5 | 19,815.00 |
| 06/02/2025 | 0360 | | HC OPERATING ROOM T2 FIRST 30 MIN | 1 | 8,340.00 |
| 06/02/2025 | 0370 | | HC ANESTHESIA TECHNICAL CHARGE PER 15 MIN (ENTERPRISE) | 6 | 2,718.00 |
| 06/02/2025 | 0370 | | HC ANESTHESIA TECHNICAL CHARGE PER 15 MIN (ENTERPRISE) | 1 | 453.00 |
| 06/02/2025 | 0430 | 97110 | HC THERAPEUTIC PX 1/> AREAS EACH 15 MIN EXERCISES | 1 | 221.00 |
| 06/02/2025 | 0430 | 97140 | HC MANUAL THERAPY TQS 1/> REGIONS EACH 15 MINUTES | 1 | 206.00 |
| 06/02/2025 | 0710 | | HC RECOVERY ROOM CHARGE PER 60 MIN | 1 | 692.00 |
| 06/02/2025 | 0730 | 93005 | HC ECG ROUTINE ECG W/LEAST 12 LDS TRCG ONLY W/O I&R | 1 | 324.00 |
| 06/03/2025 | 0120 | | HC R&B - SEMI-PRIVATE TWO BED (MEDICAL OR GENERAL) - GENERAL CLASSIFICATION | 1 | 5,449.00 |
| 06/03/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.57 |
| 06/03/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.57 |
| 06/03/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.57 |
| 06/03/2025 | 0250 | | ASCORBIC ACID (VITAMIN C) 500 MG TAB | 1 | 0.12 |
| 06/03/2025 | 0250 | | ASCORBIC ACID (VITAMIN C) 500 MG TAB | 1 | 0.12 |
| 06/03/2025 | 0250 | | BACITRACIN 500 UNIT/GRAM OINT 28 G TUBE | 1 | 8.45 |
| 06/03/2025 | 0250 | | ESCITALOPRAM OXALATE 20 MG TAB | 1 | 0.57 |
| 06/03/2025 | 0250 | | GABAPENTIN 400 MG CAP | 1 | 0.47 |
| 06/03/2025 | 0250 | | GABAPENTIN 400 MG CAP | 1 | 0.47 |
| 06/03/2025 | 0250 | | GABAPENTIN 400 MG CAP | 1 | 0.47 |
| 06/03/2025 | 0250 | | HYDROXYZINE 25 MG TAB | 1 | 0.59 |
| 06/03/2025 | 0250 | | HYDROXYZINE 25 MG TAB | 1 | 0.59 |
| 06/03/2025 | 0250 | | HYDROXYZINE 25 MG TAB | 1 | 0.59 |
| 06/03/2025 | 0250 | | METHADONE 5 MG TAB | 2 | 2.39 |
| 06/03/2025 | 0250 | | METHADONE 5 MG TAB | 1 | 1.39 |
| 06/03/2025 | 0250 | | METHADONE 5 MG TAB | 1 | 1.39 |
| 06/03/2025 | 0250 | | MULTIVITAMIN WITH MINERALS TAB | 1 | 0.30 |
| 06/03/2025 | 0250 | | OMEPRAZOLE 20 MG CPDR | 1 | 0.18 |
| 06/03/2025 | 0250 | | OXYCODONE 5 MG TAB | 2 | 1.79 |
| 06/03/2025 | 0250 | | OXYCODONE 5 MG TAB | 2 | 1.79 |
| 06/03/2025 | 0250 | | OXYCODONE 5 MG TAB | 2 | 1.79 |
| 06/03/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 2 | 1.71 |
| 06/03/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 2 | 1.71 |
| 06/03/2025 | 0250 | | QUETIAPINE 25 MG TAB | 1 | 0.44 |
| 06/03/2025 | 0250 | | QUETIAPINE 25 MG TAB | 2 | 0.88 |
| 06/03/2025 | 0250 | | ZINC SULFATE 50 MG ZINC (220 MG) CAP | 1 | 0.72 |
| 06/03/2025 | 0250 | J1650 | ENOXAPARIN 40 MG/0.4 ML SYRG | 4 | 23.27 |
| 06/03/2025 | 0300 | 80048 | HC BASIC METABOLIC PANEL CALCIUM TOTAL | 1 | 143.00 |
| 06/03/2025 | 0300 | 83735 | HC ASSAY OF MAGNESIUM | 1 | 104.00 |

This is itemization of services for the time period indicated is provided at your request.  Please call 617-726-3884 if you have any questions or need assistance with your account.

GID: 91943233, 05/14/25

| Date of Service | Rev Code | Procedure Code | Description | QTY | Amount |
|---|---|---|---|---|---|
| 06/03/2025 | 0300 | 84100 | HC ASSAY OF PHOSPHORUS INORGANIC | 1 | 76.00 |
| 06/03/2025 | 0300 | 85027 | HC BLOOD COUNT COMPLETE AUTOMATED | 1 | 93.00 |
| 06/03/2025 | 0420 | 97110 | HC THERAPEUTIC PX 1/> AREAS EACH 15 MIN EXERCISES | 2 | 442.00 |
| 06/03/2025 | 0420 | 97535 | HC SELF-CARE/HOME MGMT TRAINING EACH 15 MINUTES | 1 | 238.00 |
| 06/03/2025 | 0430 | 97110 | HC THERAPEUTIC PX 1/> AREAS EACH 15 MIN EXERCISES | 1 | 221.00 |
| 06/03/2025 | 0430 | 97140 | HC MANUAL THERAPY TQS 1/> REGIONS EACH 15 MINUTES | 1 | 206.00 |
| 06/03/2025 | 0431 | 97763 | HC ORTHOTICS/PROSTH MGMT &/TRAINJ SBSQ ENCTR 15 MIN | 1 | 387.00 |
| 06/03/2025 | 0730 | 93005 | HC ECG ROUTINE ECG W/LEAST 12 LDS TRCG ONLY W/O I&R | 1 | 324.00 |
| 06/04/2025 | 0120 | | HC R&B - SEMI-PRIVATE TWO BED (MEDICAL OR GENERAL) - GENERAL CLASSIFICATION | 1 | 5,449.00 |
| 06/04/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.57 |
| 06/04/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.57 |
| 06/04/2025 | 0250 | | ASCORBIC ACID (VITAMIN C) 500 MG TAB | 1 | 0.12 |
| 06/04/2025 | 0250 | | ESCITALOPRAM OXALATE 20 MG TAB | 1 | 0.57 |
| 06/04/2025 | 0250 | | GABAPENTIN 300 MG CAP | 1 | 0.36 |
| 06/04/2025 | 0250 | | GABAPENTIN 300 MG CAP | 1 | 0.36 |
| 06/04/2025 | 0250 | | GABAPENTIN 400 MG CAP | 1 | 0.47 |
| 06/04/2025 | 0250 | | HYDROXYZINE 25 MG TAB | 1 | 0.59 |
| 06/04/2025 | 0250 | | IBUPROFEN 600 MG TAB | 1 | 0.60 |
| 06/04/2025 | 0250 | | METHADONE 5 MG TAB | 1 | 1.39 |
| 06/04/2025 | 0250 | | METHADONE 5 MG TAB | 1 | 1.39 |
| 06/04/2025 | 0250 | | METHADONE 5 MG TAB | 1 | 1.39 |
| 06/04/2025 | 0250 | | MULTIVITAMIN WITH MINERALS TAB | 1 | 0.30 |
| 06/04/2025 | 0250 | | OMEPRAZOLE 20 MG CPDR | 1 | 0.16 |
| 06/04/2025 | 0250 | | OXYCODONE 5 MG TAB | 2 | 1.79 |
| 06/04/2025 | 0250 | | OXYCODONE 5 MG TAB | 1 | 0.90 |
| 06/04/2025 | 0250 | | OXYCODONE 5 MG TAB | 1 | 0.90 |
| 06/04/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 1 | 0.86 |
| 06/04/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 1 | 0.86 |
| 06/04/2025 | 0250 | | QUETIAPINE 25 MG TAB | 2 | 0.88 |
| 06/04/2025 | 0250 | | ZINC SULFATE 50 MG ZINC (220 MG) CAP | 1 | 0.72 |
| 06/04/2025 | 0250 | J1650 | ENOXAPARIN 40 MG/0.4 ML SYRG | 4 | 23.27 |
| 06/04/2025 | 0274 | L3908 | HC WHO COCK-UP NONMOLDE PRE OTS | 1 | 17.43 |
| 06/04/2025 | 0430 | 97110 | HC THERAPEUTIC PX 1/> AREAS EACH 15 MIN EXERCISES | 2 | 442.00 |
| 06/04/2025 | 0430 | 97140 | HC MANUAL THERAPY TQS 1/> REGIONS EACH 15 MINUTES | 1 | 206.00 |
| 06/04/2025 | 0431 | 97760 | HC ORTHOTICS MGMT & TRAINJ INITIAL ENCTR EA 15 MINS | 1 | 255.00 |
| 06/04/2025 | 0730 | 93005 | HC ECG ROUTINE ECG W/LEAST 12 LDS TRCG ONLY W/O I&R | 1 | 324.00 |
| 06/05/2025 | 0120 | | HC R&B - SEMI-PRIVATE TWO BED (MEDICAL OR GENERAL) - GENERAL CLASSIFICATION | 1 | 5,449.00 |
| 06/05/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.57 |
| 06/05/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.57 |
| 06/05/2025 | 0250 | | DOCUSATE SODIUM 100 MG CAP | 1 | 0.14 |
| 06/05/2025 | 0250 | | ESCITALOPRAM OXALATE 20 MG TAB | 1 | 0.57 |
| 06/05/2025 | 0250 | | GABAPENTIN 300 MG CAP | 1 | 0.36 |

This is itemization of services for the time period indicated is provided at your request.  Please call 617-726-3884 if you have any questions or need assistance with your account.

GID: 91943233, 05/14/25

| Date of Service | Rev Code | Procedure Code | Description | QTY | Amount |
|---|---|---|---|---|---|
| 06/05/2025 | 0250 | | GABAPENTIN 300 MG CAP | 1 | 0.36 |
| 06/05/2025 | 0250 | | GABAPENTIN 300 MG CAP | 1 | 0.36 |
| 06/05/2025 | 0250 | | HYDROXYZINE 25 MG TAB | 1 | 0.59 |
| 06/05/2025 | 0250 | | HYDROXYZINE 25 MG TAB | 1 | 0.59 |
| 06/05/2025 | 0250 | | IBUPROFEN 600 MG TAB | 1 | 0.60 |
| 06/05/2025 | 0250 | | IBUPROFEN 600 MG TAB | 1 | 0.60 |
| 06/05/2025 | 0250 | | METHADONE 5 MG TAB | 1 | 1.39 |
| 06/05/2025 | 0250 | | METHADONE 5 MG TAB | 1 | 1.39 |
| 06/05/2025 | 0250 | | METHADONE 5 MG TAB | 1 | 1.39 |
| 06/05/2025 | 0250 | | MULTIVITAMIN WITH MINERALS TAB | 1 | 0.30 |
| 06/05/2025 | 0250 | | OMEPRAZOLE 20 MG CPDR | 1 | 0.16 |
| 06/05/2025 | 0250 | | OXYCODONE 5 MG TAB | 1 | 0.90 |
| 06/05/2025 | 0250 | | OXYCODONE 5 MG TAB | 1 | 0.90 |
| 06/05/2025 | 0250 | | OXYCODONE 5 MG TAB | 1 | 0.90 |
| 06/05/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 1 | 0.86 |
| 06/05/2025 | 0250 | | QUETIAPINE 25 MG TAB | 2 | 0.88 |
| 06/05/2025 | 0250 | J1650 | ENOXAPARIN 40 MG/0.4 ML SYRG | 4 | 23.27 |
| 06/05/2025 | 0420 | 97110 | HC THERAPEUTIC PX 1/> AREAS EACH 15 MIN EXERCISES | 1 | 221.00 |
| 06/05/2025 | 0430 | 97110 | HC THERAPEUTIC PX 1/> AREAS EACH 15 MIN EXERCISES | 2 | 442.00 |
| 06/05/2025 | 0430 | 97140 | HC MANUAL THERAPY TQS 1/> REGIONS EACH 15 MINUTES | 1 | 206.00 |
| 06/06/2025 | 0120 | | HC R&B - SEMI-PRIVATE TWO BED (MEDICAL OR GENERAL) - GENERAL CLASSIFICATION | 1 | 5,449.00 |
| 06/06/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.57 |
| 06/06/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.57 |
| 06/06/2025 | 0250 | | BACITRACIN 500 UNIT/GRAM OINT 28 G TUBE | 1 | 8.45 |
| 06/06/2025 | 0250 | | ESCITALOPRAM OXALATE 20 MG TAB | 1 | 0.57 |
| 06/06/2025 | 0250 | | GABAPENTIN 300 MG CAP | 1 | 0.36 |
| 06/06/2025 | 0250 | | GABAPENTIN 300 MG CAP | 1 | 0.47 |
| 06/06/2025 | 0250 | | GABAPENTIN 300 MG CAP | 1 | 0.36 |
| 06/06/2025 | 0250 | | HYDROXYZINE 25 MG TAB | 1 | 0.70 |
| 06/06/2025 | 0250 | | HYDROXYZINE 25 MG TAB | 1 | 0.70 |
| 06/06/2025 | 0250 | | IBUPROFEN 600 MG TAB | 1 | 0.60 |
| 06/06/2025 | 0250 | | IBUPROFEN 600 MG TAB | 1 | 0.60 |
| 06/06/2025 | 0250 | | IBUPROFEN 600 MG TAB | 1 | 0.60 |
| 06/06/2025 | 0250 | | METHADONE 5 MG TAB | 1 | 1.39 |
| 06/06/2025 | 0250 | | METHADONE 5 MG TAB | 1 | 1.39 |
| 06/06/2025 | 0250 | | MULTIVITAMIN WITH MINERALS TAB | 1 | 0.30 |
| 06/06/2025 | 0250 | | OMEPRAZOLE 20 MG CPDR | 1 | 0.18 |
| 06/06/2025 | 0250 | | OXYCODONE 5 MG TAB | 2 | 1.79 |
| 06/06/2025 | 0250 | | OXYCODONE 5 MG TAB | 1 | 0.90 |
| 06/06/2025 | 0250 | | OXYCODONE 5 MG TAB | 1 | 0.90 |
| 06/06/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 1 | 0.86 |
| 06/06/2025 | 0250 | | QUETIAPINE 25 MG TAB | 2 | 0.88 |
| 06/06/2025 | 0250 | J1650 | ENOXAPARIN 40 MG/0.4 ML SYRG | 4 | 23.27 |
| 06/06/2025 | 0430 | 97110 | HC THERAPEUTIC PX 1/> AREAS EACH 15 MIN EXERCISES | 2 | 442.00 |
| 06/06/2025 | 0430 | 97140 | HC MANUAL THERAPY TQS 1/> REGIONS EACH 15 MINUTES | 1 | 206.00 |
| 06/07/2025 | 0120 | | HC R&B - SEMI-PRIVATE TWO BED (MEDICAL OR GENERAL) - GENERAL CLASSIFICATION | 1 | 5,449.00 |

This is itemization of services for the time period indicated is provided at your request.  Please call 617-726-3884 if you have any questions or need assistance with your account.

GID: 91943233, 05/14/25

| Date of Service | Rev Code | Procedure Code | Description | QTY | Amount |
|---|---|---|---|---|---|
| 06/07/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.57 |
| 06/07/2025 | 0250 | | BACITRACIN 500 UNIT/GRAM OINT 28 G TUBE | 2 | 16.90 |
| 06/07/2025 | 0250 | | DOCUSATE SODIUM 100 MG CAP | 1 | 0.14 |
| 06/07/2025 | 0250 | | ESCITALOPRAM OXALATE 20 MG TAB | 1 | 0.57 |
| 06/07/2025 | 0250 | | GABAPENTIN 300 MG CAP | 1 | 0.36 |
| 06/07/2025 | 0250 | | GABAPENTIN 300 MG CAP | 1 | 0.36 |
| 06/07/2025 | 0250 | | GABAPENTIN 300 MG CAP | 1 | 0.36 |
| 06/07/2025 | 0250 | | HYDROXYZINE 25 MG TAB | 1 | 0.59 |
| 06/07/2025 | 0250 | | METHADONE 5 MG TAB | 1 | 1.39 |
| 06/07/2025 | 0250 | | METHADONE 5 MG TAB | 1 | 1.39 |
| 06/07/2025 | 0250 | | MULTIVITAMIN WITH MINERALS TAB | 1 | 0.30 |
| 06/07/2025 | 0250 | | OMEPRAZOLE 20 MG CPDR | 1 | 0.18 |
| 06/07/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 1 | 0.86 |
| 06/07/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 1 | 0.86 |
| 06/07/2025 | 0250 | | QUETIAPINE 25 MG TAB | 1 | 0.44 |
| 06/07/2025 | 0250 | | QUETIAPINE 25 MG TAB | 2 | 0.88 |
| 06/07/2025 | 0250 | J1650 | ENOXAPARIN 40 MG/0.4 ML SYRG | 4 | 23.27 |
| 06/07/2025 | 0430 | 97110 | HC THERAPEUTIC PX 1/> AREAS EACH 15 MIN EXERCISES | 1 | 221.00 |
| 06/07/2025 | 0430 | 97530 | HC THERAPEUT ACTVITY DIRECT PT CONTACT EACH 15 MIN | 1 | 238.00 |
| 06/08/2025 | 0120 | | HC R&B - SEMI-PRIVATE TWO BED (MEDICAL OR GENERAL) - GENERAL CLASSIFICATION | 1 | 5,449.00 |
| 06/08/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.57 |
| 06/08/2025 | 0250 | | DOCUSATE SODIUM 100 MG CAP | 1 | 0.14 |
| 06/08/2025 | 0250 | | DOCUSATE SODIUM 100 MG CAP | 1 | 0.14 |
| 06/08/2025 | 0250 | | ESCITALOPRAM OXALATE 20 MG TAB | 1 | 0.57 |
| 06/08/2025 | 0250 | | GABAPENTIN 300 MG CAP | 1 | 0.36 |
| 06/08/2025 | 0250 | | GABAPENTIN 300 MG CAP | 1 | 0.36 |
| 06/08/2025 | 0250 | | GABAPENTIN 300 MG CAP | 1 | 0.36 |
| 06/08/2025 | 0250 | | IBUPROFEN 600 MG TAB | 1 | 0.60 |
| 06/08/2025 | 0250 | | METHADONE 5 MG TAB | 1 | 1.39 |
| 06/08/2025 | 0250 | | MULTIVITAMIN WITH MINERALS TAB | 1 | 0.30 |
| 06/08/2025 | 0250 | | OMEPRAZOLE 20 MG CPDR | 1 | 0.18 |
| 06/08/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 1 | 0.86 |
| 06/08/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 1 | 0.86 |
| 06/08/2025 | 0250 | | QUETIAPINE 25 MG TAB | 1 | 0.44 |
| 06/08/2025 | 0250 | | QUETIAPINE 25 MG TAB | 2 | 0.88 |
| 06/08/2025 | 0250 | J1650 | ENOXAPARIN 40 MG/0.4 ML SYRG | 4 | 23.27 |
| 06/09/2025 | 0120 | | HC R&B - SEMI-PRIVATE TWO BED (MEDICAL OR GENERAL) - GENERAL CLASSIFICATION | 1 | 5,449.00 |
| 06/09/2025 | 0250 | | ACETAMINOPHEN 325 MG TAB | 3 | 0.57 |
| 06/09/2025 | 0250 | | DOCUSATE SODIUM 100 MG CAP | 1 | 0.14 |
| 06/09/2025 | 0250 | | DOCUSATE SODIUM 100 MG CAP | 1 | 0.14 |
| 06/09/2025 | 0250 | | ESCITALOPRAM OXALATE 20 MG TAB | 1 | 0.57 |
| 06/09/2025 | 0250 | | GABAPENTIN 300 MG CAP | 1 | 0.36 |
| 06/09/2025 | 0250 | | GABAPENTIN 300 MG CAP | 1 | 0.47 |
| 06/09/2025 | 0250 | | GABAPENTIN 300 MG CAP | 1 | 0.36 |
| 06/09/2025 | 0250 | | HYDROXYZINE 25 MG TAB | 1 | 0.70 |
| 06/09/2025 | 0250 | | IBUPROFEN 600 MG TAB | 1 | 0.60 |
| 06/09/2025 | 0250 | | METHADONE 5 MG TAB | 1 | 1.39 |
| 06/09/2025 | 0250 | | MULTIVITAMIN WITH MINERALS TAB | 1 | 0.30 |

This is itemization of services for the time period indicated is provided at your request.  Please call 617-726-3884 if you have any questions or need assistance with your account.

GID: 91943233, 05/14/25

| Date of Service | Rev Code | Procedure Code | Description | QTY | Amount |
|---|---|---|---|---|---|
| 06/09/2025 | 0250 | | OMEPRAZOLE 20 MG CPDR | 1 | 0.18 |
| 06/09/2025 | 0250 | | OXYCODONE 5 MG TAB | 1 | 0.90 |
| 06/09/2025 | 0250 | | OXYCODONE 5 MG TAB | 1 | 0.90 |
| 06/09/2025 | 0250 | | PROPRANOLOL 10 MG TAB | 1 | 0.86 |
| 06/09/2025 | 0250 | | QUETIAPINE 25 MG TAB | 1 | 0.44 |
| 06/09/2025 | 0250 | | QUETIAPINE 25 MG TAB | 2 | 0.88 |
| 06/09/2025 | 0250 | J1650 | ENOXAPARIN 40 MG/0.4 ML SYRG | 4 | 23.27 |
| 06/09/2025 | 0430 | 97110 | HC THERAPEUTIC PX 1/> AREAS EACH 15 MIN EXERCISES | 1 | 221.00 |
| 06/09/2025 | 0430 | 97140 | HC MANUAL THERAPY TQS 1/> REGIONS EACH 15 MINUTES | 1 | 206.00 |
| 06/10/2025 | 0250 | | BACITRACIN 500 UNIT/GRAM OINT 28 G TUBE | 1 | 8.45 |
| 06/10/2025 | 0250 | | DOCUSATE SODIUM 100 MG CAP | 1 | 0.14 |
| 06/10/2025 | 0250 | | ESCITALOPRAM OXALATE 20 MG TAB | 1 | 0.57 |
| 06/10/2025 | 0250 | | GABAPENTIN 300 MG CAP | 1 | 0.36 |
| 06/10/2025 | 0250 | | HYDROXYZINE 25 MG TAB | 1 | 0.70 |
| 06/10/2025 | 0250 | | IBUPROFEN 600 MG TAB | 1 | 0.60 |
| 06/10/2025 | 0250 | | MULTIVITAMIN WITH MINERALS TAB | 1 | 0.30 |
| 06/10/2025 | 0250 | | OMEPRAZOLE 20 MG CPDR | 1 | 0.18 |
| 06/10/2025 | 0250 | | QUETIAPINE 25 MG TAB | 1 | 0.44 |
| 06/10/2025 | 0430 | 97110 | HC THERAPEUTIC PX 1/> AREAS EACH 15 MIN EXERCISES | 1 | 221.00 |
| 06/10/2025 | 0430 | 97530 | HC THERAPEUT ACTVITY DIRECT PT CONTACT EACH 15 MIN | 1 | 238.00 |

**Total hospital charges:** **518,206.99**
**Total hospital payments and adjustments:**

This is itemization of services for the time period indicated is provided at your request.  Please call 617-726-3884 if you have any questions or need assistance with your account.

Page 26 of 26

 **Mass General Brigham**

Patient Name: Digan,Yvette Yuri

399 Revolution Drive STE 410
Somerville, MA 02145-1462

Account:       91943233
Letter Date:   06/11/25

Yvette Yuri Digan
9H BLK 1 KENSWOOD CT, KINGSWOOD VILLAS,
YUEN LONG, HONG KONG, Unavailable #34401
Hong Kong

Visit Coverages:
Generic Commercial - Generic Travel Insurance

This is an itemization of charges, payments and adjustments for:

| Patient: | Digan,Yvette Yuri | Admission Date: | 05/14/25 |
|---|---|---|---|
| Account: | 6352662926 | Discharge Date: | 06/10/25 |
| Location: | Massachusetts General Hospital | Department: | MGH EMERGENCY |

**Total Account Balance:** $51,862.00

## Professional Charges

| Date of Service | Billing Provider | Procedure Code | PB Procedure Description | Qty | Amount |
|---|---|---|---|---|---|
| 05/14/2025 | HORVATH, RYAN JOSEPH | 99291 | PR CRITICAL CARE, E/M 30-74 MINUTES | 1 | 895.00 |
| 05/14/2025 | MCLOUD, THERESA C | 71045 | CHG RADIOLOGIC EXAM CHEST SINGLE VIEW | 1 | 36.00 |
| 05/14/2025 | PARKS, JONATHAN J | 99291 | PR CRITICAL CARE, E/M 30-74 MINUTES | 1 | 895.00 |
| 05/14/2025 | SCHULZ, JOHN T | 15002 | PR WOUND PREP, PED, TRK/ARM/LG 1ST 100 CM | 1 | 938.00 |
| 05/14/2025 | SCHULZ, JOHN T | 15003 | PR WOUND PREP, PED, TRK/ARM/LG ADDL 100 CM | 4 | 760.00 |
| 05/14/2025 | SCHULZ, JOHN T | 15004 | PR WND PREP PED, FACE/NCK/HND/FT/GEN 1ST 100 CM | 1 | 1,108.00 |
| 05/14/2025 | SCHULZ, JOHN T | 15005 | PR WND PREP,PED, FACE/NCK/HND/FT/GEN ADD 100 CM | 2 | 754.00 |
| 05/14/2025 | SCHULZ, JOHN T | 15273 | PR APP SKN SUB GRFT T/A/L AREA/>100SCM 1ST 100SCM | 1 | 825.00 |
| 05/14/2025 | SCHULZ, JOHN T | 15274 | PR APP SKN SUB GRFT T/A/L AREA/>100SCM ADL 100SCM | 4 | 748.00 |

This is itemization of services for the time period indicated is provided at your request.  Please call 617-726-3884 if you have any questions or need assistance with your account.

Page 1 of 4

GID: 91943233, 05/14/25

| Date of Service | Billing Provider | Procedure Code | PB Procedure Description | Qty | Amount |
|---|---|---|---|---|---|
| 05/14/2025 | SCHULZ, JOHN T | 15277 | PR SUB GRFT F/S/N/H/F/G/M/D />100SCM 1ST 100SCM | 1 | 941.00 |
| 05/14/2025 | SCHULZ, JOHN T | 15278 | PR SUB GRFT F/S/N/H/F/G/M/D />100SCM ADL 100SCM | 2 | 468.00 |
| 05/14/2025 | SCHULZ, JOHN T | 36556 | PR INSERT NON-TUNNEL CV CATH | 1 | 716.00 |
| 05/14/2025 | SCHULZ, JOHN T | 99291 | PR CRITICAL CARE, E/M 30-74 MINUTES | 1 | 895.00 |
| 05/15/2025 | ABBOTT, GERALD F | 71045 | CHG RADIOLOGIC EXAM CHEST SINGLE VIEW | 1 | 36.00 |
| 05/15/2025 | HORVATH, RYAN JOSEPH | 99291 | PR CRITICAL CARE, E/M 30-74 MINUTES | 1 | 895.00 |
| 05/15/2025 | NISAVIC, MLADEN | 99254 | PR IP/OBS CONSLTJ NEW/EST PT MOD MDM 60 MINUTES | 1 | 668.00 |
| 05/15/2025 | SCHULZ, JOHN T | 99232 | PR SBSQ HOSPITAL IP/OBS CARE MOD MDM 35 MINUTES | 1 | 335.00 |
| 05/16/2025 | HORVATH, RYAN JOSEPH | 99291 | PR CRITICAL CARE, E/M 30-74 MINUTES | 1 | 895.00 |
| 05/16/2025 | SCHULZ, JOHN T | 15002 | PR WOUND PREP, PED, TRK/ARM/LG 1ST 100 CM | 1 | 938.00 |
| 05/16/2025 | SCHULZ, JOHN T | 15003 | PR WOUND PREP, PED, TRK/ARM/LG ADDL 100 CM | 9 | 1,710.00 |
| 05/16/2025 | SCHULZ, JOHN T | 15273 | PR APP SKN SUB GRFT T/A/L AREA/>100SCM 1ST 100SCM | 1 | 825.00 |
| 05/16/2025 | SCHULZ, JOHN T | 15274 | PR APP SKN SUB GRFT T/A/L AREA/>100SCM ADL 100SCM | 9 | 1,683.00 |
| 05/16/2025 | SCHULZ, JOHN T | 99232 | PR SBSQ HOSPITAL IP/OBS CARE MOD MDM 35 MINUTES | 1 | 335.00 |
| 05/17/2025 | HWABEJIRE, JOHN O | 99291 | PR CRITICAL CARE, E/M 30-74 MINUTES | 1 | 895.00 |
| 05/17/2025 | SAKANO, TAKASHI | 99291 | PR CRITICAL CARE, E/M 30-74 MINUTES | 1 | 895.00 |
| 05/17/2025 | SCHULZ, JOHN T | 99232 | PR SBSQ HOSPITAL IP/OBS CARE MOD MDM 35 MINUTES | 1 | 335.00 |
| 05/18/2025 | BARRAGAN BRADFORD, DIANA | 99291 | PR CRITICAL CARE, E/M 30-74 MINUTES | 1 | 895.00 |
| 05/18/2025 | BERMAS, KRISTINA W | 99291 | PR CRITICAL CARE, E/M 30-74 MINUTES | 1 | 895.00 |
| 05/18/2025 | SCHULZ, JOHN T | 99232 | PR SBSQ HOSPITAL IP/OBS CARE MOD MDM 35 MINUTES | 1 | 335.00 |
| 05/19/2025 | GOVERMAN, JEREMY | 16030 | PR DRESS/DEBRID LARGE BURN NO ANESTH | 1 | 569.00 |
| 05/19/2025 | GOVERMAN, JEREMY | 99291 | PR CRITICAL CARE, E/M 30-74 MINUTES | 1 | 895.00 |
| 05/19/2025 | HWABEJIRE, JOHN O | 99291 | PR CRITICAL CARE, E/M 30-74 MINUTES | 1 | 895.00 |
| 05/20/2025 | GOVERMAN, JEREMY | 16030 | PR DRESS/DEBRID LARGE BURN NO ANESTH | 1 | 569.00 |
| 05/20/2025 | GOVERMAN, JEREMY | 99291 | PR CRITICAL CARE, E/M 30-74 MINUTES | 1 | 895.00 |
| 05/20/2025 | HWABEJIRE, JOHN O | 99291 | PR CRITICAL CARE, E/M 30-74 MINUTES | 1 | 895.00 |
| 05/20/2025 | LUDMIR, JONATHAN | 93010 | PR ELECTROCARDIOGRAM REPORT | 1 | 37.00 |
| 05/21/2025 | GOVERMAN, JEREMY | 15002 | PR WOUND PREP, PED, TRK/ARM/LG 1ST 100 CM | 1 | 938.00 |

This is itemization of services for the time period indicated is provided at your request.  Please call 617-726-3884 if you have any questions or need assistance with your account.

GID: 91943233, 05/14/25

| Date of Service | Billing Provider | Procedure Code | PB Procedure Description | Qty | Amount |
|---|---|---|---|---|---|
| 05/21/2025 | GOVERMAN, JEREMY | 15003 | PR WOUND PREP, PED, TRK/ARM/LG ADDL 100 CM | 9 | 1,710.00 |
| 05/21/2025 | GOVERMAN, JEREMY | 15004 | PR WND PREP PED, FACE/NCK/HND/FT/GEN 1ST 100 CM | 1 | 1,108.00 |
| 05/21/2025 | GOVERMAN, JEREMY | 15005 | PR WND PREP,PED, FACE/NCK/HND/FT/GEN ADD 100 CM | 3 | 1,131.00 |
| 05/21/2025 | GOVERMAN, JEREMY | 15011 | PR HRV SKIN FOR SKIN CELL SSP AGRFT 1ST 25 SQ CM/< | 1 | 538.00 |
| 05/21/2025 | GOVERMAN, JEREMY | 15015 | PR APPL SKIN CELL SSP AGRFT T/A/L 1ST 480 SQ CM/< | 1 | 2,774.00 |
| 05/21/2025 | GOVERMAN, JEREMY | 15016 | PR APPL SKIN CELL SSP AGRFT T/A/L EA ADDL 480 SQ CM | 14 | 6,356.00 |
| 05/21/2025 | GOVERMAN, JEREMY | 15100 | PR SPLIT GRFT TRUNK,ARM,LEG <100 SQCM | 1 | 3,143.00 |
| 05/21/2025 | GOVERMAN, JEREMY | 15101 | PR SPLIT GRFT,TRUNK,ARM,LEG EA 100 SQCM | 9 | 4,275.00 |
| 05/21/2025 | GOVERMAN, JEREMY | 15273 | PR APP SKN SUB GRFT T/A/L AREA/>100SCM 1ST 100SCM | 1 | 825.00 |
| 05/21/2025 | GOVERMAN, JEREMY | 15277 | PR SUB GRFT F/S/N/H/F/G/M/D />100SCM 1ST 100SCM | 1 | 941.00 |
| 05/21/2025 | GOVERMAN, JEREMY | 15278 | PR SUB GRFT F/S/N/H/F/G/M/D />100SCM ADL 100SCM | 3 | 702.00 |
| 05/21/2025 | GOVERMAN, JEREMY | 17999 | PR SKIN TISSUE PROCEDURE UNLISTED | 1 | 359.00 |
| 05/21/2025 | GOVERMAN, JEREMY | 99291 | PR CRITICAL CARE, E/M 30-74 MINUTES | 1 | 895.00 |
| 05/21/2025 | HWABEJIRE, JOHN O | 99291 | PR CRITICAL CARE, E/M 30-74 MINUTES | 1 | 895.00 |
| 05/21/2025 | KILCOYNE, AOIFE | 74018 | CHG RADIOLOGIC EXAM ABDOMEN 1 VIEW | 1 | 37.00 |
| 05/22/2025 | GOVERMAN, JEREMY | 16020 | PR DRESS/DEBRID SMALL BURN NO ANES | 1 | 267.00 |
| 05/22/2025 | GOVERMAN, JEREMY | 99291 | PR CRITICAL CARE, E/M 30-74 MINUTES | 1 | 895.00 |
| 05/23/2025 | GOVERMAN, JEREMY | 99291 | PR CRITICAL CARE, E/M 30-74 MINUTES | 1 | 895.00 |
| 05/24/2025 | FRIEDSTAT, JONATHAN S | 16030 | PR DRESS/DEBRID LARGE BURN NO ANESTH | 1 | 569.00 |
| 05/24/2025 | FRIEDSTAT, JONATHAN S | 99233 | PR SBSQ HOSPITAL IP/OBS CARE HIGH MDM 50 MINUTES | 1 | 504.00 |
| 05/26/2025 | MAMUYA, WILFRED S | 93010 | PR ELECTROCARDIOGRAM REPORT | 1 | 37.00 |
| 05/27/2025 | LUDMIR, JONATHAN | 93010 | PR ELECTROCARDIOGRAM REPORT | 1 | 37.00 |
| 05/28/2025 | NISAVIC, MLADEN | 99233 | PR SBSQ HOSPITAL IP/OBS CARE HIGH MDM 50 MINUTES | 1 | 504.00 |
| 05/28/2025 | PATEL, ANIRUDDH PRADIP | 93010 | PR ELECTROCARDIOGRAM REPORT | 1 | 37.00 |
| 05/28/2025 | WEINER, RORY B | 93010 | PR ELECTROCARDIOGRAM REPORT | 1 | 37.00 |
| 05/28/2025 | YANG, BIN QUAN | 93010 | PR ELECTROCARDIOGRAM REPORT | 1 | 37.00 |

This is itemization of services for the time period indicated is provided at your request.  Please call 617-726-3884 if you have any questions or need assistance with your account.

Page 3 of 4

GID: 91943233, 05/14/25

| Date of Service | Billing Provider | Procedure Code | PB Procedure Description | Qty | Amount |
|---|---|---|---|---|---|
| 05/29/2025 | NISAVIC, MLADEN | 99233 | PR SBSQ HOSPITAL IP/OBS CARE HIGH MDM 50 MINUTES | 1 | 504.00 |
| 05/30/2025 | CHAE, CLAUDIA U | 93010 | PR ELECTROCARDIOGRAM REPORT | 1 | 37.00 |
| 05/30/2025 | DAL-BIANCO, JACOB | 93010 | PR ELECTROCARDIOGRAM REPORT | 1 | 37.00 |
| 05/30/2025 | DAL-BIANCO, JACOB | 93010 | PR ELECTROCARDIOGRAM REPORT | 1 | 37.00 |
| 06/01/2025 | OSBORNE, MICHAEL T | 93010 | PR ELECTROCARDIOGRAM REPORT | 1 | 37.00 |
| 06/02/2025 | HARRINGTON, COLLEEN MARY | 93010 | PR ELECTROCARDIOGRAM REPORT | 1 | 37.00 |
| 06/02/2025 | HICKEY, SEAN A | 16030 | PR DRESS/DEBRID LARGE BURN NO ANESTH | 1 | 569.00 |
| 06/02/2025 | NISAVIC, MLADEN | 99233 | PR SBSQ HOSPITAL IP/OBS CARE HIGH MDM 50 MINUTES | 1 | 504.00 |
| 06/02/2025 | SCHRUBA, ALICE | 90791 | PR PSYCHIATRIC DIAGNOSTIC EVALUATION | 1 | 622.00 |
| 06/03/2025 | MAMUYA, WILFRED S | 93010 | PR ELECTROCARDIOGRAM REPORT | 1 | 37.00 |
| 06/04/2025 | SCHRUBA, ALICE | 90837 | PR PSYCHOTHERAPY W/PATIENT 60 MINUTES | 1 | 562.00 |
| 06/07/2025 | GOVERMAN, JEREMY | 99231 | PR SBSQ HOSPITAL IP/OBS CARE SF/LOW MDM 25 MINUTES | 1 | 210.00 |
| **Total professional charges:** | | | | | **60,943.00** |

**Professional Payments and Adjustments**

| Date | Description | Amount |
|---|---|---|
| 05/24/25 | Self-Pay Discount/Adjustment | -895.00 |
| 05/27/25 | Self-Pay Discount/Adjustment | -223.75 |
| 05/28/25 | Self-Pay Discount/Adjustment | -9.25 |
| 05/29/25 | Self-Pay Discount/Adjustment | -6,714.25 |
| 05/30/25 | Self-Pay Discount/Adjustment | -252.00 |
| 06/03/25 | Self-Pay Discount/Adjustment | -403.50 |
| 06/04/25 | Self-Pay Discount/Adjustment | -9.25 |
| 06/05/25 | Self-Pay Discount/Adjustment | -183.25 |
| 06/07/25 | Self-Pay Discount/Adjustment | -80.25 |
| 06/09/25 | Self-Pay Discount/Adjustment | -9.25 |
| 06/10/25 | Self-Pay Discount/Adjustment | -149.75 |
| 06/11/25 | Self-Pay Discount/Adjustment | -151.50 |
| **Total professional payments and adjustments:** | | **-9,081.00** |

This is itemization of services for the time period indicated is provided at your request.  Please call 617-726-3884 if you have any questions or need assistance with your account.

GID: 91943233, 05/14/25

 **Mass General Brigham**

Patient Name: Digan,Yvette Yuri

399 Revolution Drive STE 410
Somerville, MA 02145-1462

Account: 91943233
Letter Date: 06/11/25

Yvette Yuri Digan
9H BLK 1 KENSWOOD CT, KINGSWOOD VILLAS,
YUEN LONG, HONG KONG, Unavailable #34401
Hong Kong

Visit Coverages:
Generic Commercial - Generic Travel Insurance

This is an itemization of charges, payments and adjustments for:

Patient: Digan,Yvette Yuri
Account: 6353198785

Admission Date: 05/16/25
Discharge Date: 05/16/25

Location: Massachusetts General Hospital

Department: MGP 3D
RECONSTRUCTION

**Total Account Balance:** $2,480.00

**Professional Charges**

| Date of Service | Billing Provider | Procedure Code | PB Procedure Description | Qty | Amount |
|---|---|---|---|---|---|
| 05/16/2025 | SPARLING, JAMIE L | 01952 | PR ANESTH,BURN TX, 4-9% TBSA | 16 | 2,480.00 |

**Total professional charges:** 2,480.00
**Total professional payments and adjustments:**

This is itemization of services for the time period indicated is provided at your request. Please call 617-726-3884 if you have any questions or need assistance with your account.

Page 1 of 1

GID: 91943233, 05/16/25



| | |
|---|---|
| | Patient Name: Digan,Yvette Yuri |

399 Revolution Drive STE 410
Somerville, MA 02145-1462

Account:       91943233
Letter Date:   06/11/25

Yvette Yuri Digan
9H BLK 1 KENSWOOD CT, KINGSWOOD VILLAS,
YUEN LONG, HONG KONG, Unavailable #34401
Hong Kong

Visit Coverages:
International Commercial - Generic International Commercial

This is an itemization of charges, payments and adjustments for:

| | | | |
|---|---|---|---|
| Patient: | Digan,Yvette Yuri | Admission Date: | 05/21/25 |
| Account: | 6353978858 | Discharge Date: | 05/21/25 |
| Location: | Massachusetts General Hospital | Department: | MGP 3D RECONSTRUCTION |

**Total Account Balance:** $2,480.00

**Professional Charges**

| Date of Service | Billing Provider | Procedure Code | PB Procedure Description | Qty | Amount |
|---|---|---|---|---|---|
| 05/21/2025 | BARRAGAN BRADFORD, DIANA | 01951 | PR ANESTH,BURN TX, <4% TBSA | 16 | 2,480.00 |
| **Total professional charges:** | | | | | **2,480.00** |
| **Total professional payments and adjustments:** | | | | | |

This is itemization of services for the time period indicated is provided at your request.  Please call 617-726-3884 if you have any questions or need assistance with your account.

Page 1 of 1

GID: 91943233, 05/21/25



**Mass General Brigham**

399 Revolution Drive STE 410
Somerville, MA 02145-1462

Patient Name: Digan,Yvette Yuri

Account:       91943233
Letter Date:   06/11/25

Yvette Yuri Digan
9H BLK 1 KENSWOOD CT, KINGSWOOD VILLAS,
YUEN LONG, HONG KONG, Unavailable #34401
Hong Kong

Visit Coverages:
Generic Commercial - Generic Commercial

This is an itemization of charges, payments and adjustments for:

| | | | |
|---|---|---|---|
| Patient: | Digan,Yvette Yuri | Admission Date: | 05/27/25 |
| Account: | 6354750676 | Discharge Date: | 05/27/25 |
| Location: | Massachusetts General Hospital | Department: | MGP 3D RECONSTRUCTION |

**Total Account Balance:** $3,720.00

**Professional Charges**

| Date of Service | Billing Provider | Procedure Code | PB Procedure Description | Qty | Amount |
|---|---|---|---|---|---|
| 05/27/2025 | MCGUIRE, ANNA M | 01952 | PR ANESTH,BURN TX, 4-9% TBSA | 24 | 3,720.00 |
| **Total professional charges:** | | | | | **3,720.00** |
| **Total professional payments and adjustments:** | | | | | |

This is itemization of services for the time period indicated is provided at your request.  Please call 617-726-3884 if you have any questions or need assistance with your account.

Page 1 of 1

GID: 91943233, 05/27/25

 **Mass General Brigham**

Patient Name: Digan,Yvette Yuri

Account: 91943233
Letter Date: 06/11/25

399 Revolution Drive STE 410
Somerville, MA 02145-1462

Yvette Yuri Digan
9H BLK 1 KENSWOOD CT, KINGSWOOD VILLAS,
YUEN LONG, HONG KONG, Unavailable #34401
Hong Kong

Visit Coverages:
Generic Commercial - Generic Commercial

This is an itemization of charges, payments and adjustments for:

Patient:   Digan,Yvette Yuri           Admission Date:    06/02/25
Account:   6355687979                  Discharge Date:    06/02/25

Location:  Massachusetts General Hospital    Department:

**Total Account Balance:** $2,015.00

**Professional Charges**

| Date of Service | Billing Provider | Procedure Code | PB Procedure Description | Qty | Amount |
|---|---|---|---|---|---|
| 06/02/2025 | NAOUM, EMILY E | 01952 | PR ANESTH,BURN TX, 4-9% TBSA | 13 | 2,015.00 |
| **Total professional charges:** | | | | | **2,015.00** |
| **Total professional payments and adjustments:** | | | | | |

This is itemization of services for the time period indicated is provided at your request.  Please call 617-726-3884 if you have any questions or need assistance with your account.

Page 1 of 1

GID: 91943233, 06/02/25